# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | |
|---|---|
| **CHRIMAR SYSTEMS, INC.,** *et al.,* <br><br> **Plaintiffs,** <br><br> v. <br><br> **ALCATEL-LUCENT USA INC.,** *et al.*, <br><br> **Defendants.** | **Case No. 6:15-CV-163-JRG-JDL** |
| **CHRIMAR SYSTEMS, INC.,** *et al.,* <br><br> **Plaintiffs,** <br><br> v. <br><br> **AMX, LLC,** <br><br> **Defendant.** | **Case No. 6:15-CV-164-JRG-JDL** |

## DEFENDANTS'[1] RESPONSIVE CLAIM CONSTRUCTION BRIEF

---

[1] Defendants Alcatel-Lucent USA Inc., Alcatel-Lucent Holdings, Inc., ALE USA Inc., and AMX jointly submit this Responsive Claim Construction Brief.

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................ 1

II.   FACTUAL BACKGROUND ..................................................................................... 2

      A.    Basic Principles Known to A Person of Ordinary Skill In the Art As of the
            Date of Invention ........................................................................................... 2

      B.    Prosecution History ........................................................................................ 3

III.  ARGUMENT .............................................................................................................. 4

      A.    "Path Coupled Across" ................................................................................... 4

      B.    "Loop Formed Over" ...................................................................................... 5

      C.    "Current Flow" Requires The Flow of Current .............................................. 7

      D.    The Infinitives Require The Functional Language To Be Performed ................. 11

      E.    Alternatively, The Functional Infinitive Language Requires Application of
            35 U.S.C § 112 ¶ 6. ...................................................................................... 14

      F.    "Powered-Off" .............................................................................................. 21

      G.    "BaseT" .......................................................................................................... 22

      H.    "At Least One Condition" .............................................................................. 29

      I.    "Detection Protocol"/ "Part of a Detection Protocol" .......................................... 30

IV.   CONCLUSION .......................................................................................................... 30

## TABLE OF AUTHORITIES

**Cases**

*Baran v. Med. Device Techs., Inc.*,
    616 F.3d 1309 (Fed. Cir. 2010) ...................................................................................... 10, 24

*Chef Am, Inc. v. Lamb-Weston, Inc.*,
    358 F.3d 1371 (Fed. Cir. 2004) ........................................................................................... 22

*Elkay Mfg. Co. v. Ebco Mfg. Co.*,
    192 F.3d 973 (Fed. Cir. 1999) .............................................................................................. 10

*Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*,
    93 F.3d 1572 (Fed. Cir. 1996) .............................................................................................. 10

*Irdeto Access, Inc. v. Echostar Satellite Corp.*,
    383 F.3d 1295 (Fed. Cir. 2004) ..................................................................................... 23, 24

*Microprocessor Enhancement Corp. v. Texas Instruments Inc.*,
    520 F.3d 1367 (Fed. Cir.  2008) .......................................................................................... 13

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351 (Fed. Cir. 2008) .............................................................................................. 5

*PC Connector Solutions LLC v. SmartDisk Corp.*,
    406 F.3d 1359 (Fed. Cir. 2005) ..................................................................................... 22, 27

*Robert Bosch, LLC v. Snap-On Inc.*,
    769 F.3d 1094 (Fed. Cir. 2014). ..................................................................................... 17, 20

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
    247 F.3d 1316 (Fed. Cir. 2001) ........................................................................................... 24

*Typhoon Touch Technologies, Inc. v. Dell, Inc.*,
    C.A. No. 6:07-CV-546-LED, Dkt. No. 437 (E.D. Tex. Jul. 23, 2009).................................... 13

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015) (*en banc*) ............................................................ 15, 16, 18, 20

**Statutes**

35 U.S.C. § 112 ¶ 6 ...................................................................................................... 1, 15, 20

## INDEX OF EXHIBITS

Ex. 1   Declaration of Les Baxter (*Chrimar* I) (hereinafter "Baxter (Chrimar I) Decl.")

Ex. 2   '012 Prosecution History, December 6, 2011 Response

Ex. 3   October 22, 2014 Deposition Transcript of Les Baxter (hereinafter "Baxter 2014 Dep.")

Ex. 4   Declaration of Rich Seifert (hereinafter "Seifert Decl.")

Ex. 5   Declaration of Les Baxter (hereinafter "Baxter Decl.")

Ex. 6   Deposition Transcript of Les Baxter (hereinafter "Baxter Dep.")

Ex. 7   Deposition Transcript of Rich Seifert (hereinafter "Seifert Dep.")

Ex. 8   Chrimar's P.R. 4-2 Disclosure

Ex. 9   '107 Prosecution History, Application

Ex. 10  '107 Prosecution History, January 15, 2014 Amendment & Petition for Extension of Time

Ex. 11  '107 Prosecution History, November 5, 2014 Amendment

Ex. 12  *Typhoon Touch Technologies Inc. v. Dell, Inc.*, C.A. No. 6:07-CV-546-LED, Dkt. No. 437

Ex. 13  '107 Prosecution History, May 7, 2014 Office Action

Ex. 14  Desktop Encyclopedia of Telecommunications (1998) (selected excerpts)

Ex. 15  McGraw Hill Electronics Dictionary (selected excerpts)

Ex. 16  '838 Prosecution History, November 24, 2014 Amendment After Final

Ex. 17  '838 Prosecution History, March 4, 2015 Notice of Allowability

## I.    INTRODUCTION

The asserted claims of the patents-in-suit[2] are directed to a specific operational state of network equipment that existed in 1998. Only when current flows through the equipment can the claim limitations be met. Chrimar now tries to rewrite its claims to encompass any state—off or on—and capture industry standards that emerged a decade after the priority date.

Chrimar argues that the terms "path coupled across" and "loop formed over" require no construction, even though there are clear disputes between the parties regarding the scope of these terms and the parties' experts appear to agree on the proper construction. Because Chrimar maintains that these terms should be given their plain and ordinary meaning, a dispute remains and these terms require construction as a matter of law. The Court should adopt the experts' agreed-upon interpretation. Absent construction, Chrimar can later present different interpretations to the jury and its brief previews that it intends to do so.

Chrimar also tries to rewrite the claims. Chrimar argues that "current" and "current flow" have the same meaning. But this violates the doctrine that different claim terms presumptively have different meanings. It also ignores the specification and file history, which confirm that the patentee chose the different terms to have different meanings. Chrimar also tries to rewrite the infinitives ("to ____") into the format "configured, made, or designed to . . ." Adopting Chrimar's position requires construction of the claims pursuant to 35 U.S.C. § 112 ¶ 6. Chrimar also asks the Court to redraft the language "powered off" to mean "without operational power." The Court should reject Chrimar's attempts to rewrite this plain claim language.

_____

[2] The patents-in-suit are U.S. Pat. No. 8,155,012 (Dkt. No. 97-1, '012 patent); U.S. Pat. No. 8,942,107 (Dkt. No. 97-2, '107 patent); U.S. Pat. No. 8,902,760 (Dkt. No. 97-3, '760 patent); U.S. Pat. No. 9,019,838 (Dkt. No. 97-4, '838 patent).

The Court should also reject Chrimar's attempt to expand the claims beyond their meaning as of the claimed priority date. More than a decade after the original filings, the patentee coined the term "BaseT." The intrinsic record provides no support for this term apart from a few references to 10BASE-T Ethernet networks. The Court should therefore interpret BaseT as 10BASE-T and reject Chrimar's attempt to expand "BaseT" to cover industry standard Ethernet networks that came into existence well after the claimed priority date.[3]

Finally, as discussed in Defendants' Indefiniteness Motion,[4] the terms "condition" and "detection protocol" are indefinite because their scope cannot be determined with reasonable certainty.

## II.     FACTUAL BACKGROUND

### A.     Basic Principles Known to A Person of Ordinary Skill In the Art As of the Date of Invention

An Ethernet connector is a simple mechanical structure that connects wires. The connector used today is a RJ-45 modular jack. Shown below is a schematic version provided by Chrimar's expert. Also shown are reproduced portions of the IEEE 802.3i standard that Chrimar relied upon during prosecution of the patents-in-suit to try to demonstrate written description support. This 1990 version of the IEEE 802.3i standard provides for eight contacts. The 10Base-T protocol

---

[3] In prior cases between the parties, Case Nos. 6:13-cv-880 (ALU and ALE) and 6:13-cv-881 (AMX), the Court construed certain claim terms from the '012 patent.  See Case No. 6:13-cv-880 at Dkt. Nos. 92, 99.  Rather than ask the Court to redo its prior work on these terms, Defendants have filed a motion requesting that the claim construction briefing and Orders from the earlier cases be incorporated into this case for the purpose of appeal.  See Dkt. No. 90.  While Defendants believe its request is the most expedient path forward and the least burdensome on the Court, Chrimar has opposed the motion.  Defendants, therefore, incorporate the parties' briefing on claim construction, the *Markman* hearing transcript, and the Court's claim construction Orders from the earlier cases.  *See* Case No. 6:13-cv-880 at Dkt. Nos. 73, 74, 76, 78, 88, 91, 92, 93, 95 and 99; *see also* Case No. 6:13-cv-881 at Dkt. Nos. 74, 75, 77, 81, 86, 91, 95, 96, 97, 99, 100 and 105.

[4] "Defendants' Indefiniteness Motion" as used herein refers to Dkt. No. 99, filed February 11, 2016.

system referenced by Chrimar directs that pins 1, 2, 3, and 6 are used for Ethernet communication, while pins 4, 5, 6, and 8 are spare pairs.



Fig 14-20
MAU MDI Connector

(Ex. 1, Baxter (Chrimar I) Decl., ¶ 64; Ex. 2, at CMS094605.) Chrimar's expert witness, Les Baxter, admits that an Ethernet connector with a path coupled across the contacts and an impedance in the path is prior art structure. (Baxter 2014 Dep. 116:6–22; Baxter (Chrimar I) Decl. ¶ 77.) Chrimar has conceded that all the structural elements of claim 31, including impedance within the path of the '012 patent were known in the prior art. (Baxter 2014 Dep. 26:5-10, 15-19, 116:6-10, 20-22;  Baxter (Chrimar I) Decl., ¶ 77.)

### B.    Prosecution History

The patents-in-suit were prosecuted over a decade after the original patent filings.   The relevant portions are discussed in the arguments below. Discussion of the prosecution history is also presented in the attached Declaration of Rich Seifert. (Seifert Decl. ¶¶ 34-77.)

### III.    ARGUMENT

### A.    "Path Coupled Across"

| Substantively Agreed Construction |
|---|
| Path permitting energy transfer between [the claimed contacts] |

The claimed "path coupled across" should be construed as a "path permitting energy transfer between [the claimed contacts]." This construction is based upon the agreed understanding of both parties' experts during claim construction discovery. Chrimar's position is that no construction should be provided to the jury. (Chrimar Br. at 17.) Defendants disagree.

The asserted claims of the '107 and '012 patents all include the phrase "at least one path coupled across." Pertinent portions of language from exemplary claim 1 of the '107 patent are shown below:

> 1. A piece of Ethernet terminal equipment comprising:
>
> an Ethernet connector comprising first and second pairs of contacts used to carry Ethernet communication signals,
>
> at least one path for the purpose of drawing DC current, the at least one <u>path coupled across</u> at least one of the contacts of the first pair of contacts and at least one of the contacts of the second pair of contacts,

('107 patent, cl. 1)(emphasis added).

Chrimar's expert offered the opinion that "coupling" means "a mutual relationship between . . . that permits energy transfer from one to the other" and that this definition applies to the claim phrase "path coupled across." (Baxter Decl. ¶ 89; Baxter Dep. 42:1–2.) Defendants' expert agreed to apply this definition, such that "path coupled across" is construed as "path permitting

energy transfer between." (Seifert Decl. ¶¶ 107, 108; *see also* Seifert Dep. 78:20–21.)[5] Defendants propose this construction for entry by the Court.

Despite clear disagreements between the parties as to the term's scope, Chrimar inexplicably asks the Court not to enter a construction and instead argues the term should be "afforded its plain and ordinary meaning." (Chrimar Br. at 17.) A construction is necessary because the jury will not understand from the claim terms themselves that they mean "path permitting energy transfer between"—as agreed to by both parties' experts. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,* 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("by failing to construe this term, the district court left the left the jury to consider [other] arguments."). Further, without a construction in place, Chrimar may try to change its "plain and ordinary meaning" up to and during trial causing prejudice to Defendants. Defendants respectfully submit that the Court should enter "path permitted energy transfer between [the claimed contacts]" as the construction of "path coupled across."

B.    **"Loop Formed Over"**

| **Agreed Construction** |
| --- |
| "a round trip path formed over" |

The parties agree that the claimed "loop formed over" may be construed as "round trip path formed over [the claimed two conductors]." (Baxter Decl. ¶ 78; Seifert Decl. ¶ 117; Seifert Dep.

---

[5] Mr. Baxter's declaration provided Chrimar's explanation of the plain meaning of "path coupled across" for the first time. (Baxter Decl. ¶¶ 86–93.) Defendants' expert, Rich Seifert, responded addressing Mr. Baxter's comments and using Mr. Baxter's own definition of "coupling," to present "path permitting energy transfer between [the claimed contacts] an agreed construction. (Seifert Decl. ¶¶ 104–114.) Both experts have also agreed that the verb "couple" as used in the claim requires that a signal can transfer from one point to the other. (Baxter Dep. 41:21–42:6; Seifert Decl. ¶ 108.)

111:23–112:14.) Chrimar's expert further explains "round trip path" is a path that allows a signal to return from where it started. (Baxter Dep. 19:14–23; 28:7–13.)

Chrimar, however, raises a new argument that "DC supply" need not be connected to the claimed "loop" in claims 1 and 73 of the '760 patent. This is erroneous. The parties agree that the claimed "conductors" are not sufficient to form the loop.  (See Baxter Dep. 35:6–23 (conceding that the conductors themselves are insufficient to form a round trip path).) Chrimar states that the "at least one path" is also part of the "loop formed over" because "[t]he claim states that the path in the terminal equipment is configured to draw different magnitudes of current through a loop." (Chrimar Br. at 15.) Notwithstanding Chrimar's improper addition of "is configured" in its claim constructions discussed *infra* at 11, Defendants agree that the "at least one path" is also part of the loop.

Chrimar contradicts itself, however, by ignoring "from the at least one DC supply" appearing in the very same claim language from which Chrimar concludes that "path" is required. (*See* '706 patent, cl. 1, 73.)  If the "path" is part of the "loop formed over" because the claim recites the path as the structure *drawing* the current, then "DC supply" must be included as well because the claim recites the DC supply as the *source* for the current.

Chrimar also argues that "the claim does not require the system to actually function. It must only be configured to do so." (Chrimar Br. at 15 n.30.) Even if this were true, which Defendants dispute, a system without a connected "DC supply" is not configured "to draw different magnitudes of current flow from the at least one DC supply through a loop formed over [the

conductors].” Disconnecting the DC supply prevents current flow. Chrimar's position is nonsensical.[6]

Defendants respectfully request that the Court enter the agreed construction “round trip path formed over” and clarify that the claimed “DC supply” must be connected to the claimed “loop formed over.” Alternatively, the Court can resolve this dispute by adopting Defendants' construction, “complete circuit.”

### C.    “Current Flow” Requires The Flow of Current

| Current/ Current Flow | |
| --- | --- |
| **Plaintiff's Position** | **Defendants' Position** |
| No construction necessary, as the terms should be afforded their plain and ordinary meaning.<br><br>To the extent required, “current” and “current flow” mean the same thing and the plain and ordinary meaning of “current” and “current flow” is “a flow of electric charge.” | “current” means a flow of electrons. “current” and “current flow” have different meanings; “for the purpose of drawing DC current” describes the features of the path and “different magnitudes of DC current flow” requires that actual current must be present.<br><br>The dependent claims of the '107 patent are indefinite for lack of antecedent basis. |

The parties do not dispute the meaning of “current.” Defendants submit that “current” and “current flow” have different meanings as used in the claims. Chrimar presently asserts that they have the same meaning.

---

[6] Chrimar does not appear to contest that claims 1 and 73 of the '760 patent require an actual connection between the system components. Yet, Chrimar omits “*physically* connect” in its discussion of the structural requirements of the '760 patent claims. (Chrimar Br. at 14.)  To the extent that Chrimar may later contest this requirement, Defendants submit that “physically connect” requires a physical connection between the central and terminal components in claimed system.  As with “coupled” and “formed,” “physically connect” requires the recited arrangement of structure to be in place, not merely to be capable of having the recited arrangement.

The claims use "current" to define structure while "current flow" accompanies functional operations that the claimed invention is to perform. Exemplary claim 1 of the '107 patent is highlighted below.

> 1. A piece of Ethernet terminal equipment comprising:
> an Ethernet connector comprising first and second pairs of contacts used to carry Ethernet communication signals, at least one path for the purpose of drawing DC current, the at least one path coupled across at least one of the contacts of the first pair of contacts and at least one of the contacts of the second pair of contacts, the piece of Ethernet terminal equipment to draw different magnitudes of DC current flow via the at least one path, the different magnitudes of DC current flow to result from at least one condition applied to at least one of the contacts of the first and second pairs of contacts, wherein at least one of the magnitudes of the DC current flow to convey information about the piece of Ethernet terminal equipment.

The first half of claim 1 of the '107 patent recites structure in the form of an Ethernet connector (above in yellow) and "a path for the purpose of drawing DC current" (above in green). "Current" in these phrases describes the characteristics of the claimed structure. The second half of the claim is directed entirely to functional language starting with "to draw," and references "DC current flow" (above in pink). "Current flow" addresses an operational state, requiring "different magnitudes of DC current flow," which requires the actual presence of current flowing.[7] Otherwise, all of the functional language addressing "current flow" is merely an intended use.

---

[7] In their P.R. 4-2 disclosure, Chrimar stated that "current" and "current flow" have different meanings. (Ex. 8 at 2.) Chrimar also agreed with Defendants' position that "current flow" required actual current present, asserting that "current flow" means "non-zero current." (*Id.*) After Defendants requested that Chrimar drop certain dependent claims that are legally deficient due to improper antecedent basis because they recited "DC current" instead of "DC current flow," Chrimar changed its position. Asserted dependent claim 72 lacks proper antecedent basis and are invalid due to indefiniteness. This is addressed in Defendants' Indefiniteness Motion.

The prosecution history confirms the distinction in the claims. Originally filed claim 1 used the phrase "circuitry arranged to utilize the at least one electrical signal to convey information about the piece of terminal equipment." (Ex. 9 at CMS049925.) This claim was rejected in view of the prior art along with a written description rejection directed to "powered-off." Chrimar cancelled claim 1 and introduced claim 72. (Ex. 10. at CMS050931.)

Chrimar provided remarks explaining why the newly presently claims would be allowable over the prior art. (Ex. 10 at CMS050950–51.) Chrimar explained that the claimed invention requires an operational state in which "at least one path" draws current. Chrimar twice reiterated that pending claim 72 was purportedly allowable over the prior art because the references were "silent with regard to *using* the at least one path coupled across contacts used to carry Ethernet communication signals, and *to draw current* via the at least one path coupled across the recited contacts wherein the current comprises information to identify the piece of Ethernet terminal equipment." (Ex. 10 at CMS050950–51; Seifert Decl. ¶¶ 62–64.)

After another rejection, Chrimar amended pending claim 72, adding the word "flow" to recite "current flow" in the claims for the first time. (Seifert Decl. ¶ 73.) "Flow" was added to the phrase "different magnitudes of current flow," but not for "at least one path for the purpose of drawing DC current. "(Ex. 11 at CMS051035; Seifert Decl. ¶¶ 71, 74, 75.) As shown below, the changes from "to draw current" to "to draw different magnitudes of DC current flow," from "current comprises information" to "DC current flow to convey information," and the addition of "at least one condition applied" all confirm that the claims were amended to require an operational state to distinguish over the prior art. (Ex. 11 at CMS051035; Seifert Decl. ¶ 77.)

9

> 72.   (Currently amended)   ~~An identifiable~~ A piece of Ethernet terminal equipment comprising:
>
> an Ethernet connector comprising first and second pairs of contacts used to carry Ethernet communication signals, at least one path for the purpose of drawing DC current, the at least one path coupled across at least one of the contacts of the first pair of contacts and at least one of the contacts of the second pair of contacts, the piece of Ethernet terminal equipment to draw different magnitudes of DC current flow via the at least one path, the different magnitudes of DC current flow to result from at least one condition applied to at least one of the contacts of the first and second pairs of contacts, wherein at least one of the magnitudes of the DC current flow to convey ~~comprises~~ information to ~~identify~~ about the piece of Ethernet terminal equipment ~~as a particular piece of Ethernet terminal equipment.~~

(Ex. 11 at CMS051035.)[8]

Chrimar concedes that the use of these different terms creates an inference that they have different meanings. (Chrimar Br. at 8 (citing *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.,* 93 F.3d 1572, 1579 (Fed. Cir. 1996).) Chrimar also notes that evidence confirming that the patentee used the terms interchangeably can overcome the presumption. *Id.* (citing *Baran v. Med. Device Techs., Inc.,* 616 F.3d 1309, 1316 (Fed. Cir. 2010)). However, Chrimar provides no such evidence. Chrimar's footnoted citations either do not address "current" or "current flow" ('012 patent, 6:54–60) or they support Defendants' positions because they address operations as they occur: alternated current flow changes for a particular duration (12:32–38); admitted prior art when in use monitors the current flow to detect removal in the prior art (2:16–18); high pass filters when in use block DC current flow (7:18–40); the test voltage monitor when in use detects an interruption in the current flow (8:8–9); and the encoding of the signal can be accomplished

---

[8] Because the patents-in-suit are all continuations of one another, Defendant's construction applies also to the '760 and '838 patents that also use "current flow." *See Elkay Mfg. Co. v. Ebco Mfg. Co.,* 192 F.3d 973, 980 (Fed. Cir. 1999) ("When multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation.")

by altering the current flow (8:52–53). (Chrimar Br. at 8, n.15.) Chrimar also ignores the

evidence in the prosecution history altogether, which confirms that "current" and "current flow"

have different meanings.  (Chrimar Br. at 7–9.)

### D.    The Infinitives Require The Functional Language To Be Performed

| Use of the Infinitive "To" | |
| --- | --- |
| **Plaintiff's Position** | **Defendants' Position** |
| No construction necessary, as the term should be afforded its plain and ordinary meaning.<br><br>To the extent that the Court finds that construction is required, Plaintiffs contend that the plain and ordinary meaning of "to ____" in the context of these claims is "configured, made, or designed to _____." | The action claimed must occur to meet the limitation. |

The intrinsic evidence requires that the functional language using the infinitive "to ___"

defines operations that the claimed inventions must perform. For example, the phrase "to draw

different magnitudes of [DC] current flow" appears in the asserted claims of the '107 and '760

patents.[9] The asserted claims of the '838 patent similarly require "to detect different magnitudes

of DC current flow."[10] These infinitive phrases require the action claimed to occur—they do not

---

[9] The '107 patent requires DC current flow. The '760 patent requires a DC supply and current flow.

[10] The following phrases in the Asserted Claims of the Patents-in-Suit use the infinitive "to ___": "to draw different magnitudes of DC current flow";  "to detect at least two different magnitudes of the current flow"; "to detect current flow";  "to detect different magnitudes of DC current flow";   "to detect distinguishing information within the DC current"; "to distinguish one end device from at least one other end device"; "to distinguish one network object from at least one other network object"; "to distinguish the piece of Ethernet terminal equipment from at least one other piece of Ethernet terminal equipment";  "to distinguish the powered-off end device from at least one other end device"; "to distinguish the piece of BaseT Ethernet terminal equipment from at least one other piece of BaseT Ethernet terminal equipment"; "to control application of at least one electrical condition"; "to control application of the at least one DC power signal"; "to convey information about the piece of Ethernet terminal equipment"; "to convey information about the powered-off end device"; "to provide at least one DC current"; and "to result from at least one condition applied to."

say "configured, made, or designed to," but that is exactly how Chrimar proposes to redraft the claims.

The prosecution history, wholly ignored by Chrimar, provides direct guidance as to the meaning of these phrases. Chrimar responded to the Examiner's rejection of the originally filed claims in view of U.S. Patent No. 5,754,764 ("Davis"), which disclosed Ethernet functionality, an Ethernet controller and even connections for twisted-pair wiring (as used in 10BASE-T), and U.S. Patent No. 5,586,273 ("Blair"), which disclosed the Ethernet connector using the nomenclature RJ-45, by canceling the claims and presenting new claims. (Ex. 10. at CMS050931, CMS50950-51.)

Chrimar twice argued the new claims would overcome the cited prior art. Chrimar first argued that the claims are distinguishable over Davis because they require "*using* the at least one path coupled across contacts used to carry Ethernet communication signals, and *to draw current via the at least one path* coupled across the recited contacts wherein the current comprises information to identify the piece of Ethernet terminal equipment as a particular piece of Ethernet terminal equipment." (Ex. 10 at CMS050950–51(emphasis added); Seifert Decl. ¶ 63.)  Chrimar again focused on *using* the path to draw current when distinguishing the combination of Davis and Blair (admitted as including an Ethernet connector) because Blair allegedly also failed to disclose "*using* the recited contacts of the Ethernet connector, which are also used to carry Ethernet communication signals, to couple a path across *to draw current* wherein the current comprises information to identify the piece of Ethernet terminal equipment." (Ex. 10 at CMS050951 (emphasis added); Seifert Decl. ¶64.)

The prosecution history unambiguously demonstrates that it was not merely the prior art structure, a path coupled across the contacts of an Ethernet connector, but rather "using" the path

12

to draw current that comprises identifying information that was asserted as the basis for overcoming the prior art. Later amendments adding "current flow" (discussed *supra*) further confirm that use of the infinitive "to __" in the claims requires the functions to be performed. Chrimar cannot now backtrack from the patentee's statements in the public record concerning the scope of the claimed invention.

Chrimar also relies on the inapposite *Microprocessor* decision to rewrite the infinitive form into the "configured to" format. (Chrimar Br. at 5.)[11] In *Microprocessor*, "conditional execution decision logic pipeline stage performing" was interpreted as "capable of performing." *Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1371 (Fed. Cir. 2008). But *Microprocessor* does not address reciting a function using the infinitive form ("to ___") without any connection to structural elements in the body of the claim for performing the claimed function.

Under Chrimar's interpretation, the functions relied upon to distinguish over the prior art do not ever have to be performed and are therefore superfluous. (*See* Seifert Decl. ¶¶ 92–96.) That is not a legally permissible result. As this Court held in *Typhoon Touch Technologies, Inc. v. Dell, Inc.*, functional limitations are requirements that cannot be written out of the claims by construing them as mere capabilities. (Ex. 12, C.A. No. 6:07-CV-546-LED, Dkt. No. 437 at 12.) (holding that claims directed to "an operational apparatus" impose the requirement that the recited functions must be performed).

---

[11] Chrimar focuses on cases addressing invalidity in view of mixed statutory classes—a premature issue for consideration prior to claim construction. Chrimar's reliance on claim differentiation is also suspect. As discussed below, Chrimar has deviated from claim differentiation principles by proposing "electrical condition" in place of "condition."

13

Defendants' positions should be adopted because the prosecution history resolves all ambiguity concerning the functional language. The amendments to the claims, the accompanying remarks explaining how those amendments purportedly overcome the prior art, and the addition of "flow" confirm that the use of the infinitives "to ___" require that the accused device must be in the operational state required by the claims.

**E.     Alternatively, The Functional Infinitive Language Requires Application of 35 U.S.C § 112 ¶ 6.**

The parties agree that the infinitive language in the asserted claims is functional language. (Baxter Dep. at 94:14–96:19 ('107 pat., cl. 1), 110:21–111:8 ('107 pat., cl. 104), 114:3–116:3 ('838 pat., cl. 1), 126:8–128:22 ('760 pat., cl. 1), 254:9–256:6 ('107 pat., cl. 1); Baxter Decl. ¶ 16; Seifert Decl. ¶¶ 78–82.) Chrimar's proposed plain meaning highlights the inherent problem with the asserted claims' use of the infinitives—the functional language imposes some undefined structural requirements on prior art equipment. Therefore, to the extent that the Court is inclined to reject Defendants' position that the action claimed with infinitive language must occur in order to meet the limitation, Defendants alternatively request that the Court construe the infinitives as means-plus-function elements in accordance with 35 U.S.C. § 112, ¶ 6. As the Federal Circuit recently held in *Williamson*:

> The standard is whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure. When a claim term lacks the word "means," the presumption can be overcome and § 112, para. 6 will apply if the challenger demonstrates that the claim term fails to "recite sufficiently definite structure" or else recites "function without reciting sufficient structure for performing that function.

*Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015) (*en banc*).[12] As described in more detail below, each of the asserted claims with infinitive language follows the same format as the claims held to invoke 35 U.S.C. § 112, ¶ 6 in *Williamson*—a recitation of a claim term without the structure necessary to perform the functions that follow. *See id.* at 1350.

> a.   *Infinitive language in the asserted claims of the '107 patent should be construed as a means-plus-function limitation.*

| | |
|---|---|
| 104. A powered-off end device comprising:<br>an Ethernet connector comprising first and second pairs of contacts, at least one path for the purpose of drawing DC current, the at least one path coupled across at least one of the contacts of the first pair of contacts and at least one of the contacts of the second pair of contacts, the powered-off end device to draw different magnitudes of DC current flow via the at least one path, the different magnitudes of DC current flow to result from at least one condition applied to at least one of the contacts of the first and second pairs of contacts, wherein at least one of the magnitudes of the DC current flow to convey information about the powered-off end device. | **Claim 104 of the '107 Patent**<br><br>**Means Word:**<br><br>end device<br><br>**Functions:**<br><br>(1) to draw . . .<br>(2) to result . . .<br>(3) to convey . . . |

As shown above, claim 104 of the '107 patent uses infinitives to attribute three functions to an "end device." "End device" does not convey sufficient structure to perform the three functions required by claim 104. *Williamson*, 792 F.3d at 1349. Rather, "end device" is a nonce word—a generic term that reflects a verbal construct tantamount to using the word "means." *Id.* at 1350. For these reasons, the presumption against § 112, ¶ 6 is rebutted, and the Court should construe the infinitive structure of claim 104 as a means-plus-function limitation to have the functions noted above. *Id.* at 1350–51. The next step in the analysis under 35 U.S.C. § 112, ¶ 6 is to determine what structure disclosed in the specification corresponds to those functions. *Id.* at

---

[12] In *Williamson*, the Federal Circuit held that the absence of the word "means" in claims should no longer give rise to a "strong" presumption that functional claiming is not subject to § 112, para. 6 because the "strong" presumption (now overruled) "has resulted in a proliferation of functional claiming untethered to § 112, para. 6 and free of the strictures set forth in the statute." *Williamson*, 792 F.3d at 1349.

1351–52. The patents-in-suit seek to improve upon admitted prior art by adapting existing equipment to add a remote module designed to receive power from a central module. ('012 pat. at 3:18–32.) The remote module uses that power to operate a firmware kernel (generating a unique identification code), a Manchester encoder (encoding the identification number into a current waveform), and a signal transmitter that sends the modulated current signal back. ('012 pat. at 6:1–13.) Correspondingly, the minimal structure for performing the draw, convey, and result functions is the disclosed isolation power supply, signal transmitter, Manchester encoder, and firmware kernel as shown below in Figure 3 of the patent and its accompanying written description:



('012 pat. at Fig. 3, 6:7-13.) Defendants therefore request that the Court construe the infinitive language in claim 104 of the '107 patent to require the following structure to perform the draw, result, and convey functions: an isolation power supply, signal transmitter, Manchester encoder, and firmware kernel.

This same analysis holds true for the other asserted claims of the '107 patent. Claim 1 purports to attribute the same draw, result, and convey functions to "Ethernet terminal

equipment." Although "Ethernet terminal equipment" seems less generic than "end device," it is equally as generic for the functions claimed.[13] Indeed, Chrimar cannot argue that prior art Ethernet terminal equipment expressly or inherently discloses structure sufficient to perform these functions when the patentee relied on these functions to distinguish over prior art Ethernet terminal equipment. Chrimar obtained allowance of the '107 patent on the basis that at least the draw and result functional limitations distinguished the claims from the prior art. (Ex. 11 at 51059 (amending claims to include limitation of allowable claim 96); Ex. 13 at 50985 (indicating claim 96 contained allowable subject matter); Ex. 10 at 50935 (pending claim 96 containing the result functional language), and 50950–51 (arguing over prior art by pointing to the "to draw" functional language).) For these reasons, the Court should construe the infinitive language of claim 1 of the '107 patent as a means-plus-function limitation. Because the functions are the same, Defendants assert that the corresponding disclosed structure should be construed as the same set forth above with respect to claim 104 of the '107 patent. Dependent claims 43 and 111 of the '107 patent require an additional "to distinguish . . ." function. This additional function requires the same structures as discussed above for claims 1 and 104 of the '107 patent and thus should be construed to have the additional required distinguish function and the same structures.

_____

[13] This is because "Ethernet terminal equipment," as the term suggests, only connotes a general category of equipment for originating and terminating Ethernet communications. *See* C.A. No. 6:13-cv-880, Dkt. No. 99. "Ethernet terminal equipment" does not convey or suggest the required structure to perform the claimed functions. Rather, the draw, result, and convey language of claim 1 reflect additional functionality beyond conventional Ethernet communications. When considering whether a claim should be construed in accordance with § 112, para. 6, the "question is whether the claim language names particular structures or, instead refers only to a general category of whatever may perform specified functions. *Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d 1094, 1099 (Fed. Cir. 2014). If the claim language refers only to a general category for performing the claimed functions, then § 112, ¶6 applies. *Id.*

       *b.*    *Infinitive language in the asserted claims of the '838 patent should be construed pursuant to 35 U.S.C. § 112, ¶ 6.*

Whereas claims of the '107 patent focus on terminal equipment, claims of the '838 patent focus on central equipment. Claim 1 is exemplary:

| | |
|---|---|
| 1. A central piece of network equipment comprising: at least one Ethernet connector comprising first and second pairs of contacts used to carry BaseT Ethernet communication signals; and the central piece of network equipment to detect different magnitudes of DC current flow via at least one of the contacts of the first and second pairs of contacts and to control application of at least one electrical condition to at least one of the contacts of the first and second pairs of contacts in response to at least one of the magnitudes of the DC current flow. | **Claim 1 of the '838 Patent** **Means Word:** central piece of network equipment **Functions:** (1) to detect . . . (2) to control . . . |

The required detect and control functions are purported to be performed by a "central piece of network equipment." However, much like "end device," "central piece of network equipment" is the electronics equivalent of saying that big box over there (centrally located in a network). "Central piece of network equipment" does not recite "sufficiently definite structure" to do the detection and control required by the infinitive functional language of claim 1 of the '838 patent. *Williamson*, 792 F.3d at 1350. The presumption against § 112, para. 6 is therefore rebutted and the infinitive language in dispute should be interpreted as a means-plus-function limitation. *Id.* at 1350–51. The specification discloses:



Fig-3

The power generated by isolation power supply **8** is passed through signal modulator **7** which can slightly alter the voltage supplied by isolation power supply **8** based upon status data provided by the status data encoder **9**. Status data encoder **9** receives its status data from the firmware kernel **4**. Signal modulator **7** inserts this low power supply across the transmit and receive lines or into either the transmit lines or the receive lines in order to supply the remote module **16** with both status information and power. The scope of the invention

. . .

The information sent from the remote module **16** is received by the signal receiver **6** within the central module **15**, decoded by Manchester decoder **5**, and passed on to the firmware kernel **4**. The firmware kernel may now pass this received information on to an external device **19**, such as a computer responsible for asset tracking.

('012 pat. at Fig. 3, 5:53–61, 6:25–30.) Based on this disclosure, the Court should construe the structure required to perform the functions in claim 1 of the '838 patent as: an isolation power supply, Manchester decoder, firmware kernel, signal modulator, and signal receiver.

Defendants further respectfully request that the Court construe the infinitive language in the dependent claims of the '838 patent to have the function claimed and require the same structure as in claim 1. Claim 7 of the '838 patent adds two functions for the central piece of network equipment—"to provide . . ." and "to detect distinguishing information . . ." These two functions require the same structures as required in claim 1 of the '838 patent and should therefore be construed the same. (*See* '012 pat. at 5:53–61, 6:25–30.) Claim 26 of the '838 patent similarly adds "to distinguish . . ." functional language. Dependent claims 40 and 69 of the '838 patent both add "to control . . ." functional language. The minimal structure required for these functions is encompassed within the identified structure for claim 1. (*See* '012 pat. at 5:53–61, 6:25–30.) Therefore, the infinitive language in the dependent claims should be construed to require the same structure as required for claim 1.

> c.   *Infinitive language in asserted claims of the '760 patent should be construed as means-plus-function limitations.*

The '760 patent contains claims directed at a "physically connect[ed]" system of both terminal and central equipment. Like the other asserted claims with infinitive language, the asserted '760 patent claims require functions of generic equipment, such as "BaseT Ethernet terminal equipment," "central BaseT Ethernet equipment," and "central network equipment," without specifying the particular structural components required to perform the claimed

functions. (*See* '760 pat., cls. 1 & 73.)[14] Independent claims 1 & 73 both ascribe a "to draw . . ." function to the terminal equipment. For claim 1, "to detect . . ." and "to control . . ." are functions ascribed to the central equipment. For claim 73, only the detect function is required as to the central equipment. For these reasons, the infinitive language in the asserted claims of the '760 patent should also be construed according to the 35 U.S.C. § 112, ¶ 6 framework.

The written description discloses the minimum structure for the draw function of the terminal equipment. ('012 pat. at 6:7–13.) Therefore, Defendants respectfully request that the Court construe the infinitive language following "BaseT Ethernet terminal equipment" in the asserted '760 patent claims pursuant to 35 U.S.C. § 112, ¶ 6 to have the draw function claimed and require the following structure: an isolation power supply, signal transmitter, Manchester encoder, and firmware kernel. Similarly, the specification discloses the minimum structure required for the detect and control functions of the central equipment. ('012 pat. at 5:53–61, 6:25–30.) Therefore, Defendants respectfully request that the Court construe the infinitive language following "central BaseT Ethernet equipment" in claim 1 and "central network equipment" in claim 73 of the '760 patent to have the detect and/or control functions as claimed and require the following structure:  isolation power supply, signal modulator, Manchester decoder, signal receiver, and firmware kernel.

Claims 69 and 142 of the '760 patent add a "to distinguish" function to claims 1 & 73, respectively.  The minimal structure disclosed in the written description to perform this detecting

---

[14] At best, the terms "central BaseT Ethernet equipment" and "BaseT Ethernet terminal equipment" describe general categories of equipment for performing 10BASE-T Ethernet communications. The claims do not specify "sufficiently definite structure" for performing the claimed functions. Accordingly, the presumption against § 112, para. 6 is rebutted, and the Court should construe the functional infinitive language as a means-plus-function limitation. *Williamson*, 792 F.3d at 1349; *see also Robert Bosch,* 769 F.3d at 1099.

function is: a signal receiver, Manchester decoder, and firmware kernel, which is encompassed within the minimum structure required for the independent claims from which these claims depend. (*See* '012 pat. at 6:25–30, Fig. 3.) Defendants therefore respectfully request that the Court construe the infinitive language in the asserted dependent claims of the '760 patent to have the functions claimed and require the same structure as the independent claims.

### F. "Powered-Off"

| Powered-Off | |
|---|---|
| **Plaintiff's Position** | **Defendants' Position** |
| Ethernet terminal equipment/end device without its operating power | no power is applied to the claimed equipment/ device |

The only term for which Chrimar asserts that any construction is necessary is "powered-off." Yet, this is the one term for which the plain meaning is abundantly clear and for which only one conclusion can be reached. The "powered-off" claims unequivocally state that the claimed invention is "powered-off." (*See e.g.*, '107 pat. at cl. 104 ("A powered-off end device comprising:"); *see also* '760 pat. at cl. 72 ("a powered-off piece of BaseT Ethernet equipment")) "Powered-off" means exactly what it says—no power is applied to the claimed invention.

Chrimar argues that Defendant's construction would render the claims inoperable. However, the inoperability of the "powered-off" claims is not resolved by even Chrimar's own construction. The construction "without its operating power" as applied "to draw different magnitudes of current flow" renders the claim just as inoperable as no power at all. Even under Chrimar's construction, the device would lack operating power precluding its ability to draw different magnitudes of current. And thus, it could not operate.

Chrimar ultimately seeks to rewrite the claims to replace "powered-off" with "very low power mode." (Chrimar Br. at 20.) There is no support for a low power mode in the

specification. Nor do flawed analogies about a lay person turning off a television justify that this Court adopt such an unsupported construction and deviate from the plain meaning of the term.

The term "powered-off" is unambiguous. Even if the claims are rendered inoperable, it would be legal error to rewrite them as requested by Chrimar. *See Chef Am, Inc. v. Lamb-Weston, Inc.,* 358 F.3d 1371, 1374 (Fed. Cir. 2004) ("[C]ourts may not redraft claims, whether to make them operable or to sustain their validity.") (citations omitted).

### G.    "BaseT"

| BaseT | |
|---|---|
| **Plaintiff's Position** | **Defendants' Position** |
| No construction necessary, as the term should be afforded its plain and ordinary meaning. . . . "BaseT Ethernet" "twisted pair Ethernet per the IEEE 802.3 Standards (e.g. 10BaseT/IEEE 802.3i, 100BaseTX/IEEE 802.3u, and 1000BaseT/ IEEE 802.3ab) | 10BASE-T, which requires communication over twisted pair cabling at 10Mb/s |

"BaseT" is not a term of art.[15] Rather, it is a coined term that does not have a generally accepted plain and ordinary meaning to persons of skill in the art.[16] (Seifert Decl. ¶¶ 27–30, 148.) If a disputed term has "no previous meaning to those of ordinary skill in the prior art, its meaning, then, must be found elsewhere in the patent" and should be construed only as broadly as provided by the patent itself. *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295,

---

[15] Chrimar's statement in its opening brief that "[i]t is undisputed that the term "BaseT Ethernet" refers to any one of the IEEE 802.3 family of BaseT Ethernet standards . . ." (Dkt. No. 97 at 9) is false and unsupported by its own citations. What "BaseT" or "BaseT Ethernet" means in light of the intrinsic record is the exact dispute between the parties.

[16] To the extent Chrimar intends to argue or offer evidence that the term acquired some meaning in the art after April 10, 1998, the claimed priority date of the patents-in-suit, that argument does not impact the legal analysis because claim terms are construed as of the effective filing date.  *See PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1363 (Fed. Cir. 2005) (meaning must be interpreted as of the effective filing date).

1300 (Fed. Cir. 2004) (citations omitted). While the patents do not provide an express definition of "BaseT," the specification does describe using the invention with "an Ethernet 10BASE-T network." ('012 pat. at 12:3–14.) The coined term "BaseT" should therefore be construed in the context of the sole system disclosed—a 10BASE-T Ethernet network, which requires communication over twisted pair cabling at 10Mb/s.  (Seifert Decl. ¶ 148.)

Nothing in the intrinsic record dictates a broader meaning for "BaseT."  Use of "BaseT" in claim 1 of the '760 patent is illustrative of the various ways in which "BaseT" is used in the asserted claims[17]:

> 1.    A ***BaseT*** Ethernet system comprising:
>
> a piece of central ***BaseT*** Ethernet equipment;
>
> a piece of ***BaseT*** Ethernet terminal equipment;
>
> data signaling pairs of conductors comprising first and second pairs used to carry ***BaseT*** Ethernet communication signals between the piece of central ***BaseT*** Ethernet equipment and the piece of ***BaseT*** Ethernet terminal equipment, the first and second pairs physically connect between the piece of ***BaseT*** Ethernet terminal equipment and the piece of central ***BaseT*** Ethernet equipment . . .

('760 pat., claim 1 (emphasis added).) As can be seen from above, for certain claims, the patentee purposely chose to limit the invention to some subset of Ethernet, specifically "BaseT" Ethernet.  *Id.*[18] The claims, however, provide no guidance regarding the appropriate construction of "BaseT" or the proper scope of "BaseT Ethernet."

---

[17] The following asserted claims have a "BaseT" limitation: claims 36, 56, & 60 of the '012 patent, claim 5 of the '107 patent, claims 1, 31, 59, 69, 72, 73, 106, 142, & 145 of the '760 patent, and claims 1, 7, 26, 40, & 69 of the '838 patent.

[18] As another example, dependent claim 5 of the '107 patent further narrows "Ethernet communication signals" to only include "BaseT Ethernet communication signals."

"Because the term [] does not have an ordinary meaning, and its meaning is not clear from a plain reading of the claim, we turn to the remaining intrinsic evidence, including the written description, to aid in our construction of that term." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1326 (Fed. Cir. 2001). The term "BaseT" is not used in the written description. In a single instance, the specification does discuss a "10BASE-T" network:

> For example, when the invention is used with an Ethernet 10BASE-T network, the specifications for that network method place stringent restrictions on the behavior of the medium for frequencies from 5MHz to 10MHz with some parameters specified to frequencies as low as 1MHz.

('012 pat. at 12:13–17.) Thus, the only disclosure from which one of skill in the art may derive any meaning for "BaseT" is a reference to a 10BASE-T network. "BaseT" must therefore mean 10BASE-T, which is confirmed by the specification's subsequent disclosure that "[b]y way of specific example, the high frequency information in the embodiment of FIGS. 4–8 operates in the range of about 10MB/s." ('012 pat. at 12:32–34); *see also Irdeto*, 383 F.3d at 1300 ("[W]e construe a claim term only as broadly as provided for by the patent itself."). Chrimar focuses on the patents' general discussion of "Ethernet operating at speeds of 10 megabits per second and higher." (Chrimar Br. at 10.) This argument conveniently overlooks the patentee's purposeful decision to narrow some claims to a subset of Ethernet—BaseT Ethernet—and, in this context, the patentee only described the invention for use in an "Ethernet 10BASE-T network" operating "in the range of about 10Mb/s." ('012 pat. at 12:13–36.)  There is no requirement that each claim reads on every embodiment disclosed in the specification.  *See Baran v. Medical Device Techs., Ins*. 616 F.3d 1309, 1316 (Fed. Cir. 2010). The relevant claims here are directed to a particular "BaseT" embodiment, not Ethernet as a whole.

That "BaseT Ethernet" refers to "10BASE-T Ethernet" is further confirmed by the prosecution history. During prosecution, the patentee specifically relied on the 10BASE-T standard (IEEE 802.3i) when arguing patentability for claims of the '012 patent. (Ex. 2 at CMS094604–09.) Significantly, in traversing a written description rejection that "contacts" were not disclosed from the Patent Office, Chrimar relied upon actual portions of the 10BASE-T standard (IEEE 802.3i), including the definition of an MDI connector, a schematic of the two mating connector pieces, and the contact-to-signal mapping for 10BASE-T Ethernet. *Id.* In doing so, Chrimar argued that "one skilled in the art commonly uses the term 'contacts' to denote the number components of MDI connectors, as evidenced by the IEEE 802.3i standard, despite the absence of the words "contacts" from the patent disclosure." *Id.* Even as late as December 2011, the patentee continued to describe the invention in the context of 10BASE-T Ethernet. *Id.*[19]

To one of ordinary skill in the art, "10BASE-T" as used in the written description refers to an IEEE specification[20] for how to use twisted-pair wiring to send Ethernet communication signals. (Seifert Decl. ¶ 26.) The Desktop Encyclopedia of Telecommunications (1998) describes 10BASE-T as "a relatively new IEEE standard for providing 10 MBps Ethernet performance and functionality over ubiquitously available unshielded twisted-pair wiring." (Ex. 14, Chrimar_DefsII0004702.) Defendants' proposed construction of "BaseT"—10BASE-T, which requires communication over twisted pair cabling at 10Mb/s—captures the term's meaning in

---

[19] Chrimar did attempt to add a claim during prosecution of the '838 patent that provided "wherein the BaseT Ethernet communication signals comprise 10BaseT Ethernet communication signals"; however, that claim was canceled in an Examiner's amendment without substantive discussion regarding "BaseT." (Ex. 16, '838 prosecution history, Nov. 24, 2014 Am. After Final at CMS096082 (claim 12); Ex. 17, '838 prosecution history, March 4, 2015 Notice of Allowability at CMS096158.)

[20] "IEEE" stands for Institute of Electrical and Electronics Engineers and is a standards organization. The 10BASE-T specification is part of the IEEE 802.3i-1990 publication of the IEEE 802.3 standard.

light of how one of ordinary skill in the art would have interpreted the coined term in the context of the intrinsic record. (Seifert Decl. ¶¶ 30–33, 148.)

Chrimar's primary position is that the term "BaseT" does not need construction. That position is untenable because "BaseT" does not have a recognized meaning to persons of skill in the art. Chrimar's alternative position improperly defines "BaseT Ethernet" as "twisted pair Ethernet per the IEEE 802.3 Standards (e.g., 10BaseT/IEEE 802.3i, 100BaseTX/IEEE 802.3u, and 1000BaseT/IEEE 802.3ab)." (Dkt. No. 97 at 9.) However, Chrimar's expert, Les Baxter, disagrees with Chrimar's expansive construction and has stated that the plain meaning of "BaseT Ethernet" to one of skill in the art at the time of the patent filing was limited to 10BASE-T, 100BASE-TX, and 1000BASE-T. (Baxter Dep. Tr. at 143:6–13, 144:24–145:4, & 170:23–171:15.)   Setting aside this apparent disagreement between Chrimar and its expert, both constructions are erroneous because they improperly attempt to expand the scope of the coined term "BaseT" beyond the Ethernet system disclosed in the patents-in-suit.   (*See* Seifert Decl. ¶¶ 147–153.)

Chrimar's attempt to broaden "BaseT" to include at least two specifications for Ethernet communications not discussed in the written description or prosecution history—100BASE-TX and 1000BASE-T—should be rejected for multiple additional reasons. First, other than the testimony of its expert, Chrimar provides no evidence regarding why one of skill in the art would have expanded the scope of "BaseT" beyond the disclosure of 10BASE-T in the written description. Second, one of ordinary skill in the art could not have interpreted "BaseT" in 1998 as encompassing 1000BASE-T/IEEE 802.3ab. It is undisputed that IEEE 802.3ab (including the 1000BASE-T specification) had not been adopted as of the priority date of the patents-in-suit. (Seifert Decl. ¶¶ 33, 151; Baxter Dep. Tr. at 158:12–159:1 & 170:23–171:15.) It simply was not

26

a standard in existence as of the date relevant to an interpretation of "BaseT." *See PC Connector*, 406 F.3d at 1363 ("A claim cannot have different meanings at different times; its meaning must be interpreted as of its effective filing date."). Although draft forms of the IEEE 802.3ab standard existed as of the priority date, one of ordinary skill in the art would not have relied on a specification prior to final approval because details and features of it were subject to change. (Seifert Decl. ¶ 151.) Asked to define what "BaseT" would encompass, Chrimar's expert admitted that 1000BASE-T was subject to change. (Baxter Dep. at 158:12–159:1.) Chrimar's proposed plain meaning for "BaseT Ethernet" is "twisted pair Ethernet per the IEEE 802.3 Standards." Significantly, by its own proposal, 1000BASE-T cannot be included in the scope of "BaseT" because it was not a standard as of the priority date. Nor should any other after-arising IEEE 802.3 Standards be included within the scope of "BaseT." (*See* Baxter Dep. at 146:6–148:12 (higher speed versions did not exist at the time).)

Third, if the patentee had wanted to define the coined term "BaseT" to include 100BASE-TX, he could have either explicitly defined it as such or at a minimum, referenced 100BASE-TX in the written description or during the patents' prosecution history. Instead, the patentee has consistently described and argued patentability of claims in the context of 10BASE-T Ethernet. Significantly, the parties do not dispute that 100BASE-TX was a specification in existence prior to the effective filing date of the patents-in-suit, yet the intrinsic record is completely devoid of any mention of this Ethernet specification.

In addition, there are significant technical differences among twisted-pair IEEE 802.3 Standards. (*See generally* Ex. 14 at Chrimar_DefsII0004702–09 (discussing 10BASE-T, 100BASE-TX, and Gigabit Ethernet); Baxter Dep. at 162:19–163:4 (explaining different cabling requirements).) As explained by Defendants' expert, Rich Seifert:

27

> Mr. Baxter minimally attempts to include 100BASE-TX and 1000BASE-T in his definition, yet these systems use considerably lower signal levels and more complex encoding schemes than 10BASE-T. *See generally*, IEEE 802.3. While the teachings of the Patents-in-Suit (including the '260 patent incorporated by reference) may be able to operate in the relatively high-noise-margin environment of 10BASE-T, there is nothing in the specification that indicates the system would be operational in either a 100BASE-TX or 1000BASE-T environment without significant disruption of the Ethernet communications. In particular, 1000BASE-T uses a complex encoding scheme that operates at 250 MB/s per pair, in a bi-directional manner. It is quite sensitive to disturbances on the Ethernet cable, and requires very careful installation and component selection, even without the intrusion of the system described in the patent specifications.

(Seifert Decl. ¶ 150.) There simply is no disclosure in the patents-in-suit that contemplates the changes that would be required in order for the invention to be operable at higher speeds of Ethernet communications per the other standards that Chrimar now attempts to sweep into its construction of "BaseT."

Finally, Mr. Baxter's declaration purports to support Chrimar's proposed plain meaning for "BaseT;" however, inconsistencies in Mr. Baxter's opinion suggest that his declaration should be afforded little weight. As already noted, Mr. Baxter testified that the plain meaning of "BaseT" was narrower than that offered in his declaration. (*See, e.g.*, Baxter Dep. at 170:23–171:15.) Further, Mr. Baxter does not offer any factual support evidencing an art-recognized meaning for "BaseT" consistent with his opinion in paragraph 98 of his declaration. (*See* Baxter Dep. at 164:11–25.) Additionally, Mr. Baxter testified that "BaseT" is not satisfied by simply baseband communications over twisted pair because in order to be within the scope of "BaseT," a specification would need to have "BASE-T" in the title. (Baxter Dep. at 168:3–9.) As a consequence, Mr. Baxter arbitrarily excludes the IEEE 1BASE5 specification from the scope of "BaseT," merely because the phrase "BASE-T" does not appear in the title of the specification. (Baxter Dep. at 148:13–18.) Mr. Baxter's narrower understanding of this coined term is therefore

at odds with Chrimar's proposed construction. (Seifert Decl. ¶ 149.) For these reasons, Mr. Baxter's opinions regarding "BaseT" do not support Chrimar's construction and should therefore be attributed little weight in any consideration of what "BaseT" means.

Defendants' proposed construction aligns with how one of skill in the art would have interpreted the intrinsic evidence regarding "BaseT." For that reason and those discussed above, Defendants respectfully request that the Court construe "BaseT" as "10BASE-T, which requires communication over twisted pair cabling at 10Mb/s."

### H.      "At Least One Condition"

Asserted claims 1, 5, 43, 72, 83, 103, 104, 111, & 123 of the '107 patent all include the indefinite limitation "at least one condition." As explained in Defendants' Indefiniteness Motion[21], those asserted claims are invalid as failing to meet the definiteness requirement of 35 U.S.C. § 112. Chrimar disagrees and asserts that "'condition' refers to an electrical condition, such as voltage or impedance." (Dkt. No. 97 at 13.) The fact that Chrimar's plain and ordinary meaning of "condition" rewrites the claim is telling. Claims 61 and 80 of the '107 patent expressly require an "electrical condition." Moreover, use of "electrical condition" in independent claim 1 of the '760 and '838 patents counsels against Chrimar's improper attempt to rewrite claims that use the term "condition" standing alone. "Condition" is not a term used in the specification. Nor is there any clear prosecution history disclaimer that indicates "condition" should be rewritten as "electrical condition." For these reasons, Defendants respectfully request

---

[21] Defendants herein incorporate by reference the arguments made in Defendants' Indefiniteness Motion, and any forthcoming reply in support thereof, regarding "condition."

that the Court reject Chrimar's proposed construction and hold the asserted claims of the '107 patent invalid as indefinite.

> ### I.        "Detection Protocol"/ "Part of a Detection Protocol"

As used in asserted claim 35 of the '012 patent, claim 72 of the '107 patent, and claim 69 of the '760 patent, "detection protocol" is indefinite.[22] Chrimar's construction of "a detection scheme, rule, or procedure"—does not provide reasonable certainty to one of skill in the art regarding the scope of "detection protocol." (*See* Seifert Decl. ¶ 144; *see also* Ex. 15 at Chrimar_DefsII0004724.)  This is also addressed in Defendants' Indefiniteness Motion.

## IV.    CONCLUSION

For the reasons stated herein and in Defendants' Indefiniteness Motion, Defendants respectfully request that the Court reject Chrimar's proposed constructions and adopt Defendants' positions on the remaining terms in dispute.

Date: February 18, 2016                         Respectfully submitted,

                                                */s/ Danny L. Williams*
                                                Danny L. Williams—LEAD ATTORNEY
                                                State Bar No. 21518050
                                                Email: danny@wmalaw.com
                                                Chris N. Cravey
                                                State Bar No. 24034398
                                                Email: cravey@wmalaw.com
                                                Matthew R. Rodgers
                                                State Bar No. 24041802
                                                Email: mrodgers@wmalaw.com
                                                David K. Wooten
                                                State Bar No. 24033477
                                                Email: dwooten@wmalaw.com
                                                Leisa Talbert Peschel

---

[22] Defendants hereby incorporate by reference the arguments made in Defendants' Indefiniteness Motion, and any forthcoming reply in support thereof, regarding "detection protocol."

State Bar No. 24060414
Email: lpeschel@wmalaw.com
**WILLIAMS MORGAN, P.C.**
710 North Post Oak Road, Suite 350
Houston, Texas 77024
Telephone: (713) 934-7000
Facsimile: (713) 934-7011

*Attorneys for Defendants-Counterclaimants
Alcatel-Lucent USA Inc., Alcatel-Lucent
Holdings, Inc., & ALE USA INC.*

Michael E. Jones
State Bar No. 10929400
Email: mikejones@potterminton.com
**POTTER MINTON, P.C.**
110 North College, Suite 500
Tyler, Texas 75702
Telephone: (903) 597-8311
Facsimile: (903) 593-0846

*Attorneys for Defendants-Counterclaimants
Alcatel-Lucent USA Inc. & Alcatel-Lucent
Holdings, Inc.*

Date: February 18, 2016

Respectfully submitted,

/s/ *Brent A. Hawkins*

Brent A. Hawkins
David H. Bluestone
**McDERMOTT WILL & EMERY LLP**
227 West Monroe Street
Chicago, IL 60606-5096
Telephone:  (312) 372-2000
Facsimile:  (312) 984-7700
Email:  bhawkins@mwe.com
Email:  dbluestone@mwe.com

Michael E. Jones
State Bar No. 10929400
mikejones@potterminton.com
Allen Gardner
State Bar No. 24043679
allengardner@potterminton.com
**POTTER MINTON, P.C.**
110 North College, Suite 500
Tyler, Texas 75702
Telephone:  (903) 597-8311
Facsimile:  (903) 593-0846

*Attorneys for Defendant*
*AMX*

## CERTIFICATE OF SERVICE

I hereby certify that the all counsel of record who are deemed to have consented to electronic service are being served on February 18, 2016 with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3). Any other counsel of record will be served by electronic mail, facsimile transmission and/or first class mail on this same date.

/s/ *Donna E. Ward*

Litigation Paralegal

32