# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | |
|---|---|
| **CHRIMAR SYSTEMS, INC.,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Case No. 6:13-CV-880-JDL** |
| **ALCATEL-LUCENT, INC.,** *et al.*, | |
| **Defendants.** | |
| **CHRIMAR SYSTEMS, INC.,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Case No. 6:13-CV-881-JDL** |
| **AMX, LLC,** | |
| **Defendant.** | |
| **CHRIMAR SYSTEMS, INC.,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Case No. 6:13-CV-882-JDL** |
| **GRANDSTREAM NETWORKS, INC.,** | |
| **Defendant.** | |
| **CHRIMAR SYSTEMS, INC.,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Case No. 6:13-CV-883-JDL** |
| **SAMSUNG ELECTRONICS, CO.,** *et al.*, | |
| **Defendants.** | |

## DECLARATION OF LES BAXTER

My name is Les Baxter and I declare the following:

## EXPERIENCE AND QUALIFICATIONS

1.  I have been asked by Plaintiffs to provide an opinion as one of ordinary skill in the art in this matter on whether certain claims of U.S. Patent No. 8,155,012 are definite.

2.  I was employed at Bell Laboratories where I was a Member of the Technical Staff, Technical Manager, and Director in the network cable systems, optical fiber solutions, customer switching systems, and optical networking business units from 1977 through 2001.   Since 2001, I have been the Principal of Baxter Enterprises which provides consulting, engineering, and expert witness services specializing in structured cabling systems, local area networks and residential networks.

3.  During my thirty-five year career in the networking field I acquired extensive technical expertise and experience in structured cabling (copper and fiber-optic) and physical layer networking in the enterprise, network, and residential markets; local area networks, data communication/networking, protocols (particularly IEEE 1394/FireWire and IEEE 802.3/Ethernet), including connectors; systems engineering (network architecture, product and system specifications and requirements); optical networking; standards strategy and development; switching systems (circuit, packet and optical); prototyping and product development (hardware and firmware); and commercializing new technology to create successful products and systems.

4.  I was named an IEEE fellow in 2009 for my "contributions to high-speed digital communication networks."  I am a registered professional engineer in New Jersey and co-

author of the book *Premises Cabling* (Thomson Delmar Learning, 3rd ed. 2006) and author of

the book *Residential Networks* (Delmar Thompson Learning, 2006).

5.  In June 1972, I received an Associate of Arts and Science degree in Electronic Technology

from Delaware Technical Community College.  In June 1975, I received the degree of

Bachelor of Science in Electrical Engineering from the Rochester Institute of Technology.  In

June 1977, I received the degree of Master of Science in Electrical Engineering from the

University of Delaware.

6.  I have participated in numerous standards-setting committees under the auspices of the

Electronic Industries Association (EIA); Telecommunications Industries Association (TIA);

the Institute of Electrical and Electronic Engineers (IEEE), and the International Standards

Organization (ISO).   I am currently Chair of the IEEE 1394 Committee relating to High

Performance Serial Buses and am a member of the IEEE 802.3 Working Group on Ethernet

LANs.  I am a member of the IEEE Standards Association, TIA, BICSI, NSPE, and the 1394

Trade Association.

7.  I have published more than 30 articles in technical and trade journals and have made

presentations at technical conferences on five continents.  I am an inventor of eight U.S.

Patents.

8.   Attached as Exhibit 1 is a copy of my current CV which lists all publications that I authored

in the previous 10 years and lists all other cases in which, during the previous 4 years, I have

testified as an expert at trial or by deposition.

9.  I am being compensated at the rate of $250 per hour for my study and testimony in this case.

My compensation is based solely on the amount of time that I devote to activity related to

this case and is in no way affected by any opinions that I render or the outcome of the litigation.

## <u>SUMMARY OF OPINIONS</u>

10. In my opinion, "distinguishing information about the piece of Ethernet data terminal equipment," and as construed by Plaintiffs to mean "information to distinguish the piece of Ethernet data terminal equipment from at least one other piece of Ethernet data terminal equipment," read in light of the specification and prosecution history informs, with reasonable certainty, those skilled in the art about the scope of the invention recited in Claim 31. Thus, the term is definite.

11. In my opinion, "to distinguish the piece of terminal equipment having an Ethernet connector," and as construed by Plaintiffs to mean "to distinguish the piece of terminal equipment having an Ethernet connector from at least one other piece of terminal equipment having an Ethernet connector," read in light of the specification and prosecution history informs, with reasonable certainty, those skilled in the art about the scope of the invention recited in Claim 67. Thus, the term is definite.

12. In my opinion, "wherein distinguishing information about the piece of Ethernet data terminal equipment is associated to impedance within the at least one path" read in light of the specification and prosecution history informs, with reasonable certainty, those skilled in the art about the scope of the invention recited in Claim 31. Thus, the term is definite.

13. In my opinion, "arranging impedance within the at least one path to distinguish the piece of terminal equipment" read in light of the specification and prosecution history informs, with reasonable certainty, those skilled in the art about the scope of the invention recited in Claim 67. Thus, the term is definite.

14. In my opinion, claim 31 recites an apparatus claim and does not include a method step. Thus, claim 31 is not indefinite for reciting both an apparatus and a method step.

15. In my opinion, claim 31 read in light of the specification and prosecution history informs, with reasonable certainty, those skilled in the art about the scope of the invention recited in Claim 31. Thus, the claim is definite.

16. In my opinion, claim 67 read in light of the specification and prosecution history informs, with reasonable certainty, those skilled in the art about the scope of the invention recited in Claim 67. Thus, the claim is definite.

## **FACTS AND DATA CONSIDERED**

17. I have reviewed the following documents:

   o U.S. Patent No. 8,155,012 and its file history;
   o U.S. Patent No. 7,457,250 and its file history;
   o U.S. Patent No. 6,650,622 and its file history;
   o U.S. Patent No. 5,406,260;
   o Plaintiffs' Exchange of Preliminary Claim Constructions and Identification of Extrinsic Evidence Pursuant to P.R. 4-2 dated July 9, 2014 and Exhibit.
   o Defendants' Patent Rule 4-2 Disclosure and Exhibit dated July 9, 2014.
   o Joint Claim Construction and Pre-hearing Statement Pursuant to P.R. 4-3 dated August 11, 2014 and Exhibits.
   o Defendants' letter brief on Early Markman dated June 9, 2014;
   o Defendants' Combined Motion for Summary Judgment and Claim Construction and exhibits dated July 28, 2014.
   o Plaintiffs' Response to Defendants' Combined Motion for Summary Judgment and Claim Construction Brief dated August 11, 2014 and Exhibits.
   o Defendants' Reply in Support of Their Combined Motion for Summary Judgment and Claim Constructions dated August 18, 2014.
   o Plaintiffs' Early Markman Hearing Powerpoint.
   o Defendants' Early Markman Hearing Powerpoint.
   o Transcript of Early Markman Hearing held on September 3, 2014.
   o Plaintiffs' Opening Brief on Claim Construction dated September 22, 2014 and Exhibits.
   o Defendants' Technology Tutorial dated September 18, 2014.
   o Defendants' Motion for Summary Judgment of Indefiniteness dated October 6, 2014 and Exhibits.
   o Defendants' Responsive Claim Construction Brief dated October 6, 2014 and Exhibits.

   o Defendants' MSJ dated 10/6/2014 and Exhibits

**LEGAL STANDARDS**

I have been informed by counsel of the following legal standards.

18. **Claim Construction**.

   a. The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation. That starting point is based on the well-settled understanding that inventors are typically persons skilled in the field of the invention and that patents are addressed to and intended to be read by others of skill in the pertinent art.

   b. Words of a claim are generally given their ordinary and customary meaning. There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution.  To act as its own lexicographer, a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning and must clearly express an intent to redefine the term.  Disavowal requires that the specification or prosecution history make clear that the invention does not include a particular feature or is clearly limited to a particular form of the invention.

   c. The ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application.

   d. The person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification.

e.   Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean. Those sources include the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.

f.   Under the principles of claim differentiation, the independent claims are presumed to be broader.  The presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.

g.   Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

h.   A construction that would exclude the preferred embodiment is rarely, if ever, correct and would require highly persuasive evidentiary support.

i.   While claims are read in view of the specification, of which they are a part, limitations should not be read from the embodiments in the specification into the claims.

j.   The prosecution history, which is part of the intrinsic evidence, consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent.  Because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes.  The

prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be.

k.   Prior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence.

l.   If during prosecution, applicants replaced claims that had a certain limitation with new claims that did not include that limitation, that is a strong indication that the applicants intended the new claims to cover an apparatus or method that did not include the limitation.

m.   Claim terms that are not ambiguous and will be easily understood by a jury, particularly when the jury considers the terms and limitations of the claim, do not require construction and should receive their plain and ordinary meaning.

19. **Person of Ordinary Skill**.

a.   Factors that may be considered in determining the level of skill include: the type of problems encountered in the art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field.

20. **Indefiniteness**.

a.   35 U.S.C. § 112, paragraph 2, provides: The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

b.   A patent is invalid for indefiniteness under 35 U.S.C. § 112, paragraph 2 if its claims, read in light of the specification delineating the patent, and the prosecution history,

fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

c. Definiteness is to be evaluated from the perspective of someone skilled in the relevant art.

d. In assessing definiteness, claims are to be read in light of the patent's specification and prosecution history.

e. Definiteness is measured from the viewpoint of a person skilled in the art at the time the patent was filed.

f. Section 112 entails a delicate balance. On the one hand, the definiteness requirement must take into account the inherent limitations of language. Some modicum of uncertainty is the price of ensuring the appropriate incentives for innovation. One must bear in mind, moreover, that patents are not addressed to lawyers, or even to the public generally, but rather to those skilled in the relevant art.

g. A patent must be precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them. Otherwise there would be a zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims.

h. The definiteness requirement mandates clarity, while recognizing that absolute precision is unattainable. The certainty which the law requires in patents is not greater than is reasonable, having regard to their subject-matter.

i. A patent which defines a claim phrase through examples may satisfy the definiteness requirement.

    j.   Claim language employing terms of degree have been found definite where it provided enough certainty to one of skill in the art when read in the context of the invention

21. **Mixing apparatus and method**.

    a.   Claims that recite both a system and a method for using that system are invalid as indefinite under 35 U.S.C. § 112, paragraph 2.

## OPINION ON PERSON OF ORDINARY SKILL IN THE ART

22.  In my opinion, a person of ordinary skill in the relevant art with respect to the '012 patent would have an undergraduate degree or the equivalent in the field of electrical engineering or a related ancillary field, and one to three years of experience with Ethernet networks. Alternatively, a greater length of experience could replace the degree requirement.

23.  Local area networks, including Ethernet, are a rapidly advancing field characterized by increasing transmission rates and the frequent introduction of new interfaces. An indication of the breadth of this field is given by the fact that the '012 patent cites more than 500 patents as references.

24.  A person of ordinary skill in this art would need to be familiar with LAN protocols, transmission theory, cabling systems, electronic circuits, etc. Much of this is application-specific knowledge which builds on the fundamentals learned during an engineering education but is not typically taught in college courses. Hence the need for practical experience in addition to a degree.

25.  I am one of ordinary skill in the art.

## MEANING OF CERTAIN TERMS

26. As noted in my previous declarations, having read the relevant intrinsic and extrinsic evidence, I agree with Plaintiffs' proposed constructions that "distinguishing information about the piece of Ethernet data terminal equipment" means "information to distinguish the piece of Ethernet data terminal equipment from at least one other piece of Ethernet data terminal equipment," and "to distinguish the piece of terminal equipment with an Ethernet connector" means "to distinguish the piece of terminal equipment having an Ethernet connector from at least one other piece of terminal equipment having an Ethernet connector."

27. For all other terms, I use the plain and ordinary meaning of the terms, as they would have been understood by a person of ordinary skill in the art at the time of this invention and in light of the specification and patent file history.

## OPINION ON DEFINITENESS OF THE "TO DISTINGUISH" AND "DISTINGUISHING INFORMATION" TERMS

28. Dependent claims define the bounds of "information to distinguish the piece of Ethernet data terminal equipment from at least one other piece of Ethernet data terminal equipment" and "to distinguish the piece of terminal equipment having an Ethernet connector from at least one other piece of terminal equipment having an Ethernet connector."

29. Dependent claims 48 and 49 provide that the "distinguishing information" could be general information related to an electrical or physical aspect of the piece of terminal equipment.

30. Dependent claim 33 provides that the "distinguishing information" could be "identifying information" about the piece of terminal equipment.

31. Dependent claims 69 and 71 show that the "distinguishing information" could be very specific information to "uniquely distinguish" or "uniquely identify" the piece of terminal equipment.

32. The specification provides numerous examples of distinguishing information.

33. Examples include: equipment processor type, hard drive capacity, authorization information, physical attributes, physical configuration, electronic attributes, software configuration, and network attributes. Col. 4, lines 48-53; Col. 2, lines 49-58; Col. 6, lines 33-41; Col. 15, line 67 to Col. 16, line 4.

34. Defendants would have the independent claims require unique identification under their proposed construction or argue that under Plaintiffs' proposed construction the independent claims are so vague that they are indefinite. As the above portions of the claims and specification show and the below extrinsic evidence provides, Plaintiffs' proposed construction corresponds to the ordinary and customary meaning of "distinguish."

35. The plain and ordinary meaning of "distinguish" (from the Merriam Webster Collegiate Dictionary, 1998) is "to separate into kinds, classes, or categories." Synonyms (from thesaurus.com) include categorize, classify, and characterize. Thus, contrary to Defendants' proposed construction, "Distinguish" does not imply that a particular item is necessarily uniquely or individually identified.

36. The specification of the '012 patent provides an example of "distinguishing information" that classifies or categorizes a piece of terminal equipment.

37. The '012 patent describes a blocking circuit which can be used to block unauthorized access to the network in 12:54-59 "In addition, the system provides a means of blocking

communications with an unauthorized device that is connected to the network. Furthermore, the system allows the automatic blocking of communications with an unauthorized device."

38. The blocking circuit operates as described in 9:4-7 "If an invalid identification is received, the firmware kernel 4 sends signals to blocking circuits 20 and 88 commanding them to short the receive data lines together and the transmit data lines together." A more detailed description of the blocking circuit is given in 7:1-39 and Figures 5 and 6.

39. The operation of the blocking circuit may be summarized as follows: The central module puts a DC voltage across the line and analyzes the resulting DC current through the line. If an authorized station is detected, normal operation continues. If an unauthorized station is detected, no attempt is made to identify it. It is simply classified or categorized (i.e., distinguished) as unauthorized and the blocking circuit is triggered to prevent further access to the network.

40. Compare this with PoE operation where the PSE puts the detection DC voltage across the line and analyzes the resulting DC current through the line. If a valid PD is detected, the process continues with classification and application of power to operate the piece of terminal equipment. If a valid PD is not detected, the process is halted and power to operate the piece of terminal equipment is not applied.

41. In my opinion, these are analogous operations. In both cases, they result in categorizing a station as valid/authorized or not valid/unauthorized. Neither requires identification of the not valid/unauthorized stations to perform this function.

42. Defendants claim that to "distinguish" according to the plaintiffs construction requires comparing the recited piece of Ethernet data terminal equipment to at least one other piece of

Ethernet data terminal equipment.  For example, paragraph 10 (p. 5) of Mr. Carlson's declaration states:

> I understand that Mr. Baxter has asserted that "distinguishing information about
> the piece of Ethernet data terminal equipment" means "Information to distinguish
> the piece of Ethernet data terminal equipment from the at least one other piece of
> Ethernet data terminal equipment." The requirement of comparing with "at least
> one other piece of Ethernet data terminal equipment" presents further uncertainty
> because one of ordinary skill in the art could not know what other piece of
> equipment would be chosen for comparison.

43. I disagree with this characterization.  In my opinion, one of ordinary skill in the art knows that certain information about a piece of equipment varies among pieces of equipment.  For example, one of ordinary skill in the art knows that not every piece of equipment has the same processor type.  Thus, one of ordinary skill in the art does not need to have a specific piece of equipment for comparison to know whether certain information (e.g. processor type) distinguishes a piece of equipment from at least one other piece of equipment.

44.  In addition, under Plaintiffs' proposed construction, the claims do not require knowing how a piece of Ethernet data terminal equipment will later be used, e.g. within a particular network configuration.

45. Dependent claims 54 and 98 add the further limitation that the piece of terminal equipment is physically connected to a network.

46. Thus, Dependent claims 54 and 98 make it clear that "distinguishing information"/"to distinguish"  do not require a physical connection to a network much less the physical presence of a second piece of terminal equipment.

47. It is important to note that the IEEE 802.3af PoE specification uses the word "distinguish" to describe the detection process.  Mr. Carlson, as stated in his CV, chaired the IEEE 802.3af (PoE) committee which wrote this document.

48. Clause 33.1 of IEEE 802.3af states that:  "Given the large number of legacy devices with an Ethernet connector  that could be connected to a 100Ω balanced cabling system, and the possible consequences of operationally powering such devices, the protocol to **distinguish** compatible devices and noncompatible devices is important to prevent damage to non-compatible devices." (emphasis added)

49. This statement from 802.3af is clearly using the word "distinguish" to at least categorize or classify a piece of Ethernet data terminal equipment.  The 802.3af specification does not require that the detection signature within a piece of Ethernet data terminal equipment be compared to any other piece of Ethernet data terminal equipment in order to categorize or classify a piece of Ethernet data terminal equipment.

50. If every piece of Ethernet data terminal equipment has the same particular characteristic, then that characteristic does not distinguish a piece of Ethernet data terminal equipment from any other piece of Ethernet data terminal equipment.  However, if some pieces of Ethernet data terminal equipment have a characteristic and others don't, then the characteristic distinguishes the ones that have the characteristic from the ones that don't have the characteristic.   Therefore, information associated to the characteristic must be able to distinguish a particular piece of Ethernet data terminal equipment from at least one other piece of Ethernet data terminal equipment to qualify as "distinguishing information."

51. In my opinion, "distinguishing information about the piece of Ethernet data terminal equipment," and as construed by Plaintiffs to mean "information to distinguish the piece of

Ethernet data terminal equipment from at least one other piece of Ethernet data terminal equipment," read in light of the specification and prosecution history informs, with reasonable certainty, those skilled in the art about the scope of the invention recited in Claim 31.

52. In my opinion, "to distinguish the piece of terminal equipment having an Ethernet connector," and as construed by Plaintiffs to mean "to distinguish the piece of terminal equipment having an Ethernet connector from at least one other piece of terminal equipment having an Ethernet connector," read in light of the specification and prosecution history informs, with reasonable certainty, those skilled in the art about the scope of the invention recited in Claim 67.

## ETHERNET CONNECTORS WITH MULTIPLE CONTACTS

53. Claim 31 requires "an Ethernet connector comprising a plurality of contacts."

54. Claim 67 requires "the Ethernet connector comprising the contact 1 through the contact 8."

55. Dependent claims 34 and 92 explain that the Ethernet connector could be an RJ45 Jack.

56. One of ordinary skill in the art knows the scope of the above phrases as they were concepts well known in the art at the time the '012 patent was filed.

57. Mr. Carlson states as much in paragraph 6 of his declaration.

58. Ethernet connectors and their contacts were also explained during the prosecution of the '012 Patent. See '012 File History, 12/6/2011 Amendment and Petition for Extension of Time, CMS001221-001226.

59. Below is a picture representing the BASE-T Ethernet connector and its contacts:

This figure represents a front view looking into the BASE-T Ethernet connector at the contacts, which are numbered from 1 to 8.

60. Thus, the "Ethernet connector" phrases above inform, with reasonable certainty, those skilled in the art about the scope of the inventions recited in claims 31 and 67.

### PATH ACROSS CONTACTS OF THE BASE-T ETHERNET CONNECTOR

61. Claim 31 requires a "path coupled across selected contacts...of the Ethernet connector"

62. Claim 67 requires "coupling at least one path across specific contacts of the Ethernet connector."

63. One of ordinary skill in the art would understand this to mean that a path is coupled between the specific contacts.

64. <mark>Below is a picture representing the BaseT Ethernet connector and a path coupled across its contacts, in this case contact 1 and contact 8</mark>



65. Thus, the "at least one path" phrases above inform, with reasonable certainty, those skilled in the art about the scope of the inventions recited in claims 31 and 67.

**IMPEDANCE IN THE PATH BETWEEN CONTACTS OF THE ETHERNET CONNECTOR**

66. Claim 31 recites "impedance within the at least one path."

67. Claim 67 recites "arranging impedance within the at least one path"

68. Dependent claims 51 and 79 provide that the impedance could be between 10k Ohms and 15 k Ohms.

69. Intrinsic and extrinsic evidence shows that there can be no dispute that impedance was well known in the art at the time the '012 patent was filed.

- U.S. Patent No. 4,670,902 (1987), Col. 2, lines 19-21 ("Thus it is possible to independently select the direct current impedance and the alternating current impedance of the circuitry.")

- Oxford Concise Science Dictionary, pp. 362-363 (1996): "impedance Symbol Z. The quantity that measures the opposition of a circuit to the passage of a current and therefore determines the amplitude of the current. In a d.c. circuit this is the resistance (R) alone…"

- T. O'Conor Sloane, The Standard Electrical Dictionary, p. 297 (2nd ed. 1899): "Impedance. The ratio of any impressed electro-motive force to the current which it produces in a conductor. For steady currents it is only the resistance. .."

70. Defendants argue that the claims "do not define any particular impedance ranges" and that claim 67 "fails to provide any objective basis to discern what is required for impedance on the circuit." Defendants' MSJ, pp. 7-9.

71. As set forth above, impedance is a well-known concept such that one of ordinary skill in the art does not need any addition information beyond what is recited in the intrinsic record to understand the bounds of the claims.

72. Thus, "impedance" informs, with reasonable certainty, those skilled in the art about the scope of the inventions recited in claims 31 and 67.

73. Both claims 31 and 67 plainly require that the impedance is coupled in a path between contacts of the Ethernet connector.

74. Intrinsic evidence shows that one of ordinary skill in the art would understand that "arranging impedance within the at least one path" means placing an impedance in a path between contacts.  U.S. Patent No. 4,723,267 (1988), Abstract ("place a low impedance d.c. load across the tip and ring conductors…") (intrinsic evidence cited on face of '012 patent).

75. This is further supported by extrinsic evidence.  Arrange is defined by the Merriam Webster Collegiate Dictionary (1998) as "to put into a proper order or into a suitable sequence, relationship, or adjustment."

76. In Mr. Carlson's Declaration (page 6, paragraph 15), he states "One cannot arrange impedance just as one cannot arrange length, temperature or other measurable characteristics."   I disagree with this view.   In my opinion, impedance and temperature, for example, are not analogous concepts.  You can specify and buy electronic components based on their impedance.  A 1KΩ resistor, for example, has an impedance of 1KΩ and can be arranged in a path however you like.  There is no comparable component which has 10°C of temperature that you can arrange in a circuit.



77. Below is a picture representing the (BASE-T) Ethernet connector and a path coupled across its contacts with an impedance in the path:



78. In this case, the impedance is shown as a resistor which is in the path between contact 1 and contact 8.  It could be a more complicated path such as multiple resistors in series and/or the center tap of an isolation transformer.

**OPINION ON DEFINITENESS OF "WHEREIN DISTINGUISHING INFORMATION…IS ASSOCIATED TO IMPEDANCE WITHIN THE AT LEAST ONE PATH" AND "ARRANGING IMPEDANCE WITHIN THE AT LEAST ONE PATH TO DISTINGUISH…"**

79. Claim 31 recites "wherein distinguishing information about the piece of Ethernet data terminal equipment is associated to impedance within the at least one path."

80. Claim 67 recites "arranging impedance within the at least one path to distinguish the piece of terminal equipment."

81. I as one of ordinary skill in the art understand that "arranging impedance within the at least one path to distinguish the piece of terminal equipment" means that impedance is placed in the path for the purpose of making the piece of terminal equipment distinguishable.

82. Similarly, I as one of ordinary skill in the art understand that "wherein distinguishing information… is associated to impedance within the at least one path" means that impedance is placed in the path for the purpose of providing distinguishing information about the piece of terminal equipment. Defendants argue that the phrase "[wherein] distinguishing information about the piece of Ethernet data terminal equipment is associated to impedance" in claim 31 "constitutes a method step that happens by some actor at some unspecified time, and the lack of clarity regarding when infringement would occur renders apparatus claim 31 indefinite." Defendants' MSJ at p. 8. Contrary to Defendants' arguments, claim 31 does not require an active step or an action on the part of a user. Thus, claim 31 is not indefinite for reciting both an apparatus and a method step.

83. This construction is supported by the intrinsic record such as the preamble of the claims which recite "An adapted piece of Ethernet data terminal equipment comprising…" (claim 31) and "A method for adapting a piece of terminal equipment…"

84. In light of my previous discussions in this report on impedance, distinguish and the at least one path, in my opinion, "wherein distinguishing information about the piece of Ethernet data terminal equipment is associated to impedance within the at least one path" read in light of the specification and prosecution history informs, with reasonable certainty, those skilled in the art about the scope of the invention recited in Claim 31.

85. In light of my previous discussions in this report on impedance, distinguish and the at least one path, in my opinion, "arranging impedance within the at least one path to distinguish the piece of terminal equipment" read in light of the specification and prosecution history informs, with reasonable certainty, those skilled in the art about the scope of the invention recited in Claim 67.

86. I declare under penalty of perjury that the foregoing is true and correct.  Executed on October 20, 2014.

_____

Les Baxter

# EXHIBIT 1

### Les Baxter, P.E., F-IEEE
**154 Pinckney Road, Little Silver, NJ 07739**
**les@baxter-enterprises.com**
**732-212-1400**

## Work Experience

- Bell Laboratories (August 1977 to July 2001) – Member of Technical Staff, Technical Manager, and Director in the Customer Switching Systems, Network Cable Systems, Optical Fiber Solutions, and Optical Networking business units.
- Baxter Enterprises (July 2001 to present) – providing consulting, engineering, and expert witness services -- including local area networks, structured cabling systems, residential networks, and systems engineering.  For more information on recent projects, see www.baxter-enterprises.com.

## Technical Expertise and Experience include:

- Local Area Networks, data communication/networking, protocols (particularly IEEE 802.3/Ethernet, PoE and IEEE 1394/FireWire)
- Structured cabling (copper and fiber-optic) and physical layer networking in the enterprise, network, and residential markets
- Systems engineering (network architecture, product and system specifications and requirements)
- Optical networking
- Standards strategy and development
- Switching systems (circuit, packet, and optical)
- Prototyping and product development (hardware and firmware)
- Global technical, sales, and marketing support
- Commercializing new technology to create successful products and systems

## Professional Activities and Affiliations

- Named an IEEE Fellow on 1/1/2009 for "contributions to high-speed digital communication networks"
- Registered Professional Engineer in New Jersey (License No. GE 24GE03703600)
- Co-author of *Premises Cabling* (3rd edition, ISBN 1-4018-9820-0, Delmar-Thompson, 2006.)
- Author of *Residential Networks* (ISBN 1-4018-6267-5, Delmar-Thompson, 2006.)
- Have participated in numerous IEEE, EIA/TIA, and ISO/IEC standards committees.  Currently chair the IEEE 1394 committee, am a member of the IEEE 802.3 working group, and participant in the TIA TR-42 committee.
- Author of more than 30 articles in technical and trade journals (several recent publications are available at www.baxter-enterprises.com.)  Have made presentations at technical conferences on 5 continents.
- Inventor of 8 US patents
- Recipient of 1998 Bell Labs President's Gold Award (awarded annually to the top 2 or 3 R&D projects at Bell Labs) for the development of the SYSTIMAX GigaSPEED® cabling system
- Session organizer/chairman for IEEE International Conf. on Telecommunications (1995 - 1998)
- Member of IEEE Standards Association, TIA, BICSI,  NSPE, 1394 Trade Association, and IEEE USA Consultant's Network.

## Education

- Mini-MBA in Global Business, Penn State, April 1995.
- Master of Science in Electrical Engineering, University of Delaware, June 1977.
- Bachelor of Science in Electrical Engineering, Rochester Institute of Technology, June 1975.
- Assoc. of Arts and Science in Electronic Technology, Delaware Tech., June 1972.

## Les Baxter

### Publications (last 10 years)

[1] Les Baxter, "Book Review: Does My Work Matter? The Hidden Treasure in the Work We Do," *IEEE Communications Magazine*, June 2013.

[2] Les Baxter, "IEEE 1394 Ideal for Long-Haul Automotive, Consumer, Industrial, Security and PC Applications," 1394 Trade Association White Paper, July 2010 (also on eetimes.com)

[3] Les Baxter, "NFPA 731 with Applications to Residential Security Systems," BCS Reports, April 2009.

[4] Les Baxter, "New developments in IEEE 1394 (a.k.a. FireWire)," *Lightwave*, Nov. 2007.

[5] Les Baxter and John Pryma, "Make homes future-ready with Category 6 cabling" *Cabling Installation & Maintenance,* June 2006, pp. 14-19.

[6] Donald Sterling and Les Baxter, *Premises Cabling, 3rd$^d$ Edition*, Delmar Publishing, 2006, 320 pp., ISBN 1-4018-9820-3.

[7] Les Baxter, *Residential Networks,* Delmar Publishing, 2006, 423 pp., ISBN 1-4018-6267-5.

### Expert Witness Experience (last 4 years)

• Berk-Tek v. Belden, Case IPR2013-00057 (USPTO)

• ChriMar Systems v. Cisco, Hewlett Packard, Extreme Networks, and Avaya, Investigation No. 337-TA-817 (ITC)

• Bel Fuse v. Halo Electronics, Case No. 2:07-cv-02168-GEB-ES (D. N.J.)

• Belden v. Superior Essex, Case No. 1:08-cv-00063-SLR (D. Del.)