# EXHIBIT 6

ATTORNEYS EYES ONLY

Page 1

1        IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF TEXAS
2                  TYLER DIVISION
3   CHRIMAR SYSTEMS, INC., et §  CIVIL ACTION NO.
    al.,                      §  6:15-CV-163-JDL
4                             §
             Plaintiffs,      §  LEAD CASE
5                             §
    v.                        §
6                             §
    ALCATEL-LUCENT S.A., et   §
7   al.,                      §
                              §
8            Defendants.      §
9   _____
10             VIDEO DEPOSITION OF
11                  LES BAXTER
12             ATTORNEYS' EYES ONLY
13              January 20, 2016
    _____
14           VIDEO DEPOSITION OF LES BAXTER, produced as
15   a witness at the instance of the Defendants, and duly
16   sworn, taken in the above-styled and numbered cause on
17   January 20, 2016, from 9:11 a.m. to 4:40 p.m., before
18   Joseph D. Hendrick, Certified Shorthand Reporter No.
19   947 in and for the State of Texas, reported by machine
20   shorthand, in the offices of  Thompson & Knight, One
21   Arts Plaza, 1722 Routh Street, Suite 1500, Dallas,
22   Texas, pursuant to Notice and the Federal Rules of
23   Civil Procedure and any provisions stated on the record
24   or attached hereto.
25   Job No. 2219638

ATTORNEYS EYES ONLY

Page 2

1                    INDEX
2  Appearances  ....................................  4
3  LES BAXTER
4    EXAMINATION BY MR. BLUESTONE .............  6
       EXAMINATION BY MR. COHEN ................. 252
5    RE-EXAMINATION BY MR. BLUESTONE ........... 258
6
7  Reporter's Certification  ....................261
8             EXHIBITS
9  NO.      DESCRIPTION           PAGE(S)
10  EXHIBIT 1   December 17, 2015 Declaration   7
       of Les Baxter
11
    EXHIBIT 2   A copy of U.S. Patent         7
12       8,902,760
13  EXHIBIT 3   A copy of U.S. Patent         7
       8,942,107
14
    EXHIBIT 4   A copy of U.S. Patent         7
15       9,019,838
16  EXHIBIT 5   A copy of U.S. Patent         7
       8,155,012
17
    EXHIBIT 6   Copies of claims from patents:  7
18       Page 1 - Claim 1 of the '760
           patent
19       Page 2 - Claim 73 of the '760
           patent
20       Page 3 - Claim 1 of the '107
           patent
21       Page 4 - Claim 104 of the '107
           patent
22       Page 5 - Claim 1 of the '838
           patent
23       Page 6 - Claim 31 of the '012
           patent
24
25

Page 3

1  EXHIBIT 7   McGraw-Hill Electronics         40
       Dictionary Sixth Edition
2
    EXHIBIT 8   Case 6:13-cv-00881-JDL         42
3       Document 94-2 Filed 10/20/14
       Page 1of 26 Page ID #: 1949 -
4       1974
       October 24, 2014 Baxter
5       Declaration and exhibits
6
    EXHIBIT 9   Ethernet connector schematics  48
7
    EXHIBIT 10   A copy a diagram labeled       61
8       Figure 10
9  EXHIBIT 11   A copy of a diagram labeled     90
       Figure 8
10
    EXHIBIT 12   A copy of a diagram labeled    93
11       Figure 18
12
13
       REQUESTED DOCUMENTS/INFORMATION
14
    NO.   DESCRIPTION           PAGE
15
            None
16
17
18     CERTIFIED QUESTIONS/INSTRUCTIONS NOT TO ANSWER
19  NO.                  PAGE/LINE
20            None
21
22
23
24
25

Page 4

1      A P P E A R A N C E S
2  FOR THE PLAINTIFF:
     Justin S. Cohen, Esq.
3     Shivan V. Mehta, Esq.
     THOMPSON & KNIGHT
4     One Arts Plaza
     1722 Routh Street, Suite 1500
5     Dallas, Texas 75201
     (214) 969-1211
6     Justin.Cohen@tklaw.com
     Shivan.Mehta@tklaw.com
7
   FOR DEFENDANT AMX:
8     David H. Bluestone, Esq.
     McDERMOTT WILL & EMERY
9     227 West Monroe Street
     Chicago, Illinois  60606-5096
10     (312) 984-5484
     dbluestone@mwe.com
11
   FOR DEFENDANTS ALE USA, INC., ALCATEL-LUCENT, USA, INC.
12  AND ALCATEL-LUCENT HOLDINGS, INC.:
     Leisa T. Peschel, Ph.D., Esq.
13     Chris Cravey, Esq.
     WILLIAMS MORGAN, P.C.
14     710 N. Post Oak Rd., Suite 350,
     Houston, Texas 77024
15     (713) 934-4096
     LPeschel@wmalaw.com
16     Cravey@wmalaw.com
17  ALSO PRESENT:
     Michael Ince, Legal Video Specialist
18
19
20
21
22
23
24
25

Page 5

1      VIDEOGRAPHER:  We are on the record.

2  Today's date is January 20th, 2016.  It is 9:11 a.m.

3      This is the video recorded deposition of

4  Les Baxter.  My name is Michael Ince, here with our

5  court reporter Joe Hendrick.  We are here on assignment

6  from Veritext Legal Solutions at the request of counsel

7  for the defendant -- I'm sorry.  At the request of

8  counsel for the plaintiff.

9      MR. BLUESTONE:  Defendant.

10      VIDEOGRAPHER:  Thank you.  At the request

11  of the counsel for the defendant.

12      This deposition is being held at Thompson &

13  Knight in Dallas, Texas.

14      The caption of the lead case is Chrimar

15  Systems et al. versus Alcatel-Lucent et al.  This case

16  is being taken in the United States District Court for

17  the Eastern District of Texas, Tyler division, Case

18  Number 6:15-CV-163-JDL.

19      Would counsel please state their

20  appearances for the record.

21      MR. BLUESTONE:  David Bluestone, McDermott

22  Will & Emery, for AMX.

23      MS. PESCHEL:  Leisa Peschel, Williams

24  Morgan, P.C., for defendants ALE USA, Inc.,

25  Alcatel-Lucent, USA, Inc., and Alcatel-Lucent Holdings,

2 (Pages 2 - 5)

ATTORNEYS EYES ONLY

Page 6

1 Inc.

2        MR. CRAVEY:  Chris Cravey from Williams
3 Morgan, P.C., also on behalf of the same defendants.

4        MR. COHEN:  Justin Cohen of Thompson &
5 Knight for the plaintiffs.

6        MR. MEHTA:  Shivan Mehta for the
7 plaintiffs.

8        THE REPORTER:  Raise your right hand,
9 please, sir.

10        Do you swear or affirm that the testimony
11 you are about to give in this case will be the truth,
12 the whole truth, and nothing but the truth?

13        THE WITNESS:  Yes, I do.

14            LES BAXTER

15    having been duly sworn, testified as follows:

16            EXAMINATION

17 BY MR. BLUESTONE:

18    Q.    Good morning, Mr. Baxter.

19    A.    Good morning.

20    Q.    I notice you have a document in front of

21 you.  Is that a copy of your declaration?

22    A.    Yes, it is.

23    Q.    Okay.  Is it a clean copy, or does it have

24 any markups?

25    A.    It's clean.

Page 7

1    Q.    Pardon me?

2    A.    It's clean.

3    Q.    I don't need to see it.

4    A.    Just got it this morning.

5    Q.    Okay.  I'm going to just do a little

6 housekeeping and mark six exhibits for you.

7    A.    Okay.

8        (Marked Deposition Exs. 1-6)

9 BY MR. BLUESTONE:

10    Q.    Exhibit 1 is going to be a copy of your

11 declaration, which, presumably, is the same thing you

12 have in front of you.

13    A.    Okay.

14    Q.    Here is Exhibit 1.

15        It's a copy of your declaration dated

16 December 17th, 2015.

17        Exhibit 2 is going to be a copy of U.S.

18 Patent number 8,902,760.

19        Exhibit 3 is 8,942,107.

20        Exhibit 4 is U.S. patent number 9,019,838.

21        Exhibit 5 is U.S. patent number 8,155,012.

22        And then for your convenience -- you can

23 choose to use it; you can choose not to use it -- I put

24 as Exhibit 6, a copy of the claims as they are printed

25 out in the patents, just blew them up so they are a bit

Page 8

1 larger.

2    A.    All right.

3    Q.    On page 1, there is Claim 1 of the '760

4 patent.

5        Page 2 is Claim 73 of the '760 patent.

6        Page 3 is Claim 1 of the '107 patent.

7        Page 4 is Claim 104 of the '107 patent.

8        Page 5 is Claim 1 of the '838 patent.

9        And page 6 is Claim 31 of the '012 patent.

10        Again, you can choose to use them if it's

11 helpful.

12    A.    Okay.

13    Q.    Your preference is fine.

14    A.    Okay.  Thank you.

15    Q.    You're welcome.

16        Could you please state your name.

17    A.    Les Baxter.

18    Q.    And sitting here today, Mr. Baxter, is

19 there anything preventing you from giving complete

20 testimony?

21    A.    No.

22    Q.    You've had a good night's sleep?

23    A.    Mm-hmm.

24    Q.    No medications that you would have that

25 would have affected your memory?

Page 9

1    A.    No.

2    Q.    Sorry.  Have you to answer verbally for the

3 court reporter.

4    A.    Oh, okay.  I see the camera and I'm

5 thinking -- you know.  No.  I don't.

6    Q.    Okay.  Thank you.

7        If I ask you anything that's unclear,

8 please ask for clarification; otherwise, the record

9 will reflect that you understood the question.  Is that

10 fair?

11    A.    Yes.

12    Q.    Thank you, sir.

13        How many times have you been deposed

14 before?

15    A.    Six or eight probably.

16    Q.    Okay.  And how many times on behalf of

17 Chrimar?

18    A.    I believe two.

19    Q.    Okay.  And one of those instances, I took

20 your deposition; correct?

21    A.    That is correct.

22    Q.    And that deposition pertained to the '012

23 patent that is presented in front of you today;

24 correct?

25    A.    Correct.

3 (Pages 6 - 9)

ATTORNEYS EYES ONLY

Page 10

1   Q.   Okay.  Sitting here today, is there any
2   aspects of that prior testimony that you believe would
3   need to be corrected or modified?
4           MR. COHEN:  Objection.  Outside the scope
5   of the deposition.
6   A.   I -- I don't believe so.  I mean, that's a
7   separate case which is settled, and I don't think any
8   of those same terms are at issue here.  So.
9   BY MR. BLUESTONE:
10   Q.   Well, I -- I just want to make sure.  The
11   question, simply, sitting here today:
12           There's nothing that you recall that would
13   reflect that prior testimony as being inaccurate or not
14   truthful; correct?
15           MR. COHEN:  Same objection.
16   A.   Well, I -- I -- I have not reviewed that
17   testimony and studied it.  So -- but no, nothing I
18   recall without looking at it.
19   BY MR. BLUESTONE:
20   Q.   Okay.  Thank you.
21           With respect to Exhibit 1, your declaration
22   that's in front of you, when did you first begin to
23   form your opinions concerning the plain meaning of the
24   terms addressed in that declaration?
25   A.   I believe I began working on this case

Page 11

1   about last August.  And so I've had a number of
2   discussions between then and -- and the time this
3   document was issued.
4   Q.   Okay.  And specifically when would you have
5   begun to form your opinions concerning what the plain
6   meaning of the terms is?  Would that trace back to
7   August as well?
8   A.   Yes, pretty much because, you know, you --
9   to me, you have to sort of know what the terms mean or
10   you can't understand much else.  I mean, if you're --
11   so yes, I would say at least in general back to then.
12   Q.   And when you say August, we are talking
13   August 2015; is that correct?
14   A.   Yes, I -- correct, yes.
15   Q.   Did your understanding of the plain meaning
16   of the terms ever change during the course of your
17   analysis?
18   A.   Certainly as I studied and got greater
19   insight, it was refined.  But no, I never said, "Gee, I
20   think this means black and now it means white."
21   Q.   Okay.  But there could have been some
22   refinement over time?
23   A.   I -- I think there always could be.
24   Q.   Okay.  In general how did you go about
25   determining the plain meaning of the terms in the

Page 12

1   claims?
2   A.   Well, I obviously read the claims and read
3   the specification, and based on my background and
4   experience and the state of the art in the late 90's --
5   '98, '99 -- then I developed my opinions as to how one
6   of ordinary skill in the art at that time would have
7   interpreted these claims.
8   Q.   And would you have also reviewed the file
9   history of the patents?
10   A.   I have looked at the file histories, yes.
11   Q.   Okay.  When you say you've looked at them,
12   have you looked at them completely, or just portions of
13   the file histories?
14   A.   I have not read them cover to cover like a
15   novel, but I've looked at sections I thought were
16   relevant, yes.
17   Q.   Okay.  And you have reviewed the file
18   history of the '107 patent; correct?
19   A.   I have, yes.
20   Q.   If you can turn to Exhibit 1, the first
21   paragraph, it mentions that you have been asked by
22   plaintiffs to provide opinions as to one of ordinary
23   skill in the art regarding the meaning of certain terms
24   in the four patents-in-suit.
25           Do you see that?

Page 13

1   A.   Yes, I do.
2   Q.   And your declaration addressed the several
3   terms; correct?
4   A.   Yes.
5   Q.   Are there any terms that you were asked to
6   consider that didn't make their way into this report
7   for which you have opinions?
8           MR. COHEN:  Objection, form.
9   A.   No, I don't believe so.
10   BY MR. BLUESTONE:
11   Q.   In forming your opinions, did you consider
12   the Court's rulings in the prior case that settled on
13   the meaning of the claim terms?
14   A.   I was aware of it certainly, but again,
15   these -- these terms are different than those terms and
16   they are predominantly about different patents than
17   that one.  So.
18   Q.   But the '012 patent is the same patent in
19   this case; correct?
20   A.   It is the same patent, but different --
21   different terms are at issue here.
22   Q.   Okay.  Did you consider any of your prior
23   analysis related to the '012, '760, '107 -- sorry.  Let
24   me scratch that.
25           Did you consider any of your prior analysis

4 (Pages 10 - 13)

ATTORNEYS EYES ONLY

1 related to the '012 patent in forming your opinions
2 contained in this declaration in Exhibit 1?
3    A.    I did not explicitly go back and look
4 through the last case and say, hey, what did I do
5 there; if that's what you are asking, no, I did not.
6    Q.    Okay.  Do you recall that when the last
7 time you would have reviewed any of your declarations,
8 reports, or statements from the prior case?
9    A.    Not offhand, no.
10    Q.    Okay.  Let's turn to section of Exhibit 1
11 that's Paragraphs 75 through 85 where you are
12 discussing "loop formed over."
13    A.    Okay.
14    Q.    In this section you take issue with
15 defendants' proposed definition of looped formed over
16 meaning "a complete circuit that includes," and then
17 open bracket, "at least one of the conductors of the
18 first pair and at least one of the conductors of the
19 second pair," end bracket.
20        You state in Paragraph 77 that -- that you
21 disagree that it means a complete circuit.
22        Can you give us an explanation as to what's
23 wrong with "complete circuit"?
24    A.    Yes.  Basically, to me, the loop means that
25 you have the wires going out and you have a path

1 through the far end and you have the wires coming back,
2 and to have complete circuit you would have to have
3 something connected across the near end as well too.
4    Q.    Can you define what you mean by "the near
5 end"?
6    A.    I'm sorry.  The central equipment.  The
7 central equipment.
8    Q.    Okay.  So the complete circuit objection
9 that you have is that it would require a connection to
10 the -- the central module in the path?
11        MR. COHEN:  Objection, form.
12    A.    No.
13 BY MR. BLUESTONE:
14    Q.    Okay.  And we might have to discuss this
15 for a little bit until I -- until I can understand what
16 the difference is.
17        How -- what constitutes the -- the loop in
18 the embodiments of the '760 patent?
19        MR. COHEN:  Objection, form.
20    A.    "Loop" is a term really that comes from
21 telecommunications.  It refers to pairs of wires that
22 go from the central equipment to the terminal equipment
23 and is typically used whether anything is connected to
24 them or not.  It's still called the loop.  And when we
25 say a loop formed over, that means using the wires on

1 one side and the wires on the other side to connect to
2 the -- to the remote equipment.
3 BY MR. BLUESTONE:
4    Q.    Do the wires have to be connected on the
5 remote equipment side to constitute a loop?
6    A.    Well, when we say loop formed, if -- if we
7 assume that they are connected and then there's a path
8 between contacts on the far end, but there's not
9 necessarily -- I'm sorry -- the terminal end, there's
10 not necessarily one on the central equipment end.
11    Q.    Okay.  Why don't we take a look at Claim 1
12 of the '760 patent.
13    A.    Okay.  I have this.
14    Q.    And, again, whichever way you are
15 comfortable with is fine with me, either the patent or
16 Exhibit 6.
17    A.    Okay.  I have my ...
18        MR. COHEN:  David, just to be clear, you
19 are representing this is an exact copy of Claim 1 of
20 the '760 --
21        MR. BLUESTONE:  Yes, sir.
22        MR. COHEN:  -- so I don't have to check it
23 word for word.
24        MR. BLUESTONE:  Yeah, it's literally
25 copying and pasting the image from the PDFs.

1        MR. COHEN:  Thank you.
2 BY MR. BLUESTONE:
3    Q.    So if we go and take a look at -- the other
4 advantage of this is it is showing some line numbers,
5 which hopefully is helpful here.
6    A.    Yes.
7    Q.    If you can draw your attention to what's --
8 what's phrased here on, let's say, row 23 to 25.  In
9 '760 Claim 1, it says:
10        "The first and second pairs physically
11 connect between the piece of BaseT Ethernet terminal
12 equipment and the piece of central BaseT Ethernet
13 equipment."
14        Do you see that?
15    A.    I do.
16    Q.    Doesn't the claim already require a
17 physical connection?
18        MR. COHEN:  Objection, form.
19    A.    That -- that really was not part of my
20 analysis of the loop.  My comment about the loop stands
21 whether or not the wires are connected.
22 BY MR. BLUESTONE:
23    Q.    So do you have any opinion as to whether or
24 not first and second pairs physically connect between,
25 and the rest of that language, requires that the first

5 (Pages 14 - 17)

ATTORNEYS EYES ONLY

Page 18

1 and second pairs are physically connected?
2    A.   I have not formed an opinion about that,
3 no.  I was not asked to look at that, and I have not
4 formed an opinion about that specific issue.
5    Q.    So is it your position that loop would be
6 satisfied by merely an Ethernet cable like a cat 5
7 Ethernet cable?
8        MR. COHEN:  Objection, form.
9    A.   Well, what I said was a round trip path
10 formed over at least one of the conductors in the first
11 pair and at least one in the second pair.  Which is --
12 which, to me, is the traditional, plain and ordinary
13 meaning of loop.
14 BY MR. BLUESTONE:
15    Q.    Okay.  And does that encompass -- if I
16 handed you a cat 5 Ethernet cable and just put it in
17 front of you, would that have all the elements
18 necessary for a loop under Claim 1 of the '760 patent?
19        MR. COHEN:  Objection, form.
20    A.    I haven't really thought about that.
21 Typically, a loop is between the central and the
22 terminal equipment, and if that's what you were going
23 to use it for, then I suppose it could.
24 BY MR. BLUESTONE:
25    Q.    And even if that Ethernet cable is not

Page 19

1 connected to anything -- so let's say, given your
2 hypothetical, have you the central module, you have a
3 cat 5 Ethernet cable, and then you have a remote
4 module, but none -- the three things are not connected.
5        Do you have a loop?
6    A.    You could look at the pair of wires as a
7 loop if you wanted to, but my comment about loop formed
8 over was not directed to that at all.  Really whether
9 or not they're connected, a complete circuit is
10 different than a loop in that.
11    Q.    Okay.  So can you explain the difference
12 between round trip path as you propose in the complete
13 circuit?
14    A.    Okay.  If we assume the cables are
15 connected -- right? -- for the moment between the
16 common equipment and the remote equipment, then there
17 would be a path out one set of conductors through the
18 terminal equipment and back on the other set of the
19 conductors.  Right?  And that -- that's a round trip
20 path.
21    Q.    Okay.  And you said "common equipment."
22 Did you mean central equipment?
23    A.    Central.  I'm sorry.  I mean central, yes.
24    Q.    Just wanted to make the record was clear?
25    A.    Let another telephone term slip.

Page 20

1    Q.    Fair enough.  So in that circumstance you
2 just recited, if the wires are not connected to the
3 remote equipment and not connected to the common --
4 sorry, the central equipment, does that affect whether
5 there is a loop?
6        MR. COHEN:  Objection, form.
7    A.    I'm sorry.  Can you repeat that?
8 BY MR. BLUESTONE:
9    Q.    If, in your example, you said -- if we
10 assume that the cables are connected right for the
11 moment between -- and I think we corrected this -- the
12 central equipment and the remote equipment -- that was
13 the hypothetical you suggested; correct?
14    A.    (Nods head up and down.)
15    Q.    What if we changed that hypothetical such
16 that they're not connected?  It's not connected to the
17 central module or the remote module.  Do we still have
18 a loop?
19    A.    Well, you have the pairs of wires running
20 out.  Whether you want to call that a loop, I guess, is
21 up to you.  But, again, my objection was the complete
22 circuit, and my position is that even if they are
23 connected, you don't necessarily have a complete
24 circuit.  So it's essentially adding an element to that
25 claim that was not there.

Page 21

1    Q.    So unfortunately, whether we call that a
2 loop, it can't be up to me; unfortunately, I need to
3 get your opinion.  That's the term that you are opining
4 on.
5    A.    Right.
6    Q.    Does that pair of wires running together
7 without any connection between the pairs constitute a
8 loop?
9    A.    In a wiring sense, yes, it would.
10    Q.    In the sense of this claim, does it?
11    A.    In the sense of this claim, I haven't
12 really analyzed that.  I mean, I don't have an opinion
13 about this physically connected statement which you
14 mentioned here.  My concern was that the requiring of a
15 complete circuit adds an element to this claim which,
16 in my opinion, is not there even if the wires are
17 connected.
18    Q.    Okay.  And we can -- we can go into that.
19 I'll make a note that we dig into that.
20        But what I want to try and wrap up here is
21 to make sure that I understand what loop formed over
22 means to a person of ordinary skill in the art in your
23 opinion and how round trip path clarifies that meaning.
24    A.    Right.
25    Q.    And here's my question:

6 (Pages 18 - 21)

ATTORNEYS EYES ONLY

Page 22

1      If we have the pairs of wires but there's
2 no connection between the pairs on either side --
3      A.    Right.
4      Q.    -- is there any manner in which it can be
5 constituting a round trip path?
6           MR. COHEN:  Objection.  Outside the scope
7 of the deposition.
8      A.    Again, I think that's an issue which -- I
9 mean, you're asking for opinion which I have not stated
10 yet.
11 BY MR. BLUESTONE:
12     Q.    Well, I mean, you say that --
13     A.    Well, it seems to me that this is more of
14 an infringement issue which we have not -- I have not
15 issued any positions on infringement yet.  Whether it
16 has to be connected or not is a different issue than if
17 it's connected, does it have to be a complete circuit.
18     Q.    Okay.  So again, I want to listen -- elicit
19 my -- your understanding of what the claim terms cover,
20 what the scope of the claims cover.  Claim 1 of the
21 '760 patent says the first and second pairs physically
22 connect between the piece of BaseT Ethernet terminal
23 equipment and the piece of central BaseT terminal
24 equipment.
25      Does that require a physical connection?

Page 23

1           MR. COHEN:  Objection.  Beyond the scope of
2 the deposition.
3      A.    And, again, as I was saying, to me, that is
4 an infringement issue not a claim construction issue
5 and is not -- my opinion on loop is -- is not affected
6 by that one way or the other.
7 BY MR. BLUESTONE:
8      Q.    It doesn't affect it at all?
9      A.    No.  I mean, if and when they are
10 connected, a loop still does not require a complete
11 circuit.  By the -- by the wording of this claim.
12     Q.    Let's talk about the wording of the claim
13 starting at line 30 through line -- well, actually,
14 through just the rest of the claim.  I'll give you a
15 chance just to review it, and I'll ask my question when
16 you are ready, sir.
17     A.    Okay.
18     Q.    Okay.  So the claim recites that the loop
19 is formed over at least one of the conductors of the
20 first pair.
21     A.    Right.
22     Q.    And at least one of the conductors of the
23 second pair.
24     A.    Right.
25     Q.    Can that encompass just the two pairs of

Page 24

1 wires?
2           MR. COHEN:  Objection.  Beyond the scope of
3 the deposition.
4      A.    And I -- I don't understand the question.
5 BY MR. BLUESTONE:
6      Q.    Okay.  The rest of it says that the piece
7 essential BaseT Ethernet equipment is to detect at
8 least two different magnitudes of current flow through
9 the loop.
10     A.    Right.
11     Q.    Does that clause have any effect on your
12 understanding of what loop formed over means?
13     A.    Well, my -- no.  My opinion is that loop
14 formed over does not require there to be current
15 flowing at that time.  You can have a loop without
16 there being current in it.
17     Q.    Okay.  Can you detect different magnitudes
18 of current flow through the loop without the pairs
19 being physically connected to the Ethernet terminal
20 equipment?
21           MR. COHEN:  Objection.  Beyond the scope of
22 the deposition.
23     A.    And, once again, whether or not it's a loop
24 according to this claim is not dependent on whether you
25 can detect anything over it.  It's -- I mean, it's

Page 25

1 either a loop or it isn't, and -- and a loop, to me,
2 does not imply and certainly does not state here that
3 there is a complete circuit.  There can be in some
4 occasions, but there -- it does not require a complete
5 circuit.
6 BY MR. BLUESTONE:
7      Q.    Okay.  So let's assume that first and
8 second pairs physically connect.
9      A.    Okay.
10     Q.    Means that the first and second pairs
11 physically connect between the piece of BaseT Ethernet
12 terminal equipment and the piece of central BaseT
13 Ethernet equipment.
14     A.    Right.
15     Q.    In that instance, why would the loop not be
16 a complete circuit?
17     A.    Okay.  In that instance if we assume the
18 cables are connected, all right, the -- let me get my
19 line number here.
20      According to lines 27, 28, the piece of
21 BaseT terminal equipment has at least one path to draw
22 current.  Correct?
23      And by 26 and 27, the piece of central
24 BaseT Ethernet equipment has at least one DC supply.
25 Correct?

7 (Pages 22 - 25)

ATTORNEYS EYES ONLY

Page 26

1    But nothing in the claim requires that DC
2 supply to be connected to the pair at that time nor
3 does it require any path through the central equipment
4 at all times. So it requires a path at the terminal
5 end, but it does not require a path at the central end
6 and, therefore, it's not necessarily a complete
7 circuit.
8    Q.    So I'm a little confused because it seems
9 like what you are saying is that even under the
10 hypothetical circumstance by which the first and second
11 pairs are physically connecting this Ethernet terminal
12 equipment and the central equipment --
13    A.    Right.
14    Q.    -- that in that circumstance there still is
15 no path on the central terminal equipment side. I
16 don't understand how that's possible.
17    MR. COHEN: Objection, form.
18    A.    Can you rephrase?
19 BY MR. BLUESTONE:
20    Q.    I don't understand your -- your
21 circumstance by which even if we are assuming that the
22 first and second pairs are creating a physical
23 connection between the BaseT and the central bay -- the
24 central equipment -- sorry -- the piece of BaseT
25 Ethernet terminal equipment and the piece of central

Page 27

1 BaseT Ethernet equipment --
2    A.    Right.
3    Q.    -- how that does not create a -- I think
4 you said, path on the central equipment side.
5    A.    Right.
6    Q.    Can you explain that?
7    A.    Well, the -- the claim clearly requires a
8 path on the BaseT Ethernet terminal equipment and
9 through that equipment. Right? I don't see anything
10 in here that requires a path at all times through the
11 central equipment. It says it has a power supply.
12    Q.    Okay. So now we're talking about the claim
13 term "path" is your point. Your point -- let me make
14 sure I understand it; please clarify me if I'm wrong --
15    A.    Right.
16    Q.    -- in any respect, your point is that the
17 path as required in the claim of '760 doesn't require
18 it to be present in the central equipment at all. Is
19 that correct?
20    A.    At all times, yes.
21    Q.    Okay. And does that mean that the path is
22 not necessarily subsumed in the loop?
23    MR. COHEN: Objection, form.
24    A.    I -- I don't understand.
25 BY MR. BLUESTONE:

Page 28

1    Q.    So this claim term talks about a loop
2 formed over the conductors, et cetera?
3    A.    Right. Mm-hmm.
4    Q.    Does the path -- the separate term "path"
5 in the claim -- have to be part of the "loop," that
6 term in the claim?
7    A.    Well, the way I see -- again, what I said
8 the claim means, a roundtrip path formed over the
9 conductors of the two things; right? And so starting
10 from the central Ethernet equipment, you have a path
11 that goes out through one conductor, through the path
12 which is in the terminal equipment, and back on the
13 other one. And that's a round trip path. And when you
14 connect something in the central equipment, you will
15 have a complete circuit; but the claim does not require
16 that to be connected at all times, so it is not
17 necessarily a complete circuit.
18    Q.    Okay. So looking at this claim on the
19 '760, you, sitting here today, do not have an opinion
20 on what "physically connect" means?
21    A.    What "physically connect" means in terms of
22 what?
23    Q.    In terms of its recitation in Claim 1 of
24 the '760 patent.
25    A.    In terms -- you're asking must -- must it

Page 29

1 be physically connected in order to infringe? Is
2 that --
3    Q.    I'm asking whether you have an opinion,
4 sitting here today, as to what "physically connect"
5 means in Claim 1 of the '760 patent.
6    A.    I -- I do not have an opinion as to what
7 that means in terms of the overall claim, no.
8    Q.    Okay. So it's just as plausible, sitting
9 here today, that "physically connect" requires a
10 physical connection or just merely be rewritten as
11 operable to be physically connected, in your mind?
12    MR. COHEN: Objection, form. Beyond the
13 scope of the deposition.
14    A.    No, I -- I didn't say that. I said I don't
15 have an opinion.
16 BY MR. BLUESTONE:
17    Q.    But sitting here today, you can't tell me
18 which one's right or wrong?
19    MR. COHEN: Same objections.
20    A.    As I said, I -- I don't have an opinion.
21 And I would want to do more careful study and research
22 before I made an opinion.
23 BY MR. BLUESTONE:
24    Q.    Okay. So just to make sure I understand,
25 the claim starting at line 30 requires a loop that's

8 (Pages 26 - 29)

ATTORNEYS EYES ONLY

Page 30

1 formed over at least one of the conductors of the first
2 pair and at least one of the conductors of the second
3 pair. Correct? It says that.
4      A.   It says that.
5      Q.   And the claim on line 19 recites a data
6 signaling pairs of conductors; correct?
7      A.   19 -- yes.
8      Q.   And that, those data signaling pairs of
9 conductors, are what the loop is formed over; correct?
10     A.   Yes, those are the conductors that are
11 referred to.
12     Q.   And the pairs of conductors are defined to
13 comprise first and second pairs used to carry BaseT
14 Ethernet communication signals between the piece of
15 central BaseT Ethernet equipment and the piece of BaseT
16 Ethernet terminal equipment.  Correct?
17     A.   I'm sorry.  Can you run that by me again?
18     Q.   The data signaling pairs starting on
19 line 19 are defined to comprise first and second pairs
20 used to carry BaseT Ethernet communication signals
21 between the piece of central BaseT Ethernet equipment
22 and the piece of BaseT Ethernet terminal equipment.
23 Correct?
24     A.   Yes.
25     Q.   That's one requirement of the data

Page 31

1 signaling pairs; correct?
2      A.   That is.
3      Q.   And an additional requirement of the data
4 signaling pairs that the loop is formed over is also
5 that the first and second pairs physically connect
6 between the piece of BaseT Ethernet terminal equipment
7 and the piece of central BaseT Ethernet equipment?
8           MR. COHEN:  Objection, form.  Beyond the
9 scope of the deposition.
10     A.   That's what it says, yes.
11 BY MR. BLUESTONE:
12     Q.   Okay.  And sitting here today -- scratch
13 that.
14          And in preparing your analysis of a loop
15 formed over, you did not consider what the meaning of
16 the content in lines 23 through 25 is?
17     A.   I did not consider that relevant to the
18 meaning of loop because, in my opinion -- my comments,
19 my opinions here -- are accurate whether or not the --
20 the conductors are connected, that -- that the -- even
21 if they're connected, all -- it still doesn't require a
22 complete path.  So I did not take an opinion on whether
23 they must be connected, but I did take an opinion that
24 even if they are connected, the claim does not require
25 a complete circuit.

Page 32

1      Q.   But it requires a round trip path under
2 your opinion?
3           MR. COHEN:  Objection, form.
4      A.   When it's operating, it requires that, yes.
5 I did not take an opinion issue -- make an opinion upon
6 whether it is configured to do that or whether it must
7 actually be doing that and so on, right.
8 BY MR. BLUESTONE:
9      Q.   So you don't have an opinion as to whether
10 the claim requires in this system the central BaseT
11 equipment, the piece of BaseT -- sorry, let me start
12 over.
13          You don't have any opinion as to whether
14 the claim requires a piece of central BaseT Ethernet
15 equipment, a piece of BaseT Ethernet terminal
16 equipment, and the data signaling pairs to be connected
17 in any way.  You don't -- you don't know which way it
18 would -- would work --
19          MR. COHEN:  Objection.
20 BY MR. BLUESTONE:
21     Q.   -- under the claim?
22          MR. COHEN:  Form.
23     A.   Yeah, I mean, I -- I can read the claim as
24 it is here, and I see what the pieces are, but you are
25 asking me for an opinion about something which is --

Page 33

1 was not involved with the claim construction and which
2 I have not formed an opinion yet.
3 BY MR. BLUESTONE:
4      Q.   But when you were stating what the meaning
5 of these terms are, you would, of course, look at the
6 plain meaning of the claims to consider the meaning of
7 a clause in the claims; right?
8      A.   Yes.
9      Q.   But it sounds to me like what you are
10 saying is you didn't actually do that.  You didn't look
11 at the entire claim then?
12          MR. COHEN:  Objection, form.
13     A.   I did look at the entire claim, and I did
14 not think that particular section was relevant because
15 the defendants' construction, in my opinion, was
16 incorrect even if they are connected.
17 BY MR. BLUESTONE:
18     Q.   No, and I understand that.  And to be
19 perfectly candid, my hope is that we can find some
20 language that we agree upon and that this is not
21 something that is a contested issue.  Like, what is the
22 loop formed over, hopefully we can find an agreement
23 on.  Obviously, no question there.  I'm just trying to
24 frame the issue.
25     A.   Right.

9 (Pages 30 - 33)

ATTORNEYS EYES ONLY

Page 34

1    Q.   I understand that you disagree with
2    complete circuit.  Now I'd like to switch gears and
3    make sure I understand what return -- sorry, let me
4    make sure I get the exact language of what you said.
5    Pardon me for a second.
6          I'm going to point you to paragraph 78
7    where you say:
8          "A person of ordinary skill in the art,
9    reading the claims in light of the specification and
10   file history" -- let me just stop right there.
11         Would a person of ordinary skill in the art
12   also look at the remainder of the language in the claim
13   to understand what loop formed over means?
14   A.   Yes, I believe so.  I think you interpret
15   the claim as a whole.
16   Q.   Okay.  They "would understand that the
17   phrase "loop formed over" would have its plain and
18   ordinary meaning, which is a round trip path formed
19   over," and then you recite the first -- "at least one
20   of the conductors of the first pair of conductors and
21   at least one of the conductors of the second pair of
22   conductors."
23         Do you see that in paragraph 78?
24   A.   Yes, I do.
25   Q.   How do you have a round trip path without

Page 35

1    the pairs being physically connected?
2    A.   Well, you have -- you have a round trip
3    path when they are physically connected, but you don't
4    necessarily have a complete circuit.
5    Q.   Forget about complete circuit.  I just want
6    to understand about round trip path.  Do I have a round
7    trip path with just the two pairs of wires not being
8    connected in any way?
9    A.   No.  You have a round trip path when they
10   are connected, but when they have to be connected is
11   not -- the definition of that loop does not depend on
12   when they have to be connected.  It's when they are
13   connected then you have that.
14   Q.   So when pairs are wires are connected --
15   A.   Right.
16   Q.   -- you have a round trip path?
17   A.   Correct.
18   Q.   When the pairs of wires are not connected,
19   do you have a round trip path?
20   A.   Well, no, you don't have a round trip path
21   because you have a loop of wire hanging out there, but
22   there's no round trip path until you put something on
23   the far end.
24   Q.   Okay.  So sitting here today, you wouldn't
25   have an opinion as to whether Claim 1 of the '760

Page 36

1    patent would encompass a central piece of Ethernet
2    terminal equipment or -- sorry, a central piece of -- a
3    piece of central BaseT Ethernet equipment sitting in
4    Cleveland, you have a piece of BaseT Ethernet terminal
5    equipment sitting in Chicago, and we have an Ethernet
6    cable sitting here.
7          You wouldn't have an opinion on whether
8    that circumstance would be encompassed in the scope of
9    Claim 1 on the '760 patent?
10   MR. COHEN:  Objection, form.
11   A.   Well, once again, you are getting into an
12   infringement issue.
13   MR. COHEN:  Let me finish my objection.
14   THE WITNESS:  Okay.
15   MR. COHEN:  Objection, form and beyond the
16   scope of the deposition.
17   A.   Yeah, once again, you are getting into
18   infringement issues which I have not addressed yet.  I
19   have not issued any opinions yet.
20   BY MR. BLUESTONE:
21   Q.   I'm asking whether the scope of the claim
22   encompasses this.  I'm not asking you about the devices
23   that are accused from infringement in the case.
24         I'm giving you just straight out, there's
25   these three claim elements in the claim:  Central BaseT

Page 37

1    Ethernet terminal equipment, BaseT Ethernet terminal
2    equipment, and these data signaling pairs?
3    A.   Right.
4    MR. COHEN:  Same objections.  Sorry.
5    MR. BLUESTONE:  That's okay.
6    BY MR. BLUESTONE:
7    Q.   You have no opinion as to whether those
8    components can be in three different cities and still
9    be encompassed in the scope of this claim?
10   MR. COHEN:  Same objections.
11   A.   I have no opinion on that.
12   BY MR. BLUESTONE:
13   Q.   So it's possible that that could read on
14   the claim?
15   MR. COHEN:  Same objections.
16   BY MR. BLUESTONE:
17   Q.   You don't know either way.
18   A.   I don't know either way.
19   Q.   Now, what if I took your pairs of wires and
20   they are connected and I cut one of the pairs with a
21   scissors so that there's no continuity in one of those
22   pairs.
23         Do I still have a loop in that
24   circumstance?
25   MR. COHEN:  Same objections.

10 (Pages 34 - 37)

Page 38

1    A.   Well, it would no longer be a round trip
2 path if it's cut.
3 BY MR. BLUESTONE:
4    Q.   Okay.  All right.  Let's talk about the
5 path coupled across starting on paragraph 86 here.
6         Early in -- earlier in your report you
7 state that current is the flow of electric charge.  Is
8 that correct?
9    A.   I believe so, yes.
10   Q.   And you state that DC current is direct
11 current; correct?
12   A.   I believe so, yes.
13   Q.   Can you -- can you explain what a person of
14 ordinary skill in the art would understand direct
15 current to encompass?
16        MR. COHEN:  Objection.  Beyond the scope of
17 the deposition.
18   A.   Yes.  Direct current is current which is
19 flowing in one direction.  It's not reversing
20 direction.
21 BY MR. BLUESTONE:
22   Q.   Okay.  Now, does direct current allow for a
23 varying DC current signal?
24        MR. COHEN:  Objection, form.
25   A.   You are asking -- well, DC current does not

Page 39

1 have to have a constant value for all time, no.
2 BY MR. BLUESTONE:
3    Q.   Okay.  So DC current wouldn't be
4 necessarily the same thing as just a DC offset;
5 correct?
6         MR. COHEN:  Objection, form.  Beyond the
7 scope of the deposition.
8    A.   Can you clarify?
9 BY MR. BLUESTONE:
10   Q.   So DC current, you are saying, can change
11 over time; correct?
12   A.   Can change in magnitude, yes.
13   Q.   Can change in magnitude, but it always has
14 to stay above zero.  It can't change polarities;
15 correct?
16   A.   Right.  It doesn't reverse direction.  It
17 goes one way or the other.
18   Q.   Okay.  So can DC current encompass a
19 unchanging DC component and an AC varying component
20 superimposed on that unchanging DC component?
21        MR. COHEN:  Objection, form.  Beyond the
22 scope of the deposition.
23   A.   Yeah, I -- I don't know that I said
24 anything in here related to that, but yes, it does not
25 have to have the same magnitude at all times.

Page 40

1 BY MR. BLUESTONE:
2    Q.   Okay.
3         MR. BLUESTONE:  So let's mark the next
4 exhibit as Exhibit 7 here.
5         (Marked Deposition Ex. 7)
6 BY MR. BLUESTONE:
7    Q.   And this is pages from the McGraw-Hill
8 Electronics Dictionary, which I believe you cite to in
9 your report in paragraph 89.  Correct?
10   A.   I did cite to it in one place, yes.
11   Q.   If we look at Claim 1 of the '107 patent
12 and I draw your attention to line 15, it says, "the at
13 least one path coupled across at least one of the
14 contacts of the first pair of contacts and at least one
15 of the contacts of the second pair of contacts."
16        Do you see that, sir?
17   A.   Yes.
18   Q.   The phrase "one path coupled across,"
19 "coupled" is being used as a verb -- correct? -- on
20 line 15?
21        MR. COHEN:  Objection, form.
22   A.   Well, I'm not an English major, but it
23 looks that way to me, yes.
24 BY MR. BLUESTONE:
25   Q.   Okay.  You chose to reference the

Page 41

1 definition of "coupling" on page 100.  Isn't that
2 correct?
3    A.   Coupling ... yes, I did.
4    Q.   But you didn't reference -- well, and
5 "coupling" is -- is a noun; correct?
6         MR. COHEN:  Objection, form.
7    A.   Okay.
8 BY MR. BLUESTONE:
9    Q.   You don't disagree with me, do you?
10   A.   Coupling ... it could be a noun.  It could
11 be an adjective.  Depends on how you use it.
12   Q.   Okay.  Now, above, it says there's a
13 definition two above that's "couple."
14   A.   Couple, yes.
15   Q.   One relating a thermo couple and then
16 there's a second definition of couple that says, "To
17 connect two circuits so signals are transferred from
18 one to the other."
19        Do you see that?
20   A.   I do.
21   Q.   Do you have any opinion as to whether that
22 definition of couple is applicable to the claims that
23 recite "path coupled across"?
24   A.   No, it is referring to coupling in the
25 sense -- they are -- they are coupled in the sense of

11 (Pages 38 - 41)

ATTORNEYS EYES ONLY

Page 42

1 coupling here, "A mutual relation between ... that
2 permits energy transfer from one to the other," which
3 is very similar to definition 2 under "couple," which
4 is, "To connect two circuits so signals are transferred
5 from one to the other." That's the point is that you
6 can transfer signals from one to the other.
7    Q.    Okay. So do you have any objection to the
8 use of that second definition of "couple" as applied to
9 "path coupled across"?
10   A.    Well, again, I -- I object to the use of
11 the word "connect." Because "connect" could be
12 interpreted as directly soldered on with nothing
13 intervening rather than simply able to -- to couple a
14 signal to that point.
15   Q.    Well, what about the definition, "To
16 connect two circuits so signals are transferred from
17 one to the other"?
18   A.    Well, I -- I mean, I think the definition
19 for coupling exactly corresponds to what is meant here.
20 If there's coupling between them, they're coupled.
21   Q.    Okay. Well, maybe we can use some examples
22 to try and flesh this out a little bit.
23        (Marked Deposition Ex. 8)
24 BY MR. BLUESTONE:
25   Q.    I have marked Exhibit 8. Exhibit 8 is a

Page 43

1 declaration from you dated on October 14th -- sorry,
2 October 20th, 2014.
3    A.    Okay.
4    Q.    And it related to the '012 patent.
5    A.    Okay.
6        MR. COHEN:  And I am going to object to its
7 use at this time simply because it wasn't part of
8 Mr. Baxter's analysis in forming this declaration.
9        MR. BLUESTONE:  I understand your
10 objection. Are you not letting me ask him any
11 questions pertaining to it?
12       MR. COHEN:  No, go ahead.
13       MR. BLUESTONE:  Okay.
14 BY MR. BLUESTONE:
15   Q.    All right. Mr. Baxter, can you turn to
16 page 17.
17   A.    Yes.
18   Q.    The top of page 17 shows a two-dimensional
19 cross-reference of an Ethernet connector. Correct?
20   A.    This one up here?
21   Q.    Yes, sir, at the top.
22   A.    Yes.
23   Q.    Okay. And at the bottom of page 17, there
24 is another drawing.
25   A.    Right.

Page 44

1    Q.    One that shows in -- sorry. I just don't
2 want to be talking over --
3    A.    Oh, I'm sorry. Yes. I see that.
4    Q.    Okay. Thank you.
5        At the bottom of page 17, this other
6 drawing shows a Ethernet connector and a path coupled
7 across its contacts, in particular, here between
8 contacts 1 and 8. Is that correct?
9    A.    Yes.
10   Q.    And in drawing this, you wanted to show a
11 path between two contacts, so you selected 1 and 8 and
12 just made a connection between them.
13       MR. COHEN:  Objection, form.
14   A.    I did, yes.
15 BY MR. BLUESTONE:
16   Q.    Okay. Now, is this also an example of a
17 path that is coupled across at least one of the
18 contacts of the first pair of contacts and at least one
19 of the contacts of a second pair of contacts?
20   A.    Yes, it's a path that's coupled across two
21 different contacts of the -- of a modular jack.
22   Q.    Well, not just two different contacts. Is
23 it different contacts of different pairs?
24   A.    Unless you wired the thing very weirdly, it
25 would be, yes.

Page 45

1    Q.    How do you know what pairs are encompassed
2 in these different -- how do you know what pairs
3 pertain to this Ethernet connector as shown here on
4 page 17?
5    A.    Can you --
6    Q.    Rephrase it?
7    A.    Rephrase, yes.
8    Q.    Sure. Of course.
9        So maybe with an example. Are the pairs
10 one and two, three-four, five-six, and seven-eight?
11   A.    No.
12   Q.    What are the pairs?
13   A.    The pairs -- typically, standard wiring
14 would be: One-two, three-six, four-five, seven-eight.
15   Q.    Okay. Is there anything in the claim that
16 allows -- that precludes it from being: One-two,
17 three-four, five-six, seven-eight, those being the
18 pairs?
19       MR. COHEN:  Objection, form. Beyond the
20 scope of the deposition.
21   A.    If it's an Ethernet connector, no, they
22 would not be paired that way. An Ethernet connector
23 would be paired the way -- the way I previously said.
24 BY MR. BLUESTONE:
25   Q.    But -- okay. But there's nothing in this

12 (Pages 42 - 45)

ATTORNEYS EYES ONLY

Page 46

1 connector itself which tells you what pair system you
2 should use?
3      A.    Well, the Ethernet spec tells you what pair
4 system you should use.  So if this is an Ethernet
5 connector, it would follow that.
6      Q.    So I couldn't use the Ethernet connector
7 and arrange the pins such that there's different sets
8 of pairs?
9           MR. COHEN:  Objection, form.
10     A.    Well, you wouldn't --
11          MR. COHEN:  Hang on one second.
12          THE WITNESS:  Oh.
13          MR. COHEN:  Objection, form.  Beyond the
14 scope of the deposition.
15          You can go ahead.
16     A.    All right.  Can -- can you re -- or repeat
17 that?
18 BY MR. BLUESTONE:
19     Q.    So given an RJ -- "RJ45," is that the term
20 for the modular jack?
21     A.    Right, mm-hmm.
22     Q.    Okay.  So if I handed you a modular jack,
23 couldn't I set up wiring on it to arrange the pairs in
24 any way I want?
25     A.    You could.

Page 47

1      Q.    Would it no longer be an Ethernet connector
2 if I did that?
3      A.    It would no longer meet the Ethernet spec,
4 no.
5      Q.    But would it be still an Ethernet connector
6 just wired differently?
7      A.    Not in my opinion, no, because Ethernet
8 equipment wouldn't work with it.
9      Q.    Okay.  What about -- would -- would it
10 still be an RJ45 modular jack, though?
11          MR. COHEN:  Same objection.
12     A.    It would still be a modular jack.
13 BY MR. BLUESTONE:
14     Q.    Okay.  All right.  Let's turn to page 20.
15     A.    Of the same document?
16     Q.    Yes, sir.  Thank you.
17          Kind of the same schematic but now we have
18 a resistor in the lines.
19          Do you see that?
20     A.    I do.
21     Q.    Does this show an example of the path
22 coupled across at least one of the contacts of the
23 first pair of contacts and at least one of the contacts
24 of the second pair of contacts?
25     A.    Yes, if we assume the first pair as one-two

Page 48

1 and the second pair as seven-eight.
2      Q.    Okay.  So all -- so the first drawing on
3 page 17, the top, just shows an Ethernet connector.
4 There's no path coupled across the first drawing on the
5 top of 17; correct?
6      A.    Correct.
7      Q.    But there is a path that's coupled across
8 on the bottom of page 17?
9      A.    Yes.
10     Q.    And there is a path coupled across on the
11 top of page 20?
12     A.    Yes.
13     Q.    What would I do to these drawings -- make
14 this easier.  Pardon me.  All right.
15          (Marked Deposition Ex. 9)
16 BY MR. BLUESTONE:
17     Q.    All right.  So I marked Exhibit 9, and the
18 first three pages are the items that we've already gone
19 through.  And then on the last three pages, I made some
20 other examples just to see if we can flesh out an
21 understanding of what "path coupled across" in this is.
22          So in Exhibit 9, first page, we're just
23 showing the same Ethernet connector schematic; correct?
24     A.    Yes.
25     Q.    Okay.  Page 2, we have a path coupled

Page 49

1 across via that wire; correct?
2      A.    Correct.
3      Q.    Okay.  Thank you.  And it's between two
4 different pairs of contacts by virtue of the fact that
5 it's connected to 1 and 8; correct?
6      A.    Correct.
7      Q.    Okay.  Page 3 is that same resistor we were
8 talking about.  Same thing, there's a path coupled
9 across two different pairs of contacts because -- by
10 virtue of it being connected to 1 and 8; correct?
11     A.    Yes.
12     Q.    Okay.  Now, on page 4, what I tried to
13 represent here -- and if it's not the prettiest
14 drawing, I apologize -- but on page 4, I basically took
15 out the resistor and put in an inductor.
16          Do you agree with that schematically?
17     A.    Yes, that's an inductor.
18     Q.    Okay.  Would this show a path coupled
19 across at least one fin of the first set -- sorry -- at
20 least one contact of the first pair of contacts and at
21 least one contact of a second pair of contacts?
22     A.    Yes.
23     Q.    Okay.  Now, page 5, instead of using an
24 inductor, I've put in a capacitor.
25          Does that change the analysis at all?

13 (Pages 46 - 49)

ATTORNEYS EYES ONLY

Page 50

1    A.   I -- well, I don't know what analysis.
2  They're still coupled across the contacts.
3    Q.   Okay.  So in this instance, there is a path
4  coupled across at least one contact of the first pair
5  of contacts and at least one contact of the second pair
6  of contacts; correct?
7    A.   Correct.
8    Q.   Okay.  And, now, page 6, I basically just
9  have an open switch.
10    A.   Right.
11    Q.   Do I have a path coupled across here?
12    A.   In my opinion, you do not when the switch
13  is open.
14    Q.   Okay.  Okay.  All right.  So all of our
15  discussion to this point has been relating to just the
16  path coupled across.  And I want to ask the same set of
17  questions, but I want to also make sure we're
18  incorporating the fact that the claim requires that the
19  path -- sorry, I'll direct you to Claim 1 of the '107
20  patent again, line 14.
21    A.   Mm-hmm.
22    Q.   That the -- the path that's coupled across,
23  as it says on line 15, that path in line 14 is recited
24  as being "for the purpose of drawing DC current."
25    A.   Right.

Page 51

1    Q.   And what I'd like to do just to make sure
2  we are on the same page is go through these examples
3  again and see if that path is still coupled across if
4  now it's for the purpose of drawing DC current.
5    A.   Okay.
6    Q.   I think we can skip probably page 1 because
7  there's no path there at all; correct?
8    A.   Okay.  Yes.
9    Q.   Now, page 2, we now have it being for the
10  purpose of drawing DC current, is there still a path
11  coupled across at least one contact from one pair and
12  at least one contact from another pair?
13    A.   Yes.
14    Q.   Okay.  Same question for page 3, please.
15    A.   Is -- is there a path?  For DC current?
16    Q.   Is there a path coupled across at least one
17  contact of the first pair and at least one contact of a
18  second pair for the purpose of drawing DC current?
19    A.   Yes.
20    Q.   Okay.  Same question page 4, please.
21    A.   Yes, current will flow through there.
22    Q.   Okay.
23       (The reporter asked for clarification.)
24    A.   Yes, current will flow through there.  The
25  DC current will flow through there.

Page 52

1    Q.   And, now, page 5, capacitor example, in
2  this circumstance, is there a path coupled across at
3  least one contact of a first pair and at least one
4  contact of a second pair for the purpose of drawing DC
5  current?
6    A.   And, again, for the purpose of drawing DC
7  current, I would say no.
8    Q.   Okay.  Can you explain why?
9    A.   That's -- typically be called a DC blocking
10  capacitor.  You'll get a little transient when you put
11  a voltage across it and that's it.  You don't get a
12  steady current flow through.
13    Q.   Okay.  Okay.  Now, page 6, I'm guessing
14  it's not going to change your answer but just to make
15  sure we've gone through everything.
16       Now we're talking about DC current.  Is
17  there a path coupled across in page 6?
18    A.   No.
19    Q.   Okay.  Now, Mr. Baxter, I can keep going on
20  or I can take a break now if you want to take a quick
21  break.  Whatever your preference is.
22    A.   How long have we been going?
23    Q.   About an hour.  For the witness, I'd like
24  to generally take a break every hour if I can.
25    A.   That's fine.

Page 53

1    Q.   But it's up to you.
2    A.   That's fine.  Let's take a break.
3       MR. BLUESTONE:  Okay.
4       VIDEOGRAPHER:  We are off the record at
5  10:13 a.m.
6       (Break from 10:13 a.m. until 10:25 a.m.)
7       VIDEOGRAPHER:  We are back on the record at
8  10:25 a.m.  This is File 2.
9  BY MR. BLUESTONE:
10    Q.   Mr. Baxter, there is -- I'll direct your
11  attention to Exhibit 1, your Paragraph 91, please.
12    A.   Okay.
13    Q.   When you have had a chance to review 91,
14  please let me know.
15    A.   Okay.
16    Q.   There's some confusion about what you mean
17  by "currents coupled through the transformer to
18  contacts at the connector."  Can you elaborate on what
19  that means?
20    A.   Yes.  It means that the voltage source is
21  not directly connected to the contacts, it's connected
22  to the center tap at the transformer and the current
23  goes through the winding of the transformer to get to
24  the contacts.
25    Q.   Is it going through just half of the

14 (Pages 50 - 53)

Page 54

1 transformer in that circumstance or are you saying it's
2 going across the pairs of windings?
3     A.    Well, in that -- that circumstance it's
4 going through one side.  You -- you've coupled to the
5 center tap of the side that's connected to the -- to
6 the contacts.
7     Q.    Okay.  Now, I note that you are mentioning
8 power over Ethernet equipment in Paragraph 91.  The
9 patent doesn't talk about power over Ethernet
10 equipment; correct?
11     A.    That's correct.
12     Q.    So why is this Paragraph 91 relevant to the
13 meaning of path coupled across?
14     A.    It -- it's an example of a difference
15 between coupling and directly connecting.
16     Q.    Okay.  Is Paragraph 91 talking about using
17 phantom power?
18     A.    Well, power Ethernet does, yeah.  This is
19 just an example of where you put a DC voltage on there
20 and source current through the transformer rather than
21 direct.
22     Q.    But -- but is -- is that example that you
23 were citing here in Paragraph 91, is that an example
24 of -- of doing phantom power?
25     A.    You could call it that, yeah.

Page 55

1     Q.    Okay.  And as of 1998 was there anything
2 new about a phantom circuit?
3         MR. COHEN:  Objection, form.  Beyond the
4 scope of the deposition.
5     A.    I -- I would have to do more research to be
6 sure but I don't think so.
7 BY MR. BLUESTONE:
8     Q.    So sitting here you're not sure whether or
9 not using phantom power is an old technique pre-dating
10 1998?
11         MR. COHEN:  Same objections.
12     A.    I -- I believe that it is but I would want
13 to do some research to be certain if there's exactly
14 when, where, how and so on.
15 BY MR. BLUESTONE:
16     Q.    Okay.  So again in this Paragraph 91
17 example, the concern -- I want to make sure I
18 understand what the concern is here.  The concern is
19 that because it's going through some of the windings,
20 it may not be directly connected, is -- is that the
21 concern.
22     A.    Correct.
23     Q.    Is there anything in the definition of --
24 that was proposed by defendants that required a direct
25 connection?

Page 56

1     A.    Well, again in -- in -- in my view,
2 connection is a more restrictive term than coupling and
3 the claim says coupled, and I don't see any -- any need
4 to -- to restrict that further in the construction.
5     Q.    Okay.  So let's go to Paragraph 90 -- 92,
6 please, of Exhibit 1.
7         When you're saying through a transformer
8 here you are talking about just one winding?
9     A.    One winding, yes.
10     Q.    It's a top half?
11     A.    Well, depends on what you call the top, but
12 through -- through the side that's connected to the
13 contacts, yes.
14     Q.    Fair enough.  Fair enough.  So it would be
15 just through the primary or the secondary side, not
16 across the primary to the secondary or vice versa; is
17 that correct?
18     A.    In -- in this example, yes.
19     Q.    In this example.  Okay.
20         Could a circumstance by which you're
21 talking about actual passing over the primary to the
22 secondary or vice versa, could that also constitute an
23 instance in which the path is coupled across?
24         MR. COHEN:  Objection, form.
25     A.    Yes.

Page 57

1 BY MR. BLUESTONE:
2     Q.    Okay.  And he was -- go ahead.
3     A.    Yes.  In my opinion it could, yes.
4     Q.    Why?
5     A.    Why is that coupled?
6     Q.    Yeah, why does that include a coupling?
7     A.    Because transformer coupling is a very
8 standard way to -- to couple signals from one circuit
9 to another.  It's ...
10     Q.    Okay.
11     A.    There's ...
12     Q.    I'm sorry.  Was there anything else?
13     A.    No, that's --
14     Q.    Okay.
15     A.    It's a very standard technique, transformer
16 coupling.
17     Q.    Now, the claim as we just were recently
18 talking about isn't just a path coupled across, it's
19 also for the purpose of drawing DC current.  Does the
20 circumstance in which the coupling is going across from
21 say a primary to a secondary aspect of a transformer,
22 would that be coupled across for the purpose of drawing
23 DC current?
24     A.    Well, again the -- the term that was being
25 construed was "path coupled across."  It was not "path

15 (Pages 54 - 57)

ATTORNEYS EYES ONLY

Page 58

1 coupled across for the purpose of drawing DC current."
2    Q.    So if -- if we take in context the claim
3 that's saying for the purpose of drawing DC current,
4 does that affect how Paragraph 89 applies to the
5 claims?  For example, in Paragraph 89 you are talking
6 about it being inducted through a transformer or
7 capacitied through a capacitor.
8    A.    And I'm -- I -- I have lost track of what
9 your point was.
10    Q.    If we are asking about path coupled across
11 for the purpose of drawing DC current, does that
12 exclude any of the definitions that -- that are
13 encompassed in what you cite on Paragraph 89?
14    A.    Again, if it's -- if -- if it's a variable
15 DC, you can couple it through a transformer through a
16 capacitor.  The variations can still be coupled
17 through.
18    Q.    Okay.
19    A.    So again, I see -- I just -- I see no
20 reason to restrict the definition of path coupled
21 across.  It's just simply direct connection when it
22 specifically says coupled.
23    Q.    And -- and even if it's for the purpose of
24 drawing DC current, you are saying that a coupling
25 through the transformer, meaning using inductance,

Page 59

1 would still be encompassed?
2    A.    It could be, yeah.
3    Q.    Because there's some transient that's going
4 to pass; is -- is that correct?
5    A.    Well, no, if you have a -- a modulated DC,
6 for instance, there are variations that will pass
7 through a transformer or a capacitor so you -- you
8 could couple conceivably the signal that way.
9    Q.    Because the variations will pass through;
10 correct?
11    A.    Right, yes.
12    Q.    And then if we go back to what we marked
13 previously as Exhibit 9, that page 5 circumstance with
14 the capacitor -- sorry, it's on the next page of it.
15    A.    Oh, okay.
16    Q.    Yeah.
17         That -- that would allow some variation,
18 too; correct?
19         MR. COHEN:  Objection, form.
20 BY MR. BLUESTONE:
21    Q.    If you had a modulated DC signal, that
22 capacitor isn't going to block it entirely, some --
23 some of it's going to pass; correct?
24    A.    Correct.
25    Q.    Which portion is going to pass through?

Page 60

1    A.    Well, when there's change it would -- it
2 will get a passthrough.  If it's modulated with an AC
3 signal, then depending on the value of the capacitor
4 and the frequency of the signal, you'll get an output
5 or you won't.
6    Q.    Okay.  So in Paragraph 93, we are talk --
7 you -- you started talking about the transfer coupling
8 that's disclosed in the specifications of the
9 patents-in-suit; correct?
10    A.    Correct.
11    Q.    And just a matter of -- of conventions,
12 understanding, you would -- would you agree with me
13 that the specifications of the patents-in-suit all use
14 the same figures?
15    A.    Yes.  Yes, sir.
16    Q.    And they all have the same detailed
17 description section?
18    A.    Mm-hmm.
19    Q.    I think there might be some modifications
20 to the abstract but the summary section is the same;
21 correct?
22    A.    I believe so, yeah.
23    Q.    And the background of the invention section
24 is the same?
25    A.    Yeah, that -- there -- there's a minor --

Page 61

1 there might be a minor change or two, a clarification
2 somewhere, correction to figure, something like that,
3 but I -- they're essentially the same, yeah.
4    Q.    Okay.  In going forward I might just cite
5 to one of the patents.
6    A.    Okay.
7    Q.    And I'd like to have us just go forward
8 and -- and saying that that's going to be applicable to
9 the other patents unless for some reason you think it
10 wouldn't be applicable.
11    A.    Okay.
12    Q.    So, for example, if we're going through the
13 detailed description and I cite to the '012 patent, is
14 it okay if we understand that that is going to be
15 applicable to all four patents-in-suit?
16    A.    Yes.
17    Q.    Okay.  Okay.  So let me just put Figure 10
18 in front of you, I've just made a photocopy of that
19 same Figure 10 from the -- from all the
20 patents-in-suit.  Let me mark this.
21         (Marked Deposition Ex. 10)
22 BY MR. BLUESTONE:
23    Q.    Appropriately, Figure 10 is Exhibit 10.
24         MR. BLUESTONE:  Here you go.
25         MR. COHEN:  Thank you.

16 (Pages 58 - 61)

ATTORNEYS EYES ONLY

Page 62

1 BY MR. BLUESTONE:
2    Q.    So using Figure 10, or I'm sorry,
3 Exhibit 10 or Exhibit 5, which is the '012 patent, can
4 you explain how the isolation transformers are being
5 used with the receiver and transmitter circuits as you
6 recite in Paragraph 93 of Exhibit 1?
7    A.    Okay.  So -- so current is -- with respect
8 to the remote module on the right, current is being
9 sourced from the central modular through resistor 112,
10 a 4.7K resistor, and the zener diode and that provides
11 a power supply for the board at the top of the zener
12 diode.  What the current isn't being anticipated on the
13 board goes through the zener and into the center tap of
14 transformer 124.  And in the absence of anything else
15 going on it would split equally and go back half
16 through resistor 128, half through resistor 129.
17         By modulating, with the little
18 microprocessor 122, by modulating the outputs at the
19 two ends of the primary of the transformer, 124, you
20 can cause the voltage to be coupled through and be
21 either more on one side or more on the other side so
22 you will get more or less of the current in one -- you
23 get more in one and less the other, and if you do it
24 the other way you'll get more here, less there.
25         So you are effectively varying the way you

Page 63

1 split the current -- oops -- between the two -- between
2 the two conductors that are going back.
3    Q.    Okay.  So let's start from the beginning of
4 that.  You were talking about the current being sourced
5 from the central module.
6    A.    Right.
7    Q.    Which -- which line has that?  And I have
8 some highlighters, you can use whatever you want to do,
9 if you want to highlight one of them or draw on it, I
10 will make them available to you.
11    A.    Well -- well --
12    Q.    Where is the current being sourced from
13 with respect to the lines?
14    A.    On the far left there's a 15-volt supply in
15 resistor 118, and that couples up to the wire right
16 next to contact 1, and there's a DC blocking capacitor
17 to keep it from going back into the Ethernet equipment,
18 and it comes across that wire there through contacts 3
19 at the far end and over to the 4.7K resistor.
20    Q.    And that is a -- a DC current that's coming
21 along that line?
22    A.    From this source, yes.
23    Q.    And what you are pointing to that source
24 is?
25    A.    The 15-volt supply.

Page 64

1    Q.    With that reference 118 by that resistor
2 there?
3    A.    Yes.
4    Q.    Okay.  So the 15-volt supply is on that
5 third wire down from the top; correct?
6    A.    Correct.
7    Q.    And that's where the current is sourced
8 from that's going to come along that third wire from
9 the top?
10    A.    Yes.
11    Q.    And then it's going to pass down the 4.7
12 kilo ohm resistor 112; correct?
13    A.    Yes.
14    Q.    And is that current that's going to be
15 sourced modulated in any way?
16         MR. COHEN:  Objection.  Form.  Beyond the
17 scope of the deposition.
18    A.    In -- in this example, excuse me, in this
19 example here, no, it's just the 15--volt supply.
20 BY MR. BLUESTONE:
21    Q.    Okay.  So the current that's sourced that's
22 coming along the third line here on Figure 10 is going
23 to be static; correct?
24         MR. COHEN:  Objection, form.
25    A.    It's a DC current, yes.  Steady DC, yes.

Page 65

1 BY MR. BLUESTONE:
2    Q.    But it's a -- it's a static DC current?
3    A.    Yes.  Steady.
4    Q.    Steady is a better phrase?
5    A.    What -- whatever you want to say, yeah.
6    Q.    Well, I -- I want to make sure I get your
7 testimony accurate.  So if steady is the better word,
8 that's fine.
9         It's -- it's an unmodulated DC current --
10    A.    Right.
11    Q.    -- correct?
12         Okay.  So that current that's coming along
13 in Figure 10 on that third wire and passing down
14 through the zener diode and going to the center tap;
15 correct?
16    A.    Right.
17    Q.    All the way up to the center tap by that
18 transformer that's labeled 124, that's all going to be
19 a steady DC current; correct?
20    A.    Yes.
21    Q.    Okay.  And then in the absence of what's
22 going on below that isolation transformer, namely the
23 pick, the 10 -- the 10 kilo ohm resistor and the logic
24 gates, in the absence of that doing anything, it's
25 going to split that current equally coming back up to

17 (Pages 62 - 65)

ATTORNEYS EYES ONLY

Page 66

1 the first and second wires; correct?
2    A.    Correct.
3    Q.    Okay.  Now, can you explain how the -- that
4 pick in the logic is going to actually make it so that
5 the current flow on the path leading to the -- the top
6 wire may be different from the path leading on the
7 second from the top wire?
8    A.    In general terms, yes.
9    Q.    Please.
10    A.    Okay.  So the -- the pick is set up so it's
11 going to have some output, and these two exclusive OR
12 gates are going to ensure that the outputs are opposite
13 from each other.  So if it's a -- it's a high signal
14 coming out of the top exclusive OR gate into the top
15 10K resistor, it will be a low signal on the other one.
16 So you are either going to drive current through the
17 primary of the transformer, either from right to left
18 or from left to right, and that will induce a voltage
19 in the other side of the transformer and -- which will
20 be higher on one side than the other and will affect
21 the way the current splits.
22         So you can -- so if there's more voltage on
23 the one side you can -- you can effectively -- well,
24 you basically subtract off voltage from what's coming
25 in and so you'll force more current to go one way than

Page 67

1 the other, and then when you reverse the output of
2 this, it will flip the other way and you will have more
3 current back.  And as I recall in this example, it's --
4 it was roughly a 60/40 split so you'd get 60 percent of
5 the current on one, 40 on the other, and then it would
6 flip the other way.
7    Q.    Okay.  And for the isolation transformer,
8 which -- which side is primary and which side is
9 secondary, and make sure I'm referring to this
10 properly?
11    A.    Well, I would call the bottom the primary.
12 The --
13    Q.    And the top is the secondary?
14    A.    -- top is the secondary, yes.
15    Q.    Okay.  So let's talk about what's going on
16 on the -- the bottom half, the primary.
17         That actually has current flow that's
18 changing directions; correct?
19    A.    It does.
20    Q.    Is that portion starting from the bottom
21 primary going to the resistors part of the path that's
22 coupled across in Claim 1?
23    A.    I -- I would say the path coupled across is
24 down through the first 4.7K through the secondary and
25 back out.  That's -- that's the path that's directly

Page 68

1 across, and this is used to redistribute the current in
2 one or the other, but the current on these wires is
3 always flowing the same direction.
4    Q.    And the -- the sum of the two currents
5 going to the top two lines is always going to equal the
6 sum of the current coming in from the third line;
7 right?
8    A.    Minus the very small amount lost due to
9 heating on the board and so on, yeah.
10    Q.    Okay.  What's going to pass across from the
11 primary to the secondary portions of the transformer?
12    A.    I'm not sure I follow you.
13    Q.    Well, I mean, it seems to me that what's
14 going on the -- on the bottom primary side is, is AC
15 current that's happening on that bottom half; correct?
16    A.    Well, I guess that depends on how you look
17 at it.  It's -- it's current flowing to the right for
18 one bit time and principally current flowing back
19 the other way for another bit time.
20    Q.    Okay.  So does the fact that the claim says
21 that the path is for the purpose of drawing DC current,
22 does -- does that exclude the bottom half of the
23 isolation transformer or is that included in the path?
24         MR. COHEN:  Objection, form.
25    A.    Well, as I said to -- you know, to me, the

Page 69

1 path is from the third wire down through the zener die,
2 the center tap, and back to the other pass.  That's the
3 path.  And this is what you are doing to distribute
4 current around on the path.  So you are ...
5 BY MR. BLUESTONE:
6    Q.    So which is the portion of the path that's
7 drawing -- that's drawing the DC current?
8    A.    I -- I -- I think that's what we were just
9 talking about, isn't it?
10    Q.    Well, I mean, you were talking about
11 current being supplied.  Is that the same thing as --
12 as drawing current?
13    A.    Yeah, you're drawing current off that third
14 wire through resistor 112 and returning it on the top
15 two wires through resistors 128 and 129.
16    Q.    The part -- so the parts 128 and 129 are --
17 are transmitting current back; correct?
18    A.    Right, they're returning current back the
19 other way, yes.
20    Q.    So are those -- is that the part of the
21 path that's drawing current or is that a different part
22 of the path?
23    A.    Well, if -- if it's a path it's drawing
24 current you would presume it's drawing current through
25 the path; right?  I mean, it's -- certainly in this

18 (Pages 66 - 69)

ATTORNEYS EYES ONLY

Page 70

1 case it's drawing current from here over to there so
2 that to me is the path.
3      Q.    Okay.  Let's -- let's switch gears and
4 we'll come back to this in a little bit if that's okay
5 with you.
6      A.    Okay.
7      Q.    Can we go back to Claim 1 of the '107
8 patent.
9      A.    Okay.
10     Q.    It's -- if you want to use it, it's, yeah,
11 page 3 there.  It recites, "A piece of Ethernet
12 terminal equipment comprising."
13           The first part is "an Ethernet connector
14 comprising first and second pairs of contacts used to
15 carry Ethernet communication signals."
16           Let's parse that out.  "Ethernet connector
17 comprising first and second pairs of contacts," is that
18 structure in the claim?
19     A.    Yes.
20     Q.    What about "used for" -- "to carry Ethernet
21 communication signals," does that recite structure?
22     A.    Yes.
23     Q.    Okay.  The "at least one path," is that
24 structure?
25     A.    Yes.

Page 71

1      Q.    So when it says, "at least one path coupled
2 across at least one of the contacts of the first pair
3 of contacts and at least one of the contacts in the
4 second pair of contacts," that's -- that's a structural
5 limitation; correct?
6      A.    Correct.
7      Q.    Now, where it says, "at least one path for
8 the purpose of drawing DC current," is that refining
9 the structure of at least one -- of at least one path
10 coupled across in any way or is it just an intended use
11 for that structure?
12           MR. COHEN:  Objection, form.  Beyond the
13 scope of the deposition.
14     A.    And I'm -- I'm not sure I understand
15 the ... the question.
16 BY MR. BLUESTONE:
17     Q.    Well, you have -- you are opining on the
18 meaning of path coupled across.
19     A.    Right.
20     Q.    And we see that on line 14 it says that
21 "the path is for the purpose of drawing DC current."
22 Would you agree with me that that clause, "the path of
23 the purpose of drawing DC current," is germane to the
24 term the "path coupled across" that you are construing?
25           MR. COHEN:  Objection, form.

Page 72

1      A.    It's germane to the claim as a whole.  The
2 term I was construing is "path coupled across" and I
3 didn't actually construe it, I said it means what it
4 says.  I don't want to -- all I really said is don't
5 change coupled to connected; right?  That it's
6 perfectly plain as it is.  So I -- I don't think you
7 need to look at the impact on anything else to make
8 that judgment.
9 BY MR. BLUESTONE:
10     Q.    Well, what I'm trying to figure out is,
11 there's two different world views for the capacitor,
12 for example, that we discussed in that schematic
13 hypothetical.  One world view is that's not coupled
14 across because it's a blocking capacitor.  Another
15 world view is that capacitor is still coupled across
16 because it will allow some transient change.  Right?
17           MR. COHEN:  Objection, form.
18     A.    I -- I don't know that I agree with that.
19           I lost my picture.
20 BY MR. BLUESTONE:
21     Q.    Sure.
22     A.    My picture now.  Which -- we're talking
23 about ...
24     Q.    What -- will you state which exhibit you
25 are looking at?

Page 73

1      A.    This one -- I'm sorry.  Exhibit --
2      Q.    It's on the front page.
3      A.    Exhibit 9 page 5.
4      Q.    Yeah.
5      A.    That's the one, the capacitor?
6      Q.    Yeah.
7      A.    Okay.  So if you ask me is that coupled
8 across, the answer is yes.
9      Q.    Mm-hmm.  And the claim term in the '107
10 doesn't merely just say the path is coupled across.  It
11 also says that that path is for the purpose of drawing
12 DC current.
13     A.    That's right.
14     Q.    Does that factor into the analysis at all
15 of understanding what "path coupled across" means in
16 this claim?
17     A.    To me, it -- it factors into understanding
18 the claim as a whole, but this particular term, I think
19 "path coupled across" is very clear, does not need
20 construction, it means what it says, and I don't think
21 it's proper to replace coupled with a word that's more
22 restrictive.
23     Q.    Okay.  But --
24     A.    That's --
25     Q.    But now the path has become for the purpose

19 (Pages 70 - 73)

ATTORNEYS EYES ONLY

Page 74

1 of drawing DC current.  Does that impose a structural
2 change on what that path coupled across is?
3     A.    Well, whatever path you couple across had
4 better be able to draw a DC current.  That's the
5 restriction it places on it, I mean.
6     Q.    Okay.  And does that figure with the
7 capacitor that you are looking at, I think that's
8 page 5; correct?
9     A.    Yes.
10     Q.    Does that satisfy that?  Can it draw a DC
11 current?
12     A.    Does that satisfy ... a path coupled across
13 blah, blah, blah, blah, blah.  A -- a path -- at least
14 one path for the purpose of drawing DC current, be at
15 least one path coupled across to at least one of the
16 contacts ... no, I would not expect this to draw DC
17 current.  But it is coupled across the path.
18     Q.    Okay.
19     A.    Or coupled across the contacts.  I'm sorry.
20     Q.    Now, back to the -- the claims.  Does that
21 mean that for the purpose of drawing DC current is a
22 structural limitation on line 14?
23        MR. COHEN:  Objection, form.  Beyond the
24 scope of the deposition.
25     A.    And, I'm -- I'm sorry, you're asking what?

Page 75

1 BY MR. BLUESTONE:
2     Q.    Does -- for the purpose of drawing DC
3 current serve as a structural limitation to the claim?
4        MR. COHEN:  Same objections.
5     A.    Well, it is certainly a claim element which
6 you would have to meet in order to meet the
7 requirements of the claim.  So if that -- if that meets
8 your definition of structural element, then I guess it
9 would be one.
10 BY MR. BLUESTONE:
11     Q.    So I guess what I'm trying to figure out,
12 so if you can go to page 64 of your declaration -- I'm
13 sorry.  Paragraph 64 of your declaration.
14     A.    Right here.  Paragraph 64.  Okay.
15     Q.    You say that, "I also note that current and
16 current flow are not claimed structural elements of any
17 of these claims."
18        Do you see that?
19     A.    I do.
20     Q.    And you agree with that statement?
21     A.    Yes.
22     Q.    Okay.  And then the next sentence says,
23 "Instead, where the terms 'current' and 'current flow'
24 are used, they are being used merely to describe how
25 the claim's structural elements or apparatus is

Page 76

1 configured or designed to operate."
2        Do you see that?
3     A.    I do.
4     Q.    Do you agree with that statement?
5     A.    Yes.
6     Q.    So we have -- you have looked at the words
7 "current" and "current flow" as used in the claim;
8 correct?
9     A.    In which claim?
10     Q.    In Claim 1 of the '107 patent.
11     A.    Okay.  Yes.
12     Q.    And there is language here that says that
13 the path is for the purpose of drawing DC current.
14     A.    Yes.
15     Q.    How does that describe how the claimed
16 structural elements, namely the at least one path, is
17 configured and designed to operate?
18     A.    It's configured designed to operate so that
19 it draws DC current.
20     Q.    And isn't -- isn't any generic path already
21 going to be able to do that?
22        MR. COHEN:  Objection, form.  Beyond the
23 scope of the deposition.
24     A.    Is ... I'm sorry.  Will you ask me that
25 again?

Page 77

1 BY MR. BLUESTONE:
2     Q.    So what -- a path could be just a wire;
3 correct?
4     A.    That's -- that's one path.
5     Q.    Okay.  And a wire would be able to draw DC
6 current; correct?
7     A.    Yes.
8     Q.    And a path with a resistor on it could be
9 able to draw a DC current; correct?
10     A.    Correct.
11     Q.    Does it matter what the -- what the
12 magnitude of the resistor is?
13     A.    Well, depends how much current you want to
14 draw obviously.
15     Q.    I mean, like if you had like a 500 mega ohm
16 resistor, would it still be a path for the purpose of
17 drawing DC current?
18     A.    It --
19        MR. COHEN:  Objection, form.  Beyond the
20 scope of the deposition.
21     A.    Yeah, that -- that seems pretty
22 hypothetical.  I mean, if -- it depends what you're
23 trying to do with that, I mean.  In -- in most
24 practical cases, 500 mega ohms would be considered an
25 open circuit.

20 (Pages 74 - 77)

ATTORNEYS EYES ONLY

Page 78

1 BY MR. BLUESTONE:
2    Q.    Okay.  Okay.  So I now have this path and
3 I've put in an open switch.  Now, is it no longer a
4 path for the purpose of drawing DC current?
5         MR. COHEN:  Objection, form.  Beyond the
6 scope of the deposition.
7    A.    If the switch is open, it will not draw DC
8 current.
9 BY MR. BLUESTONE:
10    Q.    But is it no longer a path for the purpose
11 of drawing DC current?
12         MR. COHEN:  Same objection.
13    A.    Well, if you close the switch then it would
14 draw DC current.  If you open the switch, it won't.
15 So ...
16 BY MR. BLUESTONE:
17    Q.    But when the switch is open it's not a path
18 for the purpose of drawing DC current; correct?
19         MR. COHEN:  Same objections.
20    A.    It -- it will not draw DC current at that
21 time, no.
22 BY MR. BLUESTONE:
23    Q.    Do you have a -- a definition for the
24 meaning of "path coupled across" that you would agree
25 to?

Page 79

1    A.    Yes.  Path coupled across.
2    Q.    Which is just the same exact language in
3 the claim; correct?
4    A.    Exactly, yeah.  I don't think it needs
5 construction.  I think it -- it's very clear to one of
6 ordinary skill in the art.
7    Q.    Now, your definition is, in Paragraph 89,
8 is talking about permitting energy transfer.  Do you
9 see that?
10    A.    Yes.
11    Q.    Would path -- would path permitting energy
12 transfer from one contact to another be an acceptable
13 definition of path coupled across?
14         MR. COHEN:  Objection, form.
15    A.    Well, it's a -- my opinion, you know, that
16 you only need to do claim construction for terms which
17 are not clear and I don't think -- I think path coupled
18 across is perfectly clear so I -- I don't see any need
19 to come up with any alternative language to describe
20 it.
21 BY MR. BLUESTONE:
22    Q.    I understand that you don't think that
23 there's a need for it.  My question is:
24         Is there anything wrong with path
25 permitting energy transfer from one contact to another?

Page 80

1         MR. COHEN:  Objection, form.  Beyond the
2 scope of the deposition.
3    A.    I -- I -- I can't tell you off the top of
4 my head.  I would have to consider that more carefully.
5 BY MR. BLUESTONE:
6    Q.    Would the plain meaning of "path coupled
7 across" require continuity between the start and the
8 end of the path?
9    A.    Continuity of meaning what?
10    Q.    Would you have an understanding of what
11 continuity is in an electrical engineering sense?
12    A.    Yes, and typically it would mean if you put
13 a -- you have a test light and you stick it here and
14 here, if it lights up there's continuity.  That's at
15 least one way to describe it.
16         Would it require.  I'm ... certainly many
17 of the ways you would couple would have direct
18 continuity.  Whether there's any that don't, I -- I
19 would have to think about that more.  But, again, it
20 seems to me we're replacing something that's simple --
21 or you are proposing to replace something that's simple
22 and clear with something that's more complex so I'm --
23 I'm not sure I see the purpose in that.
24    Q.    So if we were in -- sitting in court today
25 and -- and the judge asked you is there any other

Page 81

1 meaning you can give me other than path coupled across,
2 would the answer be no, you just -- you can't give
3 anything else?
4         MR. COHEN:  Objection, form.
5    A.    I don't know if -- I've never actually had
6 a judge actually ask me anything.  I -- you know.
7 BY MR. BLUESTONE:
8    Q.    Well, in -- in my hypothetical he has.
9    A.    Yeah.
10         MR. COHEN:  Same objection.
11    A.    And -- and what did the judge ask me?
12 BY MR. BLUESTONE:
13    Q.    You can't use the phrase "path coupled
14 across," give me another collection of words that
15 describes what "path coupled across" means.  Can -- can
16 that be done?
17    A.    Did he threaten me with contempt of court
18 if I don't answer?
19    Q.    Your hypothetical is getting more --
20 more -- more dangerous for you, but let's say yes.
21    A.    Yes, okay.
22         MR. COHEN:  And same objection.
23    A.    Path coupled across, I would say it's a --
24 it's a -- it's a path coupled from one contact to the
25 other contact.

21 (Pages 78 - 81)

ATTORNEYS EYES ONLY

Page 82

1 BY MR. BLUESTONE:
2    Q.    And if there's discontinuity in the path,
3 does that eliminate coupling?
4         MR. COHEN:  Objection, form.
5    A.    Well, again, coupling to me means that you
6 can transmit energy or signals from the one to the
7 other.  So it would depend on what kind of
8 discontinuity you are talking about.
9 BY MR. BLUESTONE:
10   Q.    So in Paragraphs 86 through 93 of your
11 declaration, you are simply criticizing defendants'
12 proposal.  You are not offering any construction of
13 your own; correct?
14   A.    Right, it's my opinion it does not need
15 construction.
16   Q.    What I'm trying to figure out here is how a
17 jury can reconcile "path coupled across" having no
18 definition with all these examples in Paragraph 89,
19 which I'm not sure which apply to.  That's not a
20 question obviously, I'm just trying to frame what I'm
21 getting at here with you.
22         "Path coupled across," you disagree with
23 the word "connection," correct?
24   A.    Yes, I -- I think that's a restriction that
25 is not present in the claim.

Page 83

1    Q.    Okay.  And then in Paragraph 90 you say,
2 "The connection such as through a wire," correct?
3    A.    Correct.
4    Q.    Your point being in Paragraph 90,
5 connection, if it means just a wire, is way too narrow;
6 correct?
7    A.    I didn't say way too narrow.  I said it's
8 more restrictive than the general concept of coupling.
9    Q.    Okay.  And coupling can be including
10 elements contained in between the contacts; right?
11        MR. COHEN:  Objection, form.
12   A.    I didn't follow that.
13 BY MR. BLUESTONE:
14   Q.    Well, you were taking issue also with
15 direct connection.
16   A.    Yes.
17   Q.    If connection allows for intermediate
18 elements between the -- the requisite context of the
19 claims, is the word "connection" okay?
20        MR. COHEN:  Objection, form.
21   A.    Then we would need a construction
22 for "connection."  I mean, I -- I don't -- I don't see
23 that we are simplifying things here at all.
24 BY MR. BLUESTONE:
25   Q.    Okay.  Well, is there a plain meaning that

Page 84

1 you can give to the word "path," what a "path" is?
2    A.    A path is a -- a route, a means to get from
3 one contact to the other.
4    Q.    Okay.  And plain meaning of what the path
5 now being coupled means, how does coupled
6 modify "path"?
7    A.    Means that that path is between those two
8 contacts.  There's a way to get from this contact to
9 that contact through this path.
10   Q.    And "across," is that now explaining what
11 the beginning and endpoints are of that path?
12   A.    Right, coupled across those two contacts
13 means from this one to that one, there's a -- a route
14 or means by which you can get from there to there.
15   Q.    Now, we're not talking about me like
16 walking through sand in this context, right, we're not
17 talking about a path literally of someone walking
18 somewhere in the context of this claim; right?
19   A.    No.
20   Q.    We're talking about a transmission of
21 signals; correct?
22   A.    Right.
23   Q.    Is there anything wrong with the part of
24 the defendant's construction with you if you use the
25 word "electrical" that causes a problem?

Page 85

1         MR. COHEN:  Objection, form.
2    A.    Well, that would -- I -- I -- I don't know.
3 That's what concerns me about it.
4 BY MR. BLUESTONE:
5    Q.    Okay.  Can you explain what actually has to
6 be able to get from point A to point B for it to be a
7 path coupled across in the context of this claim?
8         MR. COHEN:  Objection, form.  Beyond the
9 scope of the deposition.
10   A.    To me, in order to be coupled from A to B,
11 you have to have a means to get energy from one place
12 to the other.
13 BY MR. BLUESTONE:
14   Q.    So energy is to --
15   A.    That's what coupled means --
16   Q.    I'm sorry.
17   A.    That's what coupled means to me is that you
18 can -- you can transfer energy from one point to the
19 other and they're coupled.
20   Q.    So it doesn't necessarily have to be an
21 electrical mechanism for getting that energy from A to
22 B?
23   A.    It just, in terms of coupling it -- it
24 could be magnetic, it could be who knows.  But it --
25 it -- it's not restricted to electrons flowing in a

22 (Pages 82 - 85)

Page 86

1 wire between one and the other.
2    Q.    So it could be the circumstance by which
3 you're going across an isolation transformer using the
4 magnetic inductance to have the energy flow, that could
5 be encompassed; correct?
6    A.    It could be, yes.
7    Q.    Okay.  And is it -- okay.  So in that same
8 circumstance, if we're talking about a modulated DC
9 signal, there is still going to be some energy
10 transferred across that transformer because it's the
11 variation that's going to pass through; correct?
12    A.    If you're going across rather than just
13 through a winding, yeah.
14    Q.    And that circumstance under your
15 interpretation of coupling -- let me start over the
16 question.  Sorry.
17          Does this path coupled across require that
18 on point A, or con -- contact 1, that the signal looks
19 identical in -- at the other end at the other contact?
20          MR. COHEN:  Objection, form.  Beyond the
21 scope of the deposition.
22    A.    The -- can you do that one more time?
23 BY MR. BLUESTONE:
24    Q.    So ... it seems like there's no problem
25 with path being coupled across as it relates to

Page 87

1 permitting energy to transfer from one contact to the
2 other; correct?
3          MR. COHEN:  Objection, form.
4    A.    Right, that's what coupled means to me.
5 BY MR. BLUESTONE:
6    Q.    Okay.  My question for you is, does it
7 preclude any change in the form of the signal being
8 sent from one contact to the other?
9          MR. COHEN:  Objection, form.
10    A.    And by "form," you mean what?
11 BY MR. BLUESTONE:
12    Q.    So let's take a hypothetical.  Let's use
13 that transformer we were talking about.
14    A.    Okay.
15    Q.    We can have a transformer and we're sending
16 across a signal that is a step function going up and
17 down, up and down.  So it's going, let's say, you know,
18 it start -- it's -- it's at 6 and the bottom is at 4.
19    A.    Okay.
20    Q.    And it keeps doing a regular periodic up
21 and down at 6 and 4, and now I'm going across the
22 transformer, not through it.  What's going to show up
23 from the primary side to the secondary side?  So
24 if applied to the primary is that hypothetical I gave
25 you, what's going to show up on the secondary side?

Page 88

1    A.    Well, you will -- you will see that
2 transition, but probably be a lot of the high
3 frequencies attenuate so it will look more -- more
4 sine-wavish or rounded off at the same rate on -- on
5 the other side and which could still be a DC signal if
6 you have a DC bias on that side of the transformer.
7 So ...
8    Q.    Okay.  Okay.  So you can -- okay.  I think
9 I'm -- I think I'm getting what you're saying.  I'm
10 sorry that I keep belaboring this point.  I just want
11 to make sure technically I'm understanding your point
12 here.
13    A.    Okay.
14    Q.    The transformer passing through the
15 modulated DC signal can still be a path coupled across
16 even though the signal at the primary side doesn't look
17 identical to the signal at the secondary side.
18    A.    Right, I mean, if -- if you -- if you
19 couple across a resistor for instance it's going to be
20 attenuated here with respect to there, so I mean, yeah,
21 it's -- it's not uncommon for signals to be changed.
22 There could be noise introduced, there could be
23 attenuation.
24    Q.    Okay.  So between permitting the signal to
25 transfer from point A to B and permitting energy

Page 89

1 transfer from one contact to the other, you prefer
2 energy transfer; that's the language you used.
3    A.    It is, yes.
4    Q.    Okay.  And there are -- and there are
5 circumstances in which, even if you're sending DC
6 current and it's for DC current, that you are still
7 going to have a coupling over an isolation transformer?
8    A.    You could.  I mean, it's possible.
9    Q.    Okay.  So let's go back to -- to Figure 10.
10 Which was Exhibit 10.
11          The portion that's the bottom half, the
12 primary side of the isolation transformer 124 in the
13 figure on the bottom half; do you see that?
14    A.    Mm-hmm.  Yes.
15    Q.    That has current going one direction and
16 then it changes and has current going the other
17 direction; correct?
18    A.    Yes.
19    Q.    And that is causing the two wires that are
20 connecting the -- the -- the top wire and the second
21 wire to change with respect to each other; correct?
22    A.    It's -- it's causing current to be placed
23 more on one than the other or vice versa, yes.
24    Q.    Okay.  So what is getting sent over from
25 the -- the primary part of the transformer to the top

23 (Pages 86 - 89)

ATTORNEYS EYES ONLY

1 half of the transformer 124 in Figure 10?  What
2 actually is passing over, is my question.
3     A.    Magnetic energy is passing over.
4     Q.    And how does it create a -- a differential
5 in -- in the currents?
6     A.    Because it induces a voltage in the
7 windings on the other side which will affect how the
8 current splits between the -- the two halves.
9     Q.    Okay.  But the -- the portion that you
10 would say is the path coupled across for the purpose of
11 drawing DC current wouldn't include this bottom part of
12 the -- the transformer, that whole path; correct?
13        MR. COHEN:  Objection, form.  Beyond the
14 scope of the deposition.
15     A.    Yeah, as I -- I think I've stated before,
16 the -- the DC path is through resistor 112 and the
17 secondary, the transformer and back through resistors
18 128 and 129.
19 BY MR. BLUESTONE:
20     Q.    Okay.  Let's go to Figure 8, which I will
21 mark as Exhibit 11.
22        (Marked Deposition Ex. 11)
23 BY MR. BLUESTONE:
24     Q.    There you go, sir.
25        MR. BLUESTONE:  Here you go, Justin.

1 BY MR. BLUESTONE:
2     Q.    Can you explain how the path is sourcing
3 current in Figure 8?
4     A.    Again, in general terms.
5     Q.    Go ahead.
6     A.    Okay.  Once -- once again, the current is
7 sourced through resistor 112 at the top.  And goes
8 through the zener diode, and you can see there's a
9 little bit tapped off there that runs into VCC on
10 the -- on the pick chip, but most of it comes through
11 the zener diode and is returned through the two 10K
12 resistors, 100 and 109 on the right to the two paths.
13     Q.    Okay.  And are those paths that are
14 including resistors 100 and 109 operating the same
15 manner as Figure 10, namely they will have different
16 amounts of current?
17     A.    Yeah, again, if you didn't do anything
18 else, they'd have the same current to within tolerance
19 of how active resistance was.
20     Q.    Same as -- same as what?
21     A.    They would have the same as each other and
22 split 50/50 if you didn't do anything else to it.
23     Q.    Okay.  And they would add up to be the
24 amount that's coming in on that third wire and then
25 passing through resistor 112?

1     A.    Right, minus any losses on the board, yeah.
2     Q.    Through heat or something you explained?
3     A.    Right.
4     Q.    Sorry.  Please go ahead.
5     A.    Okay.  And then the modulation here is by
6 the two outputs RA1 and RA2 of the pick chip.  Which if
7 you -- there is a minor error in this figure that that
8 line labeled 110 is actually a little capacitor.  It
9 says 3700 picofarad so it's a very small capacitor.  I
10 guess it didn't show up on the picture.
11     Q.    I see that.
12     A.    Okay.  So by -- by moving these lines one
13 low, one high, again you -- you can shunt some of the
14 current off of those lines and -- and recycle it
15 around, which again effectively mod -- makes there be
16 more current on one than the other and then you go
17 back.
18     Q.    And Figure 8 is not showing a modulated DC
19 signal coming across the third wire from the top
20 passing through resistor 112; correct?
21     A.    Correct.
22     Q.    So between -- in Exhibit 10 Figure 8 and
23 Exhibit 11 -- I'm sorry.  I mean, Figure 10 of
24 Exhibit 10 and Figure 8 of Exhibit 11, both of these
25 examples have the current coming on the third wire from

1 the top and that current is a DC current that's static,
2 that's steady I believe you used the word; correct?
3     A.    Yes.  Not say there isn't noise on it or
4 whatever, but yeah.
5     Q.    Okay.  But it -- it's an unmodulated DC
6 current in your example.
7     A.    Unmodulated DC current, yes.
8        (Marked Deposition Ex. 12)
9 BY MR. BLUESTONE:
10     Q.    All right.  I will mark as Exhibit 12
11 Figure 18.
12        And can you generally explain what's going
13 on in Figure 18?
14     A.    Yeah, this looks like the central module
15 end of the ...
16     Q.    Yes, and it says "Central Module" at the --
17 at the top of that; correct?
18     A.    Right, yes.
19     Q.    And then do you also see the part under --
20     A.    And then the remote module is on the far
21 side, the next stick, yeah.
22     Q.    Right.  So the remote module is the items
23 that are in this -- well, maybe -- sorry, I don't want
24 to testify for you.
25        Can you tell me what the -- the remote

ATTORNEYS EYES ONLY

1 module encompasses in Exhibit 12?
2     A.    Okay.  It's a -- it's a similar arrangement
3 to what we had before.  You have -- it's physically
4 configured a little bit different on the so-called next
5 stick arrangement.  But again you have a little
6 microprocessor there, you have current source on the
7 third line from the top, coming across through a 4.7K
8 resistor and zener diode and -- and return back through
9 this network of resistors up here.  And again by -- by
10 modifying the GP0 and GP1 signals on the pick micro
11 control, you can change the impedance in the return
12 path so that more current goes on one side than the
13 other.
14     Q.    Okay.  Let's go back to Claim 1 of the '107
15 patent.  And I want to talk about the portions of the
16 claim that start on Line 18 after "the piece of
17 Ethernet terminal equipment" specifically where it
18 starts saying "to draw."  When you've had a chance to
19 review the claim, let me know.
20     A.    Okay.
21     Q.    Thank you.
22          You state in page 16 of Exhibit 1 that "the
23 use of the infinitive 'to 'should be interpreted to
24 mean 'configured to' or 'design to' perform the
25 function recited in the claim."

1     A.    Page 16 or paragraph?
2     Q.    I'm sorry.  Paragraph 16.
3     A.    Okay.
4     Q.    Can you go through, starting at Line 18,
5 what the functions recited in the claim are for the
6 Ethernet terminal equipment, please?
7     A.    Yes.  The piece of Ethernet terminal
8 equipment is designed or configured to draw different
9 magnitudes of DC current meeting at least one path.
10 And is designed and configured such that the different
11 magnitudes of DC current flow result from at least one
12 condition applied to at least one of the contacts, and
13 it is further designed and configured such that the
14 magnitudes of the DC current flow convey information
15 about the piece of terminal equipment.
16     Q.    Okay.  So can you enumerate out what the
17 different functions are recited in the claim for
18 Ethernet terminal equipment, what the functional
19 limitations are?
20     A.    What the functional limitations are ...
21          Well, it's -- it's designed or configured
22 to have a bunch of functions, including drawing
23 different magnitudes of DC current via the path -- via
24 at least one path.
25     Q.    And that's one function.

1     A.    Right.
2     Q.    Okay.  What's the next function?
3     A.    That the different magnitudes of DC current
4 flow result from at least one condition applied to at
5 least one of the contacts of the first and second
6 pairs.
7     Q.    And that -- is it safe to say that's a
8 second function?
9     A.    Yes.
10          MR. COHEN:  Objection, form.
11 BY MR. BLUESTONE:
12     Q.    And then is the remainder after the
13 wherein, the word "wherein," the third function?
14     A.    Yes.
15     Q.    So we have a third function of at least one
16 of the magnitudes of DC current flow to convey
17 information about the piece of Ethernet terminal
18 equipment; is that correct?
19     A.    Yes.
20     Q.    So is it fair to say that Claim 1 has
21 certain limitations that are structural and certain
22 limitations that are -- are functional limitations?
23          MR. COHEN:  Objection, form.
24     A.    You know, I -- I -- I haven't really
25 thought of it in that way.  I think of them as claim

1 elements that have to be present.
2 BY MR. BLUESTONE:
3     Q.    How would I know if that claim element is
4 present, for example, to draw two different magnitudes
5 of DC current flow via the at least one path, that
6 first function?
7          MR. COHEN:  Objection, form.  Beyond the
8 scope of the deposition.
9     A.    And which -- which -- which one -- oh.
10 Line 15?  No.
11 BY MR. BLUESTONE:
12     Q.    I'm asking you about to draw different
13 magnitudes of DC current flow via the at least one path
14 which is subsumed in that section inquired about the
15 use of the infinitive "to."
16          MR. COHEN:  Same objections.
17     A.    Okay.  Well, there -- there's a couple ways
18 that you would verify that, whether it is configured,
19 designed and configured to do that, first looking at
20 the product documentation, design documentation, so you
21 could see whether that -- whether it is so designed to
22 do, and second, you could -- you could test it and see
23 if it does it.
24 BY MR. BLUESTONE:
25     Q.    Okay.  And by configure to or design to

25 (Pages 94 - 97)

Page 98

1 perform the function recited in the claim, does that
2 include any intent of the designer, any requirement of
3 what they were trying to accomplish?
4         MR. COHEN: Objection, form.  Beyond the
5 scope of the deposition.
6     A.    I -- can -- can -- can you rephrase that
7 or -- or repeat it or something?  I ...
8 BY MR. BLUESTONE:
9     Q.    In Paragraph 16 of -- of your declaration,
10 what this deposition is about, you use the language
11 that -- that the infinitive should be interpreted as
12 configured to or designed to perform the function
13 recited in the claim.
14     A.    Mm-hmm.
15     Q.    And what I'm trying to understand is what
16 you mean by "configured to" or "designed to."
17         My question is, your use of the word
18 configure to or design to, does that require me to look
19 into the intent of the person who designed the
20 equipment?
21         MR. COHEN: Same objections.
22     A.    Well, I'm -- I'm not a psychiatrist, I'm
23 not going to psychoanalyze someone and see what they
24 intended.  I -- I think you would look at the equipment
25 and the way it is designed to work, and typically a

Page 99

1 piece of communication equipment will have
2 documentation telling you how it works, there will be
3 functional specs, they'll say we're compatible with
4 this, this, and this document and so on, so that you
5 know what you can use it with.
6         So that -- that's the kind of material, I'm
7 not -- I'm not talking about, you know, putting the guy
8 who designed it under lights and interrogating him all
9 day.  But I ...
10 BY MR. BLUESTONE:
11     Q.    So let's keep on this first function.  To
12 draw different magnitudes of DC current flow via the at
13 least one path.
14         It's your opinion that it doesn't
15 require -- the claim does not require it ever to
16 actually draw different magnitudes of DC current flow
17 via the least one path.  It doesn't need to actually do
18 that, is your opinion; correct?
19     A.    It needs to be designed or configured to so
20 that it is able to, but does not have to have done it
21 yet.
22     Q.    You said "yet."  Does it have to do it
23 ever?
24         MR. COHEN: Objection, form.  Beyond the
25 scope of the deposition.

Page 100

1     A.    Yeah, that, I -- I don't know, but I -- the
2 claims are written such that they talk about the way
3 the equipment is designed and configured.  And which
4 could, of course, be verified by turning it on and
5 testing it, as well as by analyzing the documentation
6 that supports it.
7 BY MR. BLUESTONE:
8     Q.    Well, I'm not asking you to do an
9 infringement analysis obviously.  We're -- we're
10 talking about your opinions and what the plain meaning
11 of the -- the claim terms mean, just to be clear.
12     A.    Right.
13     Q.    So I agree with you earlier, that's --
14 that's a discussion for another day.
15     A.    It just -- it just sounds to me like we
16 keep going there, that's why I keep answering that.
17     Q.    Well, no, that's -- I understand and --
18 and hopefully --
19     A.    If I've misinterpreted, please correct me.
20     Q.    Yeah, and I'm hopefully trying to give
21 guidance and saying I don't -- I don't want to know
22 what your infringement analysis is going to be weeks
23 down the road.  I'm trying to understand what you mean
24 by the statements in your -- in your declaration.
25 So ...

Page 101

1     A.    Right.
2     Q.    We -- we have this function here to draw
3 different magnitudes of DC current flow via the least
4 one path.
5     A.    Yeah.
6     Q.    And we have a dispute as to the meaning of
7 the use of the word "infinitive."
8     A.    Right.
9     Q.    Is it your opinion that Claim 1 of the '107
10 patent does not require the piece of Ethernet terminal
11 equipment to ever draw different magnitudes of DC
12 current flow via the at least one path?
13         MR. COHEN: Objection, form.  Beyond the
14 scope of the deposition.
15     A.    Again, that -- that is not what I was
16 opining on here, but it -- it's my opinion that the
17 claims are directed to the way it is designed and
18 configured and does not require to be in actual
19 operation at any particular time.
20 BY MR. BLUESTONE:
21     Q.    Does it have to be in any -- in actual
22 operation ever?
23         MR. COHEN: Same objection.
24     A.    I -- I don't know.  I mean, "ever" is a
25 long time.  But it -- it needs to be capable of --

26 (Pages 98 - 101)

ATTORNEYS EYES ONLY

Page 102

1 designed and configured to be capable of doing what's
2 spelled out here is the way I look at it.
3 BY MR. BLUESTONE:
4    Q.    Configured to, or capable to?  Is there a
5 difference?
6    A.    I don't know.  I'll stick with design and
7 configured if it's -- I mean, having designed and
8 configured equipment myself, I know what I mean for it
9 to be able to do when I -- when I'm finished with the
10 design.  So ...
11    Q.    Paragraph 14 of your report says that "Our
12 construction is incorrect 'because it would be
13 improperly transforming apparatus claims into hybrid
14 apparatus method claims.'"
15          What is your basis for that statement?
16    A.    It -- it looks like you're trying to say
17 that these are steps that have to be performed was the
18 way I interpreted your ...
19    Q.    And why is that improper?
20    A.    Because that sounds to me like a method
21 claim.  A method claim gives you steps to perform and
22 apparatus claim describes apparatus.
23    Q.    So does that mean that you disagree that
24 the functional limitations have to -- that you do not
25 believe that the functional limitations have to be

Page 103

1 performed?
2          MR. COHEN:  Objection, form.
3    A.    Well, performed when I guess is your --
4 again, it's my opinion that if it is designed and
5 configured to meet this, then it meets it.
6 BY MR. BLUESTONE:
7    Q.    Okay.  So we have a path that's already
8 structure in the claim.  We agree to that; correct?  A
9 path coupled across is structure.
10    A.    Okay.
11    Q.    Do -- well, do we agree with that?
12    A.    Yes.
13    Q.    Okay.  And path coupled across means the
14 path is actually coupled across; correct?
15    A.    Well, at least one path for the purpose of
16 drawing DC current.  Right.  So it -- and for that
17 purpose it will be coupled across, yes.
18    Q.    I'm just asking about the coupled across
19 part of it.  Path coupled across, that is structure the
20 path has to be actually coupled across; correct?
21          MR. COHEN:  Objection, form.  Beyond the
22 scope of the deposition.
23    A.    I don't -- I don't believe so.  That's --
24 that's -- that's not an opinion that I have made and
25 I'm not prepared to make it today.

Page 104

1 BY MR. BLUESTONE:
2    Q.    You've given your under -- you are here to
3 talk about your understanding of the meaning path
4 coupled across as you recited in your report; right?
5    A.    Yes.
6    Q.    I'm sorry.  Your declaration I should say.
7 Right?
8    A.    Right.
9    Q.    We agree that path coupled across is a
10 structural limitation; correct?
11    A.    Right.
12    Q.    How do I know, how would one read path
13 coupled across to be anything other than the path
14 coupled across?  Are you saying that path coupled
15 across could also mean the path is configured to be
16 coupled across?
17          MR. COHEN:  Objection, form.
18    A.    Well, again, I -- I think we're getting
19 well outside what I'm saying here.  Path coupled
20 across, we -- we -- well, actually I said it didn't
21 need any construction.  But path coupled across means
22 what it says.
23 BY MR. BLUESTONE:
24    Q.    So you have no opinion that path coupled
25 across allows for the path to be merely configured to

Page 105

1 or designed to being coupled across; correct?
2          MR. COHEN:  Objection, form.
3    A.    Again, I have not stated an opinion on that
4 as far as I know.
5 BY MR. BLUESTONE:
6    Q.    Sitting here today, you have no reason to
7 tell me that path coupled across should be interpreted
8 as meaning path configured to be coupled across;
9 correct?
10          MR. COHEN:  Objection, form.
11    A.    I -- I really can't answer that right now.
12 BY MR. BLUESTONE:
13    Q.    You can't answer whether you have an
14 opinion to that effect or not?
15    A.    I -- I don't have an opinion.  I'm sorry.
16    Q.    Okay.  So your declaration nowhere says
17 that path coupled across should be something that
18 doesn't actually have to be present in the claim; that
19 statement is not in your declaration; correct?
20    A.    Right, I don't think that was at issue.
21 The issue was what path coupled across means.
22    Q.    Okay.  And you're not prepared to go and
23 tell me that I should read in additional words beyond
24 what path coupled across's plain meaning is; correct?
25    A.    Correct.

27 (Pages 102 - 105)

ATTORNEYS EYES ONLY

1    Q.    Okay.  Now, to the first functional
2 limitation to draw different magnitudes of DC current
3 flow.  Do you see that?
4    A.    Yes.
5    Q.    Now let's talk about for the purpose of
6 drawing DC current in the path coupled across.
7    A.    Okay.
8    Q.    How is there any structural difference
9 between a path that's for the purpose of drawing DC
10 current and having the functional ability to draw
11 different magnitudes of DC current flow via that path?
12        MR. COHEN:  Objection, form.  Beyond the
13 scope of the deposition.
14    A.    Again, I -- I'm really not sure what you're
15 getting at there.
16 BY MR. BLUESTONE:
17    Q.    We have portions that we agree are
18 structural limitations, and then we have portions to
19 which you've said they are functional limitations;
20 correct?
21    A.    Correct.
22        MR. COHEN:  Objection, form.
23 BY MR. BLUESTONE:
24    Q.    And for those functional limitations you
25 have opined that all those functional limitations

1 should be interpreted as reading in the
2 words "configured to" or "design to," notwithstanding
3 the fact that those words are not present in the claim
4 itself; correct?
5        MR. COHEN:  Objection, form.
6    A.    Well, I think my -- my opinions are written
7 down there.  I ...
8 BY MR. BLUESTONE:
9    Q.    Is it your opinion that we should read in
10 the words configure to or design to before "draw," on
11 Line 18 of Claim 1 of '107?
12    A.    Yes, I believe I stated that in here, that
13 to me that means is designed or configured to draw
14 different magnitudes.
15    Q.    Okay.  So under your construction, the
16 piece of Ethernet terminal equipment to draw different
17 magnitudes of DC current flow via the one -- at least
18 one path should be read as to state, "Ethernet terminal
19 equipment configured to or designed to draw different
20 magnitudes of DC current via the at least one path"; is
21 that correct?
22    A.    I believe so.
23    Q.    Okay.
24    A.    It's paraphrasing slightly but I think it's
25 right.

1    Q.    How is the structure affected by the
2 ability to draw different magnitudes of DC current flow
3 via the path from what is already present in the
4 requirement that the path is for the purpose of drawing
5 DC current?
6        MR. COHEN:  Objection, form.  Beyond the
7 scope of the deposition.
8    A.    Yeah, again, I -- I just -- I -- I really
9 don't know what you are getting at there.
10 BY MR. BLUESTONE:
11    Q.    If I have a path that's for the purpose of
12 drawing DC current, isn't that path already capable of
13 drawing different magnitudes of DC current flow?
14    A.    Could be.  I don't -- I don't -- I don't
15 know that it would necessarily have to be.  But ...
16    Q.    How -- how could a path for the purpose of
17 drawing DC current not also be able to do that with
18 different magnitudes of DC current flow?
19        MR. COHEN:  Objection, form.  Beyond the
20 scope of the deposition.
21    A.    How -- how could it not be?  I mean, if --
22 you can design constant current sources and so on.
23 I -- I'm not sure really what -- what actual issue you
24 are getting at, to be honest with you.
25        MR. BLUESTONE:  I think we have to take a

1 break to change the tape.
2        MR. COHEN:  Probably a good time to break
3 for lunch.
4        VIDEOGRAPHER:  We are off the record at
5 11:48 a.m.
6        (Break from 11:48 a.m. until 12:47 p.m.)
7        VIDEOGRAPHER:  Stand by.
8        We are back on the record at 12:47 p.m.
9 This is file 3.
10 BY MR. BLUESTONE:
11    Q.    Good afternoon, Mr. Baxter.
12    A.    Good afternoon.
13    Q.    Before we broke for lunch, we were talking
14 about the functional limitations in Claim 1 of the '107
15 patent.  Is it correct that for those three functional
16 limitations we discussed, you do not have opinion -- an
17 opinion, sitting here today, as to whether those
18 functions ever need to be performed?
19    A.    Which three?  Can you refresh me?  Which
20 three?
21    Q.    The language that's occurring for Claim 1
22 of the '107 patent, starting at column 18 -- sorry.
23 Col -- Line 18 through Line 25, starting with "to draw
24 different magnitudes of DC current flow to the end."
25        MR. COHEN:  Objection, form.

28 (Pages 106 - 109)

ATTORNEYS EYES ONLY

Page 110

1     A.    Okay.  I'm ready.
2 BY MR. BLUESTONE:
3     Q.    Do you have -- you are looking at your
4 declaration right there?
5     A.    And the Claims 18 through -- or Lines 18
6 through ...
7     Q.    Yeah.  Before lunch, we discussed that
8 those were functional limitations; correct?
9     A.    Right.
10     Q.    And my question is:  Sitting here today, do
11 you have an opinion as to whether those functional
12 limitations ever actually need to be performed to be
13 encompassed in the scope of Claim 1?
14           MR. COHEN:  Objection, form, beyond the
15 scope of the deposition.
16     A.    I do not, no.
17 BY MR. BLUESTONE:
18     Q.    You do not have an opinion as to that;
19 correct?
20     A.    Right.
21     Q.    Let's ... would that also apply to Claim
22 104 of the '107 patent, which is on Page 4 of
23 Exhibit 6?
24           MR. COHEN:  Same objections.
25     A.    Just refresh me.  What is it that's

Page 111

1 applying to this, also?
2 BY MR. BLUESTONE:
3     Q.    You don't have an opinion as to whether the
4 functional limitations recited in Claim 104 need to
5 actually be performed ever; correct?  You have no
6 opinion to that effect?
7           MR. COHEN:  Sorry.  Same objections.
8     A.    Yes, I have no opinion at this time.
9 BY MR. BLUESTONE:
10     Q.    Do you expect to have any opinions as to
11 this at a later time?
12           MR. COHEN:  Same objections.
13     A.    I might if it becomes an issue, yeah.  I
14 mean --
15 BY MR. BLUESTONE:
16     Q.    What would you have to do to formulate that
17 opinion?
18     A.    Well, I would assume that would be in
19 conjunction with some type of infringement
20 consideration and I would have to consider all the
21 relevant facts at that point.
22     Q.    Would you have -- what would you do to
23 address that as part of a claim construction analysis?
24           MR. COHEN:  Objection, form.
25     A.    Well, I think the claim -- the claim

Page 112

1 construction analysis, I've covered in my report.  I
2 think those are -- those are my opinions.
3 BY MR. BLUESTONE:
4     Q.    Okay.  And you understand what I'm trying
5 to get at here is to make sure I understand the scope
6 of what your opinions are.  So if you don't have
7 opinion on it, that's okay; I just don't want to be
8 surprised later that all of a sudden you've come up
9 with an opinion later.
10           So what I'm asking is:  Sitting here today,
11 do you have an opinion on that?
12           MR. COHEN:  Objection, form.
13           THE WITNESS:  I'm sorry.  What?
14           MR. BLUESTONE:  He was just stating his
15 objections for the record.
16           THE WITNESS:  Oh.  Okay.
17           MR. BLUESTONE:  You can go ahead.
18     A.    No, I agree with the opinions that I stated
19 in my -- in my declaration, about the use of the
20 infinitive "to" and indicating it needs to be "designed
21 and configured," and beyond that, no.
22     Q.    Okay.  Do you understand whether
23 performance of those recited functions is a claim
24 construction dispute presently before or between the
25 parties?

Page 113

1     A.    Do I understand whether it is?
2     Q.    Do you have an understanding of whether
3 there is a dispute between the parties, as a matter of
4 claim construction, as to whether these functional
5 limitations actually have to be performed?
6     A.    I'm -- I don't know quite what to say.  Can
7 you rephrase that or -- I mean, I ...
8     Q.    Well, do you under -- do you have any
9 knowledge as to whether or not -- whether the functions
10 are actually performed is a -- is a claim construct --
11 an active claim construction dispute between the
12 parties right now?
13     A.    I mean, I understand it's an issue.  I
14 don't know that it's a claim construction issue or not.
15     Q.    Okay.  But you understand that it's
16 something that the parties are disputing?
17     A.    Yes.
18     Q.    And you understand that defendants'
19 position is that, in view of all the intrinsic
20 evidence, these functions have to actually be
21 performed?
22     A.    I have heard that, yes.
23     Q.    Okay.  All right.  So let's turn to Page 5.
24     A.    Of what?
25     Q.    All right.  So now we're talking about the

29 (Pages 110 - 113)

ATTORNEYS EYES ONLY

Page 114

1 '838 patent, which we haven't really spent a lot of
2 time on yet.
3        Claim 1 of '838 starts out talking about "a
4 central piece of network equipment comprising," and
5 then below it's talking about at least one Ethernet
6 connector.  Do you see that, that clause from 14
7 through 16?
8    A.   Yes.
9    Q.   Would you agree that that's a structural
10 limitation, what the connector is?
11   A.   Yes.
12   Q.   Okay.  And do you have any opinion on the
13 effect of the language used to carry BaseT Ethernet
14 communication signals, whether it affects what an
15 Ethernet connector comprised in the first and second
16 pairs of contacts is?
17   A.   They're saying that it will be used to
18 carry Ethernet communication signals.  That's what
19 Ethernet connectors do.
20   Q.   Does the phrase "used to carry BaseT
21 Ethernet communication signals" have any effect on the
22 structure recited previously in that -- that clause?
23        MR. COHEN:  Objection, form, beyond the
24 scope of the deposition.
25   A.   Well, it does not -- does not change what

Page 115

1 an Ethernet connector is, I mean, if that's what you
2 are asking.
3 BY MR. BLUESTONE:
4    Q.   Okay.  Does it affect what pairs of
5 contacts may be relevant?
6        MR. COHEN:  Same objections.
7    A.   No, it does not.
8 BY MR. BLUESTONE:
9    Q.   Okay.  All right.  So below, now we have
10 Line 17, "the central piece of network equipment," and
11 then it starts with "to detect different magnitudes."
12   A.   Yes.
13   Q.   And then continues to "and to control
14 application."
15        Are all the -- is all the language recited
16 after "the central piece of network equipment to," are
17 those all functional limitations?
18   A.   I believe so.
19   Q.   And how many functional limitations would
20 you say are recited in Lines 17 through 23?
21   A.   I would say two.
22   Q.   And can you just briefly describe what the
23 two functions are?
24   A.   Yes.  It is my -- my interpretation is,
25 it's designed or configured to detect different

Page 116

1 magnitudes of DC current flow and designed and
2 configured to control application of at least one
3 electrical condition.
4    Q.   Okay.  So the first function relates to "to
5 detect different magnitudes of current flow," correct?
6    A.   Right.
7    Q.   And the rest of that clause; correct?
8 And -- well, let me clarify.  To detect different
9 magnitudes of DC current flow through -- via at least
10 one of the contacts of the first and second pairs of
11 contacts.  That's one functional limitation; correct?
12   A.   Correct.
13   Q.   And then the section function -- second
14 functional limitation starts with "to control
15 application" and then goes through the remainder of the
16 claim; correct?
17   A.   Correct.
18   Q.   And sitting here today, do you have an
19 opinion as to whether those functional limitations ever
20 need to be performed?
21   A.   Again, my opinion is that the equipment
22 must be designed or configured to do those things, so
23 it must be -- must have the capability to do them.
24   Q.   But do you have an opinion as to whether
25 they actually need to ever happen; actual performance?

Page 117

1        MR. COHEN:  Objection, form.
2    A.   I don't believe that they do, but they --
3 but must be capable of doing it.
4 BY MR. BLUESTONE:
5    Q.   What do you mean, I don't believe that they
6 do?
7    A.   I don't believe that they have to have
8 already done this in the past.  They have to be
9 designed and configured so that they can do it.
10   Q.   Does it have to ever happen in the future
11 or the present?
12   A.   I -- I -- to me, my understanding is
13 there's no time frame; that if it's designed and
14 configured to do that, then it meets this claim.
15   Q.   Okay.  Let's talk about that first
16 functional limitation.
17        What allows it to detect different
18 magnitudes of DC current flow?
19        MR. COHEN:  Objection, form, beyond the
20 scope of the deposition.
21   A.   I'm not -- I'm not following the question.
22 BY MR. BLUESTONE:
23   Q.   Well, it says -- your opinion is that it
24 would have to be configured to or designed to do this;
25 right?

30 (Pages 114 - 117)

ATTORNEYS EYES ONLY

Page 118

1    A.    Right.
2    Q.    What, in the central piece of network
3  equipment, provides for that?  How would you do that?
4          MR. COHEN:  Objection, form, beyond the
5  scope of the deposition.
6    A.    You are asking me how would I design the
7  equipment?
8  BY MR. BLUESTONE:
9    Q.    Well, sorry.  We kind of talked over each
10 other.  Let me start over here.
11         Is there anything recited in the claim, any
12 structure in the claim, to tell you how that central
13 piece of network equipment is supposed to detect
14 different magnitudes of DC current flow?
15         MR. COHEN:  Objection, form, beyond the
16 scope of the deposition.
17   A.    In -- are you -- in this claim, does it
18 tell you that?
19 BY MR. BLUESTONE:
20   Q.    Mm-hmm.
21   A.    No.  It says that's a function you need to
22 do; that's a capability you need to have.
23   Q.    And what about "to control application"?
24 It's just reciting what it's supposed to do; it doesn't
25 tell you how it's supposed to be done.  Correct?

Page 119

1          MR. COHEN:  Same objection.
2    A.    It does not in this claim, no.
3  BY MR. BLUESTONE:
4    Q.    Would you look to the specification to tell
5  you in what manners it should be doing these functions?
6          MR. COHEN:  Same objections.
7    A.    The specification gives a preferred
8  embodiment, it gives an example which shows how these
9  can be done, and one of ordinary skill in the art would
10 know that there are many other ways it could be done.
11 BY MR. BLUESTONE:
12   Q.    So you don't believe it would be limited to
13 what is shown in the specifications and equivalents
14 thereof?
15         MR. COHEN:  Objection, form, beyond the
16 scope of the deposition.
17   A.    I -- I -- I don't believe it's limited to
18 what's shown in the specification, no.  I mean, that's
19 a preferred embodiment.  There are other ways you could
20 -- it would be -- a person of skill in the art would
21 know there are other ways you can implement these
22 things.
23 BY MR. BLUESTONE:
24   Q.    Okay.  So any way in which this central
25 piece of network equipment can detect different

Page 120

1  magnitudes of DC current flow via at least one of the
2  contacts of the first and second pairs is -- is okay?
3          MR. COHEN:  Objection, form, beyond the
4  scope of the deposition.
5    A.    Well, again, it's -- it needs to be able to
6  do that.  "Any way" is a pretty broad thing.  I
7  would -- it is somewhat easier to analyze specific
8  examples than anything one might imagine.
9  BY MR. BLUESTONE:
10   Q.    Is there anything wrong, in your
11 understanding, for the principles that are -- the legal
12 principles that are applied to you here?  Is there
13 anything wrong with this hybrid apparatus method claim
14 that you object to?
15         MR. COHEN:  Objection, form.
16   A.    I -- I -- I don't understand the hybrid
17 apparatus method claim.
18 BY MR. BLUESTONE:
19   Q.    I mean, there's language here in your
20 report where you -- you're talking about the use of the
21 infinitive and you say, in column -- or is it paragraph
22 14, "Defendants proposed construction of the term,
23 quote, to, end quote, is incorrect because it would be
24 improperly transforming apparatus claims into hybrid
25 apparatus method claims."

Page 121

1    A.    Right.
2    Q.    What is your basis for saying that that's
3  improper?
4    A.    And you were imply -- you were imply --
5  well, because these were apparatus claims and they
6  discuss the apparatus and -- and its structure, and so
7  on.  That's what they do.
8    Q.    My question is:  Do you believe that hybrid
9  apparatus method claims are improper based on some
10 legal principle guiding your analysis?
11   A.    Well, it's my understanding they should be
12 either apparatus or method, yes.
13   Q.    Okay.  And your way of making it not be
14 that is to add in the words "capable" -- sorry --
15 "configured to" or "designed to."  That transforms it
16 into the fact that it's just apparatus; is that
17 correct?
18         MR. COHEN:  Objection, form.
19   A.    That's the way I interpret the language
20 here, yes.
21 BY MR. BLUESTONE:
22   Q.    Do you have any understanding on why the
23 claims, as drafted, don't include the phrase "operable
24 to" or "configured to"?
25   A.    No.  I didn't write the claims.  I'm just

31 (Pages 118 - 121)

ATTORNEYS EYES ONLY

Page 122

1 trying to interpret them the best I can.
2    Q.   If you weren't governed by this hybrid
3 method apparatus concern, would it be a reasonable
4 interpretation to say that these functional limitations
5 have to be performed?
6       MR. COHEN:  Objection, form.
7    A.   Well, again, if they did have to be
8 performed, I don't think it would be written this way.
9 BY MR. BLUESTONE:
10    Q.   Well, would you agree that the use of just
11 the infinitive -- now we're talking the universe of
12 grammar and not necessarily electrical engineering, but
13 -- the infinitive can be talked about -- can be used to
14 talk about the result that needs to be achieved?
15      Would you agree with that?
16       MR. COHEN:  Objection, form.
17    A.   The infinitive "can be used to talk about
18 the result that needs to be achieved"?  I'm -- I'm not
19 following that, no.
20 BY MR. BLUESTONE:
21    Q.   So the phrase is "to detect different
22 magnitudes."  That's the beginning part of this.  "The
23 central piece of network equipment to detect different
24 magnitudes of current flow."  You're saying I need to
25 read in the word "designed" or "configured" even though

Page 123

1 it's not written in the claim?
2    A.   Right.
3    Q.   Correct.  The in -- is that the only way
4 you can use the words -- the infinitive "to"?  Does the
5 use of the infinitive always require "configured to"?
6       MR. COHEN:  Objection, form.
7    A.   You mean throughout the English language?
8 BY MR. BLUESTONE:
9    Q.   Yeah.
10    A.   Well, no.
11    Q.   So there could be certain circumstances
12 where you use the infinitive and you are talking about
13 the result that needs to be achieved?
14       MR. COHEN:  Objection, form.
15    A.   I -- it's not ringing a bell.
16 BY MR. BLUESTONE:
17    Q.   Okay.  So if we put aside your hybrid
18 method apparatus claim issue and you look at the plain
19 meaning of the language of this claim, "The central
20 piece of network equipment to detect different
21 magnitudes of DC current flow," et cetera, is it your
22 position that it's just completely ridiculous to think
23 that it's actually talking about a function that's
24 being -- that needs to be performed?
25       MR. COHEN:  Objection, form.

Page 124

1    A.   I'm -- I'm not sure I understand what
2 you're getting at.
3 BY MR. BLUESTONE:
4    Q.   Well, I mean, is this an issue that
5 reasonable people can differ on as to whether "to
6 detect" requires a result to be achieved or versus
7 whether or not you should add in the language
8 "configured" or "designed"?
9       MR. COHEN:  Objection, form, beyond the
10 scope of the deposition.
11    A.   Well, that -- that's not the way I would
12 interpret it.
13 BY MR. BLUESTONE:
14    Q.   That's not how you would interpret it, but
15 is it completely unreasonable to take the other side?
16       MR. COHEN:  Objection, form.
17    A.   I -- you know, I can't speak for that.
18 That's not the way I interpret it.  I ...
19 BY MR. BLUESTONE:
20    Q.   Now, paragraph 16, you said you reviewed --
21 read the claims in light of the specification and the
22 file history.  Do you see that on paragraph 16?
23    A.   Yes.  Yes.
24    Q.   Did you also consider the claims in view of
25 the language of the claim, as a whole?

Page 125

1    A.   Yes, I considered the claim specification,
2 mm-hmm.
3    Q.   Okay.  Did you look at the file history?
4    A.   I did, yes.  I didn't memorize it, but I
5 looked at it.
6    Q.   Okay.  Can you generally recall what you
7 looked at and whether it affects your interpretation as
8 it pertains to the '838 patent?
9    A.   I -- I don't recall.  I didn't see anything
10 that made me think my interpretation was wrong.  Let's
11 put it that way.
12    Q.   Okay.  Did you see anything that affected
13 these clauses in the '838 prosecution history?
14    A.   I -- I can't recall off the top of my head.
15    Q.   Okay.  What about for the '760 file
16 history?  Is there anything in the '760 file history
17 that you thought could have been relevant?
18       MR. COHEN:  Objection, form.
19    A.   Nothing rings a bell.
20 BY MR. BLUESTONE:
21    Q.   Okay.  What about the '107 patent?
22    A.   Ditto.
23    Q.   And there's nothing in your report that
24 cites explicitly to the file history; correct?
25       MR. COHEN:  Objection, form.

32 (Pages 122 - 125)

ATTORNEYS EYES ONLY

Page 126

1   A.   There -- there is -- I don't believe there
2   is, no.
3   BY MR. BLUESTONE:
4   Q.   Okay.  And is it safe to assume that if
5   there was something that you thought was relevant, you
6   would have referenced it in your report?  Correct?
7   A.   Probably, yes.
8   Q.   Let's go back to the '760 patent.  Are
9   there any functional limitations in the '760 patent
10  Claim 1?
11  A.   Is there a particular one you are concerned
12  about?
13  Q.   If you could just go through the Claim 1
14  and just identify which items you believe are
15  functional limitations, that would be helpful.
16  A.   Okay.  I'm working on it.
17  Q.   That's fine.  Take your time.
18  A.   I'm more of a structural guy, myself.
19       All right.  So you want to know what's your
20  structural, what's your functional?
21  Q.   Sure.
22  A.   Is that it?
23  Q.   Correct.
24  A.   Okay.  Starting at Line 19, the data
25  signaling pairs are structural; having one -- at least

Page 127

1   one DC supply is structural; having at least one path
2   to draw current is structural; detect at least two
3   different magnitudes, also structural, in my opinion.
4   Q.   So are there any functional limitations?
5   You've said structural -- structural for all those.
6   A.   Okay.  And the other stuff looked more
7   functional to me.
8   Q.   So the piece of -- starting from the
9   bottom, Lines 33 through 35, "to detect at least two
10  different magnitudes of --" current "-- of the current
11  flow through the loop and to control application of at
12  least one electrical condition to at least two of the
13  conductors," is that -- are those functional
14  limitations or structural limitations?
15  A.   They seem structural to me, because
16  that's -- you have to have things and equipment to do
17  that.
18  Q.   So there's nothing in the '760 that you
19  would deem to be a functional limitation?
20  A.   Oh, I didn't say there was nothing.
21  Q.   Sorry.  So what are the items that you
22  believe are functional limitations?
23  A.   "... used to carry BaseT Ethernet
24  communication signals" sounds functional.  And I'm not
25  a hundred percent sure what you're getting at with this

Page 128

1   question, but ...
2   Q.   Well, when we were talking about the '838
3   Claim 1, where it was talking about to detect and to --
4   "to detect different magnitudes of DC current flow --
5   A.   Right.
6   Q.   -- and to control application."
7   A.   Mm-hmm.
8   Q.   That's on Page 5 of Exhibit 6.
9   A.   Okay.
10  Q.   Previously, you said those were functional
11  limitations.  For the '760, correct me if I'm wrong, I
12  believe it's using the same functional limitations to
13  detect and to control.
14  A.   Okay.  I see what you're saying.  Yeah.
15  Got it.
16  Q.   Would you -- I -- I want to know your
17  opinion, not -- I'm not the one testifying.
18       Would you say those are functional
19  limitations in Page 1, lines 33 through 36, or
20  structural?
21  A.   I mean, I guess you could consider those
22  functional, too.
23  Q.   All right.  Let's go back to Exhibit 1.
24  A.   Exhibit 1.
25  Q.   Paragraphs 54 through 66, you are

Page 129

1   discussing current and current flow.
2   A.   54 through 66.  All right.  Yes, I see
3   that.
4   Q.   Okay.  In Paragraph 65, you talk about --
5   you say that Claim 1 merely requires a path that is
6   configured to draw DC current.  Do you see that?
7   A.   And this is Claim 1 of the '760?
8   Q.   Of the '107.
9   A.   '107.  I'm sorry.
10  Q.   That's fine.
11  A.   All right.  For the purpose of drawing DC
12  current, yes.
13  Q.   You say Claim 1 merely requires a path that
14  is configured to draw DC current.  When you're saying
15  that, are you referring to the entire claim, Claim 1 of
16  the '107 patent?  That's all that's required?
17       MR. COHEN:  Objection, form.
18  A.   No, it's the "at least one path for the
19  purpose of drawing DC current," is what I'm ...
20  BY MR. BLUESTONE:
21  Q.   Okay.  And we discussed this earlier, but
22  you say that current and current flow are not claim
23  structure elements, correct, in Paragraph 64?
24  A.   Correct.
25  Q.   Now, why, in Paragraph 57, do you say that

33 (Pages 126 - 129)

ATTORNEYS EYES ONLY

Page 130

1 current flow is less commonly used?
2    A.    Just my -- my experience.
3    Q.    And is it that the word flow is somehow
4 redundant?  Is that why it's not used?
5    A.    I think the two are pretty much
6 interchangeable.  I mean, current is a flow of charge,
7 so current flow is slightly redundant, in the same way
8 that DC current is redundant.  Right?  DC is direct
9 current.  So a direct current current.  We say that and
10 nobody bats an eye.
11    Q.    Well, but direct current, though, is
12 limiting the scope of current in some perspective;
13 right?  It can't change polarities to be direct
14 current; correct?
15    A.    Right.
16    Q.    Okay.
17    A.    DC means direct current.  We often say DC
18 current --
19    Q.    Oh.  I understand now.  Okay.
20    A.    -- which is redundant, in the same way that
21 current flow would be redundant.  You will also hear
22 people say flow of current sometimes, and it's kind of
23 understood that if there's current, it's flowing.  So
24 those are just different ways of saying the same thing.
25    Q.    But in this claim, your position is that

Page 131

1 there doesn't ever need to actually be any current
2 flow; correct?
3    A.    Correct.  It's there for the purpose of
4 drawing current.
5    Q.    Did you at all consider the fact that the
6 word "flow" is added to the claims during prosecution
7 of the '107 or what became the '107 patent?
8    A.    Did I consider?  No.
9    Q.    Did you ever look at the portion of the
10 prosecution history that shows the word "flow" being
11 added?
12    A.    I don't recall if I did or not.
13    Q.    Okay.  So sitting here today, there's
14 nothing that you recall in the prosecution history as
15 to how "flow" was added to create the phrase "current
16 flow"?
17    A.    Correct.
18    Q.    And in your opinion, "flow," as used in the
19 claim, for "current flow," is just superfluous with
20 current?
21        MR. COHEN:  Objection, form.
22    A.    I -- I think they mean essentially the same
23 thing, yes.
24 BY MR. BLUESTONE:
25    Q.    Okay.  Well, if we start with the

Page 132

1 assumption that the word "flow" was added during
2 prosecution, would you say it was added for no reason?
3        MR. COHEN:  Objection, form.
4    A.    I don't know.
5 BY MR. BLUESTONE:
6    Q.    So sitting here today, you don't know why
7 "flow" was added to the claims?
8    A.    Correct.
9    Q.    I'll direct your attention to Paragraphs
10 61, 62 -- sorry -- 61 and 62, and read it to yourself
11 and let me know when -- when you're done, please.
12        Are you finished reading those paragraphs?
13    A.    Yes.
14    Q.    Okay.  Thanks very much.
15        Okay.  So starting with 61, you say, in the
16 middle of that -- that paragraph, where terms current
17 and current flow are used, it is with respect to DC,
18 quote, or direct current.  Your point here is that both
19 current and current flow, as used in Claim 1 of the
20 '107 patent, both are preceded by the word "DC,"
21 correct?
22    A.    Right.
23    Q.    And because it's preceded by the term "DC,"
24 a person of ordinary skill in the art would understand
25 that both current and current flow are talking about

Page 133

1 direct current; correct?
2    A.    Right.
3    Q.    Now, Paragraph 62, you say in every
4 instance it's been preceded by DC; correct?
5    A.    Correct.
6    Q.    Then there's Paragraph 63, then, and I'm
7 going to parse the language a little bit to -- to -- to
8 get to my point here.
9        The first word in Paragraph 63 is "thus."
10 To me, "thus" means "it follows that," or something
11 like that.  Does that make sense of what you're getting
12 at here?
13    A.    Yes.
14    Q.    So you are basically saying, because it's
15 preceded by DC current flow, a person of ordinary skill
16 in the art would understand that the terms current and
17 current flow mean the same thing.
18        Why?  I don't get why that follows.
19    A.    Well, because we're talking about direct
20 current in every case.
21    Q.    Mm-hmm.
22    A.    And as I've said before, current is a flow
23 of charge; therefore, current is always a flow.  So
24 whether you say current flow or you just say current,
25 to me, is pretty much the same thing.

34 (Pages 130 - 133)

ATTORNEYS EYES ONLY

Page 134

1    Q.   But how does it suggest in any way that
2    current and current flow mean the same thing based on
3    the fact that they're both preceded by the word "DC"?
4    I don't understand that.
5    A.   Well, we're talking about direct current in
6    all -- all cases, whether it's current or current flow.
7    They -- to me, they're the same.
8    Q.   But I guess I have to ask again, how does
9    the fact that it's preceded by the word "DC" lead to
10   one conclusion of it or the other as to whether current
11   and current flow mean the same thing?
12   A.   Well, I think they're both used
13   consistently to refer to DC current.
14   Q.   Okay.  Let's turn to Claim 1 of the '107
15   patent.
16        Would you agree with me that DC current
17   without the word "flow" is only used once in the claim?
18   And take your time to go through it.  I don't want -- I
19   don't want you to feel rushed.
20   A.   Yeah, that is true.
21   Q.   Okay.  And that is used in conjunction with
22   the structural limitation of at least one path coupled
23   across; correct?
24   A.   Yes, used in conjunction with one path,
25   right.

Page 135

1    Q.   Okay.  Now, later in the claim, current
2    flow is used three times; correct?  DC current flow.
3    A.   Yes.
4    Q.   Once is on Line 19; correct?
5    A.   Right.
6    Q.   The second time it appears is on Line 20;
7    correct?
8    A.   Correct.
9    Q.   And the third time it appears is on Line
10   23; correct?
11   A.   Correct.
12   Q.   Each one of those instances of current flow
13   relates to one of the functional limitations that you
14   discussed earlier; correct?
15        MR. COHEN:  Objection, form.
16   A.   Yeah, I believe so.
17   BY MR. BLUESTONE:
18   Q.   Okay.  So is it fair to say that in the
19   instances in the claim in which it's referring to
20   structure, the claim uses DC current, and as for
21   when -- when it's referring to the function, it's
22   referring to DC current flow?
23        MR. COHEN:  Objection, form.
24   A.   I mean, it looks like this claim might be
25   that way.

Page 136

1    BY MR. BLUESTONE:
2    Q.   Okay.  Yeah.  I'm just talking about Claim
3    1 of the '107.
4    A.   Yes.
5    Q.   Does the fact that it's using different
6    words -- in fact, the addition of the word "flow" --
7    factor into the analysis, at all, as to whether they
8    should have different meanings?
9    A.   I'm sorry.  Does the fact -- what?
10   Q.   Does the fact that it's using different
11   words -- namely, the addition of the word "flow" --
12   A.   Right.
13   Q.   -- factor into your analysis as to whether
14   or not they should have the same or different meanings?
15   A.   Well, in -- in normal usage, current and
16   current flow are the same thing.
17   Q.   Okay.  And you're talking about just --
18   you're walking down the street --
19   A.   Yeah.
20   Q.   -- current and current flow means the same
21   thing to you?
22   A.   Right.
23   Q.   I'm not talking about this claim.  We're
24   now using the principles of a person of ordinary skill
25   in the art trying to determine what the patent claim

Page 137

1    means.
2        Does the fact that there are different
3    words being used suggest, in any way, that they should
4    have different meanings?
5    A.   Not necessarily.
6    Q.   Does it factor into your analysis that we
7    should consider the different words that are used?
8    A.   Sure, you could consider.
9    Q.   And did you consider, at all, how the
10   addition of the word "flow" could impart a different
11   meaning?
12   A.   I -- I don't see that it does impart a
13   different meaning.
14   Q.   Okay.  Was there ever a point in time in
15   which you looked at it and came to the conclusion that
16   it did impart different meanings?
17   A.   No.
18   Q.   And sitting here today, you would not
19   believe that a plausible interpretation would be that
20   current is the flow of electric charge and current flow
21   is the flow of electric charge in one direction;
22   correct?
23        MR. COHEN:  Objection, form.
24   BY MR. BLUESTONE:
25   Q.   I can -- do you want me to say it again?

35 (Pages 134 - 137)

ATTORNEYS EYES ONLY

Page 138

1    A.    Yes, say it again.
2    Q.    Of course.
3          Sitting here today, you would not have --
4    you would not believe it would be an appropriate
5    interpretation to say that current is the flow of
6    electric charge, while current flow is the flow of
7    electric charge in one direction.  That would be
8    improper.  Correct?
9          MR. COHEN:  Objection, form.
10   A.    That -- that is not the way I would
11   interpret it, right.
12   BY MR. BLUESTONE:
13   Q.    Okay.  And have you ever had an opinion to
14   that effect?
15   A.    Have I ever?
16   Q.    That you are aware of.
17   A.    I don't recall.
18   Q.    Let's go to Paragraph 102 real quick.
19   A.    102 in the declaration?
20   Q.    Yes, sir.  And this is talking about BaseT,
21   and I'll get to that later in the deposition.
22   A.    Okay.
23   Q.    But you say, during prosecution the, quote,
24   10, end quote, in front of BaseT was removed.
25   A.    Right.

Page 139

1    Q.    And presumably, correct me if I'm wrong,
2    your point here is saying that when they changed the
3    wording, they changed scope of the meaning of the
4    clause; is that correct?
5    A.    Well, yes and no.  The -- it was talking
6    about a Base -- 10BaseT wiring scheme, which is the
7    same wiring scheme used for the other BaseTs, so it
8    doesn't really make a great deal of difference to me.
9    Q.    But --
10   A.    It didn't say 10BaseT --
11   Q.    The 10BaseT is narrower than just BaseT
12   under your construction; correct?
13   A.    Well, a 10BaseT wiring scheme is actually
14   broader than -- it would actually be the same as a
15   BaseT wiring scheme, because they --
16   Q.    That's not necessarily true; right?
17   Because a 10BaseT allows you to use Cat 3 --
18   A.    Right.
19   Q.    -- but a hundred BaseT would make sure that
20   you have to use at least Cat 5; right?
21   A.    Right, but if it will -- if a hundred BaseT
22   will work on it, so will 10.  All right?
23   Q.    Okay.  I just want to make sure I
24   understood what you meant by "broader."  That was a
25   little confusing to me.

Page 140

1    A.    Yeah, so the 10BaseT wiring is, if
2    anything, a superset of -- well, BaseT includes all of
3    them, which is all the same, and 10BaseT will work on
4    wiring for any of the Base-Ts, so with that particular
5    thing, I'm not sure it even makes much difference if
6    they took it out, because it wasn't talking about a
7    10BaseT network, it was talking about a 10BaseT wiring
8    scheme.
9    Q.    Interesting.  Okay.  Let's come back to
10   that --
11   A.    Okay.
12   Q.    -- the specifics of BaseT.  Because I
13   don't -- I don't want to get us distracted from what
14   we're talking about on this topic.  But we will come
15   back to that.  I promise you.
16   A.    Okay.
17   Q.    Does that -- so looking at that example of
18   10BaseT, that removal of "10" doesn't necessarily
19   impart a different meaning; the fact that that term was
20   removed?
21   A.    No, I -- I think it makes it more standard
22   like, but it doesn't necessarily --
23   Q.    Change the scope?
24   A.    -- change the scope, in my opinion.  Yeah.
25   Q.    Okay.  All right.  Let's talk about BaseT a

Page 141

1    little bit.  This is Paragraphs 94 through 105 of your
2    declaration, Exhibit 1.
3          In Paragraph 98, you say the plain and
4    ordinary meaning is, quote, twisted pair Ethernet per
5    the IEEE 802.3 standards, and you list some examples.
6    Do you see that?
7    A.    98?
8    Q.    Mm-hmm.
9    A.    Yes.
10   Q.    Does 1Base5 -- is 1Base5 included in
11   10BaseT?
12   A.    No.
13   Q.    Why not?
14   A.    It's not a BaseT.
15   Q.    But it is a twisted pair, isn't it?
16   A.    1Base5 ... I don't recall if it is or not,
17   but it -- but it's not a BaseT.
18   Q.    I can put this in as an exhibit later, if
19   necessary, but this is on Page 140 of --
20   A.    1Base5.
21   Q.    -- I believe, your book Residential
22   Networks.
23   A.    Yes.
24   Q.    Do you see the top entry in that column?
25   A.    Yup, the Base5 UTP.  Yeah, it's so long

36 (Pages 138 - 141)

ATTORNEYS EYES ONLY

Page 142

1 ago, I'd forgotten about it.
2   Q.   Yeah.  So UTP means -- what does UTP mean?
3   A.   Unshielded twisted pair.
4   Q.   Okay.  So 1Base5 is a twisted pair network
5 or a twisted pair configuration?  Pardon me.
6   A.   But it's not referred to as BaseT.
7   Q.   It's not referred to as BaseT.
8   A.   Right.
9   Q.   But your ordinary and plain meaning is
10 twisted pair Ethernet per the 802.3 standards.
11   A.   .3 standards; e.g. 10BaseT this, a hundred
12 BaseT that, and a thousand BaseT that, yes.
13   Q.   Yeah.  And you would agree with me that
14 1Base5 is twisted pair; correct?
15   A.   Yes.
16   Q.   And 1Base5 is Ethernet; correct?
17   A.   Yes.
18   Q.   And it is a standard that's recited in the
19 802.3 standards.  It's an old one.
20   A.   Probably, yes, but it is not one of the
21 BaseT standards.
22   Q.   I am confused as to how 1Base5 does not --
23 is not encompassed in your definition of twisted pair
24 Ethernet, per IEEE 802.3.
25   A.   Well, again, what it says is BaseT

Page 143

1 Ethernet, and it is not BaseT, it's Base5.  All right?
2 I mean, there's various -- Base means baseband and T
3 means twisted pair, and there's a series of those
4 standards which are all backwards compatible with each
5 other, of which 1Base5 is not one.
6   Q.   Well, your definition at Paragraph 98 is
7 that the ordinary meaning is twisted pair Ethernet, per
8 the 802.3 standards.
9   A.   And then I -- and then I list them.
10   Q.   You list e.g.  e.g. means "for example,"
11 correct?
12   A.   Right.  And those are all the ones I know
13 of.
14   Q.   Okay.  Well, just because you don't know of
15 all of them, couldn't there be other twisted pair
16 Ethernet standards that apply to your definition?
17       MR. COHEN:  Objection, form.
18   A.   Again, but it's not called BaseT.  It's
19 very obvious to one with the ordinary skill in the art
20 what BaseT means, in my opinion.
21 BY MR. BLUESTONE:
22   Q.   I understand what you're saying now, but
23 it's at odds with what it says in Paragraph 98.  Do you
24 see that?
25   A.   No.

Page 144

1       MR. COHEN:  Objection, form.
2 BY MR. BLUESTONE:
3   Q.   You don't -- you don't see the
4 inconsistency?
5   A.   I don't.
6   Q.   Do you agree with your definition in
7 Paragraph 98 that says that the plain ordinary -- the
8 plain and ordinary meaning of BaseT is twisted pair
9 Ethernet, per the IEEE 802.3 standards?
10       MR. COHEN:  Objection, form.
11   A.   Such as including the ones I mention there,
12 yes.
13 BY MR. BLUESTONE:
14   Q.   Those -- so is it your opinion now, sitting
15 here today, that twisted pair Ethernet, per the
16 standards, is not e.g., but "i.e.", 10BaseT, et cetera?
17   A.   Well, "i.e." meaning what?
18   Q.   Well, it says e.g.  e.g. means "for
19 example," correct?
20   A.   Right.
21   Q.   And when people typically use e.g., they
22 mean it not in a limiting fashion --
23   A.   Okay.
24   Q.   -- but rather, as a -- an exemplary
25 fashion; meaning, there could be more.  Right?

Page 145

1   A.   Okay, that's not the fashion I mean in
2 here.  I mean, specifically, those three are the ones.
3 Now, there -- there may be more coming, but they will
4 have BaseT in the name.
5   Q.   So what matters is whether BaseT is in the
6 name?
7   A.   That's why they call them BaseT, yeah.
8 Because it's --
9   Q.   So if I -- if I come up with a standard of
10 1 BaseT-5 now it's BaseT?  If I rename it to BaseT-5,
11 now it would read on it?
12       MR. COHEN:  Objection, form.
13   A.   I don't think that's going to happen.  I
14 don't think that you'd be as interested in 1 Base
15 anything, to be honest.
16 BY MR. BLUESTONE:
17   Q.   But if they did rename it as 1 BaseT-5,
18 then it would fit in this definition?
19       MR. COHEN:  Objection, form.
20 BY MR. BLUESTONE:
21   Q.   What if I have BaseT -- a thousand BaseT
22 and it turns out it's actually using co-ax.  Is that
23 going to be okay?
24   A.   Well, then it wouldn't be BaseT.
25   Q.   Why not?

37 (Pages 142 - 145)

Page 146

1    A.    Because the T means twisted pair.
2    Q.    Where is that in your report?
3    A.    Based -- it's commonly known by those of
4  ordinary skill in the art that Base is baseband, the T
5  is twisted pair.
6    Q.    So in Paragraph 104, you say BaseT Ethernet
7  is known and described in at least --
8    A.    Right.
9    Q.    -- 10BaseT, a hundred BaseT-X and a
10 thousand BaseT.  You don't mean that to be limited to
11 just those three; right?
12   A.    Well, they're working on higher speed ones.
13   Q.    Well, why would a higher speed one have any
14 relevance to these -- these claims asserted here?
15   A.    It doesn't.
16   Q.    Why not?
17   A.    Because the higher speed one doesn't exist
18 yet.  I mean, it might some day, but it doesn't now.
19   Q.    Well, you could already have something like
20 10 gig BaseT already, couldn't you?  I guess, as we sit
21 here today, that's something that's in the works;
22 right?
23   A.    Right, it is, yes.
24   Q.    And is that something that would be
25 encompassed in the meaning of BaseT?

Page 147

1    A.    Potentially, yes.
2    Q.    Well, what would you need to know?  You
3  said potentially.  Yes or no?
4    A.    I believe so.  I mean, I'd want to look at
5  it, but I ...
6    Q.    But at the time of the patents, their
7  priority dates --
8    A.    Right --
9    Q.    -- the applications being filed --
10   A.    -- those were not -- that was not, no.
11   Q.    So which way -- which way does it go?  Does
12 it -- is it limited just to the ones that they knew
13 about or could it be encompassed to ones that are
14 coming up later in the future?
15   A.    Well, certainly at the time, in the '98-'99
16 time frame, 10BaseT and a hundred BaseT were out and
17 well-known, a thousand BaseT was about to be issued and
18 had been widely discussed in the press, so everyone
19 knew about that, too.  So the reason I picked those is
20 because those are the ones that were known at the time
21 of the application.
22   Q.    Okay.  So these three standards, you say,
23 fit into the definition of BaseT.  The predecessor
24 twisted pair standards, like 1Base5, you would say is
25 not included in it?

Page 148

1    A.    Right.
2    Q.    Standards that are later developed, like 10
3  gig BaseT, are they included, or not?
4    A.    Well, they are BaseT Ethernet and they use
5  essentially the same type of cable, so what would work
6  in terms of the communication technique discussed in
7  these patents, what would work here would likely work
8  there, too, but they -- they don't exist yet.
9  Presumably, that's high-speed stuff, so, you know,
10 things -- things that aren't out there, you know, I --
11 I'm not that concerned about right now.  I was worried
12 about what existed at the time of the application.
13   Q.    And 1Base5 existed at the time of the
14 application, though, and it is twisted pair.
15   A.    It's twisted pair, but it's not BaseT.
16   Q.    Because it doesn't use the words BaseT or
17 because it's not twisted pair?
18   A.    Because it's not called BaseT.
19   Q.    So based -- so your opinion on what BaseT
20 means depends solely on the name and use of BaseT in
21 it, not necessarily the features?
22         MR. COHEN:  Objection, form.
23   A.    No, not at all.  The name describes the
24 features.  I mean, you put -- if it was called BaseT,
25 it wouldn't be working on fiber or co-ax, or something.

Page 149

1  It would be Ethernet on twisted pair.
2  BY MR. BLUESTONE:
3    Q.    Does the patent have any disclosure beyond
4  using twisted pair Ethernet?
5         MR. COHEN:  Objection, form, beyond the
6  scope of the deposition.
7    A.    "Disclosure" meaning?
8  BY MR. BLUESTONE:
9    Q.    Is there anywhere in any of the common
10 specifications where they contemplate the patent
11 relating to an Ethernet protocol that is using
12 something other than twisted pair?
13         MR. COHEN:  Same objections.
14   A.    Protocol?  Other than twisted pair?  I
15 don't believe so.
16 BY MR. BLUESTONE:
17   Q.    So we're already starting from the
18 framework where we know we're talking about just
19 twisted pair.  How does it make any difference whether
20 it's now using BaseT or not?  How is that inventive?
21         MR. COHEN:  Objection, form, beyond the
22 scope of the deposition.
23   A.    I'm sorry.  How is what?
24 BY MR. BLUESTONE:
25   Q.    Well, presumably when we are adding the

38 (Pages 146 - 149)

ATTORNEYS EYES ONLY

Page 150

1 word BaseT, we're changing the meaning of the claim in
2 some way. It's not just Ethernet now. Now it's BaseT
3 Ethernet.
4    A.    Right.
5    Q.    How does that have any effect, at the end
6 of the day, on whether you've added the term BaseT or
7 not?
8        MR. COHEN: Objection, form, beyond --
9    A.    Well, because --
10        MR. COHEN: Wait. Wait. Wait. Let me
11 finish my objection.
12        THE WITNESS: I'm sorry.
13        MR. COHEN: Yeah. Objection, form, beyond
14 the scope of the deposition.
15        THE WITNESS: Okay. Now, the question
16 again?
17 BY MR. BLUESTONE:
18    Q.    How does it have any effect, at the end of
19 the day, as to whether or not the claims incorporate
20 the word Base; capital B, lower case a, lower case s,
21 lower case e, capital T?
22        MR. COHEN: Same objections.
23 BY MR. BLUESTONE:
24    Q.    How does that have any effect on what the
25 claim scope should mean?

Page 151

1        MR. COHEN: Same objections.
2    A.    Because it's meant to work with equipment
3 that meets those standards, because they have
4 characteristic -- certain characteristics, such as
5 working on twisted pair and the use of pairs and the
6 modular jack, and so on.
7 BY MR. BLUESTONE:
8    Q.    Okay. So what are the features of 1Base5
9 that make it not using twisted pair and not using a
10 modular jack or something else?
11    A.    I -- I -- I don't recall really what. I
12 don't.
13    Q.    So is it possible that 1Base5 shouldn't be
14 included in your definition of BaseT?
15        MR. COHEN: Objection, form.
16    A.    I think if there's any 1Base5 equipment
17 still out there, you know, we might be willing to just
18 let it slide. You know, I don't know.
19 BY MR. BLUESTONE:
20    Q.    What's that?
21    A.    I said, we might be just willing to let it
22 slide if there's any 1 Base -- 1Base5 equipment out
23 there.
24    Q.    Well, that's all well and good, but we need
25 to go and figure out what is -- I mean, the -- the task

Page 152

1 at hand is to try and figure out what these claim terms
2 mean.
3    A.    Right.
4    Q.    Like, the fight between the parties right
5 now is, to a person of ordinary skill in the art, what
6 does this mean? And the claims are being changed to
7 add in BaseT. You see that; right? Some claims don't
8 have BaseT and some claims do. Correct?
9    A.    Right.
10    Q.    What is the effect to any of the claimed
11 inventions when you add BaseT?
12        MR. COHEN: Objection, form, beyond the
13 scope of the deposition.
14    A.    Yeah, I'm -- I'm not sure what you're
15 getting at, at all, there.
16 BY MR. BLUESTONE:
17    Q.    Well --
18    A.    I think my -- my -- my claim construction
19 issue was that -- that this is what BaseT means to one
20 of ordinary skill in the art and ...
21    Q.    But -- okay. But the claim, for example,
22 using BaseT -- capital B, lower case a-s-e, is not even
23 the way you would present it in the IEEE standard, is
24 it?
25        MR. COHEN: Objection, form.

Page 153

1    A.    Do you mean because of the capitalization?
2 BY MR. BLUESTONE:
3    Q.    Yeah.
4    A.    I think anyone would know what that means.
5    Q.    Yeah, but we're already taking a step here.
6        Let me put it this way:
7        Is there any instance in the IEEE standard
8 where it defines any group of protocols as being BaseT,
9 either capitalized or using lower-case letters?
10    A.    Well, it defines specific ones as being
11 BaseT, because it's in the title of the standard.
12    Q.    Well, it doesn't define anything as being
13 BaseT, in and of itself, does it?
14        MR. COHEN: Objection, form.
15    A.    Well, if the standard has BaseT in the
16 name, I think most people would agree it's BaseT
17 Ethernet.
18 BY MR. BLUESTONE:
19    Q.    Well, and I showed you the section in your
20 book. There's nothing in your book that said these are
21 a compilation of BaseT networks, does it?
22        MR. COHEN: Objection, form.
23    A.    I -- I -- I don't think so, but I don't
24 know what you're getting at.
25 BY MR. BLUESTONE:

39 (Pages 150 - 153)

ATTORNEYS EYES ONLY

Page 154

1   Q.   Well, the IEEE standard is going to go and
2   say, This is 1Base5 and give an explanation of what
3   1Base5 is.   What is the significance of the 5; do you
4   know?
5   A.   I actually don't remember.
6   Q.   Okay.
7   A.   That was a long time ago.
8   Q.   But presumably, it has some significance;
9   right?
10  A.   Probably, although I don't recall what.
11  Q.   Okay.  What's the significance of the
12  prefix number 1 or 10, et cetera?
13  A.   That's typically the speed in megabits.
14  Q.   Okay.
15  A.   So 10 megabit, a hundred megabit, a
16  thousand megabit.
17  Q.   Is there anything in the IEEE standard that
18  says, We have a category of networks that we are
19  calling BaseT?
20  A.   Well, if you just get a list of the IEEE
21  standards, you will see the ones that are called BaseT.
22  Q.   Yes, you will see certain ones with BaseT.
23  I concede that point.
24       Is there anything in the IEEE standards
25  that defines BaseT without a prefix number or something

Page 155

1   else?
2   A.   I -- I don't know offhand.  There are other
3   things in the literature that explain what it means.
4   Q.   Okay.  So if, all of a sudden, they decided
5   now to -- in the next iteration of the 802.3 standards,
6   decide that they don't want to use the letter "T"
7   anymore and they're going to call it "X," so now it's
8   10 Base X, the claims -- the claims would not encompass
9   those standards; right?
10      MR. COHEN:  Objection, form, beyond the
11  scope of the deposition.
12  A.   Well, if they just -- you're saying if they
13  changed the name?
14  BY MR. BLUESTONE:
15  Q.   Yeah.
16  A.   Well, the old documents would still be
17  around and they would still be compatible with them and
18  all the vendors would still say, "This is IEEE blah,
19  blah, blah, blah, which is also 10BaseT."
20  Q.   Okay.
21  A.   So I think these patents would have long
22  since expired before that name passed out of usage.
23  Q.   Well, since we're dealing with, you know,
24  our crazy hypotheticals, it has come down from above
25  that everything will now be Base-X and not BaseT, from

Page 156

1   this moment forward.  I'm going to sell my products and
2   I'm going to call them 10 Base-X and IEEE is going to
3   agree with me and that's what we're going to call them.
4       Are we no longer reading onto the scope of
5   the claims in any way?
6       MR. COHEN:  Objection, form.
7   A.   I would have to study that in more detail.
8   My guess is that it wouldn't matter, but I would have
9   to study and consider that more to give you a
10  definitive opinion.
11  BY MR. BLUESTONE:
12  Q.   Okay.  So you would agree with me, though,
13  that the standard doesn't use BaseT as it is recited in
14  the claim; right?  It doesn't use capital B, lower case
15  a, lower case s, lower case e, capital T, altogether.
16  That's not how it's used in the IEEE standard; right?
17      MR. COHEN:  Objection, form.
18  A.   It's typically all upper case.
19  BY MR. BLUESTONE:
20  Q.   Right.  So there's a difference; correct?
21  A.   There's a difference in capitalization,
22  yes.
23  Q.   Okay.  Is there anything in -- well, one of
24  the things you mention here in Paragraph 98 is a
25  hundred Base-TX.  It's not BaseT, it's Base-TX.  What

Page 157

1   does the "X" stand for in TX?
2   A.   Okay, there were several varieties of a
3   hundred BaseT.  TX is the most commonly implemented
4   one, but there's several flavors of it.
5   Q.   But it's not BaseT anymore.  Now it's
6   Base-TX.  How is that a BaseT?
7   A.   It's -- it's still BaseT.
8   Q.   So all I need is the letters B-A-S-E and T
9   together, and it reads on the claim?
10      MR. COHEN:  Objection, form.  Beyond the
11  scope of the deposition.
12  A.   I ... reads on the scope of the claim ...
13  I -- I -- I -- I am inclined to disagree with that, but
14  I would have to think it through much more thoroughly
15  to give you a definitive opinion.
16  BY MR. BLUESTONE:
17  Q.   Well, the problem that we have here is,
18  you've given a declaration as what you said the plain
19  and ordinary meaning is.
20  A.   Uh-huh.
21  Q.   This is my opportunity here to ask you
22  questions on -- to clarify what you mean by this.
23  A.   Right.  Right.
24  Q.   And I'm truly not trying to be difficult in
25  any way, but I'm trying to understand why 1Base5 is

40 (Pages 154 - 157)

ATTORNEYS EYES ONLY

Page 158

1 twisted pair, but it isn't encompassed.
2       I don't understand what the universe of
3 BaseT would encompass. Can you explain that to me?
4 How do I know what is and isn't BaseT?
5    A.   Well, I think one of ordinary skill in the
6 art does know. All right?
7    Q.   Well, the members of the jury sitting
8 there, who are going to decide whether there is
9 infringement or not, are not necessarily persons of
10 ordinary skill in the art, so we've got to go tell them
11 what it means. Right?
12   A.   Right.
13   Q.   What, to a person of ordinary skill in the
14 art, does BaseT encompass and not encompass?
15   A.   At the time of the invention, it
16 encompassed 10BaseT, a hundred BaseT and a thousand
17 BaseT.
18   Q.   Why?
19   A.   Because those were the BaseT standards that
20 were in addition -- that were in existence or about to
21 come in existence, that everyone knew about.
22   Q.   But even if it's about to come into
23 existence, it can still be changing. It hasn't been
24 adopted yet. Right?
25   A.   Right, but everyone knew it was coming, so

Page 159

1 everyone knew about a thousand BaseT, right.
2    Q.   Well, I mean, I know that at some point,
3 the standard's going to do a new one, too, but that
4 doesn't tell me anything. My point is, you're relying
5 on the fact that people would know it was going to be
6 adopted, not that it was actually adopted; correct?
7       MR. COHEN: Objection, form.
8    A.   It was widely known in the industry, right.
9 BY MR. BLUESTONE:
10   Q.   It was widely known in the industry that,
11 at some point, it would be adopted, and when it was
12 adopted, it would take in the name BaseT, and because
13 it would take in the name BaseT, at some point
14 subsequent to the day of its invention, it should be
15 encompassed?
16      MR. COHEN: Objection, form.
17   A.   We're talking about BaseT wiring, remember;
18 not a BaseT network, per se.
19 BY MR. BLUESTONE:
20   Q.   Okay. Let's go to one of the
21 patents-in-suit. Whichever -- pick whichever one you
22 want to talk about.
23   A.   Okay. '012.
24   Q.   Sure.
25      MR. COHEN: Are we at a point where we can

Page 160

1 take five or are you on one topic?
2       MR. BLUESTONE: Yeah. This won't take that
3 much longer. Can we go, like, 5 or 10 minutes to wrap
4 this up?
5       MR. COHEN: No problem.
6       MR. BLUESTONE: Thanks.
7 BY MR. BLUESTONE:
8    Q.   There's a point in which the
9 patents-in-suit are talking about how you don't want to
10 actually affect the network communications that are
11 happening over Ethernet.
12   A.   Right.
13   Q.   In that instance, whether it's 10BaseT or
14 100 BaseT could make a very big difference, couldn't
15 it?
16      MR. COHEN: Objection, form.
17   A.   Well, if -- if you do it in the manner that
18 works for 10BaseT, then you're going to be okay for all
19 the higher frequencies. All right? Because they're
20 trying to keep the frequencies lower to stay out of the
21 band where the data is. All right?
22 BY MR. BLUESTONE:
23   Q.   Right.
24   A.   I assume you're talking about the top of
25 column 12 there.

Page 161

1    Q.   That's a good example, actually. Thank you
2 very much.
3       In column 12, where he's talking about the
4 BaseT network, Line 14, isn't it correct that BaseT --
5 10BaseT is going to be more forgivable for this
6 invention than a hundred BaseT is going to be?
7       MR. COHEN: Objection, form, beyond the
8 scope of the deposition.
9    A.   No, I don't think so.
10 BY MR. BLUESTONE:
11   Q.   Isn't a hundred BaseT going to give you
12 less flexibility as to the low frequency signal you can
13 impress on the line?
14      MR. COHEN: Same objections.
15   A.   No. A hundred BaseT typically would have
16 higher frequency components, not lower, so I think if
17 you're low enough to go with 10, you'd be okay with a
18 hundred.
19 BY MR. BLUESTONE:
20   Q.   But isn't -- isn't the 10BaseT network
21 going to be, let's say, more resilient than a hundred
22 BaseT?
23      MR. COHEN: Objection.
24 BY MR. BLUESTONE:
25   Q.   It's less -- there's less demands on the

41 (Pages 158 - 161)

ATTORNEYS EYES ONLY

Page 162

1 system; right?
2       MR. COHEN:  Objection, form, beyond the
3 scope of the deposition.
4       MR. BLUESTONE:  So, for example -- let me
5 ask it a different way, because it's a very vague
6 question.
7 BY MR. BLUESTONE:
8    Q.    10BaseT is going to allow for, for example,
9 more noise on the line than a hundred BaseT will;
10 right?
11    A.   I -- I -- I have no comment on that today.
12 I mean, we're getting way, way off into the internal
13 workings of Ethernet, as opposed to these patents, and
14 the emphasis here is on keeping the frequency low
15 enough so it's well under the band being used and ...
16    Q.    Well, just a couple of more questions and
17 then I'll let us take this break.
18    A.    All right.
19    Q.    You're an expert in the wiring for Ethernet
20 communications; correct?
21    A.    Mm-hmm.
22    Q.    And when you go from 10BaseT to a hundred
23 BaseT, there's a change in the requirement for the
24 wiring; correct?
25    A.    It went from Cat 3 to Cat 5, yeah.

Page 163

1    Q.    Why did they impose a difference between
2 Cat 3 up to Cat 5?
3    A.    Because the frequency content is higher and
4 Cat 3 did not have adequate high frequency response.
5    Q.    And your opinion would be that any aspect
6 of the invention that relates for 10BaseT would relate
7 for any -- a hundred BaseT, anything else?
8       MR. COHEN:  Objection, form.
9    A.    Very likely, yeah.  I mean, again, if
10 there's some particular thing, I would have to study
11 that in more detail, but ...
12       MR. BLUESTONE:  Okay.  Why don't we take
13 our break now.
14       VIDEOGRAPHER:  We are off the record at
15 2:03 p.m.
16       (Break from 2:03 p.m. until 2:13 p.m.)
17       VIDEOGRAPHER:  We are back on the record at
18 2:13 p.m.  This is file 4.
19 BY MR. BLUESTONE:
20    Q.    Mr. Baxter, the specification doesn't use
21 the term BaseT, does it; just in and of itself, BaseT?
22    A.    Oh.  In and of itself?  I don't know.  It
23 does use 10BaseT on occasion.
24    Q.    Are you aware of any instance in which the
25 specification uses BaseT without the "10" prefix?

Page 164

1    A.    I can't think of one offhand.
2    Q.    And your declaration doesn't cite to any
3 instance in which the specification --
4    A.    No.
5    Q.    -- would state that?
6       Sorry.  I think we talked over each other.
7       Your declaration doesn't site to any
8 instance in the specification where it states that
9 there's any support for BaseT, does it?
10    A.    No, I don't believe so.
11    Q.    And your declaration doesn't include any
12 citation to any technical literature where BaseT, as it
13 is spelled in the claim, is somehow defined?
14    A.    I don't believe so, no.
15    Q.    Okay.  And there's no citation anywhere in
16 which BaseT, under any capitalization or lack of
17 capitalization or hyphenation, is defined using
18 technical literature; right?
19    A.    (Indicating)  In here?
20    Q.    In your declaration.
21    A.    No.
22    Q.    Your declaration doesn't cite to any
23 technical literature as to the meaning of BaseT;
24 correct?
25    A.    Correct.

Page 165

1    Q.    And if you were aware of something, you
2 would have cited to it; correct?
3       MR. COHEN:  Objection, form.
4    A.    I -- if I thought I needed to cite to it, I
5 would have, yeah.
6 BY MR. BLUESTONE:
7    Q.    Well, sitting here today, you are not aware
8 of any technical literature that would define BaseT,
9 correct, in and of itself, without the prefix?
10    A.    Well, yes, I am.  Right (indicating).
11    Q.    What are you pointing to?
12    A.    This other publication on the front sheet
13 of the patent.
14    Q.    And what does it say that you are referring
15 to?
16    A.    It's the Entertainment and Service Industry
17 Recommended Practice for Ethernet Cabling Systems in
18 Entertainment and Lighting Applications.
19    Q.    Okay.  And you're saying that that includes
20 a definition of BaseT?
21    A.    It -- it lists 10BaseT, a hundred BaseT, a
22 thousand BaseT, and says base means baseband, T means
23 twisted pair, yeah.
24    Q.    It says that in there?
25    A.    Yep.

42 (Pages 162 - 165)

ATTORNEYS EYES ONLY

Page 166

1    Q.    Okay.  And that, you would say, provides a
2  definition for BaseT without a prefix?
3    A.    Yes.
4    Q.    And that definition is what?
5    A.    Base -- well, they list those and they tell
6  you that the Base means baseband, the T means twisted
7  pair, so that's your BaseT.
8    Q.    Okay.  So BaseT means baseband and twisted
9  pair.  And does that include 1Base5?
10    A.    And there's -- not in my opinion, no.
11  There's the three specs, 10, a hundred, a thousand,
12  that were known at the time of the invention.
13    Q.    So even though you're saying this
14  publication says Base means baseband and T means
15  twisted pair, on the face of the patent, you would say
16  that definition is, nonetheless, too broad, because
17  1Base5 should be included?
18    A.    No.  They don't include 1Base5.
19    Q.    Well, now --
20    A.    It doesn't have a T.
21    Q.    Yes.  But if BaseT means twisted pair and
22  baseband, isn't 1Base5 encompassed in that?
23    A.    No.  "BaseT," the "Base" means baseband and
24  the "T" means twisted pair.
25    Q.    Right.  So BaseT does or does not mean

Page 167

1  baseband twisted pair?
2    A.    Well, that's -- that's what the BaseT
3  means, and 1Base5 does not have the T, it has a 5, so
4  it's not BaseT.
5    Q.    I understand that it doesn't use a T in it.
6    A.    Right.
7    Q.    But if we start from -- I want to make sure
8  I understand what you are saying.
9         If we say that this publication defines
10  Base to be baseband and T to be twisted pair --
11    A.    Uh-huh.
12    Q.    -- then are you saying to me that BaseT
13  means baseband twisted pair?
14    A.    That that is what the letters in the title
15  of the Ethernet specs mean.
16    Q.    Okay.  So putting them together, Base and
17  T --
18    A.    Right.
19    Q.    Does BaseT together, as spelled in the
20  claim, mean baseband twisted pair?
21    A.    It means the Ethernet BaseT specifications,
22  which are baseband Ethernet on twisted pair.
23    Q.    And not only that, it has to actually use
24  BaseT, so 1Base5 is not --
25    A.    That's why they call it BaseT.

Page 168

1    Q.    But we talked over each other.  I want to
2  make sure the record is clear.
3         It's not -- BaseT isn't satisfied by it
4  merely being baseband twisted pair.  You're saying it
5  also has to be baseband twisted pair and use BaseT in
6  the language.
7    A.    Right.  That's -- that's where the BaseT
8  name came from, was from the title of those
9  specifications.
10    Q.    And that distinction is based on simply the
11  naming, not any technical difference between whether
12  it's baseband twisted pair?
13         MR. COHEN:  Objection, form.
14    A.    Well, I'm sure there are technical
15  differences in 1Base5 and the BaseT specs.  I just
16  don't know what they are offhand.
17  BY MR. BLUESTONE:
18    Q.    Why are you excluding 1Base5?
19    A.    Because it's not BaseT.
20    Q.    Because it doesn't use the letters B-A-S-E,
21  -T.  It uses B-A-S-E-5?
22         MR. COHEN:  Objection, form.
23    A.    Right.  Just like Base F uses F, and so on.
24  I mean, it's lists.
25  BY MR. BLUESTONE:

Page 169

1    Q.    Okay.  Well, let's approach it from a
2  different standpoint.
3         If I have a standard that's Base F -- and
4  that means fiber; right?
5    A.    Right.
6    Q.    -- and all of a sudden I decide, You know,
7  I don't like using Base F.  I'm going to use Base
8  exclamation point, because it's so, so, so fast.  It
9  still would be a fiber network; right?
10    A.    It would.
11    Q.    But it wouldn't be Base F anymore, is your
12  point?
13         MR. COHEN:  Objection, form.
14    A.    Well, but you're making up ridiculous
15  hypotheticals that have not happened, and one of
16  ordinary skill in the art at the time of these
17  inventions knew what BaseT meant, I mean ...
18  BY MR. BLUESTONE:
19    Q.    Okay.  So again, so if the IEEE --
20    A.    ... and it was not limited to 10BaseT.
21    Q.    So if the IEEE working group decides that
22  it doesn't want to get sued anymore by John Osterman
23  and Company, they can get rid of all these patent
24  claims against them by merely agreeing to change the
25  name from BaseT to Base-something, other letter --

43 (Pages 166 - 169)

Page 170

1       MR. COHEN:  Objection.
2  BY MR. BLUESTONE:
3       Q.   -- and they're golden?
4       MR. COHEN:  Wait.  Wait.  Objection, form.
5       A.   I have no opinion on that.
6       MR. COHEN:  Hang on one second.  Objection,
7  form, beyond the scope of the deposition.
8       A.   I have no opinion on that.
9  BY MR. BLUESTONE:
10      Q.   Well, you have an opinion of what BaseT
11 means.  We've been trying to figure out what that is.
12      A.   I do, but I'm not a lawyer and I can't tell
13 you who could sue what for what reason.
14      Q.   Okay.  Do I avoid the scope of the claims
15 if I merely change the name from BaseT to Base
16 some-other-letter?
17      MR. COHEN:  Objection, form, beyond the
18 scope of the deposition.
19      A.   I -- I -- I have not considered that.  I
20 don't have an opinion.  I would have to think that
21 through carefully.
22 BY MR. BLUESTONE:
23      Q.   Okay.  Now, looking at Paragraph 98, when
24 it's saying the plain and ordinary meaning is, namely,
25 twisted pair Ethernet per the IEEE 802.3 standards --

Page 171

1       A.   Right.
2       Q.   -- and then (e.g.) and then it lists three
3  standards.
4       A.   Yes.
5       Q.   Would you correct your declaration to
6  instead of saying e.g., now say "i.e." instead?
7       A.   I would think about it.
8       Q.   Well, sitting here today, do you have any
9  thoughts on whether it needs to be changed or not?
10      A.   Well, what I meant to say was that those
11 were the three standards that were known at the time of
12 the invention, so that's what I would think it would be
13 referring to.  That's what one of ordinary skill in the
14 art at that time would have interpreted BaseT to mean,
15 is those three.
16      Q.   But you have no document -- well, did you
17 do any searching to see what BaseT would mean to
18 someone other than yourself in forming your opinions?
19      A.   Well, I've read many things over the years,
20 I've talked to many people, and when you say BaseT,
21 people know that's what it means.  I don't know anyone
22 who thinks BaseT means only 10BaseT and nothing else.
23      Q.   You agree that the only BaseT -- under your
24 definition -- network discussed at all in the
25 specification is 10BaseT; right?

Page 172

1       A.   I was using an example, yes.
2       Q.   But you agree with me that the
3  specification makes no mention of a hundred BaseT;
4  correct?
5       MR. COHEN:  Objection, form.
6       A.   I don't believe that it does.
7  BY MR. BLUESTONE:
8       Q.   And the specification makes no mention of
9  100 Base-TX?
10      A.   I don't believe so.
11      Q.   The specification makes no mention of any
12 thousand BaseT type of network?
13      A.   What the documents -- it reference -- it
14 references many, many documents in the specification
15 that reference these things.
16      Q.   Yes, but the specification, itself, never
17 says, "This will work with a thousand BaseT," correct?
18      A.   No, I don't believe so.
19      Q.   In fact, a thousand BaseT was not even
20 adopted at the time of invention; correct?
21      A.   It was not, but it was widely known.
22      Q.   But it wasn't adopted; correct?
23      A.   Correct.
24      Q.   And it's not recited anywhere in the
25 specification; correct?

Page 173

1       A.   Correct.
2       Q.   And, in fact, my device running 10BaseT,
3  that is only operable to run 10BaseT, can't even talk
4  to your device that's a hundred BaseT; right?
5       MR. COHEN:  Objection.
6  BY MR. BLUESTONE:
7       Q.   They're different standards.
8       MR. COHEN:  Sorry.  Objection.
9       A.   No.  They're backward compatible.  They can
10 all negotiate.
11 BY MR. BLUESTONE:
12      Q.   You're assuming they're all backward
13 compatible.  That's what I thought.
14      A.   Well, the standards are backward
15 compatible.  If you choose not to implement that
16 feature, then that's up to you.
17      Q.   Sure.  So my situation is, basically, I
18 have a device that's a legacy device that's only
19 10BaseT, and for whatever reason, I've decided to
20 create my device that's a hundred BaseT and is not
21 backwards compatible to 10BaseT at all.  Those two
22 devices might as well be speaking French and German.
23 They're not talking to each other.  Right?
24      MR. COHEN:  Objection, form.
25      A.   I see no relevance to anything we're

44 (Pages 170 - 173)

Page 174

1 talking about.
2 BY MR. BLUESTONE:
3     Q.    Well, they're two totally different
4 standards, right, in how they communicate?
5         MR. COHEN:  Same objection.
6     A.    No.  But I have no opinion on that.  This
7 is so far off topic, from my view.  I have not
8 expressed any opinions about anything like that and I
9 just don't see how this is even remotely relevant.
10 BY MR. BLUESTONE:
11     Q.    Okay.  Well, the patent recites Ethernet.
12 Does it or does it not?
13     A.    Yes.
14     Q.    And it recites that the connector is used
15 for Ethernet communications; correct?
16     A.    Correct.
17     Q.    The IEEE standards govern the protocols for
18 Ethernet communications; correct?
19     A.    Correct.
20     Q.    And the patent makes it very clear that
21 it's trying to make sure it puts in a low frequency
22 signal that will not interfere with the existing
23 communications; correct?
24     A.    Correct.
25     Q.    So doesn't it make sense that we have to

Page 175

1 understand what the constraints are in the system of
2 10BaseT versus a hundred BaseT?
3         MR. COHEN:  Objection, form, beyond the
4 scope of the deposition.
5     A.    Well, they were designed to be backward
6 compatible and a hundred BaseT uses higher frequencies,
7 not lower frequencies, so for this application, I don't
8 believe so.
9 BY MR. BLUESTONE:
10     Q.    And the fact that a hundred Base-TX adds
11 the letter X -- so it's not only BaseT now, it's
12 Base-TX -- makes no difference?
13     A.    That -- that's the most common variety.
14 Well, it's really the only variety in the marketplace.
15     Q.    Well, couldn't I say to you:  "Wait a
16 second.  Base-TX doesn't include BaseT because it's not
17 BaseT, it's Base-TX.  It's different."
18     A.    Well, you could say whatever you want.  I
19 wouldn't necessarily agree with it.
20     Q.    I didn't expect you to agree with me.
21     A.    Yes.
22     Q.    I'm trying to understand where we draw the
23 line of what becomes BaseT and what isn't.
24         So my question is:  You're saying it has to
25 include BaseT.  Does the addition of the letter X make

Page 176

1 any difference?
2     A.    No.  That's just a type of BaseT.
3     Q.    Would you agree -- well, let's move on.
4         Let's talk a little bit about the next
5 section in your report, "Powered off," from paragraphs
6 106 through 114 of Exhibit 1.  We were talking about
7 the specification a little bit within the context of
8 BaseT.
9         I want to shift to the discussion on the
10 specification, what the patent shows -- patents show
11 with respect to remote modules and assets.
12         Now, when the patent is talking about
13 operational power, being able to be operational --
14     A.    Mm-hmm.
15     Q.    -- it's talking solely about the asset that
16 they are trying to track, correct, not the remote
17 module?
18     A.    Correct.
19     Q.    And the remote module can't operate without
20 power.  It needs power.  Correct?
21     A.    It needs the power that it gets over this
22 wire that we're talking about, yes.
23     Q.    Okay.  And the patent makes it clear that
24 there's a difference between the asset and the remote
25 module in this specification; correct?

Page 177

1     A.    Correct.
2     Q.    And the claimed invention is indifferent to
3 whether power is on or off in the asset.  It's going to
4 operate the same.  Correct?
5     A.    Yes.
6     Q.    Okay.  Now, in the specification of the
7 patents, the function of drawing different magnitudes
8 of DC current is governed solely by the remote module,
9 right, not the asset?
10     A.    Correct.
11     Q.    And the existing assets are not even going
12 to have the capability of drawing different magnitudes
13 of DC current; like, for example, a laptop.  Correct?
14     A.    Well, assets that are compatible with this
15 technique --
16     Q.    Go ahead.
17     A.    -- will.
18     Q.    I'm sorry?
19     A.    I mean, I -- I'm not sure what you're
20 getting at.  No, things that don't implement this will
21 not be able to use it.
22     Q.    Right.  And so let's put this in context,
23 for example.
24         The '260 patent that's incorporated by
25 reference, are you familiar with that?

45 (Pages 174 - 177)

ATTORNEYS EYES ONLY

1    A.    Yes.
2    Q.    The '260 patent is using the existing
3  wiring of a laptop, for example; correct?
4    A.    Mm-hmm.
5    Q.    There's nothing you need to do to the asset
6  to have it be able to determine whether there's a
7  discontinuity in the current loop; correct?
8    A.    I believe that's true, yes.
9    Q.    But now, when we talk about the
10  patents-in-suit here, it's doing something different;
11  right?  You need this remote module to function;
12  correct?
13    A.    You need the remote module, but it can be
14  incorporated into the equipment.
15    Q.    Okay.  But when those two things are
16  incorporated in -- so we take remote module and asset
17  and we put them together in one box, draw a box around
18  it -- you wouldn't say that that box is powered off,
19  right, because at least part of the box is drawing
20  current?
21    A.    I -- I would say it's -- it's powered off.
22  If it can't -- if it doesn't have operating power to do
23  its normal functions, it would generally be considered
24  to be powered off.
25    Q.    How do I determine what the normal

1  functions are?
2    A.    Well, if it's a PC, if you can type things
3  make things happen and run programs, then that has its
4  power.  If it's off, you can't.  I mean, if it's a
5  television, if you can watch a program, it's on.
6    Q.    Mm-hmm.
7    A.    If you can't, it's off.
8    Q.    But that's only part of that box you're
9  talking about; right?  You're only talking about part
10  of the box that we just drew, that was the asset.  What
11  about the part of the box at the remote module?  It
12  needs operating power; right?
13    A.    Part of the box, the remote module, gets a
14  little bit of power over the wire from the central
15  module without disturbing the operation of the rest of
16  the box.
17    Q.    The rest of it.  Of the asset, you mean?
18    A.    Right.
19    Q.    So the -- so in this hypothetical that
20  you're talking about, the remote module is getting
21  power, but the asset is not; correct?
22    A.    Potentially.  It could be.  It could be, it
23  could not be.  I mean, the asset can be powered or
24  unpowered.
25    Q.    The remote module?

1    A.    The asset.
2    Q.    Oh.  The asset.
3    A.    Yeah, the --
4    Q.    Right.
5    A.    Right.
6    Q.    So we have a box -- our little imaginary
7  hypothetical:  We have a box in which there's a remote
8  module in the box and there is an asset in the box.
9    A.    Right.
10    Q.    And you're saying the asset could be
11  powered on or powered off, it doesn't matter, correct,
12  to the invention?
13        MR. COHEN:  Objection, form.
14    A.    I believe that's true, yes.
15  BY MR. BLUESTONE:
16    Q.    Okay.  But for the remote module to do
17  something, it needs to draw power; correct?
18    A.    Right.  And the user would not say that
19  this thing is powered up because the remote module is
20  drawing its little bit of power.
21    Q.    They wouldn't say that the asset is powered
22  up?
23    A.    Right.
24    Q.    But what about that little sender tag that
25  you stuck on your computer.  That would be powered up;

1  right?
2    A.    Well, but as I said before, it doesn't have
3  to be a sender tag.  You can build it in, much like you
4  build power Ethernet into your unit --
5    Q.    Okay.
6    A.    -- right?  And the user doesn't know
7  there's two things.  Right?
8    Q.    Sure.
9    A.    They just know they plug in and the thing's
10  off.
11    Q.    So it depends on what your definition of
12  operating power pertains to, then, doesn't it?
13    A.    Yes, operating power for the equipment.
14    Q.    Well, wait a second.  We have your box
15  scenario, where they're -- well, they're integrated
16  together.  It may lack operating power for the purpose
17  of sending an email, but it would have operating power
18  for the purpose of the asset being tracked; correct?
19    A.    Which is not typically called operating
20  power.  It's operating power for the equipment to do
21  what the equipment does.  It's not -- much like when
22  your TV is, you know, off:  There's still a little bit
23  of it powered so when you hit the power button on your
24  remote control, it can turn the rest of it on.  So we
25  routinely call that TV turned off, even though part of

46 (Pages 178 - 181)

ATTORNEYS EYES ONLY

Page 182

1 it is still powered. It's just not the part that you
2 want to look at.
3    Q.    For whatever it's worth, my TV says
4 Stand-by Mode, but I don't know if that helps or
5 affects us at all. I don't -- okay.
6        Let's take your definition of operating
7 power. Without its operating power is your definition
8 of powered off. Operating power, under your
9 construction, would apply to the functions recited in
10 the claim; correct?
11        MR. COHEN: Objection, form.
12    A.    Which claim are you talking about?
13 BY MR. BLUESTONE:
14    Q.    Well, let's do '107, if you can put that in
15 front of you. Whenever you're ready. Actually, let's
16 do Claim 104 of the '107, Page 4 of Exhibit 6, because
17 that's using this language.
18    A.    If I could find Exhibit 6, I'd be in
19 business. I'm having trouble locating Exhibit 6 now.
20    Q.    That's just the one with the reproduced
21 claims.
22    A.    Yeah, I -- I know.
23    Q.    Take your time.
24    A.    Oh. There it is. Page 4?
25    Q.    Yes. Let's do that, and then why don't you

Page 183

1 also, so we can go back and forth, pull open Exhibit 3,
2 which is the '107 patent, and get claim 103, because
3 that's the other instance where we are going to see
4 those for this patent.
5    A.    107.
6    Q.    And it's column 22. The -- basically, the
7 last page of that exhibit is going to have that
8 language.
9    A.    Okay.
10    Q.    Okay. So let's start with Claim 103.
11    A.    103?
12    Q.    Yeah. Probably the shortest one.
13    A.    Okay.
14    Q.    103 recites the piece of Ethernet terminal
15 equipment, of a variety of other claims, but it
16 modifies it by saying, wherein the piece of Ethernet --
17 I think there's a little typo there, but -- the piece
18 of Ethernet terminal equipment is a piece of powered
19 off Ethernet terminal equipment.
20    A.    Right.
21    Q.    Okay. Now let's go back to Claim 1 of the
22 '107 patent.
23    A.    Claim 1 of the '107. Okay.
24    Q.    Now, would you agree with me that all Claim
25 103 is saying is adding the limitation that now this

Page 184

1 piece of Ethernet terminal equipment, that's in that
2 first line of the claim, is now powered off?
3    A.    I believe so, yes.
4    Q.    Okay. And would you agree with me that
5 this claim explicitly defines what the piece of
6 Ethernet terminal equipment is?
7        MR. COHEN: Objection, form.
8    A.    No, I wouldn't.
9 BY MR. BLUESTONE:
10    Q.    Well, do you know what a preamble of a
11 patent claim is?
12    A.    Right. But it says comprising --
13    Q.    Yes.
14    A.    -- which means it has to have all this.
15    Q.    Correct.
16    A.    And it would typically have other things
17 like a PC, or something, which is actually the
18 equipment.
19    Q.    Are you saying that there are other
20 limitations uncited in the claim that are required?
21    A.    I'm not saying they're limitations. I'm
22 saying if -- if all you have is a piece of Ethernet
23 terminal equipment which can report information about
24 itself, it's not really a useful thing. Typically, you
25 would have a piece of Ethernet terminal equipment which

Page 185

1 does some useful function, like a PC or a monitor, and
2 can also do this.
3    Q.    Okay. But I think we have to be governed
4 by the rules of patent claims here. "Claim is a piece
5 of Ethernet terminal equipment comprising."
6    A.    Right.
7    Q.    We agreed that it says that; correct?
8    A.    We do.
9    Q.    And we agree that the claim requires that
10 it has an Ethernet connector; correct?
11    A.    Yes.
12    Q.    And the elements of the Ethernet connector
13 is defined. Agreed?
14    A.    Right.
15    Q.    We agreed that this piece of Ethernet
16 terminal equipment has to also have at least one path
17 coupled across and the rest of those structural
18 limitations; correct?
19    A.    Right.
20    Q.    And then we agreed that that piece of
21 Ethernet terminal equipment also has to, under your
22 definition, be designed or configured to perform the
23 functions starting from Line 18 through Line 25.
24    A.    Right.
25    Q.    We agree to all that; correct?

47 (Pages 182 - 185)

ATTORNEYS EYES ONLY

Page 186

1    A.    Right.
2    Q.    We also agree that there is nothing else
3  recited in this claim that needs to be present;
4  correct?
5          MR. COHEN:  Objection, form.
6    A.    Well, it doesn't need to be, but it
7  essentially always would be.
8  BY MR. BLUESTONE:
9    Q.    All right.  What is this invisible thing
10 that needs to be -- that would be --
11   A.    It's not invisible.  This is the invisible
12 thing.  The main thing is the PC; right?
13   Q.    So --
14   A.    And there's a little invisible thing in
15 there that does this.  All right?
16   Q.    Are you saying that the Claim 1 requires a
17 PC?
18   A.    No, but it's a piece of Ethernet terminal
19 equipment, and a piece of Ethernet terminal equipment
20 is generally a PC or something that does some useful
21 thing, communicates information, and in addition, it
22 also is going to do this.  Right?
23   Q.    But those things that you say -- the useful
24 thing that it's supposed to do about communicating
25 information, that is nowhere in this claim; correct?

Page 187

1    A.    Correct.
2    Q.    And your interpretation of powered off
3  means it's lacking its operating power; correct?
4    A.    Correct.
5    Q.    Or without its operating power; correct?
6  Doesn't "without its operating power" have to apply to
7  the limitations that are in the claim and not some
8  other things that are unrecited?
9    A.    Well, it applies to Ethernet terminal
10 equipment, which would apply to all of it, whatever's
11 there, and this is unpowered until you send the DC
12 current across the at least one path --
13   Q.    Okay.
14   A.    -- and then this little bit of circuitry is
15 powered and it can do what it does.
16   Q.    Right.  So these claim limitations, these
17 functions can't be done if the structure, as claimed,
18 is powered off?
19   A.    Sure they can.
20   Q.    How is it supposed to draw DC current flow
21 or DC current if it's powered off?
22   A.    Because you put a small voltage across
23 those first and second conductors and give it just
24 enough juice to do that.
25   Q.    Right.  And now you've given it juice and

Page 188

1  now it's drawing power, like the remote module;
2  correct?
3    A.    Right, but it wasn't -- it was powered off
4  prior to that, all right?  And you started doing this
5  when it was powered off and the bulk of it is still
6  powered off.  As far as the user's concerned, it's off.
7    Q.    There's nothing in this claim that talks
8  about the user's perspective; right?
9    A.    In this claim, no.
10   Q.    It never says, "Wherein a user perceives it
11 to be powered off," right?
12   A.    It says -- well, are you talking about '103
13 now?
14   Q.    Yeah.
15   A.    It does not, but it's powered off.
16   Q.    It just says, "where the piece of Ethernet
17 terminal equipment, as claimed, is powered off."  And
18 as ridiculous as it may sound, the plain meaning of the
19 claim makes no sense.  It says powered off, but all
20 this stuff needs to draw power.  Right?
21         MR. COHEN:  Objection, form.
22   A.    I don't -- I don't read it that way at all.
23 BY MR. BLUESTONE:
24   Q.    Well, what -- what you're -- what I think I
25 understand what you're doing, and correct me if I'm

Page 189

1  wrong, is:  You're saying powered off doesn't apply to
2  any of the -- any of the limitations actually in the
3  claim.  Powered off applies to some other functions
4  that are unrecited.
5          MR. COHEN:  Objection, form.
6    A.    Powered off applies to the overall piece of
7  Ethernet terminal equipment.
8  BY MR. BLUESTONE:
9    Q.    Including --
10   A.    And --
11   Q.    Including the part of it that is to draw
12 different magnitudes of DC current flow?
13   A.    And that could certainly be powered off
14 when you start, and you put that little bit of current
15 on and the unit, itself, is still not powered up; just
16 this little bit of circuitry here.
17   Q.    But there's no way you could ever have a
18 piece of Ethernet terminal equipment configured or
19 designed to draw different magnitudes of DC current
20 flow via the at least one path and, at the same time,
21 be powered off; isn't that correct?
22         MR. COHEN:  Objection, form.
23   A.    Well, that -- obviously, it depends on how
24 you interpret powered off.  Powered off typically means
25 you hit the on/off button, you pull the plug out of the

48 (Pages 186 - 189)

ATTORNEYS EYES ONLY

Page 190

1 wall, whatever it may be.
2 BY MR. BLUESTONE:
3    Q.   Okay.  There's nothing in the claim that
4 talks about an AC adapter; correct?
5    A.   No.
6    Q.   And there's nothing in the plain meaning of
7 Ethernet terminal equipment that requires two different
8 powers sources; correct?
9    A.   No, but I think one of ordinary skill in
10 the art knows what a piece of Ethernet terminal
11 equipment looks like when it's powered off.
12    Q.   That's fine.  But there's nothing in
13 plain -- well, first of all, Ethernet terminal
14 equipment is not used in the specification; correct?
15    A.   I'm sorry?  I'm not following you.
16    Q.   If we go through the patent applications,
17 as filed, you're never going to see the phrase Ethernet
18 terminal equipment.  It talks about a central module,
19 it talks about a remote module, but Ethernet terminal
20 equipment isn't there.
21    A.   Well, but it shows how to use -- for
22 instance, with a hub and PC, and says that it works
23 with Ethernet, so --
24    Q.   Okay.
25    A.   -- I would say that's Ethernet equipment.

Page 191

1    Q.   But my question is very narrow:  The Ether
2 -- the specification does not use, quote, Ethernet
3 terminal equipment.
4    A.   That exact word?
5    Q.   Yes.
6    A.   I don't recall offhand, but it clearly
7 talks about Ethernet equipment, hubs and PCs, that
8 communicate over an Ethernet network.
9    Q.   Okay.  A person of ordinary skill in the
10 art, looking at the term Ethernet terminal equipment,
11 doesn't come to the conclusion that it requires or even
12 suggests two different power sources; correct?
13    A.   Not necessarily, no.
14    Q.   And the claim is reciting, in essence, a
15 power source for it; right?  There is a power source
16 that's in essence in Claim 1 of the '107 patent?
17        MR. COHEN:  Objection, form.
18    A.   Oh, the -- the --
19 BY MR. BLUESTONE:
20    Q.   The drawing DC current is essentially a
21 power source --
22    A.   The drawing DC current.
23    Q.   -- isn't that right?
24    A.   It's a little power source for this, yeah.
25    Q.   Yeah.  So the claim, itself, is talking

Page 192

1 about elements that are drawing power.  Why would
2 powered off not apply to those specific claim
3 limitations that are directed towards the supplying of
4 power?  Why would it be something else that's
5 unrecited?
6    A.   Well, I don't think that's the way it would
7 be interpreted, in light of the specification.  I mean,
8 when -- when you have, for instance, a computer asset
9 of some kind, with one of these little tags on the
10 outside, and you move that tag inside and consider it
11 part of the equipment, it's still powered separately
12 over that little thing and the equipment would be
13 powered off when it's not working, so the fact that you
14 have sent a little trickle of current through this
15 small module down here would not be apparent to anyone.
16 It would not be typically considered a powered on unit
17 at that stage.
18    Q.   We've already agreed that nothing in the
19 claim talks about how an end user would perceive it;
20 correct?
21    A.   Right.  But how one of ordinary skill in
22 the art would perceive a powered off piece of
23 equipment, yes.
24    Q.   Okay.  In your example in which they are
25 combined together, as a unit together, is it powered

Page 193

1 off?
2    A.   Is what powered off when?
3    Q.   You have this little tag or the remote
4 module, or whatever we want to call it.  It's combined
5 together with the asset in one box and it's doing asset
6 tracking.  Together, as a unit, is it powered off?
7    A.   When it's asset tracking?
8    Q.   Mm-hmm.
9    A.   As defined in the spec, if the asset is
10 powered off, it's powered off.
11    Q.   Not the asset.  The combination of the two.
12    A.   Well, and what the spec is clearly talking
13 about is, that the asset part of it can be powered off
14 while the little part here works.
15    Q.   And when we put them together and call them
16 a combined one unit, that thing is not powered off
17 because there is DC current that is being drawn and is
18 flowing through the remote module portion; correct?
19        MR. COHEN:  Objection, form.
20    A.   No, I don't -- I don't agree with that.
21 BY MR. BLUESTONE:
22    Q.   How is it consistent with the laws of
23 physics that somehow it can be drawing DC current and
24 yet be powered off?
25    A.   I think the unit is powered off because it

49 (Pages 190 - 193)

ATTORNEYS EYES ONLY

Page 194

1 doesn't do its normal operation, much the way a TV is
2 powered off when you hit the off button.
3    Q.    But the remote module is receiving power
4 for its -- it is receiving operational power for its
5 intended purpose; correct?
6    A.    When this is operating, yes.
7    Q.    Okay.  So in that hypothetical where
8 they're put together as one unit, as you say the
9 specification discloses, in that instance, if you look
10 at that entire box, would you say there is absolutely
11 no power flowing in that box anywhere?
12    A.    I wouldn't say there's absolutely no power
13 anywhere, but I would say the box does not have its
14 operating power.
15    Q.    Would you say the remote module within the
16 box has its operating power?
17    A.    I would say the remote module does, because
18 it's -- it's doing its thing here.
19    Q.    So something in the box has its operating
20 power.  We're just focusing on the other part of the
21 box?
22    A.    We're focusing on the functionality of the
23 box, which is what we commonly mean when we say
24 something's powered off.
25    Q.    Okay.  So let's talk about Claim 104 of the

Page 195

1 '107 patent.  Now, this claim doesn't talk about
2 Ethernet terminal equipment; right?
3    A.    Right.
4    Q.    It just talks about an end device.
5    A.    Right.
6    Q.    What would a person of ordinary skill in
7 the art understand an end device to be?
8    A.    An end device will be some piece of
9 electronic equipment which has an Ethernet connector.
10    Q.    Okay.  And the specification doesn't use
11 end device, does it?
12    A.    I don't believe so.
13    Q.    And there's nothing, to a person of
14 ordinary skill in the art, in the plain meaning of end
15 device that suggests or requires two different power
16 sources; correct?
17    A.    I'm not sure how to really answer that.
18 Can you ...
19    Q.    Well, you said an end device is -- does an
20 end device, in itself, impart any particular structure?
21 Without any definite -- without looking at the rest of
22 the claim.  Just the preamble.  It says a powered off
23 end device.
24    A.    Right.
25    Q.    Just end device.  What does that tell you

Page 196

1 has to be in the device?
2    A.    An end device, in my world, as one of
3 ordinary skill in the art, would be some type of
4 communication device which has an Ethernet connector on
5 it.  It's typically there to do some function or other.
6    Q.    So I -- I have a shop and I'm going to sell
7 you an end device.  Have I told you at all what's
8 inside the thing I'm going to sell you?  Just end
9 device.
10        MR. COHEN:  Objection, form, beyond the
11 scope of the deposition.
12 BY MR. BLUESTONE:
13    Q.    You mentioned it had to do communications
14 and all these other things.  How is that an end device?
15 End device seems rather generic to me, and correct me
16 if I'm wrong.
17    A.    Well, in the context --
18        MR. COHEN:  One second.  Same objections.
19 BY MR. BLUESTONE:
20    Q.    I'm sorry.  We kind of are talking over
21 each other.
22    A.    Yeah.
23    Q.    Let your counsel make the objection.
24 And --
25    A.    Okay.

Page 197

1    Q.    I know we're -- we're having fun, but --
2    A.    Okay.  And the question was?
3    Q.    How -- how does end device connote any
4 structure at all?
5        MR. COHEN:  Objection, form, beyond the
6 scope of the deposition.
7    A.    Yeah, that is not something I have offered
8 any opinions on.  But, to me, in light of the
9 specification and the type of equipment they're talking
10 about, it would be one of the remote -- pieces of
11 remote equipment, not the -- where, sort of, the remote
12 module would go, not the central module.  That's how I
13 would interpret it, in light of the specification.
14 BY MR. BLUESTONE:
15    Q.    Okay.  So 104, the end device, you're
16 saying, is the remote module of the specification?
17    A.    No, it's the remote device, where the
18 remote module would be located with or incorporated
19 into.
20    Q.    Okay.  Let's divorce ourselves from the
21 patent and the specification and just focus on the two
22 words, "end device," as a person of ordinary skill in
23 the art.
24    A.    Well, but this is a claim in the patent,
25 though.  I can't just divorce myself from the patent.

50 (Pages 194 - 197)

ATTORNEYS EYES ONLY

Page 198

1    Q.    I agree, and we're going to get there.  I
2  promise you.
3    A.    Well --
4    Q.    But let's start off with just -- what's the
5  plain and ordinary meaning of "end device," just in
6  general.  If you had your dictionary and you had "end
7  device," what would it mean?
8         MR. COHEN:  Objection, form, beyond the
9  scope of the deposition.
10   A.    Again, I think it's what I just said
11 relative to the -- in light of the specification.
12 BY MR. BLUESTONE:
13   Q.    Okay.  So "end device" has no meaning
14 absent to -- separate and apart from the specification?
15        MR. COHEN:  Objection, form.
16   A.    I don't know that I said that.
17 BY MR. BLUESTONE:
18   Q.    Okay.
19   A.    In light of the specification, I think an
20 end device would be a piece of terminal equipment that
21 would normally be associated with a remote module.
22   Q.    Is it an Ethernet terminal equipment or is
23 it something else?
24   A.    It doesn't say that it is, but it has an
25 Ethernet connector.

Page 199

1    Q.    Okay.  But does it have to be doing
2  anything Ethernet communications related?
3         MR. COHEN:  Objection, form, beyond the
4  scope of the deposition.
5    A.    No, I don't believe it does.
6  BY MR. BLUESTONE:
7    Q.    Okay.  So there is a difference between 104
8  and Claim 1; correct?
9    A.    Right.
10   Q.    Okay.  What are the operations for which
11 it's supposed to be without operating power, for an end
12 device?
13   A.    Well, again, we'd have to talk about a
14 particular device to make any sense, but if it didn't
15 have something it was supposed to be doing, no one
16 would buy the thing; right?  I mean --
17   Q.    Mm-hmm.  So you would agree with me,
18 though, that Claim 104 of the '107 patent calls for an
19 end device --
20   A.    I'm sorry.  I'm getting too far over.
21   Q.    Claim 104 of the '107 calls for a powered
22 off end device?
23   A.    Mm-hmm.
24   Q.    That end device only needs to have an
25 Ethernet connector with a -- with a path coupled across

Page 200

1  as defined and the functional limitations that are the
2  same as the functional limitations of the Ethernet
3  connector.  Right?
4    A.    Right.  That's the first element.
5    Q.    I mean, that's it in the claim.  Where do
6  we have license to go and import other unrecited
7  limitations as being the components that are turned
8  off?
9         MR. COHEN:  Objection, form.
10   A.    You know, I -- I -- we're really getting
11 off in the weeds here.  I can't comment on that.
12        I stand behind what I said about powered
13 off; that it means without its operating power and --
14 BY MR. BLUESTONE:
15   Q.    But operating power to do what, for Claim
16 104?
17   A.    To operate.
18   Q.    But what it's supposed to do in Claim 104
19 is draw different magnitudes of DC current; right?
20 That's the operation in the claim; correct?
21   A.    Right, but if -- if -- again, as one of
22 ordinary skill in the art, I would think if you are
23 making some type of device and selling it, that it
24 probably has some purpose, some function it is intended
25 to do, and when it doesn't have operating power, it

Page 201

1  can't do that function, and if it doesn't have a
2  function other than to do this, you're not likely to
3  sell many of them.
4    Q.    So why can't it be, for example, something
5  like Figure 11 of any of the patents-in-suit, which
6  looks like this separate connector box that's acting as
7  a remote module?  In that instance, it wouldn't have
8  any other functions.
9    A.    Well, I dis ...
10   Q.    Or if you want something better, Figure 14
11 you can use, instead, if you like that one better.
12   A.    Figure 14?
13   Q.    Whichever one you want to use.
14   A.    Okay.  The IDR card, the net card.  We're
15 getting -- in the terms of -- of the specification,
16 these are -- the two things you pointed to are remote
17 modules which are used in conjunction with a hub, a PC,
18 or some other piece of equipment.
19   Q.    Mm-hmm.  So couldn't that Etherlock ID card
20 in Figure 14 be the end device, and all it's doing is
21 having an Ethernet connector, as we can see there?
22 There's presumably some path in there.  Because it's an
23 Etherlock ID, it's going to be doing this -- the
24 functional operations.  Isn't that a totally reasonable
25 read, in view of the specification?

51 (Pages 198 - 201)

ATTORNEYS EYES ONLY

Page 202

1    A.   It would not be what I would think of as an
2  end device, but -- and ...
3    Q.   Why not?
4    A.   Because I think of an end device as doing
5  something useful, not just telling me it's there.
6    Q.   Well, that's your opinion.
7    A.   Yeah.
8    Q.   How do we have a consistent opinion that
9  applies to any person who is trying to build -- I mean,
10  that's just what you think.
11    A.   Right.
12    Q.   How do we know where the boundaries are?
13    A.   That's -- that's my opinion, yes.
14    Q.   Okay.  So how does a person of ordinary
15  skill in the art know which operations are useful and
16  which operations don't count for operating power?
17        MR. COHEN:  Objection, form.
18    A.   That -- that's -- that's just -- that's too
19  hypothetical for me to give a specific answer.
20  BY MR. BLUESTONE:
21    Q.   Well, you would agree with me that
22  operating power, then, under your construction, does
23  not apply to any of the functions that are actually in
24  the claim; correct?
25        MR. COHEN:  Objection.

Page 203

1  BY MR. BLUESTONE:
2    Q.   Something else?  Sorry.
3        MR. COHEN:  Sorry.  Objection, form.
4    A.   Can you hit me with that again?
5  BY MR. BLUESTONE:
6    Q.   Sure.  Powered off, under your
7  construction, you're not applying it to any of the
8  functions that are actually, explicitly recited in the
9  claim; you're saying it applies to something that is
10  unrecited.
11        MR. COHEN:  Objection, form.
12    A.   It applies to the device, which is recited.
13  BY MR. BLUESTONE:
14    Q.   But it doesn't apply to the limitations, as
15  claimed, that need to be present in the device.
16        MR. COHEN:  Same objection.
17    A.   Yeah, and again, I think that this is going
18  well beyond my construction here.
19        Powered off does not mean that there is no
20  power, whatsoever, in the unit.  It means that it
21  doesn't have its normal operating power now.
22  BY MR. BLUESTONE:
23    Q.   But -- I'm sorry to belabor the point, but
24  operating power for what?  How am I supposed to know
25  operating power for what function?

Page 204

1    A.   Operating -- well, for a particular piece
2  of equipment, that would be obvious.  All right?  You
3  just say, in general, what's the operation?  Well,
4  there's a lot of different kinds of equipment.
5    Q.   But all those operations, you would agree,
6  are things that are not recited in the claim; correct?
7    A.   Right.  The complete operation of the
8  Ethernet terminal equipment, for instance.  Yeah, go
9  back to Claim 1:  A piece of Ethernet terminal
10  equipment.  Any one I've ever seen would have a heck of
11  a lot of other stuff besides this in it.  This --
12    Q.   But that's not claimed; right?
13    A.   But this is -- this is what's claimed,
14  right.
15    Q.   So you're relying on the fact that there's
16  other stuff that could be there, but isn't explicitly
17  mentioned?
18        MR. COHEN:  Objection, form.
19    A.   Well, there's a piece of Ethernet terminal
20  equipment there, all right?  And ...
21  BY MR. BLUESTONE:
22    Q.   So you're saying "piece of Ethernet
23  terminal equipment," by itself, draws in a whole bunch
24  of other functionality that isn't recited in the claim
25  explicitly?

Page 205

1        MR. COHEN:  Objection, form.
2    A.   Well, it's a piece of Ethernet terminal
3  equipment.  And if I tried to sell a piece of Ethernet
4  terminal equipment that only did what's in the claim, I
5  think the market would be quite small.  All right?  So
6  there's all this equipment out there that does things,
7  and if you add this capability to it, then this
8  capability can work even when the rest of it doesn't
9  have its operating power.
10  BY MR. BLUESTONE:
11    Q.   How am I supposed to know what those other
12  things are that should be encompassed in the Ethernet
13  terminal equipment?  For example, does it have to have
14  the ability to -- to be a wireless access point?
15        MR. COHEN:  Objection, form.
16    A.   Once again, I think this is just completely
17  off track.  You know, I -- I don't see where it has
18  anything to do with the claim construction of what
19  powered off means.  It may be getting into infringement
20  issues.  I don't know.  If you --
21  BY MR. BLUESTONE:
22    Q.   I'm trying to understand how powered -- how
23  I can understand what parts of -- of anything are
24  supposed to be powered off and what parts are allowed
25  to be powered on under the -- under this construction

52 (Pages 202 - 205)

Page 206

1 of operating power, without its operating power.
2    A.    All right.
3    Q.    And my question is simply:  How do I know,
4 under your definition of "without its operating power,"
5 what functions are germane to that?  How do I know?
6    A.    Well, again, if it's your piece of terminal
7 equipment, you would know.  I mean, for a particular
8 piece of equipment, it would be fairly straight
9 forward.  I mean, if you have, for instance, a wireless
10 access point, which is a piece of Ethernet terminal
11 equipment, and it has power over Ethernet in it, when
12 you start the detection process, the equipment is
13 unpowered until all that has happened.  So there is
14 some power in the equipment, but it's still off,
15 because until you pass detection classification, you
16 don't apply operating power.
17    Q.    But for the purposes of the elements of the
18 claim, at least as to how I understand the plaintiffs
19 read their infringement read, there is power going on
20 during detection.  It might be a low amount of power,
21 but there is power.
22    A.    But it's not operating power for the
23 wireless access point.  You can't communicate via the
24 wireless access point while that's going on.
25    Q.    But it is operating power for the purpose

Page 207

1 of doing detection; correct?
2         MR. COHEN:  Objection.
3    A.    That's not what I would call operating
4 power.  It's just a small amount of power to do
5 detection.  It's not operating power for the unit.
6 BY MR. BLUESTONE:
7    Q.    But it is operating power for detection;
8 correct?
9         MR. COHEN:  Objection, form.
10    A.    I would not call it operating power, no.  I
11 wouldn't call it.
12 BY MR. BLUESTONE:
13    Q.    Okay.  So what about classification?  That
14 wouldn't be operating power?
15         MR. COHEN:  Objection, form --
16    A.    No, because the unit isn't operating.
17         MR. COHEN:  Wait.  Wait.
18         MR. BLUESTONE:  Let him finish his
19 objection.
20         MR. COHEN:  Objection, form, beyond the
21 scope of the deposition.
22    A.    And, once again, yes, that's not operating
23 power.
24 BY MR. BLUESTONE:
25    Q.    Okay.  So detection, you say, is not

Page 208

1 operating power.  Classification is not operating power
2 at all?
3         MR. COHEN:  Same objections.
4    A.    Right.
5 BY MR. BLUESTONE:
6    Q.    Okay.  Now, what about the portion of it
7 where it's ramping up?  Does that now have operating
8 power?
9         MR. COHEN:  Objection, form, beyond the
10 scope of the deposition.
11    A.    I think that's irrelevant.  Once you have
12 applied 48-volt power, then you have operating power.
13 I mean, any time you apply power, there's going to be
14 some ramp-up.
15 BY MR. BLUESTONE:
16    Q.    How many volts do I need to apply for it to
17 now constitute operating power?
18         MR. COHEN:  Objection.  Wait one second.
19 Objection, form, beyond the scope of the deposition.
20    A.    Yeah, I think that, once again, that has
21 nothing to do with what we're talking about here.  And
22 in the POE spec, it tells you what the minimum you have
23 to apply.
24 BY MR. BLUESTONE:
25    Q.    Wait a second.  POE spec has nothing to do

Page 209

1 with the patent.  There's nothing in the patent that
2 talks about POE.
3    A.    Bingo.  That's what I've been saying this
4 whole five minutes of discussion; that this has nothing
5 to do with it.
6    Q.    Well, the patent, itself, doesn't mention
7 POE; correct?
8    A.    Right.  Well, you just asked a question
9 about it.
10    Q.    That's fine.  But what I'm trying to
11 understand here is:  The remote module, we've agreed,
12 has to be powered to do anything; right?
13         MR. COHEN:  Objection, form.
14    A.    Yeah, I -- I -- I think I've answered that
15 numerous times.
16 BY MR. BLUESTONE:
17    Q.    Right.  There's no dispute that the remote
18 module has to be powered to perform its functions;
19 correct?
20    A.    Right, by the current and the at least one
21 path, yes.
22    Q.    Right.  And the functions of the remote
23 module are what is recited in Claim 104; for example,
24 the '107; right?  You've got the path, it's coupled
25 across the contacts, it's drawing different magnitudes

53 (Pages 206 - 209)

ATTORNEYS EYES ONLY

Page 210

1 of current. These are the remote module functions;
2 correct?
3    A.    And with reference to the implementation
4 here, correct.
5    Q.    Yeah. And the same thing for Claim 1.
6 It's talking about only the remote module
7 functionality. It doesn't talk about anything of what
8 the asset's supposed to do; correct?
9    A.    Correct.
10    Q.    Okay. Now, the wireless access point stuff
11 that we mentioned before, even a wireless access point
12 is going to have different operating power under
13 different conditions; correct?
14    A.    It's going to need different amounts of
15 power.
16    Q.    Right. So you might be in a beacon mode,
17 for example, which is going to be a lower power draw
18 than when it's connected to an Ethernet communicating
19 device; correct?
20    A.    If you say so.
21    Q.    Well, is that -- am I wrong? I could be
22 wrong.
23    A.    I have not stated any opinions about
24 wireless access points. I --
25    Q.    Oh. I'm -- okay. I'm trying to figure out

Page 211

1 a hypothetical to understand what the scope of "without
2 its operating power" is, if it's not the elements
3 recited in the claim. That's where I'm going with
4 this.
5         Let's say that the powered up end device or
6 the Ethernet terminal equipment is a hypothetical
7 situation where it's a wireless access point. Okay?
8    A.    Okay.
9    Q.    Now, am I correct that it's your opinion
10 that if the device's POE -- now I am talking about POE
11 in this example --
12    A.    Okay.
13    Q.    -- but the device's POE detection has
14 nothing to with its operating power?
15    A.    That's my opinion, yes.
16    Q.    Now, would beacon mode be its operating
17 power?
18         MR. COHEN: Objection, form, beyond the
19 scope of the deposition.
20    A.    I -- I -- I have no --
21         THE WITNESS: Sorry. "Beyond the scope."
22 I have --
23    A.    I have no opinion on that.
24 BY MR. BLUESTONE:
25    Q.    Okay. Do you have an under -- you do

Page 212

1 understand there are different power draws for --
2 depending on the functions that are being performed by
3 a wireless access point; correct?
4    A.    I do.
5    Q.    How do I know what the floor is that
6 determines between operating power in watts and
7 irrelevant power draw? Does my question make sense?
8    A.    It does, and what I'm saying is, if it can
9 perform its normal operating functions, it has
10 operating power.
11    Q.    What if there's just an LED light on it; a
12 very small, minute current draw of a tiny little LED.
13 Is that sufficient for it to be without its operating
14 power?
15    A.    Is -- is -- is that its purpose? Just to
16 be an LED?
17    Q.    I mean, I don't know. Does it matter?
18    A.    Well, I think for the operating power, it
19 does matter; that if it doesn't -- if it's not able to
20 operate and it's on the mode because of lack of power,
21 then it doesn't have it. And --
22    Q.    Okay. So we've gone a while and I just
23 have a couple of more questions and I'll let you take a
24 break on this.
25    A.    Okay.

Page 213

1    Q.    Do you have an opinion in any way about
2 whether or not Claim 103's addition of the piece of
3 Ethernet terminal equipment being powered off, whether
4 that has -- provides any patentable distinction whether
5 it's powered off or not?
6         MR. COHEN: Objection, form, beyond the
7 scope of the deposition.
8    A.    I -- I -- I'm not sure what you're getting
9 at there.
10 BY MR. BLUESTONE:
11    Q.    Well, they've -- they've added in a
12 specific claim where the only thing that's different
13 from the base claim --
14    A.    Right.
15    Q.    -- is that it's powered off. How is there
16 anything inventive about that?
17         MR. COHEN: Objection, form.. beyond the
18 scope of the deposition.
19    A.    Well, and which -- which patent are we on?
20 The -- the 103 of what patent?
21 BY MR. BLUESTONE:
22    Q.    I'm sorry. The '107 patent.
23    A.    '107.
24    Q.    It's Exhibit 3.
25    A.    103. Okay. Well, this is a -- this is a

54 (Pages 210 - 213)

Page 214

1 dependent claim; correct?
2    Q.    Mm-hmm.
3    A.    So it's just -- it's another element added
4 to the dependent claim.
5    Q.    Right.  How is it -- we've already said
6 before that to the claimed invention, whether the asset
7 is powered on or powered off is totally irrelevant to
8 its operation; correct?
9        MR. COHEN:  Objection, form.
10    A.    Well, again, for -- for a dependent claim,
11 you don't have to have something that would be
12 inventive if it was on its own; right?  It's a further
13 restriction to -- to something which, presumably, was
14 already inventive, or it wouldn't have been an
15 independent claim.
16        MR. BLUESTONE:  All right.  Why don't we
17 take a break.
18        VIDEOGRAPHER:  We are off the record at
19 3:10 p.m.
20        (Break from 3:10 p.m. until 3:25 p.m.)
21        VIDEOGRAPHER:  We are back on the record at
22 3:25 p.m.  This is file 5.
23 BY MR. BLUESTONE:
24    Q.    Mr. Baxter, let's go to the section of your
25 declaration, paragraphs 41 through 53, where we are

Page 215

1 discussing -- you are discussing at least one
2 condition.
3    A.    Okay.
4    Q.    Now, the condition applied is used in the
5 '107 patent, the '760 patent, and the '838 patent;
6 correct?
7    A.    I believe so.
8    Q.    In the '760 patent, it recites, towards the
9 end -- I'm looking generally towards Line 35, starting
10 on 34 -- "to control the application of at least one
11 electrical condition to at least two of the
12 conductors."  Do you see that?
13    A.    Yes.
14    Q.    You claim -- or sorry -- patent --
15        In the '838 patent, on Page 5 of Exhibit 6,
16 it also is calling for at least one electrical
17 condition.  Do you see that?
18    A.    Just one moment.  Yes.
19    Q.    And in both instances, it's relating to
20 what the piece of central equipment is doing; correct?
21    A.    Sixty ... equipment ... yes.
22    Q.    Okay.  Now, the '107 patent, Claim 1 on the
23 first page of Exhibit 6 -- I'm sorry, not the first
24 page.  The third page.  Pardon me.
25        '107 patent, Claim 1, doesn't use

Page 216

1 electrical condition, it just says "to result from at
2 least one condition."  Do you see that?  Line 21.
3    A.    21.  I do.
4    Q.    So just as a framework for our discussions,
5 would you agree with me that the patents-in-suit use at
6 least one electrical condition for the central module,
7 but at least one condition for the remote module?
8        MR. COHEN:  Objection, form.
9    A.    Yes, it seems that way.
10 BY MR. BLUESTONE:
11    Q.    Okay.  Do you believe that it was a
12 drafting error by the patent attorney to omit
13 "electrical" for the '107 patent?
14        MR. COHEN:  Objection, form, beyond the
15 scope of the deposition.
16    A.    I -- I don't know why the patent attorney
17 wrote it that way.
18 BY MR. BLUESTONE:
19    Q.    Okay.  But you believe, in Paragraph 45,
20 that we should reintroduce the word "electrical" into
21 the claims for the '107 patent, even though it doesn't
22 appear there.
23    A.    '107, Claim 1 ... at least one
24 condition ...
25        Oh, I'm not saying we rewrite the claim.

Page 217

1 I'm saying that I think this means an electrical
2 condition.
3    Q.    But your interpretation effectively takes
4 the existing language and just adds the word
5 "electrical" to it?
6        MR. COHEN:  Objection, form.
7    A.    I suppose that would be fair to say.
8 BY MR. BLUESTONE:
9    Q.    And, thus, in applying something to the
10 context, condition should be electrical condition, but
11 when we're talking about the path coupled across, that
12 shouldn't be an electrical connection?
13    A.    Well --
14        MR. COHEN:  Objection, form.
15    A.    The way that I read '107, "the different
16 magnitudes of DC current flow designed and configured
17 to result from at least one condition applied to at
18 least one of the contacts of the first and second," so
19 if you're going to cause different magnitudes of
20 current by applying a condition to those two contacts,
21 it would seem to me that it would be an electrical
22 condition.
23 BY MR. BLUESTONE:
24    Q.    Does it necessarily have to be an
25 electrical condition applied to the contacts?

55 (Pages 214 - 217)

ATTORNEYS EYES ONLY

Page 218

1    A.    In the context of this specification claim,
2  I would think so.  I wouldn't think that painting them
3  blue, for instance, would -- would cause a different
4  current or, you know --
5    Q.    But potentially, a thermodynamic condition
6  could affect the current draw; right?
7    A.    A thermodynamic condition?
8    Q.    Like, there could be fluctuations that
9  could affect the current draw; right?
10    A.    Boy, that's not the way I would interpret
11  this.  I think it's pretty straightforward.
12    Q.    So what is encompassed in "electrical"?
13    A.    Well, electrical conditions that you would
14  apply typically would include voltage impedance, or I
15  suppose you could inject current in, so current source,
16  voltage source, or an impedance.
17    Q.    So is "electrical condition" only items
18  that are governed by ohms law?
19    A.    I haven't really thought of it in that way.
20  Something that you would do to effect the current,
21  which would most likely be either apply a voltage or an
22  impedance, depending on what's already there, could be
23  to apply a current source, although you could sort of
24  consider that to be like a voltage and an impedance,
25  so --

Page 219

1    Q.    Well, let's take a quick step back, just to
2  make sure the record is clear.
3        You would agree that ohms law describes the
4  relationship between voltage, impedance and current;
5  correct?
6    A.    Correct.
7    Q.    And the examples that you have for
8  electrical condition are voltage, impedance or current
9  applied to the contact; correct?
10    A.    Correct.
11    Q.    Is there anything else that you can think
12  of that would be an electrical condition, other than
13  those three items, sitting here today?
14    A.    Those are the ones that come to mind, yes.
15    Q.    And when it's saying a condition applied to
16  the context -- in the context of Claim 1 of the '107
17  patent, can that application of the condition be from
18  some source external to the Ethernet terminal
19  equipment, itself?
20        MR. COHEN:  Objection, form, beyond the
21  scope of the deposition.
22    A.    Let me check this again.  DC current ...
23        Yes, I presume it could be applied from
24  either side of the contacts, either from this end or
25  that end.

Page 220

1  BY MR. BLUESTONE:
2    Q.    So that the application of the condition
3  can come from a non-claimed source?
4    A.    Well, the condition is applied to the
5  contacts.
6    Q.    Right.  But the claim doesn't specify where
7  that condition comes from, in other words?
8        MR. COHEN:  Objection, form, beyond the
9  scope of the deposition.
10    A.    I have not actually given that any thought
11  so I -- I don't know right now.
12  BY MR. BLUESTONE:
13    Q.    Well, you did already say that you presume
14  it could be applied from either this end or that end.
15  What did that mean?
16    A.    That was a preliminary ... oh, preliminary
17  thought.  But as I said, I really would want to
18  consider this more to give you a firm answer.
19    Q.    Well, it's your opinion that this term is
20  not indefinite; right?
21    A.    That is correct, yes.
22    Q.    Okay.  And in doing that, you look to the
23  intrinsic evidence, correct, including the claim
24  language?
25    A.    Right.

Page 221

1    Q.    What's your support in the specification
2  that you should be adding the word "electrical"?
3    A.    Well, the conditions that are applied in
4  the example of limitations are either voltages or
5  impedances.
6    Q.    And because they are voltages or impedances
7  in the specification, you group them to be electrical
8  conditions, as a grouping for both?
9    A.    Yes, which is consistent with my opinion
10  that those are the things you would do to effect -- to
11  cause different magnitudes of current to flow.
12    Q.    Now, the clause starting from Line 19 of
13  Claim 1 of the '107 patent, "The different magnitudes
14  of DC current flow to result from at least one
15  condition applied to at least one of the contacts of
16  the first and second pairs of contacts."
17        Do you see that?
18    A.    Yes.
19    Q.    "At least one condition" means there can be
20  more than one condition applied; correct?
21    A.    Yes.
22    Q.    So you can have multiple conditions apply
23  to at least one of the contacts that will cause
24  different magnitudes of DC current to flow?
25    A.    Right.

56 (Pages 218 - 221)

ATTORNEYS EYES ONLY

Page 222

1    Q.    Isn't that merely just reciting multiple
2 applications of ohms law?
3    A.    I'm not sure what you mean by "merely."
4    Q.    Well, okay, let me take out the word
5 merely.
6         Isn't that allowing for multiple
7 applications of ohms law?
8         I apply a voltage at one contact, I get one
9 magnitude of DC current.  I apply another voltage and I
10 get another one.
11    A.    Yes, that's true, you can control the
12 voltage or the impedances, or both.
13    Q.    Right.  So if your condition applied in the
14 circumstances is voltage 1 and voltage 2, you're going
15 to get current 1 and current 2.
16    A.    Okay.
17    Q.    I mean, is that fair, that that's -- that
18 satisfies that clause?
19    A.    I --
20         MR. COHEN:  Objection, form, beyond the
21 scope of the deposition.
22    A.    I presume that it would, although, again,
23 you know, I think we're getting well beyond what
24 "condition" means here.
25 BY MR. BLUESTONE:

Page 223

1    Q.    And that's what I'm trying to figure out.
2         To put it plainly, one read of that clause
3 that you're talking about is, you're applying ohms law
4 to it.  You apply voltage, you get a current.  You
5 apply another voltage, you get another current.  And
6 you read on that.
7         And I'm trying to understand if that's
8 encompassed in that claim term, as you understand it.
9    A.    Well, you certainly don't want to break
10 ohms law.  That would be bad, wouldn't it?
11    Q.    I don't know how I would do that, but yeah.
12    A.    So yes, I think that that element, sure, if
13 it follows ohms law, that's fine.  You could satisfy
14 that element with voltages and current to follow ohms
15 law.
16    Q.    Okay.  And in your understanding, it has to
17 be an electrical condition -- why, again?  Because the
18 spec -- because of what the specification shows?
19    A.    Well, because in my experience, if you want
20 to draw different magnitudes of current, what you would
21 do to contacts is put some type of electrical condition
22 on them, generally either a voltage or impedance, and
23 those are the two things illustrated in the
24 specification, so that's what I would think of.
25    Q.    How is the specification showing an

Page 224

1 impedance condition applied?
2    A.    Well, we talked through several of these
3 pictures, where we were changing the impedance to move
4 current back and forth from one to the other, so the
5 impedance across the contacts out there, it was
6 changing and --
7    Q.    Do you mind -- pick whichever figure you
8 want to do.  Do you mind briefly walking through that,
9 of how the impedance?  I understood in the context of
10 current flow, but we didn't discuss it in the context
11 of impedance.
12    A.    Okay.  Here's one.  If we take Figure 10 --
13 actually, that one's harder to see.  Let's take ...
14 let's take Figure 8.
15    Q.    Okay.
16    A.    Yeah.  Figure 8.  All right.  So most of
17 the current -- the current, in the absence of any
18 changes, the current's going to flow through resistor
19 112, zener diode 114, split through the two 10K
20 resistors equally, and come back on the two top pairs.
21 All right?
22    Q.    Uh-huh.
23    A.    Now, when we -- when we modify the current,
24 we alternately draw current through the resistors
25 either attached to RA1 or RA2, basically shunt some of

Page 225

1 it off, so we're effectively changing the resistance in
2 series with that leg of the thing to make either more
3 or less current go through one than the other.  So it's
4 by -- it's by changing the effective impedance across
5 there that we move the current from one to the other.
6    Q.    Okay.  And that changing impedance is going
7 to operate to address the differential, if you will, in
8 the currents going in the top two lines?
9    A.    Right.
10    Q.    Okay.  And those differentials in Figure 8
11 are what's conveying information about the device?
12    A.    That's right.
13    Q.    Now, this might be a silly question, so I
14 apologize if it is.  I'm just trying to understand
15 "impedance condition."
16         Are we saying that impedance condition
17 would also encompass something like in the '260 patent
18 where it's talking about a discontinuity; like,
19 literally, breaking the path?
20    A.    The '260?
21    Q.    Yeah, the '260, which is incorporated by
22 reference, and I have it if you want me to pull up the
23 figures.  Just let me know.
24    A.    Right.
25    Q.    It's -- it's closing a current loop;

Page 226

1 correct?
2    A.    It is.
3    Q.    And the way it's operating is, it's going
4 through one winding of a transformer; correct?
5    A.    Right.
6    Q.    And the way you know whether that -- that
7 piece of equipment is connected or not is whether or
8 not it has broken continuity, whether that transformer
9 has been removed?
10    A.    Right.  So you're looking for current or no
11 current --
12    Q.    Right.
13    A.    -- is basically what you are looking for,
14 yes.
15    Q.    And what I'm to figure out by the read of
16 impedance condition, does that encompass a circumstance
17 where the impedance condition is just basically
18 disconnecting it?
19          MR. COHEN:  Objection, form, beyond the
20 scope of the deposition.
21    A.    Yes -- well, no.  This -- this is a
22 different scenario than the -- than the '260, where we
23 are altering the current from one value to another;
24 we're not disconnecting it.
25 BY MR. BLUESTONE:

Page 227

1    Q.    Okay.  Okay.  Let's talk detection protocol
2 a little bit.
3    A.    Okay.
4    Q.    And that's paragraph 67 through 74.
5    A.    Mm-hmm.  Okay.
6    Q.    What support is there in the specification
7 for a detection protocol?
8    A.    The spec discusses detecting, for instance,
9 an unauthorized piece of equipment and gives you,
10 basically, a means to do that if you want.
11    Q.    Okay.
12    A.    And similarly, it references the '260,
13 which allows you to detect a piece of disconnected
14 equipment.
15    Q.    Is there anything else that you can pick up
16 through there?
17    A.    Those are the -- the main things I can
18 think of right now, yeah.
19    Q.    Okay.  Now, you talk about what detection
20 protocol means in Paragraph 70, 73 and 74.  Take a
21 minute to re-read those to yourself and let me know
22 when you are ready.
23    A.    Okay.
24    Q.    How do you reconcile that there are three
25 different definitions in each -- one in each of these

Page 228

1 paragraphs?
2          MR. COHEN:  Objection.  One second.
3 Objection, form.
4    A.    Well, in 74, we're talking about
5 specifically what it means in the context of the
6 claims.  In 70 and 73, we're talking about what it
7 means sort of in plain English, and I think those are
8 pretty much the same thing.
9 BY MR. BLUESTONE:
10    Q.    And then what about 70?
11    A.    Well, 70, I think, is very similar to 73.
12 I mean --
13    Q.    Well, 70 says it's a detection scheme rule
14 or procedure or a part thereof, but then in 73, you're
15 saying it's a procedure, scheme or set of rules, but
16 not for detecting, discovering or determining the
17 existence of something.
18    A.    Right, and it's just a little more
19 elaboration about what you might be detecting.
20    Q.    Well, which one's the one that I should --
21 if -- if we're saying the claim term is indefinite and
22 you're saying not, which one is the one that we should
23 be applying?
24    A.    Well, I don't really think they're
25 inconsistent with each other, I mean, I guess is ... 70

Page 229

1 is, in light of the specification, what you would
2 think, and 73 is, in plain English, what it would mean,
3 and I think they are pretty much the same.
4    Q.    Okay.  Well, in 73, the claim talks about
5 "detect."  What's being added by discovering or
6 determining?
7    A.    Those are sort of -- well, as it said in
8 the first line, "detect" means to detect, discover or
9 determine the existence of something.  Detection means.
10 So I'm just plugging in that definition.
11    Q.    So in the '260 patent, it's -- the
12 detection is whether there's the devices on the network
13 or not?
14    A.    You're detecting a device that's been
15 disconnected, yes.
16    Q.    You're detecting presence of the device
17 based on continuity in the circuit?
18    A.    Right, and you're detecting when it's been
19 disconnected by absence of continuity.
20    Q.    So the fact that there is just current
21 flow, a non-zero current is conveying in, is -- is --
22 is that detection protocol?
23    A.    Well, it's putting it there and looking for
24 it, yes.
25    Q.    Who describes -- who ascribes what meaning

58 (Pages 226 - 229)

ATTORNEYS EYES ONLY

Page 230

1 should be applied to this physical characteristic of a
2 circuit?
3        MR. COHEN: Objection, form, beyond the
4 scope of the deposition.
5    A.   Who ascribes what to what?
6 BY MR. BLUESTONE:
7    Q.   If it's this -- a detection scheme, rule or
8 procedure, whose procedure do we apply?
9        MR. COHEN: Objection, form, beyond the
10 scope of the deposition.
11   A.   You would want me to tell you?
12 BY MR. BLUESTONE:
13   Q.   Sure.
14   A.   I think the designer of the equipment will
15 decide if they want to detect something, and if so, how
16 they want to do it and what -- what the procedure is.
17 I mean, I --
18   Q.   So what if I've designed my equipment and I
19 don't really want to detect anything.
20   A.   Okay.
21   Q.   And it's drawing 5 milliwatts in its normal
22 operation.  That's just what it does.  And, Mr. Baxter,
23 you decide that you're going to go and say that
24 anything under 10 milliwatts is low power, after the
25 fact.  Is that same already-existing circuitry now part

Page 231

1 of a detection scheme?
2    A.   No, not in my opinion.
3    Q.   Why not?
4    A.   Because a detection scheme -- again,
5 detection is a procedure, scheme or set of rules, so
6 you would have to say, "Hey, look, I'm going to do this
7 and if this happens, it means X and if that happens, it
8 means Y, and if the other happens, it means Z," and
9 presumably someone else is going to be looking for that
10 and noticing it.  Otherwise, there's not much point in
11 doing it.  So you would need to define that detection
12 protocol and build it into your equipment.
13   Q.   So it depends on what the person designing
14 it is thinking at that time?
15   A.   No.  No.  No.  We've been around this barn
16 a dozen times, I mean, between the two depositions.
17      I mean, engineers are not as clueless as
18 you give us credit for, there, Mr. Bluestone.  When
19 you're designing a product, you think through the
20 requirements and how it's going to operate and you have
21 a set of specifications and you design it to meet them.
22   Q.   Okay.
23   A.   And if you decide, for instance, that you
24 are going to do POE, you are going to build that
25 detection algorithm in.  If you decide you're going to

Page 232

1 follow this particular example he used in the
2 specification, you would build the circuit like this in
3 and you would define, for your equipment, what these
4 pulses mean when they're coming back, so the other end
5 can make sense of it, and so it's not like, you know,
6 you're going to put a 12-ohm resistor there, and a year
7 from now get sued because someone says, "Hey, to me, 12
8 ohms is very significant."  It's in your equipment and
9 the way it operates.  Is that what it's doing?
10        Furthermore and additionally, let me say,
11 these are all dependent claims, so you would have to
12 have already implemented one of the independent claims
13 before this even became an issue.  All right?  So it's
14 not like you're minding your own business, haven't done
15 anything wrong, when somebody says, "Wait a minute.
16 That's a detection protocol.  Off to jail with you."
17 All right?  I mean --
18   Q.   But what -- what stops that from happening
19 in the plain meaning of the claim?  I mean, it's just
20 saying it's a detection protocol; right?
21        MR. COHEN: Objection, form, beyond the
22 scope of the deposition.
23 BY MR. BLUESTONE:
24   Q.   I mean, I get that that's not what you
25 would -- would do.  But what's stopping from -- the

Page 233

1 claim from being read as being a detection protocol
2 that is in place after the fact?
3        MR. COHEN: Objection, form.
4    A.   Well, again, let me state I'm not a
5 lawyer -- I can't -- much less a judge.  I can't say
6 who can sue who or if they would win, but, I mean,
7 unless you had (a) already infringed some other claim,
8 independent claim, and (b) had documented that you had
9 this detection protocol and how it works, I think it
10 would be very difficult to show that you were
11 infringing these claims.
12 BY MR. BLUESTONE:
13   Q.   Why?  Why would that be difficult?  Let's
14 assume that the independent claim is satisfied and
15 there's no fight.
16   A.   Okay.
17   Q.   Why is it difficult to show whether or not
18 you are part of a detection protocol, or not, to
19 infringe the claim?
20        MR. COHEN: Objection, form, beyond the
21 scope of the deposition.
22   A.   Again, I have not thought this through in
23 great detail.  I really don't have a firm opinion on
24 that question.  But there are protocols for doing
25 things that are documented and that would be evidence

59 (Pages 230 - 233)

ATTORNEYS EYES ONLY

Page 234

1 that you were, but ...
2 BY MR. BLUESTONE:
3    Q.    Does the protocol have to be -- be in
4 existence at the time of the person making the device?
5         MR. COHEN:  Objection, form, beyond the
6 scope of the deposition.
7    A.    Again, you I -- what was the question again?
8 I ...
9 BY MR. BLUESTONE:
10    Q.    For -- you say that detection protocol is
11 not indefinite.
12    A.    Right.
13    Q.    And my question is:  Is there a temporal
14 limitation to detection protocol such that it needs to
15 be in existence at the time that the person is making
16 the device in question?
17    A.    Oh, I see.
18         MR. COHEN:  Same objections.
19    A.    I -- I really have not considered that in
20 depth and I can't answer.  I could speculate, but I
21 don't see any point in that.
22 BY MR. BLUESTONE:
23    Q.    Well, I mean, go ahead and speculate, if
24 you can come up with some meaning to it.
25         MR. COHEN:  Objection, form, beyond the

Page 235

1 scope of the deposition.
2    A.    I think that would require further study.
3 I don't want to ...
4 BY MR. BLUESTONE:
5    Q.    So sitting here today, you can't tell me
6 whether or not there's any timing component to
7 detection protocol?
8    A.    Not in any legal sense, no.  I mean, I
9 would think it's very unlikely that you are going to
10 innocently make something and five years later, you
11 know, someone's going to say, "Oh, well, that's painted
12 red; I can detect it because of that."  I mean, that's
13 -- you know, I think in -- in -- in the sense this is
14 already an ind- -- or a dependent claim, you would have
15 to be doing this stuff (indicating) in the way that
16 also the detection protocol, and I -- I really don't
17 see that happening by accident.
18    Q.    Okay.  Well, let's say that Claim 1 of the
19 '107 patent is found to be invalid, in view of prior
20 art.  The prior art doesn't show a detection protocol,
21 for some odd reason.
22    A.    Mm-hmm.
23    Q.    Does the existence that it can be part of a
24 detection protocol make any difference, then, to the
25 validity of that dependent claim?

Page 236

1         MR. COHEN:  Objection, form, beyond the
2 scope of the deposition.
3    A.    I -- I have not addressed the validity or
4 invalidity at all, thus far, so I have no opinion.
5 BY MR. BLUESTONE:
6    Q.    Earlier you said if you decide, for
7 instance, that you're going to do POE, you are going to
8 build that detection algorithm in.  If you decide
9 you're going to follow this particular example you used
10 in the specification to build a circuit like this and
11 you defined your equipment for what these pulses mean
12 when they're coming back, so the other end could make
13 sense of it.
14         And there's more.  I want to talk about
15 those two circumstances.
16         Do you agree with me -- well, let's first
17 talk about specification.
18         Is there something in the specification
19 that's talking about an asset tracking detection
20 protocol?
21         MR. COHEN:  Objection, form.
22    A.    Is that a question?
23         Well, I would view the -- the Chrimar
24 patents, the earlier ones, to be doing that with the
25 disclosure about how you get the interaction between a

Page 237

1 central module and remote module and how you get
2 information back, and so on.  That could be considered
3 a protocol for detecting information.
4 BY MR. BLUESTONE:
5    Q.    When you said the earlier ones, are you
6 talking about the '260 patent or are you talking about
7 something else?
8    A.    Well, the '250, in particular, I was
9 thinking of, is in great deal, but that's the claim;
10 but the specifications are there in all of them, so --
11    Q.    What about the part of the specification
12 that talks about how you are encoding a unique ID
13 number and modulating it via DC current.  Would that be
14 a detection protocol disclosed?
15    A.    Well, I think that's part of a detection
16 scheme, yes.
17    Q.    Okay.  So a person reading the patent might
18 know of that detection scheme; correct?
19    A.    They might or they would, yes.
20    Q.    Would a person reading the patent have any
21 knowledge of a POE detection scheme?
22    A.    If they were of ordinary skill in the art,
23 they would, but --
24    Q.    At the time of the invention of the
25 patents?

ATTORNEYS EYES ONLY

Page 238

1    A.    Not then, no.
2    Q.    It would only be relevant after-the-fact;
3 right?
4    A.    After-the-fact of the invention.
5    Q.    Mm-hmm.
6    A.    So if you're asking, did they invent this
7 before POE invented detection, my answer would be yes.
8    Q.    No.  My -- my question is, in essence:  How
9 is it at all fair to go and have the claims encompass
10 POE as part of a detection protocol when the patent,
11 itself, makes no mention of POE?
12        MR. COHEN:  Objection, form, beyond the
13 scope of the deposition.
14    A.    I don't ... again, that -- that's outside
15 my area of expertise.  That's more of a legal question,
16 in my view, and I have no response.
17 BY MR. BLUESTONE:
18    Q.    Well, you're going to be doing testing of
19 our devices at some point; correct?
20    A.    Hopefully.
21    Q.    And you're going to be using a Sophos
22 tester; correct?
23    A.    Presumably.
24    Q.    And a Sophos tester is to test power over
25 Ethernet functionality; correct?

Page 239

1    A.    Right.
2    Q.    And the patent doesn't mention power over
3 Ethernet functionality; correct?
4        MR. COHEN:  Objection, form, beyond the
5 scope of the deposition.
6    A.    That is correct.
7 BY MR. BLUESTONE:
8    Q.    And power over Ethernet detection and
9 classifications are detection protocols?
10    A.    They are, in my opinion.
11    Q.    Right.  But they're not detection protocols
12 that were implemented at the date of invention in these
13 patents.  At least they weren't standardized.  Right?
14    A.    Right.
15    Q.    When did those power over Ethernet
16 standards become a detection protocol that can be
17 encompassed in Claim 72 of the '107 patent?
18        MR. COHEN:  Objection, form, beyond the
19 scope of the deposition.
20    A.    Again, I have no insight to offer on that,
21 and they couldn't possibly be unless it was found that
22 the operation of those protocols infringed some of the
23 other claims first.  So --
24 BY MR. BLUESTONE:
25    Q.    Sure.  Understood.  But I'm talking about

Page 240

1 the circumstance that we're now looking at, Claim 72 of
2 the '107 patent, which now says that at least one of
3 the different magnitudes is part of a detection
4 protocol.  Would power over Ethernet's protocols
5 encompass a detection protocol?
6        MR. COHEN:  Objection, form --
7    A.    Yes, in my opinion.
8        MR. COHEN:  -- beyond the scope of the
9 deposition.
10        THE WITNESS:  Oops.  Sorry.
11 BY MR. BLUESTONE:
12    Q.    So it wouldn't encompass a detection
13 protocol, notwithstanding the fact that the patent
14 doesn't mention it in any way, shape or form?
15        MR. COHEN:  Objection, form, beyond the
16 scope of the deposition.
17    A.    Well, the patent --
18        THE WITNESS:  I'm sorry.
19    A.    Yeah, I -- I have nothing more.
20 BY MR. BLUESTONE:
21    Q.    And power over Ethernet wouldn't encompass
22 a detection protocol, in your opinion, even though it's
23 not standardized until after the alleged dates of
24 invention; correct?
25    A.    Well, power --

Page 241

1        MR. COHEN:  One second.  Objection, form,
2 beyond the scope of the deposition.
3    A.    Power over Ethernet does include a
4 detection protocol.  I don't think there's any question
5 about that, so --
6 BY MR. BLUESTONE:
7    Q.    Okay.  It does include a detection
8 protocol, but it's a detection protocol that isn't
9 adopted until after the alleged dates of invention;
10 correct?
11    A.    That is correct.
12    Q.    How would a person reading the patent
13 specification know to avoid using power over Ethernet
14 as a suitable detection protocol?
15        MR. COHEN:  Objection, form, beyond the
16 scope of the deposition.
17    A.    Well, I -- again, I don't have much
18 constructive to add here.  I think ultimately, that's a
19 matter for the courts to decide, and it seems like
20 we're getting into infringement issues here, which I am
21 not prepared to comment on, but --
22 BY MR. BLUESTONE:
23    Q.    Fine.  I'm trying to understand what the
24 scope of detection protocol is.  There is an argument
25 that I can make that would say detection protocol is

61 (Pages 238 - 241)

ATTORNEYS EYES ONLY

Page 242

1 completely unbounded, it can be anything and everything
2 under the sun, and for that reason, this claim is
3 infinite.
4       MR. COHEN: Object.
5       MR. BLUESTONE: Sorry. Go ahead.
6       MR. COHEN: Object to the --
7       MR. BLUESTONE: I have a feeling I can do
8 your objection for you, but that would be some sort of
9 acquiescence to it which I'm not prepared to do and I
10 don't think would be appropriate.
11       MR. COHEN: I'm waiting for the question.
12       MR. BLUESTONE: Yeah, let's start that
13 over. We're getting late in day anyway here.
14 BY MR. BLUESTONE:
15       Q.   What I'm trying to probe with you here is
16 detection protocol and what the scope of that is to be
17 in the analysis.
18       A.   Right.
19       Q.   You are giving me an example where you're
20 saying, "Well, I wouldn't say someone designed
21 something for a purpose and then later on now is
22 infringing because a detection protocol came up later."
23 Well, this is what I'm arguing is exactly what's
24 happening here, because the patent application does
25 include power over Ethernet. No question yet.

Page 243

1       Here's my question:
2       Aren't you saying that detection protocol
3 is encompassed -- encompasses protocols that are put
4 into effect after the date of invention?
5       MR. COHEN: Objection, form, beyond the
6 scope of the deposition.
7       A.   Well, again, I don't really have anything
8 sensible to add there. It seems like we're getting
9 into infringement issues and it seems kind of unusual
10 to argue that you don't infringe because you did your
11 thing after the other one was invented. I mean,
12 typically, it goes the other way, but again, that's --
13 that's sort of all I have on that subject.
14 BY MR. BLUESTONE:
15       Q.   Can you give any guidance, to a person of
16 ordinary skill in the art who has reviewed the
17 specifications, as to how they would protect themselves
18 from the particular limitations of Claim 72 moving
19 forward into the future?
20       MR. COHEN: Objection, form, beyond the
21 scope of the deposition.
22       MR. BLUESTONE: Do you want me to rephrase
23 that?
24       A.   Well, I do have a consulting business. No,
25 I'm just kidding.

Page 244

1 BY MR. BLUESTONE:
2       Q.   You might have a little conflict issue
3 there, but yeah, that's a funny joke.
4       A.   I'm glad you recognized it.
5       Q.   No. We both smiled. It's a long day, so I
6 totally understand that. That was acute.
7       But okay, let me start over, because this
8 is a legitimate question here.
9       How do -- how do you, as a person of
10 ordinary skill in the art, looking at Claim 72 of the
11 '107 patent, know that they're not part of a detection
12 protocol?
13       MR. COHEN: Objection, form, beyond the
14 scope of the deposition.
15       A.   I agree with all that; but in addition --
16       MR. BLUESTONE: Well, your objections are
17 working, Justin.
18       A.   In addition, I mean, if you didn't already
19 infringe some other claims, this wouldn't even be an
20 issue. Right? So --
21       Q.   Yeah, but that's -- that's non-responsive.
22 That's -- that's not my question, at all.
23       My question is simply about Claim 72 and I
24 need to be able to decipher the bounds between what is
25 a detection protocol and what isn't.

Page 245

1       A.   So your question is, you want to build
2 something that infringes other claims, but you don't
3 want to get nailed on 72, or whatever?
4       Q.   Why not. Go with that hypothetical. Why
5 not.
6       A.   Well I -- I mean, that's not always pos --
7 I mean, dependent claims can be tough to evade if
8 you've hit the independent claim, has been my
9 experience. That's all I can say.
10       Q.   So you can't think of any way that you can
11 protect yourself from Claim 72?
12       MR. COHEN: Objection, form, beyond the
13 scope of the deposition.
14       A.   Once again, I agree. And yes, I've already
15 told you, don't infringe on any of the others, for
16 starters.
17 BY MR. BLUESTONE:
18       Q.   Okay. We're past that. And now 72.
19       MR. COHEN: Same objection.
20 BY MR. BLUESTONE:
21       Q.   So let's go through 72. It says, "Where at
22 least one magnitude of the DC current is part of a
23 detection protocol."
24       A.   Right.
25       Q.   And in Claim 1, it says there could be

62 (Pages 242 - 245)

Page 246

1 multiple magnitudes of DC current.
2    A.    Right.
3    Q.    So correct me if I'm wrong, all you've got
4 to do in 72 is have a device that meets the limitations
5 of the claims and have just one value of DC current be
6 part of a detection protocol and you infringe it.
7    A.    That's what it says, yes.
8    Q.    That's what it says.
9        How is a magnitude of DC current part of a
10 detection protocol and how do I know if that's
11 happening or not?
12       MR. COHEN:  Objection, form, beyond the
13 scope of the deposition.
14    A.    Yeah, I mean, I think I've already
15 addressed that several times.  I don't know what to add
16 to it.
17 BY MR. BLUESTONE:
18    Q.    Okay.  74, Paragraph 74 of Exhibit 1, you
19 say, "In the context of the claims, detection protocol
20 means the equipment is configured or designed so the
21 magnitude of the current (flow) or the impedance in the
22 path allow it to detect or determine some information
23 about the equipment at the other end of the path."
24    A.    Okay.
25    Q.    Claim 72 just says a magnitude of current

Page 247

1 is part of a detection protocol.  Why is Paragraph 74
2 talking about equipment being configured, et cetera,
3 et cetera?
4    A.    Well, because it depends on other claims
5 that require that.
6    Q.    So even though Claim 72 is only talking --
7 well, DC current, we -- you stated, is not a structural
8 limitation; right?  There's no structure in DC current;
9 correct?
10    A.    Right.
11    Q.    So Claim 72 is saying this component, which
12 you say is not necessarily even present in the device,
13 has a magnitude, and that magnitude is part of a
14 detection protocol?
15       MR. COHEN:  Objection, form.
16 BY MR. BLUESTONE:
17    Q.    How am I at all supposed to go look at this
18 claim and know, if the device doesn't even need to be
19 actually doing this, whether it's ever going to be part
20 of a detection protocol?  I don't get it.
21       MR. COHEN:  Objection, form.
22    A.    I'm with you.  I think we've been around
23 this barn several times.  I don't have -- if I haven't
24 been able to explain it yet, I don't have anything else
25 to add.

Page 248

1 BY MR. BLUESTONE:
2    Q.    So if the IEEE working group that was doing
3 802.3 AF and 802.3 AT decides to discontinue the
4 protocol, "We're no longer going to be part of the
5 standard, do whatever you want," is it no longer a
6 detection protocol under Claim 72?
7       MR. COHEN:  Objection, form, beyond the
8 scope of the deposition.
9    A.    Again, I can't give you legal advice on
10 what to do with your --
11 BY MR. BLUESTONE:
12    Q.    I'm not asking for legal.  I'm saying as to
13 your understanding of detection protocol.
14    A.    Well, those --
15       MR. COHEN:  Same -- hang on one second.
16 Same objections.
17    A.    Yeah, I just -- all I can say is, those
18 detection protocols would not be wiped off the face of
19 the earth.  They are still published.  They still
20 exist.  So if you follow them, they would still be
21 detection protocols.
22 BY MR. BLUESTONE:
23    Q.    Okay.  My last line of questioning on this.
24    A.    Okay.
25    Q.    The IEEE is a group of engineers who get

Page 249

1 together and adopt standards; right?  And in your
2 opinion, the IEEE standards count as detection
3 protocols.
4    A.    Well, they can, if they have a detection
5 protocol in them.
6    Q.    Right.  But that group of people is
7 sufficient to provide a detection protocol?
8       MR. COHEN:  Objection, form.
9    A.    Yes.
10 BY MR. BLUESTONE:
11    Q.    Is it sufficient for a detection protocol
12 to be provided by just one person?
13       MR. COHEN:  Objection, form, beyond the
14 scope of the deposition.
15    A.    I'm not sure what you're getting at.
16 BY MR. BLUESTONE:
17    Q.    So the IEEE standard is a group of people
18 getting together and they're adopting conventions,
19 functional specifications; correct?  I'm sorry.  You
20 have to say --
21    A.    I'm sorry.  Yes.  Yes.
22    Q.    And I'm asking you a situation where now
23 it's not the IEEE, it's one guy sitting in a garage,
24 for example, publishing his thoughts on the -- on --
25 into the Ethernet -- or, sorry -- the Internet, "This

ATTORNEYS EYES ONLY

Page 250

1 is what I think a detection protocol should be." Is
2 that enough for it to be a detection protocol?
3        MR. COHEN: Objection, form, beyond the
4 scope of the deposition.
5     A.   Well, once again, all I can say is that
6 this is -- I only have opinions, I don't determine the
7 outcome, and this is something that would be determined
8 at trial by a judge and jury.  And if it's some guy in
9 his garage, I think you've got a pretty good chance of
10 beating him.  If it's an IEEE spec, not so much.  That
11 would be my guess.  But again, I'm speculating.
12        We're well beyond the scope of anything
13 I've said.
14 BY MR. BLUESTONE:
15     Q.   But -- and I'm sorry, I'm not trying to be
16 difficult, but that's not answering my question.
17        You are here testifying as to the meaning
18 to a person of ordinary skill in the art.  A person of
19 ordinary skill in the art, how would they understand
20 how many people have to get together for something to
21 be a detection protocol?
22        MR. COHEN: Objection, form, beyond the
23 scope of the deposition.
24     A.   Again, I think that would be a
25 case-by-case.  I mean, if you're accused, you can

Page 251

1 defend yourself and ...
2 BY MR. BLUESTONE:
3     Q.   So you can't answer that question?
4     A.   Give you a definitive answer that separates
5 the world into detection protocols and non-detection
6 protocols?
7     Q.   Sure.  Yeah.
8     A.   No, other than what I've said here.  If it
9 uses the techniques taught in this patent to -- to do
10 what I say in Claim 7 -- or Line -- Paragraph 74, then
11 in my opinion, it would.
12     Q.   What if it's using techniques that are not
13 taught in the patent, though?
14     A.   Well, then it wouldn't infringe, would it?
15     Q.   What if it's using techniques that are not
16 part of the preferred embodiments, but are alleged to
17 encompass the scope of the claims?
18        MR. COHEN: Objection, form, beyond the
19 scope of the deposition.
20     A.   Are you -- I mean, again, you're -- you
21 know, I'm not a lawyer.  I can't -- I can't advise you
22 on those things.  I --
23        MR. BLUESTONE: All right.  Let's take a
24 break.
25        VIDEOGRAPHER: We are off the record at

Page 252

1 4:16 p.m.
2        (Break from 4:16 p.m. until 4:21 p.m.)
3        VIDEOGRAPHER: We are back on the record at
4 4:22 p.m.
5 BY MR. BLUESTONE:
6     Q.   Mr. Baxter, do you have any other opinions
7 on claim construction other than those that are recited
8 in your declaration Exhibit A or that you have stated
9 today in this deposition?
10     A.   No, not at this time.
11        MR. BLUESTONE: Okay.  I have no further
12 questions for the witness at this time.
13        MR. COHEN: I think we will take a
14 five-minute break and see what we -- if we have any
15 questions.
16        MR. BLUESTONE: Okay.
17        VIDEOGRAPHER: We are off the record at
18 4:22 p.m.
19        (Break from 4:22 p.m. until 4:31 p.m.)
20        VIDEOGRAPHER: We are back on the record at
21 4:31 p.m.
22        EXAMINATION
23 BY MR. COHEN:
24     Q.   Mr. Baxter, I have just a few questions.
25        In the course of preparing for your

Page 253

1 deposition, did you notice any errors or corrections in
2 your declaration?
3     A.   Yeah, there was a couple.
4     Q.   And can you point them out for us?
5     A.   Yes.  Paragraph 31 is an incorrect
6 copy-and-paste or cut-and-paste.  It should say
7 "designed or configured to distinguish the piece of
8 Ethernet equipment" blah, blah, blah, as above, on the
9 previous page, not what it says here.
10     Q.   And any others?
11     A.   Yes.  There was one point that's --
12 Paragraph 101 said that one -- one claim, Claim 31,
13 originally filed with the '012 patent, said 10BaseT.
14 There were actually two.  I guess two is a superset of
15 one.
16     Q.   And do either of those corrections have any
17 impact on your opinions?
18     A.   No.
19     Q.   And would those corrections affect any of
20 your testimony today?
21     A.   No.
22     Q.   Now, we spent a lot of time talking about
23 functional claim language versus structural claim
24 language.  Would you agree?
25     A.   Yes, I would.

64 (Pages 250 - 253)

ATTORNEYS EYES ONLY

Page 254

1   Q.   Is that how you normally talk in talking
2   about and discussing claim limitations?
3   A.   No.  I'm a technical guy.  I look at the
4   technical aspects of them, but it's not something I
5   normally think about.
6   Q.   Now, I'd like to turn your attention back
7   to Exhibit 6, specifically Page 3.  This is Claim 1 of
8   the '107 patent; correct?
9   A.   Yes.  Yes.
10   Q.   And I'd like to walk through each element,
11   and if you could give us a little description on what
12   part is structural, in your opinion, and which part is
13   functional.
14        So starting with the preamble, a piece of
15   Ethernet terminal equipment.
16   A.   That's the preamble.  That's apparatus.
17   Q.   An apparatus claim.  So that's structural?
18   A.   Yes.
19   Q.   And Ethernet connector?
20   A.   Structural.
21   Q.   First and second pairs of contacts?
22   A.   Structural.
23   Q.   Used to carry Ethernet communication
24   signals?
25   A.   Functional.

Page 255

1   Q.   And that's "used to" as sort of the
2   preceding two words; correct?
3   A.   Yes.
4   Q.   At least one path?
5   A.   Structural.
6   Q.   For the purpose of drawing DC current.
7   A.   Functional.
8   Q.   And on that one, the preceding words
9   are "for the purpose of," correct?
10   A.   Yes.
11   Q.   And that's different than "used to" --
12   A.   Yes.
13   Q.   -- but still signifying a functional
14   limitation?
15   A.   Yes.
16        MR. BLUESTONE:  Objection, leading.
17   BY MR. COHEN:
18   Q.   The piece of terminal Ethernet equipment,
19   is that functional or structural, in your opinion?
20   A.   Structural.
21   Q.   Following that, the limitation "to draw
22   different magnitudes of DC current flow," is that
23   structural or functional?
24   A.   It's functional.
25   Q.   And following that:  "The different

Page 256

1   magnitudes of DC current flow to result from at least
2   one condition applied to at least one of the contacts
3   of the first and second pairs of contacts"?
4   A.   Functional.
5   Q.   And the "wherein" clause following that?
6   A.   Is also functional.
7   Q.   And, in your opinion, do those functions
8   need to occur in order to meet the limitations in this
9   claim?
10   A.   No.  It's an apparatus claim as long as
11   they are configured to do it and it meets the elements.
12   Q.   Now, we had a lengthy discussion about
13   powered off.  Do you recall?
14   A.   I do.
15   Q.   And, in your opinion, powered off would
16   mean that the Ethernet terminal equipment without its
17   operating power; is that correct?
18   A.   Yes.
19   Q.   Now, I think some of the questions were
20   about whether or not power would be applied to these
21   claim -- structural claim limitations.  Do you remember
22   that?
23   A.   Yes, I do.
24   Q.   Now, in the context of this claim, does
25   your construction of powered off still work, given your

Page 257

1   opinion on the structural functional limitations we
2   were just discussing?
3   A.   Yes, I believe so.
4   Q.   And can you explain that?
5   A.   Yes.  Well, because it does not have to be
6   powered up at all; it simply has to be configured to do
7   these things.  Then this would meet it, whether powered
8   up, or not, whether it's all powered up, or not.
9   Q.   Now, do you recall the Court's claim
10   construction from the prior case regarding Ethernet
11   data terminal equipment and terminal equipment?
12   A.   Not specifically, no.
13   Q.   If I told you that terminal equipment was
14   construed in the last case to be a device at which data
15   transmission can originate or terminate, does that
16   sound correct to you?
17   A.   Yes.
18   Q.   In the context of the '107 patent, it's a
19   piece of Ethernet terminal equipment; correct?
20   A.   '107.  Yes, it is.
21   Q.   And the Court construed Ethernet data
22   terminal equipment in the last case as a device at
23   which data transmission can originate or terminate and
24   that is capable of Ethernet communication; is that
25   right?

65 (Pages 254 - 257)

ATTORNEYS EYES ONLY

Page 258

1    A.    I believe so, yes.
2    Q.    Given the limitations in this claim, if you
3  had these limitations alone, could this piece of
4  Ethernet terminal equipment be a device at which data
5  transmission can originate or terminate and that is
6  capable of Ethernet communication?
7    A.    No, the communication here is not Ethernet
8  in nature, so it would need that, in addition to the
9  elements here.
10   MR. COHEN:  Thank you.  I have no further
11  questions.
12   MR. BLUESTONE:  I have a few questions.
13        RE-EXAMINATION
14  BY MR. BLUESTONE:
15   Q.    Mr. Baxter, while you were on break with
16  your counsel, did you discuss the substance of your
17  testimony you were giving right here?
18   A.    In general terms.
19   Q.    Okay.  What did you discuss with counsel?
20   A.    Just, in general, the areas that we wanted
21  to clean up a bit.
22   Q.    Did he discuss with you the portions of
23  your declaration that needed to be corrected?
24   A.    No.  I had -- I had actually flagged those
25  earlier and we were kind of expecting you were going to

Page 259

1  bring them up, but --
2    Q.    Okay.  Did he discuss with you the aspects
3  of your testimony, as to which aspects of the claims
4  are functional and structural?
5    A.    We discussed that I kind of had a brain
6  freeze there earlier and that we needed to clean that
7  up, yes.
8    Q.    So he helped you provide some corrections
9  to your testimony?
10   MR. COHEN:  Objection, form.
11   A.    We discussed in general terms.
12  BY MR. BLUESTONE:
13   Q.    What about powered off?  Did you discuss
14  powered off with Mr. Cohen?
15   A.    In general terms.
16   Q.    Okay.  And did he show you anything to help
17  you with your testimony?
18   A.    Did he show me anything?
19   Q.    Is there anything that he pointed out to
20  you, while you were talking, that he thought would help
21  clarify your testimony?
22   A.    Well, he mentioned the previous Court --
23  what do you call them? -- claim constructions, yes.
24   MR. BLUESTONE:  We object to all the lines
25  of questioning, Justin, that you asked, because we

Page 260

1  think it's improper for you to go and meet with a
2  witness while he's under oath and try and elicit
3  coached testimony.
4    I have no further questions.
5    VIDEOGRAPHER:  Are we off the record?
6    MR. COHEN:  Yes.  No further questions.
7    VIDEOGRAPHER:  We are off the record at
8  4:40 p.m.
9         -o0o-
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 261

1      IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF TEXAS
2            TYLER DIVISION
3  CHRIMAR SYSTEMS, INC., et § CIVIL ACTION NO.
   al.,                     §  6:15-CV-163-JDL
4                           §
       Plaintiffs,  § LEAD CASE
5                   §
   v.               §
6                   §
   ALCATEL-LUCENT S.A., et  §
7  al.,             §
                    §
8      Defendants.  §
9
       REPORTER'S CERTIFICATION
10     DEPOSITION OF LES BAXTER
          January 20, 2016
11
12     I, Joseph D. Hendrick, Certified Shorthand
13  Reporter in the State of Texas, do hereby certify to
    the following:
14
15     That the witness, LES BAXTER, was duly
16  sworn by the officer and that the transcript of the
17  oral deposition is a true record of the testimony given
18  by the witness;
19
20
21
22
23     That the amount of time used by each party
24  at the deposition is as follows:
25

66 (Pages 258 - 261)

ATTORNEYS EYES ONLY

Page 262

1     David H. Bluestone 05 hr 28 min;
      Justin S. Cohen -
2     All other counsel - 00 hr 00 min;
3     That pursuant to information given to the
4 deposition officer at the time said testimony was
5 taken, the following includes counsel for all parties
6 of record:
7 FOR THE PLAINTIFF:
      Justin S. Cohen, Esq.
8     Shivan V. Mehta, Esq.
      THOMPSON & KNIGHT
9     One Arts Plaza
      1722 Routh Street, Suite 1500
10    Dallas, Texas  75201
      (214) 969-1211
11    Justin.Cohen@tklaw.com
      Shivan.Mehta@tklaw.com
12
    FOR DEFENDANT AMX:
13    David H. Bluestone, Esq.
      McDERMOTT WILL & EMERY
14    227 West Monroe Street
      Chicago, Illinois  60606-5096
15    (312) 984-5484
      dbluestone@mwe.com
16
    FOR DEFENDANTS ALE USA, INC., ALCATEL-LUCENT, USA, INC.
17 AND ALCATEL-LUCENT HOLDINGS, INC.:
      Leisa T. Peschel, Ph.D., Esq.
18    Chris Cravey, Esq.
      WILLIAMS MORGAN, P.C.
19    710 N. Post Oak Rd., Suite 350,
      Houston, Texas 77024
20    (713) 934-4096
      LPeschel@wmalaw.com
21    Cravey@wmalaw.com
22    I further certify that I am neither counsel
23 for, related to, nor employed by any of the parties in
24 the action in which this proceeding was taken, and
25 further that I am not financially or otherwise

Page 263

1 interested in the outcome of the action.
2         Further certification requirements will be
3 certified to after they have occurred.
4         Certified this date:  February 3, 2016.
5
6
7
8
9
10        *Joseph D. Hendrick*
          Joseph D. Hendrick, CSR #947
11        Expiration Date: 12/31/16
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 264

1            Veritext Legal Solutions
             1 North Franklin Street - Suite 3000
2            Chicago, Illinois 60606
             Phone: 312-442-9087
3
4
    February 3, 2016
5
    To: Justin S. Cohen
6
    Case Name: Chrimar Systems, Inc., et al. v. Alcatel-Lucent S.A.
7
    Veritext Reference Number: 2219638
8
    Witness: Les Baxter      Deposition Date: 1/20/2016
9
10 Dear Sir/Madam:
11 Enclosed please find a deposition transcript.  Please have the witness
12 review the transcript and note any changes or corrections on the
13 included errata sheet, indicating the page, line number, change, and
14 the reason for the change.  Have the witness' signature at the bottom
15 of the sheet notarized and forward errata sheet back to us at the
16 address shown above, or email to production-midwest@veritext.com.
17
18 If the errata is not returned within thirty days of your receipt of
19 this letter, the reading and signing will be deemed waived.
20
21
22
23 Sincerely,
24
25 Production Department

Page 265

1            DEPOSITION REVIEW
             CERTIFICATION OF WITNESS
2
3    ASSIGNMENT NO: 2219638
     CASE NAME: Chrimar Systems, Inc., et al. v. Alcatel-Lucent
     DATE OF DEPOSITION: 1/20/2016
4    WITNESS' NAME: Les Baxter
5        In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6 my testimony or it has been read to me.
7    I have made no changes to the testimony
     as transcribed by the court reporter.
8    _____
9    Date            Les Baxter
10       Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
11 the referenced witness did personally appear
     and acknowledge that:
12
       They have read the transcript;
13     They signed the foregoing Sworn
       Statement; and
14     Their execution of this Statement is of
       their free act and deed.
15
     I have affixed my name and official seal
16
     this _____ day of_____, 20____.
17   _____
18     Notary Public
19   _____
       Commission Expiration Date
20
21
22
23
24
25

67 (Pages 262 - 265)

ATTORNEYS EYES ONLY

Page 266

1      DEPOSITION REVIEW
           CERTIFICATION OF WITNESS

2

     ASSIGNMENT NO: 2219638
3   CASE NAME: Chrimar Systems, Inc., et al. v. Alcatel-Lucent
    DATE OF DEPOSITION: 1/20/2016
4   WITNESS' NAME: Les Baxter
5     In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7     I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9     I request that these changes be entered
    as part of the record of my testimony.
10

     I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____
      Date      Les Baxter
14

     Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17    They have read the transcript;
    They have listed all of their corrections
18    in the appended Errata Sheet;
    They signed the foregoing Sworn
19    Statement; and
    Their execution of this Statement is of
20   their free act and deed.
21    I have affixed my name and official seal
22  this _____ day of_____, 20_____.
23  _____
     Notary Public
24

25    Commission Expiration Date

Page 267

1      ERRATA SHEET
     VERITEXT LEGAL SOLUTIONS MIDWEST
2      ASSIGNMENT NO: 2219638
3  PAGE/LINE(S) /     CHANGE     /REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19

  _____   _____
20    Date         Les Baxter
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23  _____
     Notary Public
24

  _____
25    Commission Expiration Date

68 (Pages 266 - 267)