**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| **CHRIMAR SYSTEMS, INC. d/b/a CMS TECHNOLOGIES AND CHRIMAR HOLDING COMPANY, LLC,** | § § § § § | |
| **vs.** | § § | **Civil No. 6:15-cv-163-JDL** |
| **ALCATEL-LUCENT USA, INC. et al.,** | § § | |
| **CHRIMAR SYSTEMS, INC. d/b/a CMS TECHNOLOGIES AND CHRIMAR HOLDING COMPANY, LLC,** | § § § § § | |
| **vs.** | § § | **Civil No. 6:15-cv-164-JDL** |
| **AMX, LLC,** | § § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendants Alcatel-Lucent USA, Inc., Alcatel-Lucent Holdings, Inc., ALE USA Inc., and AMX LLC's (collectively, "Defendants") Motion for Summary Judgment of Indefiniteness.  (Doc. No. 99.) Plaintiffs Chrimar Systems, Inc. d/b/a CMS Technologies and Chrimar Holding Company LLC ("Plaintiffs" or "Chrimar") filed a response (Doc. No. 101) and Defendants filed a reply (Doc. No. 105).  On March 10, 2016, the Court held a hearing.  Having considered the parties' arguments and for the reasons stated below, the Court **DENIES** Defendants' Motion for Summary Judgment (Doc. No. 99).

**BACKGROUND**

Plaintiffs allege Defendants infringe claims 31, 35, 36, 43, 56, and 60 of the '012 Patent, claims 1, 5, 43, 72, 83, 103, 104, 111, and 125 of the '107 Patent, claims 1, 31, 59, 69, 72, 73,

106, 142, and 145 of the '760 Patent, and claims 1, 7, 26, 40, and 69 of the '838 Patent.  (Doc. No. 99, at 2.)  Plaintiffs contend that "[a]ll four patents share, in substance, a common specification and disclose inventions related to managing devices that connect to a wired network."  (Doc. No. 97, at 1.)  Specifically, the '107 Patent is a continuation of the '012 Patent, and the '760 Patent and the '838 Patent are continuations of the '107 Patent.

For reference, background on the '012 Patent is provided. The '012 Patent is titled "System and Method for Adapting a Piece of Terminal Equipment," and relates to tracking of devices that are connected to a wired network.  *See generally* '012 Patent.  More specifically, the '012 Patent describes permanently identifying an "asset," such as a computer, "by attaching an external or internal device to the asset and communicating with that device using existing network wiring or cabling." '012 Patent at 1:67–2:2.  The '012 Patent refers to that device as the "remote module." *Id.* at 3:22–26.  The asset can then be managed, tracked, or identified by using the remote module to communicate a unique identification number, port ID, or wall jack location to the network monitoring equipment, or "central module." *Id.* at 6:7–13, 8:66–9:4.  The '012 Patent further discloses that "asset identification" may be done in a way "that does not use existing network bandwidth." *Id.* at 3:10–12.  These concepts are reflected in the patents' asserted claims, and independent claim 31 is set forth below for reference:

> 31. An adapted piece of Ethernet data terminal equipment comprising:
>     an Ethernet connector comprising a plurality of contacts;
>         and
>     at least one path coupled across selected contacts, the selected contacts
>         comprising at least one of the plurality of contacts of the Ethernet
>         connector and at least another one of the plurality of contacts of the
>         Ethernet connector,
>     wherein distinguishing information about the piece of Ethernet data
>         terminal equipment is associated to impedance within the at least
>         one path.

'012 Patent at 18:62–19:5 (Claim 31).

Defendants move for summary judgment that the certain asserted claims of the '012, '107, and '760 Patents are invalid because the following phrases fail to comply with the definiteness requirement of 35 U.S.C. § 112, ¶ 2: (1) "at least one condition [applied]" ('107 Patent, Claims 1, 104); (2) "detection protocol" ('012 Patent, Claim 35; '107 Patent, Claim 72; '760 Patent, Claim 59); and (3) "DC current" ('107 Patent, Claim 72).

## LEGAL STANDARD

### I.      Summary Judgment Standard

"Summary judgment is appropriate in a patent case, as in other cases, when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Nike Inc. v. Wolverine World Wide, Inc.,* 43 F.3d 644, 646 (Fed. Cir. 1994); FED. R. CIV. P. 56(c).

### II.     Indefiniteness

Indefiniteness is a question of law.  *Teva Pharms. USA, Inc. v. Sandoz, Inc.,* 723 F.3d 1363, 1368 (Fed. Cir. 2013).  "[D]etermination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *Exxon Research & Eng'g Co. v. United States,* 265 F.3d 1371, 1376 (Fed. Cir. 2001) *abrogated on other grounds by Nautilus v. Biosig Instruments, Inc.,* - U.S. -, - n. 9, 134 S.Ct. 2120, 2130 n. 9, 189 L.Ed.2d 37 (2014).  Indefiniteness is a challenge to the validity of the patent that must be established by clear and convincing evidence. *Nautilus,* 134 S.Ct. at 2130, n. 10 (citing *Microsoft Corp. v. i4i Ltd. Partnership,* - U.S. -, -, 131 S.Ct. 2238, 2242, 180 L.Ed.2d 131 (2011) for the clear-and-convincing standard applicable to challenges to invalidity and declining to alter this standard).

3

Under 35 U.S.C. § 112 ¶ 2, "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."  "A lack of definiteness renders invalid 'the patent or any claim in suit.'" *Nautilus,* 134 S.Ct. at 2125 (citing 35 U.S.C. § 282, ¶ 2(3)).  Until recently, a claim was indefinite "only when it [was] not amendable to construction or insolubly ambiguous."  *Id.* at 2127.  The Supreme Court rejected this standard as too imprecise.  *Id.* at 2130.

Under the new standard, "a patent is invalid for indefiniteness if its claims, read in light of the specification ..., and the prosecution history, fail to inform, with *reasonable certainty,* those skilled in the art about the scope of the invention."  *Id.* at 2124 (emphasis added).  In rejecting the prior standard, the court found it insufficient "that a court [could] ascribe *some* meaning to a patent's claims."  *Id.* at 2130.  Reasonable certainty is something more precise than insolubly ambiguous, but short of absolute precision. *Id.* at 2129–30.  In describing the new standard the court "mandates clarity."  *Id.* at 2129.

The Supreme Court noted the "delicate balance" to the indefiniteness analysis.  *Id.* at 2128.  In summarizing this balance *post-Nautilus,* the Federal Circuit explained that "[t]he definiteness standard 'must allow for a modicum of uncertainty' to provide incentives for innovation, but must also require '*clear notice* of what is claimed, thereby appris[ing] the public of what is still open to them.'"  *Interval Licensing LLC v. AOL,* 766 F.3d 1364, 1370 (Fed. Cir. 2014) (emphasis added) (quoting *Nautilus,* 134 S.Ct. at 2128–29).

The Supreme Court did not apply the new standard in *Nautilus.*[1]  The Federal Circuit, however, has both applied the new standard and provided guidance on the level of precision

---

[1] The court declined to apply the new "reasonable certainty" standard to the claim language at issue in *Nautilus*, "mounted ... in spaced relationship with each other." *Nautilus,* 134 S.Ct. at 2131.  The language describes the location of two electrodes on a cylinder held in the user's hand. *Id.* at 2127. In concluding the language was not

required.  *Interval,* 766 F.3d at 1369–71.  "Although absolute precision or mathematical precision is not required, it is not enough as some of the language in ... prior cases may have suggested, to identify 'some standard for measuring the scope of the phrase.'"  *Id.* at 1370–71 (quoting *Datamize, LLC v. Plumtree Software, Inc.,* 417 F.3d 1342, 1351 (Fed. Cir. 2005)). "The claims, when read in light of the specification and the prosecution history, must provide *objective boundaries* for those of skill in the art."  *Id* at 1371 (emphasis added) (relying on *Nautilus,* 134 S.Ct. at 2130 & n. 8).  In noting the necessity for objective boundaries, the Federal Circuit relied on the finding in *Halliburton Energy Servs., Inc. v. M–I LLC* that "[e]ven if a claim term's definition can be reduced to words, the claim is still indefinite if a person of ordinary skill in the art cannot translate the definition into *meaningfully precise* claim scope."  *Id.* (emphasis added) (relying on *Halliburton,* 514 F.3d 1244, 1251 (Fed. Cir. 2008)).

Other parts of the indefiniteness inquiry remain the same.  Indefiniteness is still "evaluated from the perspective of someone skilled in the relevant art at the time the patent was filed."  *Nautilus,* 134 S.Ct. at 2128.  Claims must also still "be read in light of the patent's specification and prosecution history."  *Id.* at 2128.

## DISCUSSION

### I.    "at least one condition [applied]" ('107 Patent, Claims 1, 104)

| Plaintiffs' Proposal | Defendants' Proposal |
|---|---|
| No construction necessary, as the term should be afforded its plain and ordinary meaning. | Indefinite |

---

indefinite, the reversed Federal Circuit decision had concluded the spaced relationship could not be greater than the width of a user's hand. *Id.* at 2127.

In their motion for summary judgment, Defendants argue that the phrase "at least one condition" is indefinite because the intrinsic record provides no guidance regarding the objective bounds of the term "condition." (Doc. No. 99, at 5.) Defendants submit that "it was not until November 5, 2014 (more than 10 years after the earliest filing date of the original specification) that the abstract of the '107 patent eventually was amended to add the term 'condition.'"  *Id.* Defendants further argue that the dependent claims claim certain "conditions," therefore indicating what things "condition" is not limited to, but providing no further bounds to what is meant by the term "condition." *Id.* at 6. Plaintiffs respond that "'[a]t least one condition' . . . refers to something that will cause different magnitudes of current to flow through the at least one path when applied to a contact.  (Doc. No. 101, at 3.) Plaintiffs contend that while this may be broad, it is not indefinite. *Id.*  Plaintiffs also urge that in the context of the patents-in-suit, "the term 'condition' refers to an electrical condition."  *Id.* at 4–5 (footnotes omitted).  Defendants reply that Plaintiffs' proposal of "something that will cause different magnitudes of current to flow" demonstrates the indefiniteness of the recited "condition."  (Doc. No. 105, at 2.)

Here, the claim language itself indisputably provides some bounds regarding the term "condition." For example, claim 1 of the '107 Patent demonstrates that the "condition" causes "different magnitudes of DC current flow." *See* '107 Patent at 17:19–21 ("…the different magnitudes of DC current flow to result from at least one condition applied to at least one of the contacts.") The recited language alone provides context. Defendants' own expert recognizes this requirement of the claim language and goes through several examples of what a "condition applied" could be understood to mean, including those examples a person of ordinary skill in the art would understand to change the magnitudes of DC current as claimed. (Doc. No. 99-6 ("Seifert Decl.") at ¶¶ 134–137.)

Moreover, by virtue of their own arguments regarding claim differentiation, Defendants concede that at least several lower bounds of the claim scope are known and easily understood. (Doc. No. 99, at 6.) Defendants' expert also discusses some of these examples and opines how he would understand their application as recited in the claim. *See, e.g.*, Seifert Decl. at ¶¶ 137, 138 ("[t]o the extent that a 'voltage' condition is applied to the contacts, a person of ordinary skill in the art would understand what is required because it is a clear application of Ohm's law to a recited element of the claim.") Plaintiffs' expert also describes some of these same conditions and indeed describes how he would understand their operation in the recited claim language as a person of ordinary skill in the art. (Doc. No. 101-5 ("Baxter Decl.") at ¶¶ 47–49 ("[a] person of ordinary skill in the art, reading this claim, would understand that the 'condition' that would be applied…must be an electrical condition such as voltage or impedance, since the claim requires that the Ethernet terminal equipment must be configured to draw different magnitudes of current in response…") While the claimed "at least one condition" may encompass more than one "condition" as recited in the claims, the surrounding claim language (*e.g.* result of "different magnitudes of DC current flow") as well as the other intrinsic and extrinsic evidence demonstrate that "condition" refers to electrical conditions.[2]

For these reasons, the Court finds that the phrase "at least one condition" does not fail to "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus*, 134 S. Ct. at 2129; *see also In re Gardner*, 427 F.2d 786, 788 (C.C.P.A. 1970)

---

[2] Defendants argue that limiting the "at least one condition…" to an "electrical condition" violates the principles of claim differentiation. (Doc. No. 99, at 6.) However, the dependent claims that actually modify the "at least one condition" recite the condition as specific examples of electrical conditions—voltage and impedance. '107 Patent at 18:27 – 32 (Claims 22, 23.) Therefore, those dependent claims, which recite specific subsets of electrical conditions, further limit was is claimed to the specific electrical condition recited. Claim 61, which recites "electrical condition" is distinguishable as it modifies *the path* as a function of an electrical condition, whereas claim 1 refers to the magnitude of DC current flow being a function of a condition. '107 Patent at 12–16 (Claim 61). Moreover, Defendants' expert agrees with this reading of the claims. (Doc. No. 101-6, Seifert Deposition, at 75:12-76:14. ("the electrical condition in Claim 61 is modifying the path…").)

("[b]readth is not indefiniteness."). The Court accordingly finds the phrase "at least one condition" is not indefinite and means "at least one electrical condition."

## II.    "detection protocol" ('012 Patent, Claim 35; '107 Patent, Claim 72; '760 Patent, Claim 59)

| Plaintiffs' Proposal | Defendants' Proposal |
|---|---|
| No construction necessary, as the term should be afforded its plain and ordinary meaning.<br><br>To the extent that the Court finds that construction is required, Plaintiffs contend that the plain and ordinary meaning of "detection protocol" is "detection scheme, rule, or procedure" | Indefinite |

Defendants argue that the term "detection protocol" is indefinite because "there is no objective boundary as to what constitutes a 'detection protocol,' and the patents provide no assistance in understanding the scope of the terms." (Doc. No. 99, at 7.)  Plaintiffs argue that the term is not indefinite and that "Mr. Seifert [(Defendants' expert)] admits that a person of ordinary skill in the art would understand the term 'protocol' and would be familiar with data-communications protocols." (Doc. No. 101, at 8.)  Defendants further argue that "encoded signals sent pursuant to the invention do not use Ethernet network communication—in other words, whatever 'protocol' [is] used is distinct from the Ethernet data communication protocols known to those of skill in the art." (Doc. No. 105, at 3.)

Turning first to the recited claims, claim 35 of the '012 Patent, for example, recites: "35. The piece of Ethernet data terminal equipment according to claim 31 wherein the impedance within the at least one path is part of a *detection protocol*." '012 Patent at 19:20–22 (Claim 35) (emphasis added).  The specification does not use the terms "detection protocol" or "protocol," but does discuss "detecting."  For example, the specification discloses that "[r]elocation of the electronic equipment with the attached communication device to another location on the network

8

is *detected* immediately and may be used to update a database," and that "[f]rom the foregoing it will be understood that the invention provides a system and method for remotely *detecting* and reading an asset identity and location." '012 Patent at 3:32-35, 16:44-46 (emphasis added).

Although the specification does not use the terms "detection protocol" or "protocol," the plain meaning of "protocol" is sufficiently clear and does not become any less clear when joined with "detection" as it is claimed.  Here, for example, Defendants' own expert acknowledges that, at least in the context of IEEE 802.3 communications, a "protocol" is "a series of procedures, possibly including syntax and semantics of exchanged information to achieve some desired end." (Doc. No. 101, Ex. F, Feb. 2, 2016 Seifert Deposition, at 106:8-10.)  Similarly, Plaintiffs' expert opined that the plain and ordinary meaning of "protocol" would be a "scheme, rule, or procedure," which in the context of being claimed as a "detection protocol" would mean a "detection scheme, rule, or procedure."  Baxter Decl. at ¶ 70.  Plaintiffs' expert further went on to opine that "[i]n the context of these claims, 'detection protocol' means that the equipment is configured or designed so that the magnitude of the current (flow) or the impedance in the path allow it to detect or determine some information about the equipment at the other end of the path." *Id.* at ¶ 74. In this regard, the experts are in general agreement as to the plain and ordinary meaning of the term "protocol" in the art, and the Court finds that "detection protocol" can be understood by a person of ordinary skill in the art with reasonable certainty in view of the recited claims and the specification.

Defendants' expert's concern with Plaintiff's expert's position regarding his stated understanding of the term "detection protocol" is that it would leave designers with no guidance as to how to avoid infringement of the claims because a "detection protocol" could be "conjured up at a later time by a different party." Seifert Decl. at ¶ 146.  However, the test for

indefiniteness is not whether a device or process would infringe.  Instead, the test is whether the claim read in light of the specification delineating the patent, and the prosecution history, informs, with reasonable certainty, those skilled in the art about the scope of the invention. *Nautilus*, 134 S. Ct. at 2124.  Overall, Defendants have failed to demonstrate indefiniteness under this standard.  Therefore, the Court finds the term "detection protocol" to be definite, and finds that no further construction is necessary**.**

### III.    "DC current" in Claim 72 of the '107 Patent

| Plaintiffs' Proposal | Defendants' Proposal |
|---|---|
| No construction necessary, as the terms should be afforded their plain and ordinary meaning.<br><br>To the extent that the Court finds that construction is required, Plaintiffs contend that "current" and "current flow" mean the same thing and the plain and ordinary meaning of "current" and "current flow" is "a flow of electric charge" | Dependent claim 72 of the '107 patent is indefinite for lack of antecedent basis. |

Defendants argue that the phrase "at least one magnitude of DC current" recited in claim 72 of the '107 Patent has no antecedent basis in claim 1, from which it depends, and is therefore indefinite. (Doc. No. 99, at 11.)  Plaintiffs respond that "the specification refers equally to the 'current' between two devices and the 'current flow' between them."  (Doc. No. 101, at 11.) Alternatively, Plaintiffs submit that "'the magnitudes of DC current flow' are magnitudes of the 'DC current' drawn through the same 'at least one path.'"  *Id.* at 12.  Defendants reply that "[w]hether the 'DC current' of claim 72 refers back to the 'at least one path for the purpose of drawing DC current' or the 'DC current flow' that results from the condition applied to a contact makes a difference in claim scope."  (Doc. No. 105, at 4.)

Claims 1 and 72 of the '107 Patent recite:

1.  A piece of Ethernet terminal equipment comprising:
        an Ethernet connector comprising first and second pairs of

contacts used to carry Ethernet communication signals,

at least one path for the purpose of *drawing DC current*, the at least one path coupled across at least one of the contacts of the first pair of contacts and at least one of the contacts of the second pair of contacts, the piece of Ethernet terminal equipment to draw different *magnitudes of DC current flow* via the at least one path, the different *magnitudes of DC current flow* to result from at least one condition applied to at least one of the contacts of the first and second pairs of contacts, wherein at least one of the *magnitudes of the DC current flow* to convey information about the piece of Ethernet terminal equipment.

* * *

72.  The piece of Ethernet terminal equipment of claim 1 wherein at least one *magnitude of the DC current* is part of a detection protocol.

'107 Patent at 17:11–25 (emphasis added), 20:47–49 (Claim 72) (emphasis added).

As a preliminary matter, as discussed in the Court's corresponding claim construction opinion, the claims and the specification demonstrate that, at least for purposes of the present case, any distinction between "DC current" and "DC current flow" is a distinction without a difference.  *See* '012 Patent at 2:16-18, 6:48-54, 7:17-21, 7:40-42, 7:48-50, 8:7-8, 8:11-17, 8:27-31, 8:52-53, 12:32-38.  Indeed, Defendants' expert uses these terms without distinction in describing the "current loop path" of the incorporated prior art '260 Patent. *See* Doc. No. 101, Ex. G, Jan. 21, 2016 Seifert Decl. at ¶ 40 ("…the figure relates to a device that sends a low DC current over the existing Ethernet wiring and detects whether the path is present or broken, by the presence (or lack of) current flow in the path.") Therefore, the Court construed the terms "current" and "current flow" to mean "a flow of electric charge." Because there is no discernable distinction between the terms, as discussed above and in the Court's claim construction opinion, the "at least one magnitude of the DC current" in Claim 72 has sufficiently clear antecedent basis in the "magnitudes of DC current flow" in Claim 1. *See Energizer Holdings Inc. v. Int'l Trade*

*Comm'n*, 435 F.3d 1366, 1371 (Fed. Cir. 2006) (holding that "an anode gel comprised of zinc as the active anode component" provided implicit antecedent basis for "said zinc anode"); *see also Ex Parte Porter*, 25 U.S.P.Q. 2d (BNA) 1144, 1145 (B.P.A.I. 1992) ("The term 'the controlled fluid' . . . finds reasonable antecedent basis in the previously recited 'controlled stream of fluid . . . .'").

The Court therefore rejects Defendants' indefiniteness argument and finds that the "at least one magnitude of the DC current" in Claim 72 has sufficiently clear antecedent basis in the "magnitudes of DC current flow" in Claim 1.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment (Doc. No. 99) is **DENIED**.

So ORDERED and SIGNED this 28th day of March, 2016.

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE