# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# TYLER DIVISION

| | |
|---|---|
| CHRIMAR SYSTEMS, INC., et al, § <br> § <br> v. § <br> § Civil Action No. 6:15-cv-163 -JDL <br> ALCATEL-LUCENT USA, INC., et al. § <br> (LEAD CASE) § <br> § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant ALE USA Inc.'s ("ALE") Motion for construction of the terms "adapted" and "physically connect." (Doc. No. 298.) Plaintiffs Chrimar Systems, Inc. and Chrimar Holding Company, LLC ("Chrimar") filed a response. (Doc. No. 309.)

## BACKGROUND

The Court previously held that the preambles of claims 31 and 67 of U.S. Patent No. 8,115,012 ("the '012 Patent") to be limiting, which contain the terms "adapted" and "adapting," respectively. (6:13-cv-00880 (Doc. No. 99, at 17).) At the parties' request, the Court entered that finding in the instant action. (Doc. No. 117.) This Court was never asked to construe the term "physically connect," which is found in 8,902,760 ("the '760 Patent"). Defendants now contend that there is a dispute regarding the scope of these claim terms that must be resolved by the Court.

### A. The Patents

The '012 Patent is titled "System and Method for Adapting a Piece of Terminal Equipment," and relates to tracking of devices that are connected to a wired network. *See generally* '012 Patent. More specifically, the '012 Patent describes permanently identifying an "asset," such as a computer, "by attaching an external or internal device to the asset and

communicating with that device using existing network wiring or cabling." '012 Patent at 1:67–2:2. The '012 Patent refers to that device as the "remote module." *Id.* at 3:22–26. The asset can then be managed, tracked, or identified by using the remote module to communicate a unique identification number, port ID, or wall jack location to the network monitoring equipment, or "central module." *Id.* at 6:7–13, 8:66–9:4. The '012 Patent further discloses that "asset identification" may be done in a way "that does not use existing network bandwidth." *Id.* at 3:10–12. These concepts are reflected in the patents' asserted claims, and independent claim 31 is set forth below for reference:

> 31. An adapted piece of Ethernet data terminal equipment comprising:
> an Ethernet connector comprising a plurality of contacts;
> and
> at least one path coupled across selected contacts, the selected contacts
> comprising at least one of the plurality of contacts of the Ethernet
> connector and at least another one of the plurality of contacts of the
> Ethernet connector,
> wherein distinguishing information about the piece of Ethernet data
> terminal equipment is associated to impedance within the at least
> one path.

'012 Patent at 18:62–19:5 (Claim 31).

The '760 Patent is related, and claim 1 recites:

> 1. A BaseT Ethernet system comprising:
> a piece of central BaseT Ethernet equipment;
> a piece of BaseT Ethernet terminal equipment;
> data signaling pairs of conductors comprising first and
> second pairs used to carry BaseT Ethernet communication
> signals between the piece of central BaseT Ethernet
> equipment and the piece of BaseT Ethernet terminal
> equipment, the first and second pairs physically connect
> between the piece of BaseT Ethernet terminal equipment
> and the piece of central Base T Ethernet equipment,
> the piece of central BaseT Ethernet equipment having at
> least one DC supply, the piece of BaseT Ethernet terminal
> equipment having at least one path to draw different
> magnitudes of current flow from the at least one DC
> supply through a loop formed over at least one of the

>               conductors of the first pair and at least one of the conductors
>               of the second pair, the piece of central BaseT
>               Ethernet equipment to detect at least two different magnitudes
>               of the current flow through the loop and to control
>               the application of at least one electrical condition to
>               at least two of the conductors.

('760 Patent at 17:15–36 (Claim 1).)

## APPLICABLE LAW

The Federal Circuit has held: "When the parties raise an actual dispute regarding the proper scope of [the] claims, the court . . . must resolve that dispute." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008). The court must resolve the dispute because "the scope of the asserted claims is a question of law," and the court cannot leave "the jury free to consider the[] [parties'] arguments" on a disputed question of law. *Id.* at 1361–62.

The Court applies the familiar principles of claim construction to resolve this dispute. Those begin: "the words of a claim 'are generally given their ordinary and customary meaning.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). "[T]he context in which a term is used in the asserted claim can be highly instructive." *Id.* Other claims, asserted and unasserted, can provide additional instruction because "terms are normally used consistently throughout the patent." *Id.* at 1314. "[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex. Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. For example, "[a] claim interpretation that excludes a preferred embodiment from the scope of the claim 'is rarely, if ever, correct.'" *Globetrotter Software, Inc. v. Elam Computer Group Inc.*, 362 F.3d 1367, 1381 (Fed. Cir. 2004) (quoting *Vitronics Corp.*, 90 F.3d at 1583). But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed language in the claims, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988); *see also Phillips*, 415 F.3d at 1323.

Although, "less significant than the intrinsic record in determining the legally operative meaning of claim language," the Court may rely on extrinsic evidence to "shed useful light on the relevant art." *Phillips*, 415 F.3d at 1317 (quotation omitted). Technical dictionaries and treatises may help the Court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but such sources may also provide overly broad definitions or may not be indicative of how terms are used in the patent. *Id.* at 1318. Similarly, expert testimony may aid the Court in determining the particular meaning of a term in the pertinent field, but "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful." *Id.*

In patent construction, "subsidiary fact finding is sometimes necessary" and the court "may have to make 'credibility judgments' about witnesses." *Teva v. Sandoz*, 135 S.Ct. 831, 838 (2015). In some cases, "the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or

the meaning of a term in the relevant art during the relevant time period." *Id.* at 841. "If a district court resolves a dispute between experts and makes a factual finding that, in general, a certain term of art had a particular meaning to a person of ordinary skill in the art at the time of the invention, the district court must then conduct a legal analysis: whether a skilled artisan would ascribe that same meaning to that term *in the context of the specific patent claim under review*." *Id.* (emphasis in original). When the court makes subsidiary factual findings about the extrinsic evidence in consideration of the "evidentiary underpinnings" of claim construction, those findings are reviewed for clear error on appeal. *Id.*

## ANALYSIS

### 1. "adapted"

ALE argues that the construction of the term "adapted" is disputed and must be resolved. (Doc. No. 298, at 2.) Specifically, ALE argues that Chrimar alleges "adapted" should have its plain and ordinary meaning of "designed, configured, or made" in accordance with the claim, which ALE argues reads out the meaning of term "adapted." *Id.* at 2–3. ALE contends that instead the Court should adopt its construction of "adapted" to mean "modification of preexisting equipment," because it captures the problem confronted by the inventors taking existing networks and adapting them to make equipment distinguishable. *Id.* at 5.

Chrimar agrees that the term "adapted" should be construed, but disagrees with ALE's proposed construction. (Doc. No. 309, at 1–2.) Chrimar maintains that Defendants continue to try and read in to the claim a requirement that "adapted" means modifying or retrofitting an existing piece of equipment. *Id.* at 2. Specifically, Chrimar argues that "ALE's proposed construction seeks to limit the claim to one particular embodiment (i.e., where the remote module is external to and attached to a network asset) while completely ignoring that the

5

specification explicitly describes integrating the circuitry of the remote module into the motherboard or NIC of the Ethernet equipment." *Id.* at 4. Chrimar argues that its construction is a well-known understood meaning of "adapted" in patent claims consistent with its proposed construction and disputes that its construction reads out the term "adapted" because only devices that "have the circuitry for implementing PoE are adapted Ethernet data terminal equipment meeting the limitations of claim 31 of the '012 Patent." *Id.* at 5.

As stated above, the Court previously found the preamble of the '012 Patent to be limiting, which recites: "[a]n adapted piece of Ethernet data terminal equipment comprising…" '012 Patent at 18:62–63. The Court further found the preamble to have its plain and ordinary meaning, and construed the term "Ethernet data terminal equipment" to mean "device at which data transmission can originate or terminate and that is capable of Ethernet communication," which the Court has entered as the construction in the instant action. (6:13-cv-880, (Doc. No. 99, at 13); 6:15-cv-163, (Doc. No. 117).)

As to the term "adapted" as recited in the preamble of claim 31, the specification provides little guidance as to the meaning, and only states generally that "[t]his invention is particularly adapted to be used with an existing Ethernet communications link or equivalents thereof," and that "[t]he communication system 15 and 16 described herein is particularly adapted to be easily implemented in conjunction with an existing computer network 17 while realizing minimal inter-ference to the computer network." '012 Patent at 3:35–37; 4:56–60. Nothing in the specification specifically discusses the "adapted piece of Ethernet data terminal equipment" recited in the preamble of claim 31 of the '012 Patent.

ALE provides no support for its narrowed interpretation of "adapted" to mean "modification of preexisting equipment." Indeed, there is nothing in the '012 Patent that requires

6

the "modification" of any device, or specifically, the claimed "Ethernet data terminal equipment." Instead, as discussed above, the specification generally uses the term "adapted" to describe the invention as being particularly adapted for use with a known structure or network. But nothing about these disclosures warrants a construction that contradicts the term's plain and ordinary meaning or requires modification of the claimed device. Chrimar cites to the following portion of the specification to argue that in fact modification is specifically not required: "[i]t is also envisioned that the electronics of the network identification circuitry can be placed on a motherboard within the computer or as part of the circuitry on the NIC card." '012 Patent, at 11:16–19. The Court agrees with Chrimar that based upon the disclosures discussed herein, a construction of "adapted" that requires "modification of preexisting equipment" would be inconsistent with the disclosures in the specification and too narrow in this case. Moreover, Chrimar cites to deposition testimony from Defendants' expert, Ian Crayford, where he agrees that a PC manufactured with remote module functionality included can be "adapted" as recited in claim 31 of the '012 Patent, even though it was originally manufactured that way. (Doc. No. 309-3, at 118:7–119:8.)

It is for these reasons that the Court finds that the term "adapted" cannot mean "modification of preexisting equipment." Instead, for the reasons discussed herein, the Court finds that the term "adapted" should be construed consistently with its plain and ordinary meaning to mean "designed, configured, or made" in accordance with the elements of claim 31.

### 2. "physically connect"

ALE also contends that the term "physically connect" is disputed and should be construed to have its plain and ordinary meaning—*i.e.* to "physically connect." (Doc. No. 298, at 6.) ALE cites to Chrimar's expert report to contend that Dr. Madisetti takes the position that this

term "physically connect" means "each device is configured to be connected." *Id.* ALE contends that this position literally reads the "physically connect" limitation out of the claim. *Id.* at 7.

Chrimar contends that there is no claim construction dispute over the term "physically connect" and that ALE misconstrues Chrimar's infringement contentions. (Doc. No. 309, at 6.) Chrimar argues that "claim 1 recites 'physically connect' and not 'physically connected,' which is the construction ALE seeks." *Id.* at 7. Chrimar argues that "physically connect" describes the function "performed by the first and second conductors,"—"to connect the central BaseT Ethernet equipment and the piece of BaseT Ethernet terminal equipment so that the equipment may be used cooperatively." *Id.* Chrimar cites to the doctrine of claim differentiation to point out that dependent claim 71 actually requires that the "first and second pairs are physically connected." *Id.*

Here again, while ALE contends there is a dispute regarding the plain and ordinary meaning of the term "physically connect," ALE does not explain its proposed construction, or why the '760 Patent requires such a construction, and instead argues why Chrimar's expert's infringement reading cannot be correct. While ALE contends its position is that the term have its plain and ordinary meaning—actually "physically connect"—in reality, as set forth by the briefing, ALE is reading the claim to "require a piece of central equipment 'physically connect[ed]' to a piece of terminal equipment." (Doc. No. 298, at 6.) But the plain language of claim 1 of the '760 Patent does not recite "physically connected;" instead, it states "…the first and second pairs *physically connect* between the piece of BaseT Ethernet terminal equipment and the piece of central Base T Ethernet equipment…" '760 Patent at 17:23–25.

Moreover, claim 71, which depends from claim 1, recites "[t]he BaseT Ethernet system of claim 1 wherein the first and second pairs *are physically connected* between the piece of

BaseT Ethernet terminal equipment and the piece of central BaseT Ethernet equipment." '760 Patent at 21:28–31 (emphasis added). Where the dependent claim recites the further limitation that "the first and second pairs *are physically connected* between the piece of BaseT Ethernet terminal equipment and the piece of central BaseT Ethernet equipment," the doctrine of claim differentiation dictates that the independent claim which recites "the first and second pairs *physically connect* between the piece of BaseT Ethernet terminal equipment and the piece of central Base T Ethernet equipment," does not require that the first and second pairs are actually *physically connected*. *See Phillips,* 415 F.3d at 1315 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim."); *Alcon Research, Ltd. v. Apotex Inc.*, 687 F.3d 1362, 1367 (Fed. Cir. 2012) (citing 35 U.S.C. § 112 ¶ 4) ("It is axiomatic that a dependent claim cannot be broader than the claim from which it depends . . . A dependent claim narrows the claim from which it depends."); *Enzo Biochem, Inc. v. Applera Corp.,* 599 F.3d 1325, 1334 (Fed. Cir. 2010) ("A person of ordinary skill would presume that a structure recited in a dependent claim will perform a function required of that structure in an independent claim.").

ALE's reading of a structural requirement that the pairs are physically connected is unsupported by the plain language of the claim, as well as the doctrine of claim differentiation. Therefore, the Court rejects any such interpretation of "physically connect" in the context of claim 1 of the '760 Patent. Rather, in the context of claim 1 of the '760 Patent, a system is claimed to include first and second pairs of conductors configured to physically connect between the piece of BaseT Ethernet terminal equipment and the piece of central Base T Ethernet equipment. Having resolved the parties' dispute, the Court finds no further construction of the term "physically connect" is necessary.

## CONCLUSION

As set forth herein, the Court has resolved the parties' dispute regarding the terms "adapted" and "physically connect."

**So ORDERED and SIGNED this 26th day of September, 2016.**

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE