# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

CHRIMAR SYSTEMS, INC., *et al.*,

      Plaintiffs,

v.

ALCATEL–LUCENT ENTERPRISE USA INC.,

      Defendant.

6:15–CV–163–JDL

Patent Case

**Jury Trial Demanded**

---

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S BRIEF ON EQUITABLE ISSUES [ECF 377]

---

TABLE OF CONTENTS

I.  ALE's Brief does not relate to any pending motion. ..........................................................1

II.  Introduction ...........................................................................................................................1

III.  Discussion .............................................................................................................................2

  A.  ALE has not established the elements of equitable estoppel. .................................. 2

    1.  Chrimar had no duty to disclose its pending patent applications. .............. 2

    2.  Chrimar did not conceal its pending patent applications. ........................ 12

    3.  ALE could not have relied on Chrimar's allegedly misleading
        conduct. ...................................................................................................... 13

    4.  ALE has not established that it was prejudiced. ........................................ 13

  B.  ALE has not established the elements for waiver. .................................................. 14

  C.  Chrimar's claims are not barred by prosecution laches. ........................................ 16

  D.  ALE's assertion of inequitable conduct fails. ........................................................ 20

    1.  ALE has not met its burden of proving materiality................................... 21

    2.  ALE has not met its burden of proving intent to deceive. ........................ 23

IV.  Conclusion ..........................................................................................................................23

## I.   ALE's Brief does not relate to any pending motion.

In its Order regarding post-trial issues [ECF 351], the Court required all post-trial motions to be filed by November 10, 2016. ALE filed a "Brief on Equitable Issues" ("ALE Brief") [ECF 377], but it does not correspond to any pending motion. Chrimar responds to the arguments in the ALE Brief but objects to ALE's request for relief in the absence of a motion.

## II.   Introduction

The ALE Brief is long on argument and short on evidence. Indeed, it repeats the same incorrect and unfounded arguments that ALE has made throughout this case regarding Chrimar's few sporadic encounters with the IEEE. And it now argues that it is entitled to judgment based on prosecution laches and inequitable conduct — two issues that none of its experts addressed in their expert reports. The ALE Brief presents no legitimate basis for disturbing the jury's verdict.

As the evidence at trial bore out, the IEEE did not impose any obligation on participants to disclose any patents, much less pending patent applications, or to provide a letter of assurance. Instead, the evidence was clear that the IEEE's patent policy was one of "request and encourage" but that it did not <u>require</u> any type of disclosure.

In denying Chrimar's motion for summary judgment on all of ALE's IEEE-related defenses and counterclaims, the Court found that "further testimony from the parties' IEEE experts will be necessary for the Court to fully resolve this question." [ECF 255], at 14. As the factfinder, the jury heard the testimony of the witnesses, weighed the evidence, and concluded that Chrimar did not breach any contract with the IEEE. Because the only alleged "contract" with the IEEE was an alleged duty to disclose its pending patent applications, the jury's factual finding of no breach demonstrates that the IEEE imposed no such duty on participants, much less one- or two-time attendees. Absent a duty, ALE's equitable defenses of estoppel and waiver fail as a matter of law.

Nor do the facts support ALE's defenses of alleged prosecution history laches or inequitable conduct. Notably, ALE has provided no expert testimony or analysis on either of

these defenses. Rather, they appear to be after-the-fact throw-ins grasping for some excuse to to nullify the jury's verdict and avoid judgment in favor of Chrimar on all issues.

## III. Discussion

Although ALE asserted a wide variety of equitable defenses in its pleadings, its post-trial brief [ECF 377] addresses only four of these: (A) equitable estoppel; (B) waiver; (C) prosecution laches; and (D) inequitable conduct. None of these defenses has merit, and indeed, the evidence presented at trial and belatedly submitted with ALE's post-trial briefing fails to establish the required elements of any of those defenses. Accordingly, the Court should enter judgment in favor of Chrimar on each of these defenses.

### A.   ALE has not established the elements of equitable estoppel.

In its post-trial brief, ALE lists the three elements that ALE must establish to prevail on its equitable-estoppel defense: (1) the patentee, through misleading conduct, leads the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer; (2) the alleged infringer relies on that conduct; and (3) due to its reliance, the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim. ALE Brief, at 3 (citing *A.C. Auckerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992) (en banc)). ALE has not established these elements.

#### 1.   Chrimar had no duty to disclose its pending patent applications.

ALE has not shown that Chrimar was under a duty to disclose anything to the IEEE, including its pending patent application(s). Rather, ALE has continued to maintain this false narrative despite the overwhelming evidence to the contrary.

The existence or absence of a duty to disclose patents in a standards setting environment is a question of law to be decided by the Court. *Hynix Semiconductor Inc. v. Rambus Inc.*, 441 F. Supp. 2d 1066, 1073 (N.D. Cal. 2006); *see also Rambus Inc. v. Infineon Techs. AG*, 318 F.3d 1081, 1087 n.3 (Fed. Cir. 2003) ("A number of states treat the existence of a disclosure duty as a

question of law, and the breach of that duty as a question of fact."). Under Texas law, whether a duty to speak exists is a question of law. *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001) (citing *Ralston Purina Co. v. McKendrick*, 850 S.W.2d 629, 633 (Tex. App.—San Antonio 1993, writ denied)).

In denying Chrimar's motion for summary judgment on the IEEE issues, the Court found that questions of material fact existed as to whether Chrimar had a disclosure duty for its then-pending '430 Application when Chrimar provided a letter of assurance ("LOA") for its '260 Patent. [ECF 255], at 14–16. In particular, the Court noted that "further testimony from the parties' IEEE experts will be necessary for the Court to fully resolve this question." *Id.* at 14.

During trial, the Court heard testimony from a number of witnesses, including (i) David Ringle, an IEEE employee who was the Administrator of the IEEE–SA Patent Committee ("PatCom") during the relevant time frame; (ii) Al Petrick, ALE's expert on IEEE-related issues; and (iii) Clyde Camp, Chrimar's expert who was the Chair of the IEEE–SA PatCom during 2001. As both a legal and factual matter, the evidence presented at trial does not establish that Chrimar had a legal duty to disclose its pending patent application to the IEEE.

To find a duty, there must be terms "clear enough that the parties can understand what each is required to do." *Hynix*, 441 F. Supp. 2d at 1073. A lack of details regarding alleged "disclosure" policies precludes a finding of mutual agreement on terms. *Id.* at 1074. Indeed,

> [a] policy that does not define clearly what, when, how, and to whom the members must disclose does not provide a firm basis for the disclosure duty necessary for a fraud verdict. ***Without a clear policy, members form vaguely defined expectations as to what they believe the policy requires — whether the policy in fact so requires or not.***

*Rambus Inc. v. Infineon AG*, 318 F.3d 1081, 1102 (Fed. Cir 2003) (emphasis added).

> Just as lack of compliance with a well-defined patent policy would chill participation in open standard-setting bodies, after-the-fact morphing of a vague, loosely defined policy to capture actions not within the actual scope of that policy likewise would chill participation in open standard-setting bodies.

*Id.* at 1102 n.10. As discussed below, there was no duty of disclosure.

> a.   The IEEE–SA Standards Board Bylaws do not impose obligations on meeting attendees.

ALE incorrectly states: "The IEEE Bylaws set forth the controlling written statement on the IEEE patent policy, which requires that participants disclose patents and patent applications relevant to a proposed IEEE standard through a letter of assurance." ALE Brief, at 4. This one statement contains numerous false positions. First, the Bylaws are not the sole document describing the IEEE's patent policies, as the Standards Board Operations Manual also describes the policies. Trial Tr., at 710:6–23 (10/5 pm). Second, the Bylaws do not require "participants" to do anything, as the Bylaws are directed to the IEEE's board itself, the staff, and officers, such as committee chairs. Trial Tr., at 999:6–12 (10/6 pm). Third, even if a person chooses to submit an LOA, it is acceptable to submit a "blanket LOA," which does not disclose any particular patent or application. Trial Tr. 726:4–17 (10/5 pm), 1020:14–16 (10/6 pm). Fourth, the IEEE's patent policy was focused on "essential patents" and not patents that are merely potentially "*relevant* to a proposed IEEE standard." Trial Tr. 711:16–23; 725:3–9; 798:18–22 (10/5 pm); Ex. B — (PTX–090), at 1, 3, 4; Ex. A — (PTX–124), at 3 (arguing against FTC imposing disclosure obligations for "patents that relate (but are not essential) to a proposed standard"). And finally, in the 2000–2001 time frame at issue, the IEEE's patent policy was directed to asking for assurance with respect to "patents" and not "patent applications," as the IEEE treated those differently. *See* Ex. C — (PTX–085) § 6.3.2.

ALE's positions about what the IEEE's patent policy required were based solely on the testimony of its expert Mr. Petrick. During cross-examination, Mr. Petrick admitted that PatCom is responsible for both developing and interpreting the IEEE's patent policies. Trial Tr. 779:18–780:9 (10/5 pm). Yet Mr. Petrick was never a member of PatCom, and in fact, never attended a single PatCom meeting. Trial Tr. 780:18–23 (10/5 pm). Indeed, Mr. Petrick admitted that when

he was vice-chair of the IEEE 802.11 working group, when questions of patent policies came up, he referred those questions to PatCom. Trial Tr. 780:13–17 (10/5 pm). In contrast, Chrimar's expert Mr. Camp was the Chair of PatCom in 2001, the year that Chrimar submitted its LOA for the '260 Patent. As the trier of fact on ALE's equitable defenses and counterclaims, the Court may consider the relative experience of the parties' IEEE experts.

Mr. Petrick blindly reads section 6 of the Bylaws as imposing a disclosure obligation. But Mr. Camp explained that the Bylaws are procedures governing "the board itself, the staff, and any officers of the organization, such as committee chairs." Trial Tr. at 998:25–999:8. Notably, Mr. Camp explained that participants in technical working groups are not governed by the Bylaws. Trial Tr. 999:9–12. As such, neither the Bylaws nor any other IEEE documents impose any duty of disclosure on any participants.

Specifically, Mr. Camp explained the IEEE's patent policies do not require anyone to disclose patents, patent applications, or to provide an LOA to the IEEE. Instead, the IEEE has a "request and encourage" policy:

> Q.     What do you mean by "request and encourage"?
>
> A.     Well, we can't -- we don't have any control over who holds patents on our standards. So we send out, as soon as we find out that someone may have a standard -- for example, one of the members of the jury might have a standard --
>
> Q.     Mr. Camp, let me just interrupt you there. You're referring to "we.' Who are you referring to as "we"?
>
> A.     I apologize. When I say "we" like that, I worked for the organization for 25 years; and I sort of dropped back into the IEEE mode.
>
> The IEEE-SA wants letters of -- or requests to go out to potential owners of patents saying: Hi there. Okay. We understand you might have a patent that might apply to this standard. If you do, we would appreciate your sending us back this letter of assurance.
>
> Q.     Now, is a patent holder required to respond?
>
> A.     Absolutely not.
>
> Q.     And why not?
>
> A.     Well, because we don't have any control over where they -- we

don't have -- we can't coerce them. The bylaws themselves say "without coercion." We send these letters out. We want to get the results back, but we can't coerce them.

We can't make them. We don't have any control over people with patents living in China or Japan or Europe. We simply don't have control over the patent holder.

Trial Tr. 997:10–998:20 (10/6 pm).

ALE's reading of the Bylaws is at odds with the other governing documents presented in this case. In particular, although ALE focuses solely on the Bylaws, Mr. Ringle explained that the Standards Board Operations Manual and the Bylaws both provided policies and procedures. Trial Tr., at 710:6–23 (10/5 pm). Section 6.3 of the 2001 IEEE Standards Board Operations Manual ("Operations Manual") recognizes that an LOA may not be obtained even when requested: ("In the event that a patent may apply to a standard and a letter of assurance cannot be obtained, the working group shall refer this matter to the Patents Administrator in the IEEE Standards Department."). Ex. C — (PTX–085), at § 6.3 (emphasis added). If, as ALE asserts, patent holders (or patent applicants) were *required* to provide an LOA, the IEEE would not need to have a procedure for addressing the inability to obtain an LOA.

After reviewing all of the relevant documents and considering the testimony in the trial, Mr. Camp explained that Chrimar had not breached any duty or obligation owed to the IEEE or to any member or participant in the IEEE working groups. Trial Tr. at 1026:1–9 (10/6 pm). And on cross-examination, Mr. Camp further explained that participants in IEEE standards-development activities are not expected to disclose their patents and patent applications that are relevant to the standard. Trial Tr. 1030:14–16 (10/6 pm).

Mr. Camp's testimony was not only supported by his extensive experience as the Chair of PatCom, it was also confirmed by the IEEE's own description of its patent policies to the U.S. government during the relevant time frame. Specifically, ALE's position about a purported mandatory obligation to disclose patents and patent applications is belied by the IEEE's April 17,

– 6 –

2002 letter to the Federal Trade Commission. Ex. A — (PTX–124). That letter confirms that: "Participation in standards developing committees is voluntary and <u>disclosure of patents is based on the willingness of the individual participants to disclose any known patents</u> whose use would be required in the practice of the standard and for such patents to be licensed on reasonable terms that are not unfairly discriminatory." Ex. A, at 2 (emphasis added).

> *b.* <u>During the relevant time period, the IEEE treated patents and patent applications differently.</u>

While ALE argues that Chrimar had some obligation to disclose pending patent applications to the IEEE, the evidence at trial does not support that assertion. Indeed, when asked to do so, Chrimar provided an LOA for its '260 Patent. The IEEE accepted Chrimar's December 3, 2001, LOA. Trial Tr. 743:22–744:2 (10/5 pm). At the time, Chrimar did not have any issued patents other than the '260 Patent. Trial Tr. 1020:17–20 (10/6 pm). Nor did Chrimar have any belief that its pending patent application was essential to the PoE Standard that was under development at the time. Trial Tr., at 556–57 (10/4 pm).

During the trial, ALE presented deposition testimony of the IEEE's Mr. Ringle. During that testimony, he discussed the "call for patents" that is made at IEEE standards-setting meetings. Trial Tr. 711:14–712:4 (10/5 pm). In this testimony, Mr. Ringle confirmed that the call for patents relates to patents — not applications — that may be related to the standard under development. There was no mention in Mr. Ringle's testimony that the IEEE's patent policies required anyone to disclose patent applications. Trial Tr., 708:18–715:12 (10/5 pm).

ALE's own expert, Mr. Petrick testified that it was important to listen to Mr. Ringle's testimony because Mr. Ringle was an actual IEEE employee (the manager within the IEEE's Standards Association), and Mr. Ringle understands the IEEE's patent policies. Trial Tr., 782:3–12 (10/5 pm). Mr. Petrick also agreed that 802.3af Task Force Chair Mr. Carlson (another of ALE's experts) did not even read the patent policy at the May 2000 and July 2000 IEEE 802.3af

Task Force meetings, which are the meetings that Mr. Austermann attended parts of:

> Q.     Mr. Carlson didn't read the patent policy at the May 2000 or July 2000 meetings, did he?
>
> A.     No. He said he didn't.

Trial Tr. 786:24–787:1 (10/5 pm). Instead, Mr. Petrick attempted to put the burden on Mr. Austermann to ask what the policy was to avoid being accused of breaching some duty. Trial Tr. 786:8–787:19 (10/5 pm). Further, Mr. Petrick could not point to any testimony of Mr. Ringle that the IEEE's patent policies required the disclosure of patent applications. Trial Tr., 789:15–790:12 (10/5 pm).

Moreover, on cross-examination, Mr. Petrick did not recall ever seeing before a copy of the July 17, 2001, memorandum/letter (PTX–090) authored by Mr. Camp, PatCom Chair at the time. Trial Tr., 793:18–25, 794:16–18, 795:23–25 (10/5 pm); *see also* Ex. B — (PTX–090). Mr. Petrick agreed that Mr. Camp sent the memo to the technical working group chairmen to describe the IEEE's patent policies. Trial Tr., 796:8–13 (10/5 pm). Mr. Petrick agreed that the memo explained that the "IEEE–SA Standards Board Patent Committee has completed the definition of a procedure that should ease the process by which working groups gather information concerning intellectual property rights," and that the procedure was for "handling essential patents that may relate to the standards under development within the IEEE." Ex. B — (PTX–090) (emphasis added); Trial Tr. 794:1–11 (10/5 pm). Mr. Petrick confirmed that the memo said nothing about patent applications. Trial Tr., 794:1–14 (10/5 pm); *see also* Ex. B.

With regard to the form letter that the working group chair was to send, unaltered, to intellectual property managers at a company; that letter refers to "essential patents," which, according to the letter, are defined by the IEEE to mean "those patents whose infringement is unavoidable in a compliant implementation of the standard and where there is no other reasonable technical alternative" — Mr. Petrick did not disagree with that definition. Trial Tr., 799:10–800:4 (10/5 pm); Ex. B. There is no mention of patent applications in the form letter.

– 8 –

The final page of Mr. Camp's memo was the form LOA that the IEEE patent committee requested patent holders to complete and return. Trial Tr., 800:6–800:15 (10/5 pm); Ex. B — (PTX–090). The LOA states that if the patent holder "owns or controls granted patent(s) and/or pending applications that it believes may be infringed by compliance with the Proposed IEEE Standard, please specify the patent number, published application, and/or relevant claims." Ex. B. But the form only provides a blank for "patent number(s)" (not for patent applications) and only offers options for the patent holder to make known "its position with respect to licensing such patent(s)" (as opposed to patent applications).

The LOA form does not unambiguously require the disclosure of pending patent applications or impose a duty to state a licensing position with respect to pending patent applications. Instead, it states a request ("please specify"), but even then, the form does not provide a line for listing patent applications — only "Patent Number(s)." Similarly, section 6 of the Bylaws, *see* Ex. H — (DX–249), does not unambiguously <u>require</u> disclosure of pending patent applications; in fact, it <u>prohibits</u> the IEEE from requiring anyone to provide an LOA through coercion.

The version of the Operations Manual in effect when Chrimar submitted its LOA in December 2001 does not provide any procedures for requesting information about pending patent applications. Trial Tr., 802:4–7 (10/5 pm); Ex. C — (PTX–085), at 24–25. Instead, the manual talks of "patents" and "patent holders" — not patent applications and patent applicants. Ex. C — (PTX–085), at 24–25. This point was confirmed by Mr. Petrick. Trial Tr. 800:17–802:3.

In 2004, the Operations Manual was amended to seek LOAs with respect to patent applications. *See* Ex. D — (PTX–087) (amending language to "Patent holder <u>or patent applicants</u> . . . ." and "In the event that a patent <u>or patent application</u> . . . ."), at § 6.3 at pp. 25–26; *see also id.* at § 6.3.2 at pp. 25–26 (pertaining to requests for an LOA concerning patents or patent applications). Mr. Petrick was aware that the IEEE Standards Board amended the

Operations Manual in 2004 to now include patent applications and patent applicants, and he further confirmed that the 2004 amendment was not retroactive. Trial Tr. 803:2–12, 804:8–11 (10/5 pm). It is undisputed that Chrimar's last attendance at an 802.3af Task Force meeting was in July 2000. Trial Tr. 804:24–805:2 (10/5 pm).

In addition, the IEEE also informed the U.S. government that its patent policies treated issued patents differently than patent applications. In its April 17, 2002, letter to the Federal Trade Commission, the IEEE explained that "[s]tandards committees realize that until a patent has been issued there is very little value to disclosure since the scope of valid patent claims has not been determined. This is why it is not appropriate to group issued patents and applications together . . . ." Ex. A — (PTX–124), at 6 (emphasis added). ALE has presented no evidence — except Mr. Petrick's uninformed and conclusory opinion — that the IEEE patent policies required disclosure of patent applications.

The issue of whether Chrimar breached a duty to disclose its pending patent applications to the IEEE was submitted to the jury in connection with ALE's breach-of-contract claim. In its verdict, the jury found that Chrimar did not breach a contract with the IEEE and further that Chrimar did not commit fraud against ALE. [ECF 348]. These factual findings are entirely consistent with the lack of evidence to support ALE's counterclaims relating to the IEEE. Because ALE's equitable claims all require breach of a duty of disclosure — as did ALE's claims for breach of contract and fraud — the Court should similarly find against ALE's equitable defenses and counterclaims relating to the IEEE.

        c.        ALE presented no evidence that a duty could be implied by a course of conduct.

ALE tries to salvage its defenses by arguing that a duty of disclosure "arose from the conduct of IEEE participants, who treated the IEEE patent policy as requiring a letter of assurance for any patents or patent applications that might affect a proposed standard." ALE

– 10 –

Brief, at 4. Notably, however, ALE cites **zero evidence** that supports this assertion. Instead, ALE points to submissions of LOAs by participants, (*e.g.*, DX–155), but the fact that these participants *voluntarily* provided LOAs does not lead to ALE's conclusion that they treated providing an LOA as a *requirement*.

Moreover, ALE's citation to case law involving other standards-development organizations is insufficient for the Court to impose an implied obligation here. Even if there were evidence about how others treated the IEEE's patent policies — and there is none — Chrimar's attendance at parts of two IEEE 802.3af meetings — one in Ottawa where Mr. Austermann did *ad hoc* product demonstrations <u>outside the meeting room</u>, and one in La Jolla where Mr. Austermann gave a product demonstration and <u>left the meeting after a few hours</u> of a multi-day meeting — is far different from the cases where the courts have implied a duty. In the *Qualcomm* case cited by ALE, for example, "Qualcomm [was] a member of the American National Standards Institute ('ANSI'), which is the United States representative member body in the ISO/IEC, and was an active dues-paying member for many years prior to 2001. It [was] also a member of the ITU–T and a participant in the JVT." *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1009 (Fed. Cir. 2008). Thus, the court considered the beliefs of the other participants about the JVT's patent policy as relevant to Qualcomm's understanding of the policy.

Here, neither Mr. Austermann nor anyone with Chrimar was ever a member of the IEEE, much less the task force that drafted the PoE Standards. As such, it would be improper to saddle Chrimar with an obligation based solely on the beliefs of others, particularly when none of those individuals communicated their beliefs to Chrimar. ALE's argument is also especially improper considering the IEEE was aware — and repeatedly acknowledged — that Chrimar did not wish to participate in the development of the standard. Ex. E — (PTX–141) ("CMS has indicated that they do not wish to participate in the development of the 802.3af Standard").

Finally, contrary to ALE's argument, Chrimar did not undertake a duty to disclose its

patent applications by submitting an LOA for the '260 Patent. The unrebutted testimony at trial was that Chrimar submitted its LOA after the IEEE requested an LOA for the '260 Patent. Trial Tr. at 553–554 (10/4 pm). The LOA form states a request ("please specify"), but even then, the form does not provide a line for listing patent applications — only "Patent Number(s)." Ex. F — (PTX–116), last page. Still, the testimony was clear that it was perfectly acceptable to leave that line blank — even if the party had issued patents. Trial Tr. 1020:14–16 (10/6 pm). Notably, fifteen years have passed since Chrimar submitted its LOA to the IEEE, and the IEEE has never informed Chrimar that it was incorrect or incomplete. Trial Tr. 557:11–558:12 (10/4 pm). Nor has the IEEE ever requested an additional LOA for the patents-in-suit under the 802.3af or 802.3at PoE Standards. ALE's arguments should be rejected.

> 2.   *Chrimar did not conceal its pending patent applications.*

Because Chrimar had no duty of disclosure, ALE's equitable defenses must be rejected. Nevertheless, ALE cannot establish the other elements for these defenses. In particular, ALE argues that Chrimar "concealed" its pending patent applications from the IEEE. That is incorrect.

The testimony at trial established that — even before attending part of the La Jolla meeting in July 2000 — Mr. Austermann met with employees of 3Com Corporation and disclosed its pending applications to 3Com. Trial Tr. 539:15–542:6 (10/4 pm). 3Com was heavily involved in the development of the PoE Standards, and in fact, Michael McCormack, the editor of the 802.3af standard, was employed by 3Com at that time, while 3Com's David Law was the Vice-Chair of the entire 802.3 Working Group. Ex. G (PTX–008), at page v.  Mr. McCormack later became the Chair of the 802.3at Task Force. Trial Tr. 719:4–5 (10/5 pm). Under the IEEE patent policy, once an officer of a standards-development committee became aware of potential essential patents, the committee chair was required to request an LOA from the patent holder. Trial Tr. 1002:15–21. Despite that fact, neither Mr. Law, Mr. McCormack, nor anyone associated with the IEEE requested an LOA from Chrimar with respect to any applications or

patents in the family of the patents-in-suit for either 802.3af or 802.3at Standards. Trial Tr. 558:9–12 (10/4 pm); 1025:13–16 (10/6 pm).

> 3. *ALE could not have relied on Chrimar's allegedly misleading conduct.*

ALE asserts that it relied on Chrimar's silence. ALE Brief, at 6. Of course, this is not true, as ALE did not even exist until 2014 — thirteen years after Chrimar submitted its LOA for the '260 Patent to the IEEE.[1] Recognizing this fact, ALE states in generalized and conclusory fashion that "each participant in the PoE industry relied" and the "IEEE and ALE's predecessors relied." ALE Brief, at 6. Notably, however, there is no evidence in the record that anyone, ALE included, relied on Chrimar's alleged silence. Without such evidence, ALE cannot establish this element, and the Court should reject ALE's equitable-estoppel defense.

> 4. *ALE has not established that it was prejudiced.*

ALE has not shown, and cannot show, that it suffered any prejudice from Chrimar's failure to provide an LOA for the patents-in-suit. The evidence at trial established that it was perfectly acceptable to provide a "blanket letter of assurance" that did not identify by number any patents or patent applications, but rather, stated that the holder was willing to license any essential patents on reasonable and non-discriminatory terms. Trial Tr., 726:4–17 (10/5 pm). Mr. Austermann testified that he was unaware at the time Chrimar submitted the LOA for the '260 Patent that it could have submitted a blanket LOA. Trial Tr., 558:13–21 (10/4 pm). He further testified that Chrimar's licensing policy is consistent with such an LOA — Chrimar's licensing policy for the patents-in-suit is reasonable and non-discriminatory, and it would not be any different if Chrimar had provided a blanket LOA instead of putting the patent number for the '260 Patent on its submitted LOA. Trial Tr., 559:5–18 (10/4 pm). And Mr. Mills testified

---

[1]   To the extent ALE contends its defenses stem from alleged conduct directed to its "predecessors," ALE did not provide any evidence that it was in privity with such companies. Moreover, the real successor company, Alcatel–Lucent USA Inc. ("ALU"), settled with Chrimar and released all claims and defenses that it might have with respect to Chrimar's alleged conduct with the IEEE. ALE has failed to establish any rights as a successor to any companies that were involved in the IEEE standards development.

that his analysis would be the same if Chrimar had a RAND obligation. SEALED Trial Tr. at 29:8–21 (10/5 am).

ALE did not present any evidence about what it would have done differently had Chrimar submitted a blanket LOA rather than the LOA for the '260 Patent as the IEEE requested. And with respect to ALE's suggestion that *the IEEE* could or would have done something differently had it been aware of Chrimar's patent applications, that is rank speculation. Indeed, ALE's expert, Steve Carlson, admitted that the IEEE 802.3af task force was aware of the Network–1 patent in July 2001, and yet, took no effort to design around or avoid infringement of that patent. Trial Tr., 701:8–702:7 (10/5 pm).[2] Given the testimony that Chrimar's licensing policy would be the same, ALE cannot show any prejudice from Chrimar's alleged breach of a disclosure duty.

**B.   *ALE has not established the elements for waiver.***

"To support a finding of implied waiver in the standard setting organization context, the accused must show by clear and convincing evidence that '[the patentee's] conduct was so inconsistent with an intent to enforce its rights as to induce a reasonable belief that such right has been relinquished.' Such conduct can be shown where (1) the patentee had a duty of disclosure to the standard setting organization, and (2) the patentee breached that duty." *Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1348 (Fed. Cir. 2011) (quoting *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1020, 1011–12 (Fed. Cir. 2008)).

Trying to force a square peg into a round hole, ALE argues — again without citing any evidence — that "Chrimar intentionally organized a plan to shield the undisclosed patent family from consideration by the IEEE, intending to later obtain royalties from PoE-complaint

---

[2]    Mr. Carlson's opinion as to what the IEEE "would have actually adopted" is rank speculation. *Cf. Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc.*, No. C 92–20643 RMW, 1995 WL 261407, at *3 (N.D. Cal. Apr. 25, 1995) ("The court grants Applied's motion precluding Nusbaum from testifying about what the examiner would have done if Nusbaum had been the examiner, or if the examiner had different information. The evidence would be irrelevant speculation and Nusbaum is not skilled in the art. Further, expert testimony is only appropriate if helpful to understand or to determine a fact in issue.").

products." ALE Brief, at 7. But as discussed above, contrary to ALE's assertions, Chrimar disclosed its pending patent applications to 3Com, an active IEEE 802.3af participant, in July 2000. Even though 3Com's Mr. McCormack was the editor of the 802.3af Task Force and later the Chair of the 802.3at Task Force, neither Mr. McCormack nor any participant in the IEEE standards development ever asked Chrimar to provide an LOA for the pending applications, which is the procedure specified under the IEEE policy. *See* Ex. C — (PTX–085) § 6.3.2.

As discussed above in connection with ALE's equitable-estoppel defense, Chrimar was under no duty of disclosure to the IEEE, and thus, ALE cannot establish the first element required for its waiver defense. *See supra*, at 2–12. As to the second element, whether Chrimar breached such a duty, that question was answered in the negative by the jury. Indeed, the jury was instructed on the elements for breach of contract, and returned a verdict that Chrimar had not breached any contract with the IEEE. The Court should not disturb that factual determination, which is the same inquiry required for ALE's waiver defense.

Moreover, contrary to ALE's assertions, Chrimar has never acted in a way that is inconsistent with enforcing its patent rights. Indeed, when Chrimar believed that Cisco was infringing the '260 Patent in 2001, it sued Cisco for patent infringement. Nevertheless, at that time, and when Chrimar provided its LOA for the '260 Patent, Chrimar's pending patent applications would not be infringed by the 802.3af standard that was under consideration. Trial Tr., at 557:11–18 (10/4 pm). ALE has presented no evidence that any claims of any Chrimar application that was pending during the relevant time period was essential (or believed to be essential) to the PoE Standards under development.[3]

---

[3]   Even in cases where a disclosure duty existed, courts have made clear that such duty would extend only to pending applications where the <u>claims</u> of the applications were essential. *See, e.g.*, *Rambus Inc. v. Infineon Techs. AG*, 318 F.3d 1081, 1100–01 (Fed. Cir. 2003) ("Rambus's duty to disclose extended only to claims in patents or applications that reasonably might be necessary to practice the standard. . . . By the same token, the disclosure duty <u>does not arise</u> for **a claim** that recites individual limitations directed to a feature of the JEDEC standard as long as that <u>claim</u> also includes limitations not needed to

### C. *Chrimar's claims are not barred by prosecution laches.*

Without any evidence in support, ALE argues that Chrimar's infringement claims are barred by the doctrine of prosecution laches. Rather, ALE cites a few cases that have no application here. Indeed, the cases cited by ALE involve patents that were governed by the pre-GATT term-limits provisions that were enacted in the early 1990s. Those statutory term-limit changes overhauled the patent system to specify that patents would no longer have a term that was measured from the **issue date** of the patent, but rather, the term would end "20 years from the date on which the application for the patent was filed in the United States or, if the application contains a specific reference to an earlier filed application or applications under section 120, 121, 365(c), or 386(c), from the date on which the earliest such application was filed," regardless of when the patent issued. 35 U.S.C. § 154(a)(2).

Incredibly, ALE fails to mention this fact in its brief, which is significant because in one of the few cases ALE cited, *Cancer Research Technology Ltd. v. Barr Labs., Inc.*, the Federal Circuit indicated that the statutory patent-term changes would eliminate the concerns underlying the prosecution-laches doctrine: "Finally, we note that the facts of this case are not likely to be frequently repeated, as patent terms are now measured from effective filing date, *id.* § 154(c)(1), subject to only limited extensions provided by statute, not by delaying issuance by refiling." 625 F.3d 724, 732 (Fed. Cir. 2010). ALE's failure to cite a single case finding prosecution laches in a case where the patent was subject to the post-GATT 20-year-from-filing term — like all of the patents-in-suit here are — is telling. In fact, even though *Cancer Research* involved pre-GATT patents, the Federal Circuit found that prosecution laches did not apply there. *Id.* at 732.

Thus, the only case cited by ALE where prosecution laches was applied to render the patents unenforceable involved extreme and egregious facts that are nothing like the facts here.

---

practice the standard.") (emphasis added); *id.* at 1103 (reversing district court finding of breach of a disclosure obligation because "substantial evidence does not support the finding that these <u>applications</u> had <u>claims</u> that read on the SDRAM standard") (emphasis added).

Specifically, ALE cites two separate appellate opinions relating to the Lemelson Foundation's assertion of patents against bar-code readers. In these cases, the patentee was the owner of "185 unexpired patents and many pending patent applications of Jerome H. Lemelson" that claimed "the benefit of the filing date of two applications filed in 1954 and 1956." *Symbol Techs., Inc. v. Lemelson Med.*, 277 F.3d 1361, 1363 (Fed. Cir. 2002) ("*Symbol II*"). When Lemelson began making infringement allegations in 1998 — <u>**over 40 years after the claimed priority date**</u> — two bar-code-reader manufacturers filed a declaratory-judgment action asserting that the patents were unenforceable because of prosecution laches. In *Symbol II*, the Federal Circuit concluded that prosecution laches could apply where there was an "unreasonable and unexplained delay in prosecution." *Id.* at 1363, 1368.

On remand, the district court found that prosecution laches rendered Lemelson's patents unenforceable. On appeal from that determination, the Federal Circuit remarked the extreme and egregious nature of the facts found by the district court:

> The [district] court found that <u>**an 18– to 39–year**</u> time period had elapsed between the filing and issuance of the patents in suit. *Symbol III*, 301 F. Supp. 2d at 1155. That period of time is not what is contemplated by the patent statute when it provides for continuation and continuation-in-part applications. Patent applications should normally be permitted to issue when they have been allowed and the statutory requirements complied with. The court also found that <u>**Lemelson had engaged in "culpable neglect" during the prosecution**</u> of these applications and it recognized the adverse effect on businesses that were unable to determine what was patented from what was not patented. *Id.* at 1156. It noted that the Lemelson patents occupied the "<u>**top thirteen positions**</u>" for the longest prosecutions from 1914 to 2001. *Id.* The court also cited the existence of "intervening private and public rights." *Id.* at 1157. It concluded that "[i]f the defense of prosecution laches does not apply under the totality of circumstances here, the Court can envision very few circumstances under which it would." *Id.* at 1156. Under those circumstances, we can hardly conclude that the court abused its discretion in holding the involved patents unenforceable on this ground.

*Symbol Techs., Inc. v. Lemelson Med., Educ. & Research Found.*, 422 F.3d 1378, 1386 (Fed. Cir.), *amended on reh'g in part sub nom. Symbol Techs., Inc. v. Lemelson Med., Educ. & Research Found., LP*, 429 F.3d 1051 (Fed. Cir. 2005) ("*Symbol IV*") (emphasis added). None of these concerns or

egregious facts is present here, where there was no unreasonable or unexplained delays in prosecution.

Indeed, the Federal Circuit in *Symbol IV* cautioned against inappropriate applications of prosecution laches, reserving the defense for "egregious" cases:

> There are legitimate grounds for refiling a patent application which should not normally be grounds for a holding of laches, and the doctrine should be used sparingly lest statutory provisions be unjustifiably vitiated. The doctrine should be applied <u>**only in egregious cases of misuse of the statutory patent system**</u>.

*Symbol IV*, 422 F.3d at 1385 (emphasis added). None of the patents-in-suit had any unreasonable or unexplained delays in prosecution. Nor would there be any benefit to Chrimar to have such delay. Indeed, because they are all subject to the post-GATT 20-year-from-filing term, any delay in prosecution would only reduce the enforcement period (i.e., the damages period) by delaying the issue date, while the expiration date was fixed by the priority date. This situation is far different from *Symbol* where the patents were in force and being asserted over 40 years after their priority date because of the pre-GATT term.

The court in *Digital Control Inc. v. McLaughlin Manufacturing Co.*, 248 F. Supp. 2d 1015 (W.D. Wash. 2003), analyzed the applicability of prosecution laches to patents subject to the post-GATT term, and concluded that the doctrine did not render the patents unenforceable. There, the court explained, that "<u>patents subject to GATT</u> or terminal disclaimers limiting patent protection to twenty years <u>will tend to be reasonable</u>. Courts condemning continuation practice have generally done so in the context of inventors that effectively extend the life of patents." 248 F. Supp. 2d at 1018 (emphasis added).

In its Brief, ALE complains that it was prejudiced by Chrimar's alleged prosecution delays. In particular, it argues that it had "intervening rights" because of its development of products. ALE Brief, at 9. Notably, however, ALE cites no authority for its suggestion that prosecution laches must apply simply because Chrimar's patents are essential to the PoE Standard. Instead, it

– 18 –

cites only *Symbol IV*, ALE Brief at 10, which as discussed above, involved egregious and far-different facts and patents that were not subject to the post-GATT 20-year term.

Notably, ALE did not cite Judge Ward's opinion in *SynQor Inc. v. Artesyn Technologies, Inc.*, No. 2:07cv497–TJW, 2011 WL 2729214 (E.D. Tex. July 13, 2011), which rejected the exact argument ALE makes here.[4] As here, the patentee in *SynQor* prosecuted its patents in serial fashion with continuation applications filed in the priority chain. 2011 WL 2729214, at *3. The court found "no evidence of an unreasonable delay" and that the prosecution strategy was not unreasonable, noting that "[t]his is not the type of situation shown in Symbol where the patentee intentionally kept valid claims from issuing in order to prolong the life of his patents." *Id.* at *6 (citing *Symbol IV*, 422 F.3d at 1385–86). The court also rejected the argument ALE makes about the patentee improperly drafting claims to cover the defendants' products, noting that even if it had, "this would not by itself require a finding of prosecution laches" as "[t]here is nothing unusual or improper about drafting claims to cover a competitor's product, as long as there is a basis in the pending application." *Id.* at *7 (citations omitted). Judge Ward concluded: "This is not the type of 'egregious' misuse of the patent system the doctrine of prosecution laches was designed to remedy." *Id.*

ALE's submission attaches a declaration of its technical expert, Ian Crayford, that merely provides a chronology of prosecution. [ECF 376–1]. Notably, this declaration provides <u>no analysis</u> of any alleged delays in prosecution, and it <u>does not provide any opinions</u> that any delay was either unreasonable or unexplained. As such, it does not provide any support for establishing the requisite elements of prosecution laches, to the extent that such doctrine has any relevance to post-GATT patents like the patents-in-suit. Thus, ALE's post-trial brief on this issue amounts to nothing but attorney argument.

---

[4] ALE's counsel, Richard Vasquez and his colleagues, were counsel for certain defendants in the *Synqor* case.

In opposition, Chrimar submits the Declaration of G. Gregory Schivley, Chrimar's patent attorney, whose firm prosecuted all of the patents in suit. *See* Ex. I — Schivley Decl. In contrast to Mr. Crayford's lack of testimony or evidence, Mr. Schivley, through his direct and personal knowledge, explains that there were no unusual delays in prosecution of the patents-in-suit that were caused by Chrimar. *Id.* ¶¶ 65, 25, 39, 51, 64. Indeed, the only significant delays were <u>caused by the PTO</u> during the prosecution of the applications that led to the '250 Patent and the '012 Patent. *Id.* ¶¶ 15, 25. In those cases, the PTO recognized their own delay and granted term extensions for these patents of 895 and 331 days respectively. *Id.* ¶¶ 21, 35. Patent-term extensions are not granted if the delay in prosecution is caused by the patent applicant. *Id.*; 35 U.S.C. § 154(b)(1)(B).

ALE was required to prove the elements of prosecution laches by clear-and-convincing evidence. *SynQor*, 2011 WL 2729214, at *8. It has not done so, and Chrimar is entitled to judgment on this defense.

### D. *ALE's assertion of inequitable conduct fails.*

Like its other equitable defenses, ALE's inequitable-conduct defense has no basis in fact. Notably, ALE has presented no expert analysis or testimony to support this defense. But as the Federal Circuit has explained, "the remedy for inequitable conduct is the 'atomic bomb' of patent law," *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1288 (Fed. Cir. 2011) (*en banc*) (citations omitted), because it has the prospect of wiping out entire patents or even patent families. For that reason, the Federal Circuit recognized that "charging inequitable conduct ha[d] become a common litigation practice" and "ha[d] been overplayed, [was] appearing in nearly every patent suit, and [was] cluttering up the patent system." *Id.* at 1289. The court described this practice as "an absolute plague," where "[r]eputable lawyers seem[ed] to feel compelled" to make the allegation. *Id.*

For those reasons, the *en banc* Federal Circuit in *Therasense* overhauled the inequitable-

conduct inquiry. In addition to proving materiality, "[t]o prevail on an claim of inequitable conduct, the accused infringer must prove that the patentee acted with the **specific intent to deceive** the PTO." *Therasense*, 649 F.3d at 1290 (emphasis added). The court explained that negligence or even gross negligence "does not satisfy the intent requirement." *Id.* The intent requirement is a separate inquiry from the materiality requirement, and the specific intent to deceive "must be 'the single most reasonable inference able to be drawn from the evidence.'" *Id.* (citations omitted).

Here, ALE sets up a straw man by *assuming* that the Declaration of Messrs. Cummings and Austermann is false, and then based on that assumption, argues that it was therefore material and the alleged falsity was intentional. *See* ALE Brief, at 10–11. To even make this argument, ALE must prove that that the Declaration was "unmistakably false." *Id.* at 1292.

ALE's unsupported arguments must be rejected, as the Declaration is not false, but in addition, ALE's "proof" falls far short of carrying the clear-and-convincing burden required to detonate the atomic bomb ALE tries to drop.

The sole basis of ALE's inequitable conduct defense is Paragraph 6 of the Declaration:

> 6. We designed circuity that was utilized in conjunction with a system and method for performing the claimed subject matter prior to the critical date. Evidence of our circuit design is attached as Exhibits B1–B17. (Note: Sheet 6 of 18 is not currently available) The dates in Exhibit B have been redacted but they are prior to the critical date. The circuit boards were ordered from a company called American Broadband, Inc. A copy of an invoice from American Broadband, Inc. is attached as Exhibit C. The dates in Exhibit C have been redacted but they are prior to the critical date.

ALE Brief, at 11 (quoting DX–085). In particular, ALE asks the Court to find materiality and an intent to deceive the PTO because Messrs. Cummings and Austermann were not the individuals that prepared the circuit designs that were submitted as Exhibits B1–B17 to the Declaration.

   1.   *ALE has not met its burden of proving materiality.*

Recognizing that there is no possibility of proving "but for" materiality, ALE argues —

– 21 –

again based on its straw-man assumption — that by submitting an allegedly false Declaration, the Court should assume materiality. ALE Brief, at 12. To support its assertion of falsity, ALE cites the deposition testimony of Clyde Boenke, who merely testified to what is not in dispute, namely that American Broadband prepared the detailed circuit diagrams that were submitted as Exhibits B1–B17 to the Declaration. *Id.* Notably, however, ALE ignores the testimony of Mr. Cummings, who explained that Chrimar hired Mr. Boenke to prepare the circuit diagrams using the OrCAD schematic-design program based on block diagrams and concepts describing the invention Mr. Cummings provided to Mr. Boenke. Trial Tr. at 262–63 (10/3 pm).

ALE also ignores the fact that the Declaration does not assert that Mr. Cummings and Mr. Austermann prepared the circuit-design diagrams. In fact, the very paragraph ALE complains about makes that point clear. Specifically, Paragraph 6 of the Declaration states: "The circuit boards were ordered from a company called American Broadband, Inc.," (DX–085) ¶ 6, which is Mr. Boenke's company. Far from being false, this paragraph expressly identifies American Broadband as the source of the circuit boards used in Chrimar's products incorporating the patented inventions. And each schematic submitted to the PTO is an American Broadband drawing listing "C. Boenke" as the engineer for the circuit schematics. (DX–085), at B1–B17.

Because the Declaration identifies American Broadband as the source of the circuit boards and the attached drawings specifically identify Mr. Boenke as the engineer who prepared the circuit schematics, ALE's assumption that the Declaration is false is unwarranted. In essence, ALE's inequitable-conduct claim merely attempts to second-guess the wording used in one paragraph of a Declaration submitted to address three dependent claims in a reexamination for a patent not in issue here, where the PTO didn't even rely on the Declaration in confirming the claims because it found the independent claims patentable. Regardless of whether different words would have been better, the Declaration is not "unmistakably false," which is the standard ALE must satisfy by clear-and-convincing evidence. *Therasense*, 649 F.3d at 1292.

2.   *ALE has not met its burden of proving intent to deceive.*

As discussed above, in addition to proving materiality, to prevail on its inequitable-conduct defense, ALE must show by clear-and-convincing evidence that Chrimar had a <u>specific intent to deceive</u> the PTO. *Id.* at 1290. The Declaration itself defeats ALE's argument. If Messrs. Cummings and Austermann were trying to deceive the PTO about the source of the drawings for the circuit boards referenced in the Declaration, they certainly would not have identified American Broadband as the source of the circuit boards and would not have provided American Broadband drawings with Mr. Boenke's name on them as attachments to the Declaration. Indeed, as the *Therasense* court held, to prevail on this defense, ALE had to show by clear-and-convincing evidence that specific intent to deceive "must be 'the single most reasonable inference able to be drawn from the evidence.'" *Therasense*, 649 F.3d at 1290 (citations omitted). ALE has not shown such intent.

ALE's inequitable-conduct counterclaim is no more than an attempt to reargue what the jury rejected — that Mr. Boenke is an/the inventor of the patents. ALE has not met its burden of proving inequitable conduct, and the Court should enter judgment for Chrimar on that defense.

## IV. Conclusion

For the reasons discussed above and in Chrimar's Motion for Judgment on ALE's IEEE-Related Equitable Defenses and Counterclaims [ECF 379], (i) all of ALE's equitable defenses and counterclaims should be rejected, and (ii) Chrimar objects to each and every finding of fact and conclusion of law in ALE's Amended Findings of Fact and Conclusions of Law [ECF 376]. Chrimar previously submitted proposed Findings of Fact and Conclusions of Law for ALE's IEEE defenses and counterclaims. [ECF 379], at 13–20. Chrimar is submitting herewith proposed findings and conclusions for ALE's prosecution laches and inequitable conduct defenses.

Respectfully submitted,


  /s/ Richard L. Wynne, Jr.
Richard W. Hoffmann
  hoffmann@reising.com

**REISING ETHINGTON PC**
755 West Big Beaver Road, Suite 1850
Troy, Michigan 48084
248.689.3500
248.689.4071 (facsimile)

Justin S. Cohen
  Texas Bar No. 24078356
  justin.cohen@tklaw.com
Richard L. Wynne, Jr.
  Texas Bar No. 24003214
  richard.wynne@tklaw.com

**THOMPSON & KNIGHT LLP**
1722 Routh Street, Suite 1500
Dallas, Texas 75201
214.969.1700
214.969.1751 (facsimile)

ATTORNEYS FOR PLAINTIFFS


## CERTIFICATE OF SERVICE

I hereby certify the foregoing document was filed electronically on December 5, 2016, and was served that same day via the Court's ECF System.


  /s/ Richard L. Wynne, Jr.
Richard L. Wynne, Jr.