# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# TYLER DIVISION

| | |
|---|---|
| **CHRIMAR SYSTEMS, INC., CHRIMAR HOLDING COMPANY, LLC,** § § § § **Plaintiffs,** § § **v.** § § **ALCATEL-LUCENT ENTERPRISE USA INC.,** § § § **Defendant.** | **CIVIL ACTION NO. 6:15-CV-00163-JDL** |

## MEMORANDUM OPINION AND ORDER

On March 9, 2015, Plaintiffs Chrimar Systems, Inc. d/b/a CMS Technologies and Chrimar Holding Company LLC ("Chrimar") filed the instant action against Defendant Alcatel-Lucent Enterprises USA, Inc. ("ALE"). (Doc. No. 3.) In this action, Chrimar alleges infringement of U.S. Patent Nos. 8,115,012 ("the '012 Patent"), 8,902,760 ("the '760 Patent"), 8,942,107 ("the '107 Patent"), and 9,019,838 ("the '838 Patent") ("patents-in-suit")). This case proceeded through claim construction, dispositive motions and pretrial, and the trial between Chrimar and ALE commenced on October 3, 2016. The following claims, defenses, and counterclaims were presented to the jury: damages, invalidity based on derivation and improper inventorship, fraud, and breach of contract. (Doc. No. 350.) At the close of evidence, the Court provided ALE an opportunity to present additional evidence pertaining to ALE's equitable defenses.[1] On October 7, 2016 the trial concluded and the jury returned a verdict as follows: (1)

---

[1] ALE indicated they wanted to call Mr. Crayford—their technical expert—back on the stand to provide testimony on prosecution laches. Tr. at 1209:10–18. Chrimar objected that Mr. Crayford had not opined on prosecution history

1

Claims 31, 35, 43, and 60 of the '012 Patent were not invalid; Claims 1, 5, 72, and 103 of the '107 Patent were not invalid; Claims 1, 59, 69, 72, and 145 of the '760 Patent were not invalid, and Claims 1, 7, and 26 of the '838 Patent were not invalid; (2) the sum of money that would fairly and reasonably compensate Chrimar for ALE's infringement was $324,558.34; (3) ALE did not prove by a preponderance of the evidence that Chrimar committed fraud against ALE; and (4) ALE did not prove by a preponderance of the evidence that Chrimar breached a contract with the IEEE. (Doc. No. 349.) After the conclusion of the trial, on November 10, 2016, ALE filed a brief on equitable issues seeking judgment against Chrimar on: (1) equitable estoppel; (2) waiver; (3) prosecution laches; and (4) inequitable conduct. (Doc. No. 377.) Chrimar filed a response (Doc. No. 394), to which ALE filed a reply (Doc. No. 397), and Chrimar filed a sur-reply (Doc. No. 399). The Court rules on these equitable defenses as set forth herein.

### A. Equitable Estoppel

To prove equitable estoppel, the accused infringer must prove by a preponderance of the evidence that: (1) "[t]he patentee, through misleading conduct, leads the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer…"; (2) "[t]he alleged infringer relies on that conduct"; and (3) "[d]ue to its reliance, the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim." *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020, 1028 (Fed. Cir. 1992) (en banc).

In arguing Chrimar is estopped from enforcing the patents-in-suit, ALE argues first that Chrimar misled the PoE industry by failing to disclose the patent family to the IEEE. (Doc. No. 377, at 3.) To establish this, ALE argues that Chrimar had a duty to disclose the patents-in-suit to

---

laches in his expert report. Tr. at 1209:19–1210:10. The Court directed the parties to meet and confer and submit the issue on the papers, which are the papers filed relevant to this Order. Tr. at 1210:16–1213:2.

2

the IEEE via a letter of assurance. *Id.* at 4. Chrimar contests it owed any such duty to the IEEE. (Doc. No. 394, at 4–6.)

"The existence of a disclosure duty is a legal question with factual underpinnings." *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1012 (Fed. Cir. 2008) (citing *Rambus Inc. v. Infineon Techs. AG*, 318 F.3d 1081, 1087 n.3 (Fed. Cir. 2003)). In deciding whether a duty to disclose existed, the Court looks first to (1) whether the written policies impose disclosure obligations; and (2) if it is understood that the policies impose such obligations. *Qualcomm*, 548 F.3d at 1012.

In ruling on summary judgment, this Court already addressed the issue of whether a duty of disclosure was owed to the IEEE by Chrimar. As to the written policies, the Court reviewed the relevant IEEE written policies as follows:

> Turning first to the written policies, Section 6.3 of the IEEE-SA Standards Board Operations Manual provides: "Patent holders shall submit letters of assurance to the IEEE Standards Department (to the attention of the Staff Administrator, Intellectual Property Rights) before the time of IEEE-SA Standards Board review for approval." (Doc. No. 204-29, at 24.) Section 6.3.2 further provides that "[t]hrough the working group, the Sponsor chair shall request that known patent holders submit a statement either that the patent does not apply to the standard or that licenses will be made available without compensation or under reasonable rates, terms, and conditions." Id. at 25. The operations manual further refers to the "patent policy" as set forth in clause 6 of the IEEE-SA Standards Board Bylaws.

(Doc. No. 255, at 13.)

The Court then turned to Section 6 of the Bylaws, which provides the following patent policy:

> IEEE standards may include the known use of patent(s), including patent applications, if there is technical justification in the opinion of the standards-developing committee and provided the IEEE receives assurance from the patent holder that it will license applicants under reasonable terms and conditions for the purpose of implementing the standard. This assurance shall be provided without coercion and prior to approval of the standard (or reaffirmation when a patent becomes known after initial approval of the standard).

*Id.*

3

Based on the analysis of these relevant policies, the Court concluded that "[t]hese written policies appear to be directed to how the IEEE Board deals with patents and standard adoption generally" and that it "*is unclear to what extent the written policies place an affirmative duty on patent holders through the black letter of the policy*." *Id.* at 14 (emphasis added). Therefore, the Court concluded that "further testimony from the parties' IEEE experts will be necessary for the Court to fully resolve this question." *Id.* These policies remain the relevant policies with the Bylaws being asserted as the guiding policy.

Having now received the testimony of both side's IEEE experts, the Court is not convinced that the IEEE policies place any affirmative duties on patent holders. For example, Chrimar's IEEE expert, Mr. Camp, testified at length that the IEEE has a "request and encourage" policy for submissions by patent holders who may have patents relevant to a standard because the IEEE bylaws provide a "without coercion" policy and the IEEE has no control over patent holders. Trial Transcript "Tr." at 997:10–998:20; 1028:11–1029:25. Further, Mr. Camp testified that the IEEE bylaws only govern "the board itself, the staff, and any officers of the organization, such as committee chairs"—not patent holders. Tr. at 999:6–8. ALE's expert Mr. Petrick testified that the bylaws "*allow[] patent holders to participate and patent holders may include the known use of patents and patent applications and they must provide an assurance on that particular application.*" Tr. at 741:15–22 (emphasis added). Thus, Mr. Petrick agrees that the relevant IEEE policies permissively allow patent holders to participate—*i.e*. there is no forced participation—and that similarly patent holders *may* include the known use of patent and patent applications. Given the clear language of the IEEE patent policies and the testimony of the experts at trial, the Court concludes that the policies themselves did not impose a duty of disclosure on Chrimar as a patent holder.

Further, there was insufficient evidence presented that the treatment of such policy language by those involved with the IEEE imposed the duty ALE contends Chrimar had. *Rambus*, 318 F.3d at 1098. Here, Mr. Petrick simply provided bare conclusions that Mr. Austermann had a duty of disclosure based on alleged attendance at IEEE meetings in Ottawa and La Jolla. Tr. at 770:10–771:8. The Court cannot find these conclusions credible without any explanation as to how Mr. Austermann's conduct would have given rise to an affirmative duty to disclose the patents-in-suit where the plain language of the policies do not impose any affirmative duty.

ALE points to the fact that Chrimar had attended a PatCom meeting (the committee responsible for setting patent policies), that Chrimar had discussions with IEEE members, that Chrimar had submitted letters of assurance pursuant to the patent policy, had received the Bylaws via email, and was asked to submit a letter of assurance. (Doc. No. 377, at 4, citing DX-208, DX-209A, DX-210, and DX-211.) But Chrimar's knowledge of the Bylaws and *voluntary* participation cannot give rise to an additional affirmative disclosure duty where Chrimar's conduct was consistent with what the Bylaws require. Again, Mr. Camp testified that even when the IEEE sends out a letter requesting disclosure, like the one Chrimar received, it is a "request and encouragement" because the Bylaws themselves state that "assurance shall be provided without coercion." Tr. at 997:10–998:20; 1028:11–1029:25; DX-247, at § 6. ALE provided no evidence of other IEEE members or participants who complied with the IEEE policies in a manner that is consistent with the duty it claims exists. Indeed, it may also very well be that the jury in considering this exact evidence, similarly found that ALE had not proven by a preponderance of the evidence that Chrimar had breached a contract to the IEEE or committed

fraud. (Doc. No. 349.) Accordingly, the Court finds that, based on the evidence presented, Chrimar did not owe a duty of affirmative disclosure to the IEEE.

Because Chrimar was under no affirmative duty to disclose the patents-in-suit to the IEEE, ALE's claim of equitable estoppel fails. However, even if Chrimar had had a duty to disclose, ALE has not provided evidence of reliance or material prejudice. ALE indisputably did not exist at the time the relevant standards were being considered and adopted and was not a member of the IEEE. ALE argues that its "predecessors relied on Chrimar to tell the truth in its letters of assurance." (Doc. No. 377, at 6.) This statement is problematic for two reasons. First, ALE provided no evidence that the information contained in Chrimar's letter of assurance was false or misleading. Rather, it was ALE's argument that because Chrimar had sent a letter of assurance on a patent from a different patent family, it had an affirmative obligation to send in a letter on the patents-in-suit. Second, ALE provided no evidence at trial regarding its predecessor's interest and involvement in the IEEE or the PoE standard-setting process. As such, ALE has failed to prove by a preponderance of the evidence that it relied on Chrimar's misleading conduct. Similarly, with respect to prejudice, ALE relies on economic prejudice suffered by its predecessor from 2000 through 2013. (Doc. No. 377, at 6.) Once again, there was no evidence presented by ALE with respect to its relationship to its predecessor such that a nexus could be shown to establish material prejudice to ALE.

For these reasons, the Court finds that ALE did not prove by a preponderance of the evidence that Chrimar is equitably estopped from enforcing the patents-in-suit based on its interactions with the IEEE.

**B. Waiver**

ALE relies on the same evidence and argument to contend that Chrimar has waived its rights to enforce the patents-in-suit and any related patents. (Doc. No. 377, at 7–8.) For the same reasons explained above with respect to equitable estoppel, the Court finds that ALE has failed to prove by a preponderance of the evidence that Chrimar has waived its rights to enforce the patents-in-suit.

### C. Prosecution Laches

ALE relies on *Symbol II* to argue that "the equitable doctrine of laches may be applied to bar enforcement of a patent that issued after unreasonable and unexplained delay in prosecution even though the patent applicant complied with pertinent statutes and rules." (Doc. No. 377, at 8–9, citing *Symbol Techs. Inc., v. Lemelson Med., Educ. & Research Found., LP*, 277 F.3d 1361, 1368 (Fed. Cir. 2002). ALE argues that the prosecution of the patents-in-suit started in 1998 and extended over 17 years, during which the IEEE standards were implemented and ALE was locked into use of the standard based on industry-wide adoption. (Doc. No. 377, at 9–10.) Chrimar argues that ALE cites to no evidence to support this defense and instead relies on cases that "involve patents that were governed by the pre-GATT term-limits provisions that were enacted in the early 1990s." (Doc. No. 394, at 16.)

As an initial matter, the Court has previously noted the oddity of this case:

> Chrimar contends that all of the patents-in-suit are standard essential patents. Yet, the progression of the patents-in-suit and the IEEE PoE standard adoption is perplexing. Chrimar maintains that it filed Provisional Application No. 60/081,279 on April 10, 1998 ("the Provisional Application"). (Doc. No. 204-3.) Chrimar next maintains that it filed Non-Provisional Application No. PCT/US99/07846 on April 8, 1999 (the '430 Patent Application), claiming priority to the Provisional Application. Chrimar maintains that the '430 Patent Application was unpublished until it issued as U.S. Patent No. 6,650,622 ("the '622 Patent") on November 18, 2003. Chrimar maintains that each of the patents-in-suit claims priority to the '622 Patent, the '430 Patent Application, and the Provisional Application. (Doc. No. 204, at ¶ 35.) The IEEE adopted the 802.3af standard in June 2003, and the patents-in-suit issued on April 10, 2012, January

7

> 27, 2015, December 2, 2014, and April 28, 2015, respectively. ¶ While Chrimar maintains that the patents-in-suit are standard essential and claim priority to the '430 Patent Application, Chrimar also maintains that the claims that arose from the '430 Patent Application are not essential to the standard. In other words, Chrimar claims priority to an application that existed prior to the adoption of the IEEE 802.3 standard that Chrimar claims is not essential to that standard, but that gave rise to the claims of the patents-in-suit that are allegedly standard essential.

(Doc. No. 255, at 15–16.)

Thus, while the Court notes the unusual circumstances of this case, there is no equitable basis for it to render judgment on these facts. Indeed, Chrimar is correct in that the term of the patents-in-suit are subject to a 20 year limit from "the date on which the earliest such application was filed." 35 U.S.C. § 154(a)(2). These provisions, which provide the counterbalance of limiting the life of a patent that undergoes a lengthy prosecution (by starting the term from the first filed application), alleviate the need for the equitable remedy ALE promotes based on a delayed prosecution. Here, there is no evidence cited by ALE that there was any unreasonable or unexplained delays in prosecution or any conduct by Chrimar to support such a delay.

ALE did submit an additional declaration from its expert, Ian Crayford, setting forth opinions on this equitable remedy. (Doc. No. 376-1.) Mr. Crayford's declaration simply goes over the timeline of the prosecution of the patents-in-suit and concludes that Plaintiffs have claimed a "relatively simple concept in thousands of different ways throughout the prosecution history," and that "[t]he seventeen year prosecution history has allowed Plaintiffs to morph their claims to attempt to cover the IEEE 802.3af and 802.3at PoE standards." *Id.* at ¶ 21. Mr. Crayford also opines that he understands that Chrimar "had knowledge of the IEEE 802.3af PoE standard in the early 2000s, before prosecution of the claims that issued in the patents-in-suit began." *Id.* But other than these conclusions provided by their expert, ALE has provided no evidence of Chrimar's knowledge or its conduct with respect to the prosecution of the patents-in-

suit that would warrant barring Chrimar from enforcing its rights to the patents-in-suit. The Court is unaware of any equitable remedy that would suggest the patents-in-suit should be held to be unenforceable and ultimately finds the evidence insufficient here. Finally, for the same reasons that were discussed above, ALE has not shown by a preponderance of the evidence that it was prejudiced by these actions.

For these reasons, the Court finds that ALE did not prove by a preponderance of the evidence that Chrimar is equitably estopped from enforcing the patents-in-suit based on prosecution laches.

### D. Inequitable Conduct

Lastly, ALE argues that the patents-in-suit are unenforceable as a result of inequitable conduct. (Doc. No. 377, at 11.) Specifically, ALE contends that to secure allowance of the '250 Patent during reexamination, the named inventors submitted a false declaration to the PTO to swear behind certain prior art. (Doc. No. 377, at 11.) Chrimar argues that ALE assumes the declaration is false and therefore assumes it was material and the alleged falsity was intentional. (Doc. No. 394, at 21.) Chrimar argues that ALE has not met its burden on proving materiality or intent to deceive. *Id.* at 21–22.

"To prevail on the defense of inequitable conduct, the accused infringer must prove that the applicant misrepresented or omitted material information with the specific intent to deceive the PTO." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011) (en banc). Intent and materiality are separate elements. *Id.* at 1290. To establish intent, the accused infringer must show that a specific intent to deceive is "the single most reasonable inference" supported by the evidence. *Id.* To establish materiality, the accused infringer must generally show that the patent would not have been granted but for the applicant's inequitable

9

conduct. *Id.* at 1291. Both intent and materiality must be established by clear and convincing evidence. *Id.* at 1287.

Here, ALE's defense of inequitable conduct relies entirely on the declaration submitted by Messrs. John Austermann and Marshall Cummings to the USPTO to swear behind certain prior art. (DX-085.) That declaration states in relevant part:

> 6. We designed circuity that was utilized in conjunction with a system and method for performing the claimed subject matter prior to the critical date. Evidence of our circuit design is attached as Exhibits B1–B17. (Note: Sheet 6 of 18 is not currently available) The dates in Exhibit B have been redacted but they are prior to the critical date. The circuit boards were ordered from a company called American Broadband, Inc. A copy of an invoice from American Broadband, Inc. is attached as Exhibit C. The dates in Exhibit C have been redacted but they are prior to the critical date.

(DX-085, at ¶ 6.)

ALE further cites to the testimony of Clyde Boenke stating that Messrs. Austermann and Cummings did not design the circuitry in question. (Doc. No. 377, at 12, citing Tr. at 911:8–21.) Thus, it is ALE's argument that the declaration was unmistakably false because Clyde Boenke created the circuit schematics attached to the declaration. *Id.* The Court finds that Mr. Boenke's testimony in conjunction with the declaration does not provide clear and convincing evidence of materiality. Indeed, the declaration itself states that the "circuit boards were ordered from a company called American Broadband, Inc." (DX-085.) American Broadband, Inc. is Mr. Boenke's company and the fact that the circuit boards came from American Broadband, Inc. was disclosed to the PTO via the declaration. DX-085; Tr. at 873:15–18. Thus, there is no indication that the declaration was "unmistakably false." *See Therasense.*, 649 F.3d at 1292 ("When the patentee has engaged in affirmative acts of egregious misconduct, such as the filing of an unmistakably false affidavit, the misconduct is material.")

Even if ALE had proven materiality by clear and convincing evidence, there is a dearth of evidence regarding an intent to deceive. "[T]o meet the clear and convincing evidence standard, the specific intent to deceive must be the single most reasonable inference able to be drawn from the evidence." *Therasense.*, 649 F.3d at 1290 (internal quotations omitted). To draw this inference, ALE argues that Chrimar failed to cure any false statements in the declaration, that Mr. Boenke designed the circuits, that there is no evidence that the named inventors did any circuit design, and that the inventors have a habit of deceiving their patent attorney. (Doc. No. 377, at 12.) Regarding the declaration, again, ALE's arguments rely on the assumption that the statements were false such that Chrimar would have needed to correct the declaration because Mr. Boenke designed the circuit schematics and the named inventors did not. But as discussed above, the declaration is not unmistakably false. While the declaration states "[w]e designed circuity…" it very clearly states that the attached "circuit boards were ordered from a company called American Broadband, Inc."—Mr. Boenke's company. Perhaps this language in the declaration could have been worded better; however, the following language disclosing American Broadband, Inc.'s work and attached circuit schematics does not lead to the single inference that this statement was made with the specific intent to deceive. Further considering the inventor's statements to their patent attorneys and the testimony provided at trial does not lead to the single inference that this statement was made with the specific intent to deceive. As such, ALE has failed to prove an intent to deceive by clear and convincing evidence.

For these reasons, the Court finds that ALE has failed to meet its burden on proving inequitable conduct.

## CONCLUSION

For the reasons stated herein, the Court finds that ALE has failed to meet its burden in proving equitable estoppel, waiver, prosecution laches, and inequitable conduct. Judgment will issue as a separate order.

**So ORDERED and SIGNED this 24th day of January, 2017.**

_____
JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE