IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| **CHRIMAR SYSTEMS, INC., CHRIMAR HOLDING COMPANY, LLC,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**ALCATEL-LUCENT ENTERPRISE USA INC.,**<br><br>**Defendant.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **CIVIL ACTION NO. 6:15-CV-00163-JDL** |

**REDACTED MEMORANDUM OPINION AND ORDER**

Before the Court is: (1) Defendant Alcatel-Lucent Enterprises USA, Inc. ("ALE") Motion for Judgment as a Matter of Law and Motion for A New Trial (Doc. No. 378); and (2) Plaintiffs' Chrimar Systems, Inc. d/b/a CMS Technologies and Chrimar Holding Company LLC ("Chrimar" or "Plaintiffs") Motion for Judgment as a Matter of Law on ALE's IEEE-related Equitable Defenses and Counterclaims (Doc. No. 379). The Motions have been fully briefed. For the reasons stated below, Defendant's Motion for Judgment as a Matter of Law and Motion for a New Trial (Doc. No. 378) is **DENIED**. Plaintiffs' Motion for Judgment as a Matter of Law (Doc. No. 379) is **DENIED**.

**BACKGROUND**

On March 9, 2015, Plaintiffs Chrimar Systems, Inc. d/b/a CMS Technologies and Chrimar Holding Company LLC ("Chrimar") filed the instant action against ALE. (Doc. No. 3.) In this action, Chrimar alleges infringement of U.S. Patent Nos. 8,115,012 ("the '012 Patent"), 8,902,760 ("the '760 Patent"), 8,942,107 ("the '107 Patent"), and 9,019,838 ("the '838 Patent")

("patents-in-suit"))[1]. Chrimar maintains that each of the patents-in-suit are standard essential patents ("SEP"). Specifically, Chrimar maintains that the patents-in-suit are SEPs for Power over the Ethernet ("PoE") standards IEEE 802.3af-2003 and IEEE 803.3at-2009. This case proceeded through claim construction, dispositive motions and pretrial, and the trial between Chrimar and ALE commenced on October 3, 2016. The following claims, defenses, and counterclaims were presented to the jury: damages, invalidity based on derivation and improper inventorship, fraud, and breach of contract. (Doc. No. 350.)

At the conclusion of Plaintiffs' case-in-chief, ALE moved pursuant to Rule 50(a) for judgment as a matter of law on Plaintiffs' allegations of willfulness and damages. Trial Transcript "Tr." at 612:17–616:3. The Court denied ALE's motion as to Plaintiffs' damages model (Tr. at 616:8–9), and granted ALE's motion as to willfulness (Tr. at 624:4–7). At the close of Defendant's case-in-chief, Plaintiffs moved pursuant to Rule 50(a) on the following issues: (1) infringement; (2) invalidity; (3) derivation; (4) antitrust; (5) implied license; (6) fraud; (7) breach of contract; and (8) damages reduction by noninfringing alternatives. (Tr. at 964:14–984:14.) The Court denied all of these motions, but granted as to written description and enablement, the antitrust claim, and implied license. (Tr. at 965:17–20; 966:12–18; 969:14; 969:25–970:1; 984:14; 986:4–9.) Additionally, at the close of evidence, the Court also provided ALE an opportunity to present additional evidence pertaining to ALE's equitable defenses.

On October 7, 2016, the trial concluded and the jury returned a verdict as follows: (1) Claims 31, 35, 43, and 60 of the '012 Patent were not invalid; Claims 1, 5, 72, and 103 of the '107 Patent were not invalid; Claims 1, 59, 69, 72, and 145 of the '760 Patent were not invalid, and Claims 1, 7, and 26 of the '838 Patent were not invalid; (2) the sum of money that would

[1] Prior to trial, ALE stipulated to infringement of all of the asserted claims of the patents-in-suit. (Doc. Nos. 298, 337.)

fairly and reasonably compensate Chrimar for ALE's infringement was $324,558.34; (3) ALE did not prove by a preponderance of the evidence that Chrimar committed fraud against ALE; and (4) ALE did not prove by a preponderance of the evidence that Chrimar breached a contract with the IEEE. (Doc. No. 349.) Both Chrimar and ALE have now moved to renew their motions for judgment as a matter of law pursuant to Rule 50(b). Specifically, ALE moves to renew its motion on damages (Doc. No. 378); and Chrimar moves on all IEEE-related claims and defenses, including (1) estoppel; (2) unclean hands; (3) waiver; (4) implied license; (5) patent misuse; (6) unenforceability; (7) breach of contract; (8) fraud; (9) antitrust. (Doc. No. 379.)

## LEGAL STANDARDS

### I. Judgment as a Matter of Law

A renewed motion for judgment as a matter of law ("JMOL") is a challenge to the legal sufficiency of the evidence supporting the jury's verdict. *Power-One, Inc. v. Artesyn Tech., Inc.*, 556 F. Supp. 2d 591, 593 (E.D. Tex. 2008) (citing *Flowers v. S. Reg'l Physician Servs.*, 247 F.3d 229, 235 (5th Cir. 2001)). Rule 50 provides that judgment as a matter of law is appropriate if the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue. Fed.R.Civ.P. 50(a)(1). In ruling on a renewed motion for JMOL, the court may allow judgment on the verdict, if the jury returned a verdict; order a new trial; or direct the entry of judgment as a matter of law. Fed.R.Civ.P. 50(b).[2] A post-trial motion for JMOL should be granted only when the facts and inferences so conclusively favor one party "that reasonable jurors could not arrive at a contrary verdict." *TGIP, Inc. v. AT&T Corp.*, 527 F. Supp. 2d 561, 569 (E.D. Tex. 2007) (citing *Tol–O–Matic, Inc. v. Proma Produkt–Und Mktg. Gesellschaft m.b.H.*, 945 F.2d 1546, 1549 (Fed. Cir. 1991)). "If reasonable persons in the

[2] In order to advance a renewed motion for judgment as a matter of law under Rule 50(b), the movant must raise the same arguments during trial, in a Rule 50(a) motion for judgment as a matter of law. Fed.R.Civ.P. 50 (a)-(b).

exercise of impartial judgment could differ in their interpretations of the evidence, then the motion should be denied." *Id.* Thus, a jury's verdict may be overturned if, viewing the evidence and inferences therefrom in the light most favorable to the party opposing the motion, there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did.[3] *Guile v. United States*, 422 F.3d 221, 225 (5th Cir. 2005) (citing *Delano-Pyle v. Victoria County*, 302 F.3d 567, 572 (5th Cir. 2002)). The court may not make credibility determinations, nor weigh the evidence. *Power-One*, 556 F. Supp. 2d at 594 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

## II. New Trial

Under Federal Rule of Civil Procedure 59, a new trial may be granted to any party to a jury trial on any or all issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed.R.Civ.P. 59. "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612–13 (5th Cir. 1985). The Court is required to view the evidence "in a light most favorable to the jury's verdict, and [] the verdict must be affirmed unless the evidence points so strongly and overwhelmingly in favor of one party that the court believes that reasonable persons could not arrive at a contrary conclusion." *Dawson v. Wal-Mart Stores, Inc.*, 978 F.2d 205, 208 (5th Cir. 1992).

## ALE'S MOTION FOR JUDGMENT AS A MATTER OF LAW AND MOTION FOR NEW TRIAL ON DAMAGES

[3] Because a motion for judgment as a matter of law is a procedural matter not unique to patent law, the law of the regional circuit governs under Rule 50(b). *See SynQor, Inc. v. Artesyn Techs.*, 709 F.3d 1365, 1373 (Fed. Cir. 2013) ("This court reviews the grant or denial of a motion for JMOL under the law of the regional circuit . . . .").

ALE moves for JMOL, a vacatur of the damages verdict, or in the alternative, a new trial, on grounds that Chrimar failed to prove damages. Specifically, ALE claims that: (1) Chrimar's damages expert, Mr. Mills, improperly based his opinions on the Entire Market Value Rule ("EMVR"); (2) Mr. Mills failed to properly apportion; (3) the Court erred in its instruction on smallest saleable unit; (4) the Court erred in allowing Chrimar to present evidence of and rely on settlement agreements; and (5) the Court erred in allowing Chrimar to present evidence on *Georgia-Pacific* Factors 8, 9, and 10. (Doc. No. 378).

**a. Applicable Law**

The damages statute, 35 U.S.C. § 284, sets the floor for "damages adequate to compensate for [patent] infringement" at "a reasonable royalty for the use made of the invention by the infringer." The burden of proving damages falls on the patentee. *Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1381 (Fed. Cir. 2003). Calculation of a reasonable royalty requires determination of two separate and distinct amounts: (1) the royalty base, or the revenue pool implicated by the infringement; and (2) the royalty rate, or the percentage of that pool "adequate to compensate" the plaintiff for the infringement. *See Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 286 (N.D.N.Y. 2009). A reasonable royalty is based on a hypothetical negotiation that takes place between the patentee and the infringer on the date infringement began. *Unisplay, S.A. v. American Electronic Sign Co.*, Inc., 69 F.3d 512, 517 (Fed. Cir. 1995). "Although this analysis necessarily involves an element of approximation and uncertainty, a trier of fact must have some factual basis for a determination of a reasonable royalty." *Id.* The trial court has discretion to discern the reliability of methods used to arrive at a reasonable royalty. *See SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1164 (Fed. Cir. 1991) ("[D]ecisions underlying a damage theory are discretionary with the court, such as, the choice of

an accounting method for determining profit margin, or the methodology for arriving at a reasonable royalty.") (internal citations omitted)).

**b. Analysis**

**1. Entire Market Value Rule**

ALE argues that Mr. Mills improperly calculated his royalties by "applying percentage rates from Chrimar's past licenses to ALE's net sales of the accused products," "which is equivalent to the entire market value of such products." (Doc. No. 378, at 5.) Chrimar points out that ALE never objected to Mr. Mills's testimony as violating the EMVR, and argues that Mr. Mills properly "apportioned the value of the patented technology and arrived at a royalty rate tied to the number of PoE ports per device, regardless of the price or revenue generated by the product," and that "he does not use the entire accused device as the royalty base." (Doc. No. 393, at 5.)

In determining a reasonable royalty for a multi-component product, it is generally required that "royalties be based not on the entire product, but instead on the 'smallest salable patent-practicing unit.'" *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012). The entire market value rule is an exception to this rule, and "allows a patentee to assess damages based on the entire market value of the accused product only where the patented feature creates the 'basis for customer demand' or 'substantially create[s] the value of the component parts.'" *Uniloc USA, Inc. v. Microsoft Corp*., 632 F.3d 1292, 1318 (Fed. Cir. 2011) (quoting *Lucent Techs. V. Gateway, Inc.*, 580 F.3d 1301, 1336 (Fed. Cir. 2009); *Rite–Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1549–50 (Fed. Cir. 1995)).

The accused devices in this case were Powered Device ("PD") and Power Sourcing Equipment ("PSE") products compliant with the relevant IEEE PoE standards. Sealed Tr. at

17:9–18:12; Doc. No. 206, at 4. Specifically, Chrimar accused ALE's PD products such as wireless access points, VOIP phones, and WLAN controllers that comply with the PoE standard. *Id*. As an initial matter, Mr. Mills did not base his reasonable royalty off of the entire accused device.[4] Instead, Mr. Mills testified that he used PoE ports as a royalty base. Sealed Tr. at 8:7 –9. In fact, the parties agreed to the number of PoE ports as a royalty base on which the jury was instructed. *See* Final Jury Instructions (Doc. No. 350, at 19) ("[i]n this case, the parties have stipulated that there are 268,971 ports sold by ALE that create the royalty base.") ALE did not then, nor does it now, object to this instruction.

When ALE filed its initial *Daubert* motion challenging Mr. Mills's opinions, ALE did not accuse Mr. Mills's opinions of violating the EMVR. (Doc. No. 205.) It was not until ALE's reply brief that ALE first challenged Mr. Mills's opinions based on the EMVR.[5] (Doc. No. 228.) In its reply, the only basis ALE identified as violating the EMVR was Mr. Mills's comparison of PoE premiums that were based on the sale of an end product. (Doc. No. 228, at 3.) As to that specific challenge, the Court found that "Mr. Mills's consideration of the price difference between Defendants' products that include PoE functionality and those that do not include PoE functionality, does not violate the entire market value rule" because "Mr. Mills is not using the revenue numbers of the final products to establish a royalty base or to assess damages based on the entire market value of the accused products, but instead has isolated the premium in an attempt to apportion and value the patented features." (Doc. No. 253, at 7.)

[4] ALE disputes this because they contend the ports are not distinct components. (Doc. No. 378, at 5.) Regardless, it is undisputed that Mr. Mills did not use the entire revenue of the accused devices to begin his analysis, but instead started his analysis with an average revenue per PoE port. *Id.*; Sealed Tr. at 53:4–12.

[5] *See Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010) ("Arguments raised for the first time in a reply brief are generally waived.") Although this argument was waived during briefing, the Court nonetheless considered the argument in ruling on ALE's *Daubert* motion.

Despite the fact that Mr. Mills's damages opinions have not changed, not once did ALE affirmatively raise an issue with respect to his opinions and the EMVR, let alone the plethora of issues it now outlines for the Court in its JMOL. Indeed, ALE filed a second motion to strike Mr. Mills's opinions and again did not raise any argument that his opinions violated the EMVR. (Doc. No. 284.) Similarly, ALE did not challenge these opinions at the pretrial conference. (Doc. No. 268.) Most importantly, not once during the entirety of Mr. Mills's testimony, did ALE object. Sealed Tr. at 5:5–34:6. Thus, ALE waived its contention it now brings that Mr. Mills violated the EMVR. Rather than objecting to Mr. Mills's testimony on this basis, at trial, ALE instead attempted to insert the EMVR in cross examining Mr. Mills. For example, ALE's Motion begins by citing a portion of Mr. Mills's testimony that was solicited on cross-examination. (Doc. No. 378, at 4.) [redacted]

[redacted] In the entirety of that testimony, Mr. Mills actually explained that [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Next, ALE argues that Mr. Mills violated the EMVR by using net sales of the accused products in his analysis of past licenses. (Doc. No. 378, at 5.) As Mr. Mills testified, where he looked at past licenses and considered net sales, he did so in order to do a direct comparison because those past licenses were running royalty agreements based on a percentage of net revenue. Sealed Tr. at 6:12–16; 8:16–21. Because the royalty bearing licenses were negotiated based on the invention or comparable inventions—not the value of the accused products—the starting point for such an analysis cannot be said to be off of the total revenue of the accused product. Thus, multiplying a running royalty from a past license that was based on a percentage of net sales to ALE's net sales of the accused products does not violate the EMVR. Instead, it provides a direct comparison to apportion the value of the technology (as previously licensed) and ascertain a reasonable royalty as to ALE.

In sum, Mr. Mills is not using the revenue numbers of the final products to establish a royalty base or to assess damages based on the entire market value of the accused products. Accordingly, ALE's motion is **DENIED** as to its challenges based on EMVR.

### 2. Apportionment

ALE argues that Mr. Mills failed to apportion for the features of the accused products that are unrelated to PoE, that he failed to apportion for the patented versus unpatented features of the PoE standard, and that he failed to apportion for the value of standardization. (Doc. No. 378, at 7–10.)

During direct examination, Mr. Mills identified for the jury these three issues with respect to apportionment in this case:

> Q. Now, do we have any particular apportionment issues in this case that we need to talk about?
>
> A. Yes. There are three issues in this case. One is the value of PoE functionality. The products at issue here have other functionality besides just PoE functionality; so, we need to focus, when we're talking about profit, on the profit associated with PoE functionality.
>
> The second is within PoE functionality there are technologies that are covered by the patents-in-suit and technologies that are not. And, so, we need to focus the analysis on the aspects of PoE that are covered by the patents-in-suit.
>
> And, finally, we need to consider the value of standardization to determine whether the act of standardization itself provided any kind of artificial value or enhanced value to the patents-in-suit.

(Sealed Tr. at 21:7–23.)

Mr. Mills then went on to testify as to how he accounted for apportionment in each of these manners. Sealed Tr. at 22:5–26:22. With respect to apportionment of the value of the patented PoE technology, Mr. Mills testified that he was able to look at PoE price and profit premiums to compare the prices (and profits) of the exact same products with and without the PoE functionality. Sealed. Tr. at 22:5–25:12. [REDACTED] Sealed Tr. at 24:10–13. The use of price and profit premiums from the sale of non-PoE products as compared to the same products with PoE functionality is a measurable and appropriate way to isolate the value of the PoE functionality. This analysis alone allowed Mr. Mills to begin to apportion the value of the patented technology.

With respect to the value of the patented features contained in the standard, Mr. Mills testified that he relied on Dr. Madisetti's opinions that "the patents-in-suit relate to the majority and the most critical aspects of the standard," and that therefore the patents "should be credited

with a significant portion of this profit premium"— discussed above. Sealed Tr. at 25:13–26:11. Mr. Mills then testified that this information indicated his $2.50 per port rate was inherently reasonable. *Id.* And ultimately, Mr. Mills testified that $2.50 was reasonable for just the contributions of the patents and setting aside artificial value due to standardization. Sealed Tr. at 26:12–22.

The jury heard evidence that the profit premium on ALE's accused products that include the PoE functionality is  As discussed above, because this premium is the difference between the same products that have and do not have the PoE functionality, it is a reliable indicator of the value of the PoE functionality. The jury was thus then able to consider Mr. Mills's $2.50 royalty rate as a fraction of that value that he opined was reasonable based on Dr. Madisetti's opinions regarding the importance of the patented technology to the standard and irrespective of any value from standardization itself.[6] Moreover, the jury heard evidence as to how Mr. Mills's analysis of Chrimar's past license agreements led him to believe $2.50 was a reasonable rate. Sealed Tr. at 5:5–6:16; 28:3–29:7. The jury also heard Mr. Mills testify regarding a  that Mr. Mills testified showed what ALE was willing to pay for comparable technology. Sealed Tr. at 9:5–10:23.  Sealed Tr. at 10:8–11.

The jury heard all of this testimony and evidence on apportionment and ultimately did not fully accept Mr. Mills's rate, but determined a rate of $1.2067 per port was reasonable:

[6] The jury heard Dr. Madisetti's testimony on the importance of the "detection" and "classification" aspects of the patented inventions as it relates to the IEEE standard. *See, e.g.*, Tr. at 316:23–319:10. The jury was allowed to weigh the credibility of this testimony based on the evidence presented.

2. **QUESTION 2- DAMAGES**

Answer Question No. 2 only if you have found at least one claim in Question No. 1 is not invalid (*i.e.* wrote "No" in any blank).

What sum of money do you find by the preponderance of the evidence would fairly and reasonably compensate Chrimar for ALE's infringement of the patent claims?

$ 324,558.34 ($1.2067 per port)

(Doc. No. 349, at 2.)

In light of the testimony that was provided at trial, the Court finds that substantial evidence supported the jury's damages determination. Accordingly, the Court **DENIES** ALE's request for judgment as a matter of law that Chrimar failed to prove damages.

### 3. The Court's Instructions

Finally, ALE argues that the Court erred in three ways: (1) its instructions on the smallest saleable unit; (2) by allowing Chrimar to present evidence of settlement agreements to support its royalty rate; and (3) by allowing Chrimar to present evidence on *Georgia-Pacific* Factors 8, 9, and 10. (Doc. No. 378, at 11–16.)

#### i. Smallest Saleable Unit

As to the instructions on the smallest saleable unit, ALE objects to the following instruction by the Court:

> A product may have both infringing and non-infringing components. In such products, royalties should be based not on the entire product, but instead on the "smallest saleable unit" that infringes each asserted claim of the patents and has close relation to the claimed invention. Where the smallest saleable unit is, in fact, a multi-component product containing several non-infringing features with no relation to the patented feature, damages must only be based on the portion of the value of that product that is attributable to the patented technology. This may involve estimating the value of a feature that may not have ever been individually sold.

(Doc. No. 350, at 19.)

As discussed above, while the Court did not intend to provide this instruction based on the testimony presented in this case, because ALE interjected this issue during the cross-examination of Mr. Mills, the Court felt it necessary to clarify the issue for the jury. Not surprisingly, it was ALE who proposed and argued for such an instruction in the first place. (Doc. No. 317, at 64.) ALE now objects to the change from "the 'smallest salable unit' that *practices* the patent and has close relation to the claimed invention" to "the 'smallest salable unit' that *infringes* the patent and has close relation to the claimed invention." (Doc. No. 378, at 11.)

As an initial matter, ALE did not clearly object on the bases it now raises. At the charge conference, counsel for ALE stated "I don't think any change needs to be made" and that a change would be "to basically just skew the argument in favor of the Madisetti testimony." Tr. at 1099:23–1100:14. Thus, the arguments now raised are extraneous to what was raised on the record and have been waived. However, even if not waived, the focus of ALE's current argument is on the need to include the idea that the "smallest saleable unit" have "close relation to the claimed invention." The Court instructed the jury that the smallest saleable unit must have "close relation to the claimed invention." (Doc. No. 350, at 19.) Thus, the only real objection can be

some imputed difference between the words "practice" and "infringe." ALE has not explained the significance of that difference such that a new trial would be warranted. Moreover, even if an error was made in stating the word "infringes" instead of "practices" in the instructions, that error was harmless because, as discussed above, the royalty base was agreed and the jury was instructed on the exact per port base at issue in this case. *See* Final Jury Instructions (Doc. No. 350, at 19) ("[i]n this case, the parties have stipulated that there are 268,971 ports sold by ALE that create the royalty base.") For these reasons, the Court **DENIES** ALE's request for judgment and a new trial based on this instruction.

**ii. Settlement Licenses**

As to the settlement licenses, ALE did not challenge these licenses as unreliable in its *Daubert* motions or during the pretrial proceedings. *See* Doc. Nos. 205, 284, 268.[7] ALE also did not object to this evidence and testimony regarding the licenses at trial. In fact, each of the licenses were admitted into evidence without objection. Tr. at 602:1–16. Accordingly, this argument was waived. ALE's failure to timely raise objections on the issues it now presents to the Court is a consistent theme throughout its JMOL. While the Court functions as a gatekeeper, it is the litigant's responsibility to raise issues they believe warrant gatekeeping in a timely manner at an appropriate stage in the case. Here, the Court held an early damages hearing on April 19, 2016, where early damages expert reports were exchanged by the parties on March 31, 2016. As early as that point in time, ALE knew Mr. Mills was relying on these license agreements and yet never challenged those opinions or testimony during pretrial or trial.

[7] ALE's only objection to the licenses in its *Daubert* motion was that the licenses were entered after industry adoption of the standard and that therefore Mr. Mills did not properly account for the value of the standard. (Doc. No. 205, at 12–13.) ALE raised no objection to reliance on these licenses because they were the result of a litigation settlement—the challenge it now raises.

Finally, even if the settlement licenses here had not been presented to the jury, the jury's verdict is still supported by the additional evidence discussed above including the PoE premiums. Accordingly, there is no basis for a judgment of no damages or a new trial based on this evidence and the Court **DENIES** ALE's requests.

### iii. *Georgia-Pacific* Factors 8, 9, and 10

As to *Georgia-Pacific* Factors 8, 9, and 10, it was the Court that first raised a concern on these issues with the parties. Again, ALE has filed a motion for judgement as a matter of law on an issue that ALE did not raise with respect to Mr. Mills's opinions before or during trial. When Mr. Mills testified as to these factors during the trial, ALE did not object to this testimony. Sealed Tr. at 5:5–34:6. The Court, recognizing the precedent on this issue and having concerns with Mr. Mills's testimony, had to call the parties into chambers to discuss if and how the Court could proceed in light of Mr. Mills's testimony. The Court and the parties were in agreement that any harm could be cured with specific jury instructions. Therefore, the Court carefully crafted its final instructions to the jury to address this issue. Specifically, the Court removed factors 8, 9, and 10 from its list of factors to be considered and instead instructed the jury as follows:

> You may also consider the established profitability of the product made under the patents, its commercial success, and its current popularity; the utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar results; and the nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor, and the benefits to those who have used the invention. However, if you consider these factors you must also consider the standard's role (as opposed to the patents' role) in causing commercial success, as well as the standard's role in the profitability of the accused products and the accused products' popularity. In addition, you must consider the benefits of the standard over old modes as well as the benefits to those who use the standard to which the patents-in-suit are alleged to be essential. You must take this into consideration because the patentee's royalty must be premised only on the value of the patented feature, not any value added by the standard's adoption of the patented technology. These steps are necessary to ensure that the royalty award is based on the incremental value that the patented invention adds to the product, not any

> value added by the standardization of that technology. In other words, the patent holder should only be compensated for the approximate incremental benefit derived from his invention.¶ This is particularly true for standard essential patents. When a technology is incorporated into a standard, it is typically chosen from among different options. Once incorporated and widely adopted, that technology is not always used because it is the best or the only option; it is used because its use is necessary to comply with the standard. In other words, widespread adoption of a standard essential technology is not entirely indicative of the added usefulness of an innovation over the prior art.

(Doc. No. 350, at 18–19.)

The Court finds these instructions were sufficient to cure any harm that may have come from Mr. Mills's testimony on these factors. Indeed, the Federal Circuit has never stated that these factors should be all together removed in a case involving standard essential patents, but instead that they should be modified. For example, in *Ericsson*, the Federal Circuit stated as follows:

> Several other *Georgia–Pacific* factors *would at least need to be adjusted* for RAND-encumbered patents—indeed, for SEP patents generally. For example, factor 8 accounts for an invention's "current popularity," which is likely inflated because a standard requires the use of the technology. Factor 9—"utility and advantages of the patented invention over the old modes or devices,"—is also skewed for SEPs because the technology is used because it is essential, not necessarily because it is an improvement over the prior art. Factor 10, moreover, considers the commercial embodiment of the licensor, which is also irrelevant as the standard requires the use of the technology. Other factors may also need to be adapted on a case-by-case basis depending on the technology at issue. Consequently, the trial court must carefully consider the evidence presented in the case when crafting an appropriate jury instruction. In this case, the district court erred by instructing the jury on multiple *Georgia–Pacific* factors that are not relevant, or are misleading, on the record before it, including, at least, factors 4, 5, 8, 9, and 10 of the *Georgia–Pacific* factors.

*See Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1231 (Fed. Cir. 2014) (emphasis added).

Given this precedent, the Court's instructions on these issues were proper and Mr. Mills's testimony cited by ALE was not so harmful that the bell could not be "unrung" as ALE claims. It is again important emphasize that litigants carefully consider the testimony and evidence

presented to the jury and timely raise objections where appropriate. While the Court will always proactively scrutinize evidence that comes in during a trial to ensure the jury is not impermissibly tainted by any testimony and/or evidence, the Court must also rely on litigants to raise meritorious objections when warranted. In this case, not a single objection was raised by counsel and the parties submitted proposed *agreed* jury instructions with a parroted list of *Georgia-Pacific* factors. (Doc. No. 317, at 59–63.) This issue should have been teed up by the parties long before trial when the Court had to initiate the conversation with the parties and conduct a chambers conference, delaying the trial and making the jury wait in recess. Given the circumstances, however, in this instance the harm could be cured with proper instructions from the Court, as was done here. Therefore, the Court **DENIES** ALE's request for a new trial on this basis.

## **CHRIMAR'S MOTION FOR JUDGMENT AS A MATTER OF LAW AS TO IEEE-RELATED CLAIMES AND DEFENSES**

Chrimar moves for judgment as a matter of law on all IEEE related equitable defenses and counterclaims. (Doc. No. 379.) As a preliminary matter, Chrimar moves on the basis that all of the equitable defenses require a duty of disclosure for which Chrimar seeks a judgment that it owed no such duty. (Doc. No. 379, at 1–2.) This Court has already issued an order finding that on the evidence presented "Chrimar did not owe a duty of affirmative disclosure to the IEEE." (Doc. No. 413, at 6.) A judgment will be entered in accordance with that finding. Accordingly, Chrimar's JMOL is **DENIED** as moot as to that point. Specifically, the Court has issued findings that ALE did not carry its burden on claims of equitable estoppel, unclean hands, and waiver. (Doc. No. 413.) Accordingly, as to those defenses, Chrimar's JMOL is **DENIED** as moot.

As to the implied license defense, the Court granted Chrimar's JMOL on implied license pursuant to Rule 50(a) during trial. Tr. at 986:4–9. Accordingly, Chrimar's request to enter renewed judgment on that defense pursuant to Rule 50(b) is **DENIED** as moot.

As to the claims of breach of contract and fraud, the jury found that ALE did not prove those claims by a preponderance of the evidence. (Doc. No. 349.) Chrimar's renewed motion for JMOL merely seeks to confirm its favorable outcome on those issues. Accordingly, because Chrimar prevailed on those claims at trial, Chrimar's renewed motion for JMOL as to those claims is **DENIED** as moot.

Finally, Chrimar moves on the remainder of IEEE defenses and claims that were not presented by ALE at trial, including claims pursuant to monopolization under § 2 of the Sherman Act and patent misuse. While the antitrust claim was specifically raised by Chrimar in a 50(a) motion at the close of evidence, and subsequently granted by the Court (Tr. at 969:15–970:1), to clarify the record, the Court's intention in granting that motion was to confirm that that issue was not going to be presented to the jury as the parties were in agreement that evidence on that claim had not been presented and the claim was no longer being pursued. As to these claims specifically, and all claims and defenses that were not presented at trial, the Court **DENIES** Chrimar's request to enter judgment as a matter of law. The Court will not enter judgment on claims that were dropped and not presented at trial.

## CONCLUSION

ALE's Motion for Judgment as a Matter of Law and New Trial (Doc. No. 378) is **DENIED**. Chrimar's Motion for Judgment as a Matter of Law (Doc. No. 379) is **DENIED** as set forth herein. Final judgment will issue as a separate order.

Within **7 days** of the issuance of this Order, the parties shall jointly submit a proposed redacted version of this Order so that a public version can be made available**.**

**So ORDERED and SIGNED this 3rd day of February, 2017.**

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE